**BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
DAVID R. STICKNEY (Bar No. 188574)
(davids@blbglaw.com)
LUCAS E. GILMORE (Bar No. 250893)
(lucas.gilmore@blbglaw.com)
JACOB T. SPAID (Bar No. 298832)
(jacob.spaid@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323

        -and-

JEROEN VAN KWAWEGEN (admitted *pro hac vice*)
(jeroen@blbglaw.com)
REBECCA E. BOON (admitted *pro hac vice*)
(rebecca.boon@blbglaw.com)
JULIA K. TEBOR (admitted *pro hac vice*)
(julia.tebor@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:    (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Lead Plaintiff*
*SEB Investment Management AB*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES FELIX, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SYMANTEC CORPORATION, GREGORY S. CLARK, NICHOLAS R. NOVIELLO, and MARK S. GARFIELD, <br><br> Defendants. | Case No. 3:18-cv-02902-WHA <br><br> ECF CASE <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> DEMAND FOR JURY TRIAL <br><br> Dept.: Courtroom 12, 19th Floor <br> Judge: Honorable William Alsup |

# <u>TABLE OF CONTENTS</u>

Page

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION AND VENUE .......................................................................... 5

III.   PARTIES ............................................................................................................ 6

       A.    Lead Plaintiff ......................................................................................... 6

       B.    Defendants ............................................................................................. 6

IV.    BACKGROUND TO SYMANTEC AND ITS "UNIQUE
       TRANSFORMATIVE PERIOD" ........................................................................ 9

       A.    Symantec's Business .............................................................................. 9

       B.    Symantec Acquires Blue Coat And LifeLock And Promotes These
             "Transformative Acquisitions" To Investors ........................................ 10

V.     DEFENDANTS MANIPULATED SYMANTEC'S FINANCIAL
       RESULTS THROUGHOUT THE CLASS PERIOD ......................................... 15

       A.    Defendants' Revenue Recognition Practices Violated GAAP, And
             Symantec's Internal Controls Were Ineffective During The Class
             Period ................................................................................................... 15

             1.    GAAP Revenue Recognition Principles ..................................... 15

             2.    GAAP Deferred Revenue Principles .......................................... 18

             3.    Symantec's Obligation To Maintain Effective Internal
                   Controls Over Financial Reporting ............................................ 18

             4.    Defendants Improperly Recognize Revenue At Period-End
                   To Make Their Numbers ........................................................... 19

             5.    Defendant Garfield Leaves Symantec Due To Improper
                   Revenue Recognition Practices And Ineffective Internal
                   Controls, But Only After He Closes The Books For 2017 ......... 25

             6.    Defendant Clark Learns That Deals Involving SOX
                   Violations Were Improperly Booked At Year-End ..................... 26

       B.    Defendants' Manipulation Of Reported Transition Costs Was
             Misleading And Violated SEC Rules And Regulations ......................... 29

             1.    Additional Accounting Principles For Adjusted Financial
                   Measures ................................................................................... 29

             2.    Defendants Inflated Symantec's Adjusted Revenue
                   Through Improper Revenue Recognition Practices ..................... 31

|   | 3. | Symantec Reported "Transition Costs" As Adjusted Measures Throughout The Class Period | 31 |

3. Symantec Reported "Transition Costs" As Adjusted Measures Throughout The Class Period ...................................... 31

4. Defendants Inflated And Misclassified Recurring Costs As "Transition Costs" .................................................................. 31

5. Defendants Inflated Symantec's Non-GAAP Operating Margins And EPS ............................................................... 37

C. As A Result Of Their Accounting Manipulations, Executives Received Large Payouts In 2017 And 2018 ............................... 37

D. Defendants Manipulated Costs To Indicate The Success Of Acquisitions .................................................................... 41

E. Violations Of Symantec's Codes Of Conduct ........................... 44

1. Symantec's Codes Of Conduct ................................... 44

2. Widespread Code Of Conduct And Ethical Violations During The Class Period ............................................ 46

F. The Individual Defendants Took Advantage Of Symantec's Inflated Stock Price To Sell Their Own Shares For Nearly $20 Million .............................................................................. 47

G. The Truth Is Revealed .............................................................. 50

H. The Aftermath .......................................................................... 56

VI. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ............................................... 59

A. Fourth Quarter Fiscal Year 2017 And Fiscal Year 2017 ........... 59

1. Improper Recognition Of Revenue .............................. 60

2. Manipulating Adjustments Of GAAP Measures To Non-GAAP Measures .............................................. 61

3. False Internal Controls And SOX Certifications ........... 64

B. First Quarter Fiscal Year 2018 Results ..................................... 65

1. Improper Recognition Of GAAP Revenue ................... 66

2. Manipulating Adjustments Of GAAP Measures To Non-GAAP Measures .............................................. 67

3. False Internal Controls And SOX Certifications ........... 70

C. August 8, 2017 Item 5.02 On Form 8-K ................................... 71

D. August 16, 2017 Proxy Statement ........................................... 72

E. Second Quarter Fiscal Year 2018 Results ................................ 73

|  |  | 1. | Improper Recognition Of GAAP Revenue | 73 |
|  |  | 2. | Manipulating Adjustments Of GAAP Measures To Non-GAAP Measures | 74 |
|  |  | 3. | False Internal Controls And SOX Certifications | 78 |
|  | F. | Third Quarter 2018 Results |  | 78 |
|  |  | 1. | Improper Recognition Of GAAP Revenue | 79 |
|  |  | 2. | Manipulating Adjustments Of GAAP Measures To Non-GAAP Measures | 80 |
|  |  | 3. | False Internal Controls And SOX Certifications | 83 |
|  | G. | Fourth Quarter 2018 Results |  | 84 |
|  |  | 1. | Improper Recognition Of GAAP Revenue | 84 |
|  |  | 2. | Manipulating Adjustments Of GAAP Measures To Non-GAAP Measures | 85 |

VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................ 88

VIII.   LOSS CAUSATION ........................................................................................... 97

IX.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........................... 99

X.      THE PRESUMPTION OF RELIANCE ................................................................ 100

XI.     CLASS ALLEGATIONS .................................................................................. 100

XII.    CLAIMS BROUGHT PURSUANT TO SECTION 10(b), 20(a) AND 20(A) OF THE EXCHANGE ACT ................................................................. 102

COUNT I  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS) ....................................................................................... 102

COUNT II  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (AGAINST DEFENDANTS CLARK, NOVIELLO, AND GARFIELD) ............................................................................................ 104

COUNT III  FOR VIOLATION OF SECTION 20A OF THE EXCHANGE ACT (AGAINST DEFENDANTS CLARK AND NOVIELLO) ........................................... 105

XIII.   PRAYER FOR RELIEF ................................................................................... 107

XIV.    JURY DEMAND ............................................................................................ 107

Lead Plaintiff SEB Investment Management AB, by and through its undersigned counsel, brings this action pursuant to Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other persons or entities who purchased or otherwise acquired securities of Symantec Corporation ("Symantec" or the "Company") during the period from May 11, 2017 to August 2, 2018, inclusive (the "Class Period") and were damaged thereby (the "Class").  Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based on the ongoing independent investigation of its undersigned counsel, including from the following sources: (i) Symantec's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Symantec securities; (vii) consultation with experts; (viii) accounts from former Symantec employees; (ix) additional materials and data concerning the Company and industry as identified herein; (x) accounting rules, regulations, and guidance; and (xi) disclosures from companies that Symantec identified in its financial statements as its peers.

## I.     **INTRODUCTION**

1.     This securities class action arises from the manipulation of financial results tied to lucrative executive compensation bonus and equity packages.  Symantec, together with its top officers – Chief Executive Officer ("CEO") Gregory S. Clark , Chief Financial Officer ("CFO") Nicholas R. Noviello, and former Chief Accounting Officer ("CAO") Mark S. Garfield (collectively, the "Individual Defendants") – reported financial results that violated Generally Accepted Accounting Principles ("GAAP") and also reported non-GAAP adjustments, which analysts and investors closely followed throughout the Class Period, that were materially false and misleading.  When a whistleblower revealed Defendants' deceptive accounting practices, the Company's Audit Committee and the SEC launched investigations.  With this news and the later disclosure of the results of the Audit Committee investigation, Symantec's stock price plunged,

causing investors to suffer substantial damages. Accordingly, Lead Plaintiff brings this action under Sections 10(b), 20(a), and 20(A) of the Exchange Act on behalf of purchasers of Symantec common stock during the Class Period (May 11, 2017 through August 2, 2018, inclusive).

2. Symantec provides cybersecurity products and services, including its flagship Norton Antivirus software. The Company emerged in the 1990s as a world leader in cybersecurity software, but starting in 2005, the Company's performance steadily declined over the following decade. In an effort to transform the Company and restore its revenue growth and market share, Symantec announced in 2016 the acquisition of Blue Coat Systems, Inc. ("Blue Coat"), a privately-held network security firm. Blue Coat's CEO Gregory Clark became CEO of Symantec. Clark stocked nearly the entire C-suite with former Blue Coat executives, including Symantec's Chief Operating Officer, Chief Financial Officer, Chief Strategy Officer, Chief Technology Officer, and Head of Worldwide Sales. These and additional Blue Coat leaders imported a free-wheeling culture with deficient controls over revenue recognition and accounting. The unethical practices that arrived with Blue Coat led to scores of employees leaving Symantec. One such employee was Symantec's former CAO, Defendant Mark Garfield, who resigned due to his concerns surrounding revenue recognition and privately received a pay package in exchange for endorsing Symantec's reported financial results for fiscal year 2017.[1]

3. After acquiring Blue Coat, Symantec announced the acquisition of LifeLock, Inc. ("LifeLock"), a consumer identity-protection company. Defendants promoted the two acquisitions as "transformative," positioning Symantec to reinvigorate its stagnate Enterprise and Consumer business segments, benefit from synergies and other cost savings initiatives, and emerge as the most dominant provider of cybersecurity solutions.

4. The Class Period begins on May 11, 2017, the day after Defendants reported the Company's Q4 2017 results. Defendants emphasized the Company's "strong" financial performance and outlook, highlighting the Company's reported revenue, and emphasizing the

---

[1] Symantec reports pursuant to a 52/53-week fiscal year ending on the Friday closest to March 31. For example, Symantec's fiscal year 2017 consisted of 52 weeks, ending on March 31, 2017.

Company's adjusted operating margin.  Such margins, Defendants said, resulted from the Company's execution of previously announced cost-savings initiatives and synergies related to the Blue Coat and LifeLock acquisitions.

5.  Defendants' assurances impressed analysts and investors.  For example, on May 11, 2017, Greg Moskowitz of Cowen & Company wrote that Blue Coat "finally provides the co. [Symantec] with a legitimate network security presence, as well as stronger footing in the cloud.  Moreover, we believe the influx of leadership talent at SYMC was much needed, and that CEO Greg Clark is a great fit."

6.  Defendants' false and misleading representations regarding Symantec's performance artificially inflated Symantec's stock price.  Contrary to GAAP and the Company's internal revenue recognition policy, Symantec recognized revenue on sales that did not have signed contracts, did not go through the appropriate approval channels, contained unapproved extended terms, or were to customers who were unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met GAAP's revenue recognition criteria.

7.  Moreover, Defendants misled investors as to the Company's adjusted operating income.  Defendants improperly recorded ongoing costs as "transition costs" and removed them from their adjusted operating expenses to inflate Symantec's adjusted operating income and metrics tied to this figure, including operating margin and earnings per share.  These metrics, in turn, determined the compensation of senior executives at Symantec.

8.  Defendants' manipulations of those metrics allowed them to exceed their 2017 executive compensation plan targets. Defendants Clark and Noviello obtained nearly $52.1 million in equity awards and will receive nearly $4 million more based on their purported achievement of non-GAAP compensation metrics.  Moreover, Defendants were able to assure the market that Symantec's recent and purportedly "transformative acquisitions" of non-public Blue Coat and LifeLock were successful, that Symantec was achieving cost synergies, and that the Company had emerged, as promised, as "the leading pure play cyber security company" in the world.

9.     Investors started to learn the truth on May 10, 2018, when the Company announced, after market close, that the Audit Committee of the Board of Directors had commenced an internal investigation due to concerns raised by a former employee and contacted the SEC.  Given the investigation, the Company informed investors that its "financial results and guidance may be subject to change," and that it is "unlikely that the investigation will be completed in time for the Company to file its annual report . . . in a timely manner."  On this news, Symantec stock declined on heavy trading by over 33%, from $29.18 per share on May 10, 2018, to $19.52 per share on May 11, 2018, representing the worst day of trading in Symantec stock in almost 17 years and erasing roughly $6 billion of market capitalization.

10.    On August 2, 2018, Symantec announced an expansion of the internal investigation and disappointing financial results that followed the cessation of accounting manipulation. Morningstar Equity Research correctly observed that in prior quarters "management may have inflated restructuring expenses," a line item that included transition costs, "by placing expenses that would have typically been regular operating expenses into this line item."

11.    All told, Symantec's stock lost over $7 billion in shareholder value during the Class Period, and the shares remain down approximately 40% from their Class Period high.



12. In the aftermath, Symantec announced that its Audit Committee and consultants had concluded their internal investigation into Symantec's improper accounting. In this announcement, Defendants **admitted**:

- weak and informal processes with respect to some aspects of the review, approval, and tracking of transition expenses;

- that the Audit Committee had identified certain behavior inconsistent with the Company's Code of Conduct and related policies, that these matters had been referred to the Company, and that the Company intended to take appropriate action;

- that the Audit Committee had identified an additional transaction in which $12 million of $13 million recognized as revenue in the fourth quarter of fiscal year 2018 should have been deferred;

- that the Company would have to revise its previously disclosed financial results for both Q4 2018 and Q1 2019;

- that Symantec had brought in an outside accounting firm, and taken other steps to enhance, the Company's reported non-GAAP measures, since the quarter ending September 29, 2017;

- that in the wake of the internal investigation, Symantec would be making substantial structuring changes to its internal management, including appointing a separate Chief Accounting Officer and a separate Chief Compliance Officer reporting to the Audit Committee, and adopting enhanced internal controls; and

- that the SEC had commenced an investigation into Symantec's accounting.

13. By this action, investors seek redress pursuant to the federal securities laws.

II. **JURISDICTION AND VENUE**

14. This action arises under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated under the Exchange Act.

15. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). At all relevant times, Symantec conducted business in this District and maintained its headquarters in this District at 350 Ellis Street,

Mountain View, California 94043.  In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

17.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

## III.    PARTIES

### A.    Lead Plaintiff

18.    Lead Plaintiff SEB Investment Management AB ("SEB" or "Lead Plaintiff") is a Swedish limited liability company that manages investment funds.  SEB serves as the investment manager for SEB Teknologifond, a fund organized under Swedish law that has no independent legal identity and does not have the capacity to bring lawsuits.  SEB is the only entity authorized and empowered to act on behalf of SEB Teknologifond.  SEB is also the investment manager for SEB Alternative Strategies SICAV ("SEB SICAV") and obtained a valid assignment of SEB SICAV's claims.

### B.    Defendants

19.    Defendant Symantec is a corporation organized under Delaware law and headquartered at 350 Ellis Street, Mountain View, California 94043.  Symantec's stock trades on the NASDAQ Stock Market under the symbol "SYMC".  The Company sells cybersecurity products and services and has operations in more than 35 countries.  The Company's historical operating segments include Consumer Security and Enterprise Security.  Symantec's Consumer Security products include a range of Norton-branded products and services to protect customers within their personal computing and mobile environments.  Symantec's Enterprise Security products include threat protection, website security, and other products and services.  These two business segments accounted for virtually all of the Company's revenues and profits during the Class Period.  Throughout the Class Period, Symantec disseminated SEC filings, press releases, investor presentations, and additional reports.

20.     Defendant Gregory S. Clark ("Clark") was the CEO and a director of Blue Coat from 2011 to August of 2016.  He became Symantec's CEO when it acquired Blue Coat.  Since August 1, 2016, Clark has served as Symantec's CEO and a member of Symantec's Board of Directors.  During the Class Period, Clark made materially false and misleading statements and omissions about Symantec's financial performance, stated metrics, and internal controls for financial reporting, in the Company's public filings, at investor presentations, and during conference calls.  Clark also was present at earnings calls when other Defendants made materially false and misleading statements or omissions on these subjects, which Clark knew to be false and misleading, yet failed to correct.  Clark executed certifications relating to Symantec's false and misleading reports on the Company's May 19, 2017 Form 10-K, August 4, 2017 Form 10-Q, November 3, 2017 Form 10-Q, and February 2, 2018 Form 10-Q SEC filings.  Clark also directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and financial performance.  Clark also shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading.  Because of this position of control and authority, his ability to exercise power and influence over Symantec's conduct, and his access to material inside information about Symantec during the Class Period, Defendant Clark was a controlling person within the meaning of Section 20(a) of the Exchange Act.

21.     Defendant Nicholas R. Noviello ("Noviello") served as Blue Coat's CFO before Symantec acquired Blue Coat in August 2016.  Noviello joined Symantec as Chief Integration Officer in August 2016, following its acquisition of Blue Coat.  He has been the CFO of Symantec since December 1, 2016, and the Company's Principal Accounting Officer ("PAO") since August 7, 2017.  Throughout the Class Period, Noviello had actual knowledge of and was personally involved in the Company's integration of acquired entities, implementation of cost reduction programs, and preparation of financial statements.  Under Noviello's Corporate Profile on Symantec's website, Noviello held himself out as "lead[ing] the company's integration and

transformation office, and the company's cost reduction program."   As CFO, Noviello was responsible for establishing, maintaining, and evaluating Symantec's disclosure controls and procedures, including its financial reporting.   During the Class Period, Noviello made materially false and misleading statements and omissions about Symantec's financial performance, stated metrics, and internal controls for financial reporting in the Company's public filings, at investor presentations, and during conference calls.   Noviello also was present when the other Defendants made materially false and misleading statements or omissions on these subjects, which he knew to be false and misleading, yet took no steps to correct.   Noviello executed certifications relating to Symantec's false and misleading reports on the Company's May 10, 2017 Form 8-K, May 19, 2017 Form 10-K, August 2, 2017 Form 8-K, August 4, 2017 Form 10-Q, August 8, 2017 Form 8-K, November 1, 2017 Form 8-K, November 3, 2017 Form 10-Q, January 31, 2018 Form 8-K, February 2, 2018 Form 10-Q and May 10, 2018 Form 8-K SEC filings.   Noviello directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and financial performance.   Noviello also shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading.   At all relevant times, Defendant Noviello possessed the power and authority to control, and approved of, the contents of the Company's press releases and investor and media presentations.   Because of this position of control and authority, his ability to exercise power and influence over Symantec's conduct, and his access to material inside information about Symantec during the Class Period, Defendant Noviello, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

22.   Defendant Mark S. Garfield ("Garfield") was Symantec's CAO from February 3, 2014 to August 7, 2017, and continued at Symantec in an "advisory capacity" through October 2017. As CAO, Garfield's responsibilities included: (i) managing Symantec's financial processes, including oversight of over 270 employees; (ii) participating in Audit Committee meetings, including presenting to Symantec's Board of Directors and Audit Committee; (iii) interacting with

investors, including the formulation of external financial communication strategy, setting guidance, drafting scripts, and answering questions from shareholders and sell side analysts; (iv) conducting finance diligence, including making model assumptions and post close integration analysis for both the Blue Coat and LifeLock acquisitions; and (v) developing a strong team, focused on people development, ethics, accountability, and respect.[2]  During the Class Period, Garfield made materially false and misleading statements and omissions about Symantec's financial performance and stated metrics in the Company's May 19, 2017 Form 10-K SEC filing. Defendant Garfield directly participated in the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and financial performance.  Garfield also shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading.  Because of this position of control and authority, his ability to exercise power and influence over Symantec's conduct, and his access to material inside information about Symantec during the Class Period, Defendant Garfield, at the time of the wrongs alleged herein, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

## IV.  BACKGROUND TO SYMANTEC AND ITS "UNIQUE TRANSFORMATIVE PERIOD"

### A.  Symantec's Business

23.     Symantec is based in Mountain View, California, and provides consumer and enterprise security software products and services.  Symantec emerged as a leader in the security software industry when it released its Norton Antivirus software in 1990.  The Company historically operated in two segments: Consumer Security and Enterprise Security.  Symantec's Consumer Security products are directed to individuals and include a range of Norton-based products and services for personal computing and mobile environments.  The Enterprise Security

---

[2] *See* Mark Garfield, Profile, *available at* LinkedIn, https://www.linkedin.com/in/markgarfield/ (last visited November 9, 2018).

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-02902-WHA                                                                                    -9-

side of the business is directed to entire business operations or enterprises, and includes various threat protection and website security products, among others.

24.     By 2005, Symantec's security business had substantially slowed down.  In order to address this decline, Symantec determined to change its business strategy to focus on both security technology (as it had in the past), and on software storage/availability technologies.  To facilitate the new strategy, Symantec paid $13.5 billion to acquire Veritas Software, a leader in the software storage and backup/recovery industries.

25.     Symantec's dual strategy of focusing on both security and software storage/availability technologies was unsuccessful.  Between 2005 through 2015, Symantec underperformed its peers.  The Company's Enterprise and Consumer businesses declined, and Symantec reported disappointing financial results, leading to a series of management changes.  The Board of Directors demanded that Enrique Salem step down as CEO in July 2012 and replaced him with Board of Directors Chairman Steve Bennett.  Less than two years later, in March 2014, Symantec ousted Bennett and named Michael Brown ("Brown") as interim CEO and President of the Company, formally confirming Brown in that role in September 2014.  Due to pressure from shareholders, in late 2014 Symantec determined to divest its Veritas Software business; Symantec closed the divesture transaction in early 2016.  However, on April 29, 2016, after the Company had reported a series of disappointing financial quarterly results, Symantec's Board of Directors requested that Brown step down as CEO.

### B.     Symantec Acquires Blue Coat And LifeLock And Promotes These "Transformative Acquisitions" To Investors

26.     Shortly after Symantec's divestiture of Veritas Software, Symantec announced on February 4, 2016, that it was targeting cost savings of approximately $400 million to be achieved by the end of its fiscal year 2018 (ended March 31, 2018).

27.     On June 12, 2016, Symantec announced that it was acquiring Blue Coat, a leader in the web and cloud security industry, for $4.65 billion.  The acquisition closed on August 1, 2016.

Industry commentators have since explained the unusual and "concerning" features of the transaction and subsequent integration.[3]

28.    <u>First</u>, following completion of the transaction, Blue Coat's top management team, including Blue Coat CEO, Defendant Clark; Blue Coat CFO, Defendant Noviello; Blue Coat Chief Technology Officer, Hugh Thompson; Blue Coat Chief Operating Officer ("COO"), Michael Fey; Blue Coat Chief Marketing Officer, Michael Williams; and Blue Coat Chief of Staff, Matt MacKenzie, all assumed the identical posts at Symantec.  Analysts noted the "rare" occasion in which a large public company like Symantec chooses to replace its entire top management team with the management of a just-acquired, smaller, private company like Blue Coat.  Moreover, at least one analyst has observed, "Plugging in a C-suite from a recent acquisition certainly seems like a risk factor for dysfunction, as it could set up an 'us' versus 'them' war in the ranks.  Such a highly politicized environment can create a toxic culture that leads to mistakes, cover ups, and outright wrongdoing."[4]

29.    <u>Second</u>, Symantec acquired Blue Coat from private equity manager, Bain Capital ("Bain"), a firm with a business model and reputation for restructuring investee companies and engineering their financials to facilitate fast exits.  Bain purchased Blue Coat in 2015 for $2.4 billion.  Bain owned Blue Coat for only one year before selling it to Symantec for $4.9 billion – a 100% return on Bain's investment.  Thus, as one analyst has noted, "in addition to the general concern of bringing in a new C-suite from an acquired company, the C-suite from such a PE-itized company seems a non-obvious choice for a replacement C-suite, given that Blue Coat seems to fit the PE profile of being managed for an exit."[5]

---

[3] *See, e.g.*, Carson Block, *Symantec Cold Read: Where Were The Short Sellers On Symantec?*, Forbes (May 13, 2018), *available at* https://www.forbes.com/sites/cblock/2018/05/13/symantec-cold-read-where-were-the-short-sellers-on-symantec/#6c5107141fdf.

[4] *Id.*

[5] *Id.*

30.     Symantec promoted its acquisition of Blue Coat as advancing Symantec's profitability and growth.  For example, in Symantec's August 1, 2016 press release announcing the Blue Coat closing, new CEO Clark stated:

> With our increased scale, portfolio and resources, *large enterprises can now look to Symantec as a single strategic source for integrated solutions across endpoints,*[6] *cloud and infrastructure to defend against sophisticated attacks and create a stronger, more cost-efficient security posture*.

31.     In the same August 1, 2016 press release, Symantec Chairman Dan Schulman reiterated:

> *Nearly two years ago, we announced our intention to become the leading pure play cyber security company.  Today, that intention becomes a reality,* as we combine Symantec's leadership in endpoint, email, data loss prevention and datacenter security with Blue Coat's strength in cloud security with the #1 market share position at the secure web gateway.

32.     Analysts viewed the Blue Coat acquisition positively.  For example, on August 1, 2016, Jefferies concluded, "We Remain Positive on the Deal Overall," stating that "We see logical product synergies as SYMC makes a push to become more of a security 'platform' across endpoints, web security, and more," but noting that "significant execution risk remains."  Jefferies also viewed the arrival of Defendant Clark and Michael Fey to Symantec positively: "Greg Clark (appointed CEO) and Michael Fey (appointed COO) bring with them a very strong track record from Blue Coat, where they and their team are largely credited with modernizing Blue Coat's products, reigniting growth, and positioning for shifts to cloud and mobile."

33.     MKM Partners similarly observed on August 2, 2016, that "Positive Investor Sentiment Could Continue," as "Investors have been enthusiastic about the Bluecoat [sic] deal as reflected by the 18% increase in SYMC shares since the announcement as compared to 6% for NASDAQ.  F1Q17 EPS upside potential and the reiteration of the acquisition's benefits could potentially boost the shares in the near term."

---

6 "Endpoint" security is a term in the software industry that refers to protecting a business network when it is accessed by remote devices.  Endpoint software is installed on network servers and remote devices.

34.    On August 4, 2016, the Company held an earnings conference call to discuss its results for the first quarter of fiscal year 2017.  During that call, now-former Symantec CFO Thomas Seifert, described the acquisition as creating "$550 million in cost efficiencies and Blue Coat integration synergies," which included $150 million in annual synergies from the Blue Coat acquisition, and an additional $400 million in net cost savings.

35.    The Blue Coat acquisition directly impacted Symantec's equity compensation plan for management.  Defendants explained in the Company's September 5, 2017 Form 14A filed with the SEC, that Symantec "Revised goals upward [for its Annual Incentive Plan] to reflect Blue Coat . . . impact[.]"   The Company increased the revenue and income targets for executive compensation.   In addition, Symantec's Compensation Committee revised their performance metric for "Equity Incentives" for executives to be tied to adjusted operating income.   The revisions are summarized in the graphic below.



36.    On November 20, 2016, Symantec announced that it had entered into an agreement to acquire identity-protection software company LifeLock for $2.3 billion.  Defendants represented

to investors that LifeLock would transform Symantec's consumer business segment and create organic growth.  For example, Defendant Clark stated in Symantec's November 20, 2016 press release:

> As we all know, consumer cybercrime has reached crisis levels.  LifeLock is a leading provider of identity and fraud protection services, with over 4.4 million highly-satisfied members and growing.  With the combination of Norton and LifeLock, we will be able to deliver comprehensive cyber defense for consumers. . . .  ***This acquisition marks the transformation of the consumer security industry*** from malware protection to the broader category of Digital Safety for consumers.

37.    Symantec's Chairman of the Board of Directors, Dan Schulman, similarly stated in the Company's November 20, 2016 press release: "With the acquisition of LifeLock, Symantec adds a new dimension to its protection capabilities to address the expanding needs of the consumer marketplace."

38.    Defendants further announced during a November 21, 2016 conference call that in addition to the previously announced $550 million in cost efficiencies and Blue Coat synergies, Defendants expected annual cost synergies from the LifeLock acquisition of $30 million by the end of Symantec's fiscal year 2018, increasing to over $80 million by the end of fiscal year 2020.

39.    Analysts viewed the LifeLock acquisition positively.  For example, on November 21, 2016, in a report entitled, "Norton Joins the Transformation Train via LifeLock," BTIG stated that the LifeLock acquisition "mark[ed] the third and (we believe) final step in the evolution of the 'new' Symantec.  Now, the consumer business joins the transformation train, started by the Veritas divestiture and continued by the Blue Coat acquisition."  BTIG further wrote, "We are hesitant to point to revenue synergies as a material long term tail wind here, but do like the deal for a simple reason: it returns the consumer business back to growth."  Cowen & Company similarly wrote on November 21, 2016, "No Slowdown in Symantec M&A Train; Acquires LifeLock for $2.3b."

40.    Symantec closed the LifeLock acquisition on February 9, 2017.

**V.     DEFENDANTS MANIPULATED SYMANTEC'S**
       **FINANCIAL RESULTS THROUGHOUT THE CLASS PERIOD**

41.     Under the new leadership of Defendants Clark and Noviello, Symantec manipulated financial metrics throughout the Class Period to meet executive compensation targets and to persuade the market that the Blue Coat and LifeLock acquisitions were transformational for Symantec's revenue and growth.

42.     As detailed below, Defendants manipulated Symantec's reported financial results in two ways.  First, Defendants improperly recognized revenue, including revenue that should have been deferred, in violation of GAAP.  Such tactics resulted in misleading, overstated GAAP and adjusted revenue numbers.  Second, Defendants improperly recorded operating expenses that were incurred in the ordinary course of business as "transition costs," and adjusted those costs as part of Symantec's non-GAAP measures in violation of SEC rules and regulations.  Defendants' misclassification of transition costs allowed them to report inflated adjusted operating income metrics.  Defendants' internal controls over financial reporting were ineffective during the Class Period, enabling the improper accounting manipulations.

**A.     Defendants' Revenue Recognition Practices Violated GAAP, And**
       **Symantec's Internal Controls Were Ineffective During The Class Period**

**1.     GAAP Revenue Recognition Principles**

43.     GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements.  The SEC has the statutory authority to codify GAAP and has delegated that authority to the Financial Accounting Standards Board.  SEC Regulation S-X (17 C.F.R. Part 210) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  During the Class Period, Symantec represented that its financial statements were presented in conformity with GAAP.

44.     Symantec is required under GAAP to recognize revenue only when certain criteria are met, and in the period when those criteria are met.  A company violates GAAP when it misleadingly shifts revenue from one period to another for the purpose of making one period look

better.  The use of such accounting manipulations is often tied to an entity's need to achieve or report predetermined financial results.

45.     Arbitrarily moving and recording revenue from one period to another is misleading because recognizing revenue in the proper period is a GAAP requirement and is critical to the transparency and accuracy of financial statements.  Indeed, accounting literature places significant emphasis on the fact that one of the goals of financial statements based on accrual accounting, which is an accounting method that records revenues when earned and expenses when they are incurred, "is to account in the periods in which they occur for the effects on an entity of transactions and other events and circumstances."  This is done through the use of the "matching principle" – matching revenue to the period to which it relates.  Financial Accounting Standards Board Concepts Statement ("FASCON") No. 6.  At all relevant times, Symantec's accounting was (purportedly) accrual accounting.  Moreover, accounting guidance requires that in order for financial information to be useful, it must be relevant and faithfully represent what it purports to represent.  FASCON No. 8.

46.     Accounting Standards Codification ("ASC") 605-10-25-1 provides that revenue may be recognized when it is realized or realizable and earned.  ASC Topic 605 provides, in relevant part: "Revenue and gains are realized when products (goods or services), merchandise or other assets are exchanged for cash or claims to cash. . . .  [R]evenue and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash."  Additionally, ASC Topic 605 states:

> Revenue is not recognized until earned. . . .  [A]n entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by revenues.

47.     ASC 985-605-25-3, Software Not Requiring Significant Production, Modification, or Customization, establishes basic revenue recognition criteria for software licenses.  ASC 985-605-25-3 provides:

> If the arrangement does not require significant production, modification, or customization of software, revenue shall be recognized when all of the following criteria are met:

  a. Persuasive evidence of an arrangement exists;

  b. Delivery has occurred;

  c. The vendor's fee is fixed or determinable; and

  d. Collectability is probable.

48. With respect to subpart (a), ASC 605-25-16 further states:

> If the vendor operates in a manner that does not rely on signed contracts to document the elements and obligations of an arrangement, the vendor should have other forms of evidence to document the transaction (for example, a purchase order from a third party or online authorization). If the vendor has a customary business practice of using written contracts, evidence of the arrangement is provided only by a contract signed by both parties.

49. ASC 958-605-25-21 further reiterates with regard to customer acceptance, "After delivery, if uncertainty exists about customer acceptance of the software, license revenue shall not be recognized until acceptance occurs."

50. With regard to Subpart 3(d), whether collectability is probable, ASC 985-605-25-34 provides that "any extended terms in a software licensing arrangement may indicate that the fee is not fixed or determinable."

51. Consistent with the accounting rules set forth above, Defendants included Symantec's revenue recognition policy in the Company's financial statements. That policy provided, among other things, "We recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability is probable."

52. KPMG, Symantec's audit firm during the Class Period, issued guidance regarding Revenue from Contracts with Customers: "Under current SEC guidance, if an entity's customary business practice is to have, in addition to meeting the other criteria, a contract signed by both parties before it concludes that persuasive evidence of an arrangement exists, the entity does not recognize revenue until a written sales agreement is finalized – including being signed by both the customer and the entity . . . ." The same KPMG guidance states, "Under current SEC guidance and U.S. GAAP for software entities, consideration in a contract has to be fixed or determinable in order for the entity to recognize revenue."

53.     Accordingly, under GAAP and Symantec's revenue recognition policy, and consistent with the guidance provided by Symantec's auditor, revenues must not be recognized (i) unless and until the vendor has documentation of the transaction (such as a purchase order), or the underlying contract and agreement is executed and is in the hands of management prior to the end of an accounting period; (ii) if uncertainty exists about customer acceptance of the software; and/or (iii) if extended terms in the software licensing arrangement indicate that the fee is not fixed or determinable.

### 2.     GAAP Deferred Revenue Principles

54.     Deferred revenue, or payments that a company receives for products or services that are to be delivered or performed in the future, is a liability.  Deferred revenue is recorded when a company bills a customer before satisfying GAAP's revenue recognition criteria.  As noted above, these criteria include that delivery of the goods or service has occurred (*e.g.*, an exchange has taken place).

55.     Recognizing deferred revenue that is not realized or realizable and earned violates GAAP, and renders the subject financial statements misleading.

### 3.     Symantec's Obligation To Maintain Effective Internal Controls Over Financial Reporting

56.     Symantec was also obligated under Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") to maintain effective internal controls.[7]   Specifically, SOX Section 404 requires Symantec to assess its internal controls over financial reporting, and disclose whether or not such controls are effective, including the identification of any "material weaknesses" in those controls.

---

[7] In early 2003, the SEC staff issued the Report Pursuant to Section 704 of the Sarbanes-Oxley Act of 2002 (the "Section 704 Report").  In compiling the information for the Section 704 Report, the SEC staff studied enforcement actions filed during the period of July 31, 1997 through July 30, 2002.  The greatest number of enforcement actions related to improper revenue recognition.  A common theme in these enforcement actions related to "side letters," or verbal side agreements, that were not considered in recognizing revenue.  *See also* SEC FRR 104, "The Significance of Oral Guarantees to the Financial Reporting Process."

Section 404 further requires Symantec's CEO and PAO to personally certify the effectiveness of Symantec's internal controls each quarter.

57.    A "material weakness" is a deficiency or combination of deficiencies in a company's internal control over financial reporting, which creates a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.  A company's internal control over financial reporting cannot be considered effective if one or more material weakness exists.  Internal controls that impact significant accounting estimates or critical accounting policies are generally considered to be higher risk.

58.    Company management is further required to ensure that testing procedures are performed to assess the operating effectiveness of the company's internal controls.  If management is aware or determines that the design or operation of a control does not allow management or company employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis, this means that a control deficiency exists.  Management is then required to evaluate the control deficiency to ascertain the likelihood that the deficiency or combination of deficiencies could result in a significant deficiency or a material weakness.

59.    All significant deficiencies and material weaknesses must be reported to the company's audit committee.  Moreover, a single material weakness renders the company's internal controls ineffective, and any material weakness must be publicly disclosed.  Significantly, the SEC has observed that disclosures regarding management's remediation efforts "may call into question the validity and completeness of the material weaknesses disclosed."

### 4.    Defendants Improperly Recognize Revenue At Period-End To Make Their Numbers

60.    Throughout the Class Period, Defendants engaged in improper revenue recognition practices in violation of GAAP and Symantec's own stated revenue recognition policy.  Among other things, Defendants recognized revenue at period-end on sales that did not have signed contracts, did not go through the appropriate approval channels, contained unapproved extended terms, and/or for which customers could not or would not pay.  Defendants also improperly

accelerated the recognition of deferred revenue when such revenue had not met GAAP's revenue recognition criteria.

61.     Symantec's improper revenue recognition practices violated GAAP and Symantec's own stated revenue recognition policy because revenue may not be properly recognized under GAAP unless it is realized or realizable and earned.  The revenue recognition criteria are not met (i) unless and until the vendor has documentation of the transaction (such as a purchase order), or the underlying contract and agreement is executed and is in the hands of management prior to the end of an accounting period; (ii) if uncertainty exists about customer acceptance of the software; and/or (iii) if extended terms in the software licensing arrangement indicate that the fee is not fixed or determinable.  As detailed further in Section VI below, Symantec's practices made its reported GAAP revenue and deferred revenue false and misleading. Symantec's representations that it complied with GAAP and its internal revenue recognition policy, as well as the Company's representations about effective internal controls, were likewise false and misleading.   Overstated GAAP revenue allowed Symantec employees to project increased growth and achieve higher revenue compensation targets.

62.     On September 24, 2018, Symantec admitted that it had recognized revenue that should have been deferred in its earnings releases for the fourth quarter of fiscal year 2018 and first quarter of fiscal year 2019, and that those financial statements would be restated accordingly:

> [T]he Audit Committee reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018 (which is still an open period).  After subsequent review of the transaction, the Company has concluded that **$12 million of the $13 million should be deferred**. Accordingly, the previously announced financial results for the fourth quarter of fiscal year 2018 and the first quarter of fiscal year 2019 (ended June 29, 2018) **will be revised to take into account this deferral and any other financial adjustments required as a result of this revision**.

63.     Also, on September 24, 2018, Symantec announced a massive corporate reshuffling, and the need for improvements to its internal controls:

> The Audit Committee proposed certain recommendations which the Board of Directors has adopted, including: appointing a separate Chief Accounting Officer; appointing a separate Chief Compliance Officer reporting to the Audit Committee; clarifying and enhancing the Code of Conduct and related policies; **and adopting certain enhanced controls and policies related to the matters investigated**.

64.     Multiple reliable former employees provided firsthand accounts explaining that Defendants engaged in improper revenue recognition practices throughout the Class Period that were inconsistent with GAAP and the Company's internal revenue recognition policy.   For example, a former Vice President ("VP") and Chief Security Officer ("CSO") from 2014 through June 2017 worked at Symantec headquarters for 7.5 years.   For the first 3.5 years in his/her tenure as the CSO, he/she reported to Symantec's Chief Information Officer, Sheila Jordan ("Jordan"), who in turn reported to Defendant Noviello shortly after the Blue Coat acquisition.   During the last six months of his/her tenure as CSO, he/she reported to Symantec's General Counsel, Scott Taylor.

65.     Symantec's former VP and CSO recalled Defendant Clark making lots of references in meetings with executives about their ability and flexibility to shift and record revenue because it was a hardware business.   Clark would regularly talk about opportunities from having been at Blue Coat prior to the acquisition, and the opportunity to be flexible in how they were spreading out revenue over time for these big and expensive hardware purchases.   According to Symantec's former VP and CSO, they had the ability to "massage" that.

66.     Symantec's former VP and CSO further explained that Clark talked frequently about their ability to manipulate or adjust revenue by various periods or a year.   The intimation was that if they had already made their target for a particular quarter, then they would not deliver and record revenue until the next quarter.   Symantec's former VP and CSO explained that Clark specifically discussed this issue at senior leader meetings with executives which occurred approximately monthly.   According to Symantec's former VP and CSO, during these calls, they discussed the financial performance of various parts of the business.   Clark's views on "opportunities" to be "flexible" with respect to revenue recognition were not a secret.

67.     Symantec's former VP and CSO further explained that a number of investigations were opened about the Blue Coat leadership and unethical behavior, including the leveraging of Company expenses and resources, and how the Company was closing deals.   The investigations were led by Cameron Hoffman, head of investigations at Symantec, under Scott Taylor.

Symantec's former VP and CSO stated that these were serious, real investigations under the Ethics Department.

68.     A former Senior Manager, Pricing & Licensing from July 2011 through June 2017, who had worked at Symantec for 18 years, first in Channel Inside Sales from September 1999 through September 2007, then as a Senior Project Management Specialist from September 2007 until July 2010, said that Blue Coat management imposed unethical accounting practices at Symantec.  He/she explained, for example, that Symantec was trying to figure out a way to change from a subscription model to a licensing model so that they could bring all the revenue in at once and not defer it.  He/she knew from a person who had been on his/her team and still works for the Company that they were changing a lot of those models so that they could recognize the revenue earlier.

69.     Symantec's former Senior Manager, Pricing & Licensing, further confirmed that he/she was sure that people were trying to shove revenue through at the end of the quarter that they should not have been.  They were trying to shove deals through that Symantec people would not have allowed to go through previously.  For example, Symantec's former Senior Manager, Pricing & Licensing stated that a few people said that they had been asked at quarter-end to put a bunch of orders through, when they knew that the orders would not be processed, just to meet numbers and then after end of quarter, back them out.  He/she described how the request came at quarter-end from a Vice President who came from Blue Coat.  The order processing team was located in Springfield, Oregon.  Symantec's former Senior Manager, Pricing & Licensing, explained that he/she knew about this issue because at quarter-end everyone was working long hours together and all sat together.  The former Blue Coat Vice President's request occurred at a quarter-end after the acquisition of Blue Coat, and after Blue Coat had gotten rid of a lot of Symantec management and put its own in place.

70.     Specifically, one of the former Blue Coat and now Symantec Vice Presidents called the Springfield office and spoke with managers in Order Management, telling them to put numerous orders through at the end of the quarter.  You had to have a signed contract in order to put orders through, and they did not have the signed contracts and the things the Company

normally required in order to put orders through.  According to Symantec's former Senior Manager, Pricing & Licensing, this raised a lot of red flags because there are certain processes with contracts, and with Symantec, for which there was no wiggle room.  The concern was that these were not solid, signed deals, and should not have been put through.

71.     A former Symantec Manager Bill and Collect-Finance, Americas, from January 2014 until October 2017, who worked at Symantec for over 18 years, similarly described how Symantec was bringing in deals two to three quarters in advance just to make numbers.  The former Manager Bill and Collect-Finance explained that the new sales team following the Blue Coat acquisition was allowed to bring in deals "that were sort of half baked."  The former Manager Bill and Collect-Finance, who had a background in sales, knew that deals were allowed to go through when customers really did not have a thorough credit check.

72.     For example, there were a few multi-million dollar deals where the former Manager Bill and Collect-Finance and his/her boss, Toni Doveri, were told to ignore the fact that the deals were inappropriate and that the customers were not going to be able to pay two to three quarters out.  The former Manager Bill and Collect-Finance explained that around January 2016, one deal was worth approximately $6 million, and they were allowed to bring it in about two quarters ahead of time to make numbers for the end of the fiscal year.  According to the former Manager Bill and Collect-Finance, deals like that occurred every quarter after the Blue Coat acquisition.  The amount of deals improperly being pushed through was millions of dollars.

73.     The former Manager Bill and Collect-Finance further explained that a lot of customers are sending him/her emails saying that they did not want to sign the deal with Symantec, but the sales rep forced them to.  He/she received three such emails in the last quarter.  Moreover, the former Manager Bill and Collect-Finance stated that Symantec would promise the customer something to make these deals.  Specifically, in the last quarter at DigiCert (where the former Symantec employee currently works),[8] he/she saw two instances where the customers had been promised a number of free security certifications from Symantec.  Symantec promised them X

---

[8] DigiCert acquired Symantec's Website Security and related PKI solutions in 2017.

1  number of free security certificates to bring this deal now, and the customer would pay for it with

2  extended terms.  The extended terms either did not come through Finance, or if they did, Finance

3  was forced to push them through.  According to the former Manager Bill and Collect-Finance,

4  revenue had to have been recognized improperly because DigiCert is still trying to get paid for

5  deals that occurred a year and a quarter ago.

6  74.    The former Manager Bill and Collect-Finance further explained that the practice of

7  pushing deals through continued at least until after he/she left the Company.  The former Manager

8  Bill and Collect-Finance frequently received calls from the highest executive staff, such as

9  Defendant Garfield, telling them to release those orders or to allow those orders to go out.  There

10  would be a fight about it, but Garfield would indicate that the order to do so had come from

11  someone else above him.  He would quote Defendant Clark or Defendant Noviello.

12  75.    In addition, a Senior Financial Analyst working at Symantec on a contract basis

13  from May 2017 to July 2017, who was tasked with transitioning the merger/acquisition to

14  Symantec of Watchful Software, stated that he/she questioned the way that Symantec was bringing

15  in revenue.  Specifically, the former Senior Financial Analyst explained that Watchful Software

16  had a lot of deferred revenue, including maintenance revenue, that went on for years.  According

17  to the former Senior Financial Analyst, Symantec discounted that deferred revenue to

18  approximately 50% and recognized it all upfront.  The former Senior Financial Analyst provided

19  the following example of this practice: take a subscription for a three-year sale that was going to

20  be $10,000 recognized over a three-year period.  Symantec would say that they were not going to

21  recognize this over three years.  Instead, they were going to make it $5,000 and recognize it all

22  today.  But it was revenue that was going to be earned over time.

23  76.    Moreover, Eloisa Schnurr, a Senior Manager in Finance at Symantec who

24  coordinated Symantec's integrations, told the former Senior Financial Analyst that the former

25  Senior Financial Analyst did not need to record deferred revenue entries because "we got rid of

26  that."  The former Senior Financial Analyst confirmed with the former Controller of Watchful

27  Software that this practice occurred and that both he/she and the former Controller questioned this

28  practice at the time.

5.     **Defendant Garfield Leaves Symantec Due To**
       **Improper Revenue Recognition Practices And Ineffective**
       **Internal Controls, But Only After He Closes The Books For 2017**

77.     Symantec's former VP and CSO explained that Defendant Garfield, the former CAO of Symantec who "resigned" effective August 7, 2017, left the Company due to revenue recognition concerns and due to the way that Symantec was recognizing revenue under the leadership of Defendants Clark and Noviello.  Symantec's former VP and CSO heard this from both Carolyn Herzog, former Deputy General Counsel, and John Eversole, former head of Physical Security and Executive Protection (who personally provided protection to Clark on many occasions).  Symantec's former VP and CSO explained that Garfield was pushed into a position he was uncomfortable with and took a stand that he would not close the books because of that.  However, Garfield ultimately reached an accommodation that included him leaving with a financial package in hand so long as the books got closed.  Garfield ultimately did sign off on the books for the prior financial year (2017) in exchange for a package.

78.     Moreover, Symantec's former VP and CSO stated that he/she learned from multiple people who were part of the senior executive team that Garfield was really unhappy with the aggressive accounting practices that were being implemented under Defendant Noviello and was uncomfortable that the practices were not lining up to Symantec's controls.  It was common knowledge among the most senior VPs and EVPs that Garfield was very unhappy and butting heads with Noviello over accounting practices, and it was openly discussed.

79.     Symantec's former Manager Bill and Collect-Finance further explained that someone on Garfield's team, possibly Maddy Gatto ("Gatto"), brought something forward prior to the numbers being released to the Street.  The former Manager Bill and Collect-Finance believes that the bad numbers were reported to the Street.  Gatto left the week after Garfield, with her resignation effective on August 15, 2017.  According to the former Manager Bill and Collect-Finance, Garfield left first and received a big payout, and then Gatto may have been pushed out.  The former Manager Bill and Collect-Finance explained that he/she knew this information because Symantec had a very family-like mentality and is a small community; therefore, people were not

afraid to talk to each other, and Springfield employees (in his/her office) are very connected to Mountain View (Symantec's headquarters), and employees travel there.

80.     It was the former Manager Bill and Collect-Finance's understanding that Garfield knew things that people did not want him to know.  According to the former Manager Bill and Collect-Finance, someone continued to push forward this issue appropriately because it was still a topic of conversation when he/she left Symantec on November 1, 2017.  However, the former Manager Bill and Collect-Finance's understanding is that Symantec did file the incorrect numbers. The former Manager Bill and Collect-Finance believes, based on legitimate conversations that took place, that Gatto or Garfield may have tipped off the Audit Committee.

### 6.     Defendant Clark Learns That Deals Involving SOX Violations Were Improperly Booked At Year-End

81.     A former Symantec Account Manager – Strategic Account Manager for Verizon from December 2013 until October 2017, said that individuals who came over from Blue Coat to Symantec were violating the rules applicable to public companies, including SOX.  As Symantec's former Account Manager put it, "It was almost like they did not understand the rules of a publicly traded company, or they just didn't care."  Symantec's former Account Manager explained that the Company was not accurately and completely recording some financial information related to revenues, and there were breaches of SOX on multiple levels with the new management team coming in through the Blue Coat acquisition.  The former Account Manager left Symantec because he/she knew these issues would come out.

82.     The former Account Manager saw the first breach in the fourth quarter of fiscal year 2017.  Specifically, the former Account Manager was responsible for driving all net new purchases as well as maintaining and overseeing renewals of existing solutions.  There are specific approval processes that have to go through Symantec's systems to ensure that renewals stay at a run rate.  It is very strict and run rates that occur on renewals cannot go below a certain level. According to the former Account Manager, it takes a while to get all the approvals for these deals and if there are any changes or additional discounting during the negotiations, it has to go back through the approval process.

---

83.     The former Account Manager explained that Verizon was negotiating, and certain management got worried about closing a $13 million deal at the end of the fourth quarter of fiscal year 2017.  According to the former Account Manager, Steve Tchejeyan ("Tchejeyan"), Head of Global Sales at Symantec, breached SOX specifications.  Tchejeyan spoke with one of the contacts he knew at Verizon from his Blue Coat days that was involved in the transaction, and without consulting the former Account Manager, his/her boss, or his/her boss's boss, and without getting any approvals through the system, made a verbal agreement to give Verizon $1 million off the entire transaction.

84.     This created tremendous havoc throughout Symantec's whole process.  For example, according to the former Account Manager, approvals had to be made and overridden because renewals were not allowed to go below a certain amount.  The former Account Manager explained that relevant accounting practices do not allow renewals to go below a certain number called a run rate.  The deal created a lot of issues for the renewal team because they were discounting on products they cannot discount that low, but they all had no choice.  Without approvals and without consulting anyone downstream, Tchejeyan made a personal, verbal deal with an executive at Verizon that he had contact with.  This executive did not even own all of the products at issue, it was merely someone Tchejeyan had contact with from his Blue Coat days.  Tchejeyan's actions breached SOX.

85.     The former Account Manager further explained that while they had technically booked this deal in the fourth quarter of fiscal year 2017, when the former Account Manager came back to work the next week, the deal was not booked with a Q4 end date in the new system and instead, it had a Q1 end date.  The deal also did not have the right products and included products that Verizon did not even own.  The former Account Manager believes that someone manually changed the booking in the system to go into Q1 2018.  The former Account Manager explained that if this was just a system malfunction, the relevant products for the Q4 deal and the Q1 deal would be the same, but they were different in the system.

86.     The former Account Manager further stated that many people know about this within Symantec.  He/she explained that the booking of a Q4 deal in Q1 happened to about five

Symantec Account Managers.  According to the former Account Manager, these were all big deals that were booked in Q4 but ended up in Q1.

87.     With respect to the specific $13 million deal at issue, the former Account Manager went to his/her boss and his/her boss's boss to ask what happened.  Ultimately, the former Account Manager had to write a justification to Defendant Clark documenting the order numbers for Q4 to prove that it actually booked in Q4, and the former Account Manager ultimately received credit for the deal as a Q4 deal at the Q4 rate.  The former Account Manager knows that Defendant Clark was fully aware of the issue, and Defendant Clark responded to the former Account Manager's email telling him/her that the deal was approved.  The other five account managers who experienced the same issue all had to write to Defendant Clark to get credit for the deals as Q4 transactions.

88.     Symantec never fixed the issue in the system, and the information in the system has implications on how different divisions recognize revenue.  The former Account Manager carried a resignation letter with him/her from March 2017 through October 2017 when he/she left Symantec because he/she was so concerned about how this deal occurred.

89.     The former Account Manager further explained that his/her boss, who came over from Blue Coat, asked him/her multiple times on conference calls to do a verbal agreement with Verizon.  The former Account Manager refused and found the request shocking.  According to the former Account Manager, there is a compliance document that everyone at Symantec has to sign that states that they have made no side agreements.  A verbal agreement is considered a side agreement.

90.     The former Account Manager's boss requested that the former Account Manager enter into verbal agreements on conference calls with other people on the former Account Manager's team 2-3 more times on different calls about different products.  The team members were asking themselves what was going on, and what kind of business processes do these people follow.  Entering into such a verbal agreement would be grounds for termination.

**B.      Defendants' Manipulation Of Reported Transition
            Costs Was Misleading And Violated SEC Rules And Regulations**

**1.      Additional Accounting Principles For Adjusted Financial Measures**

91.      Symantec reported "non-GAAP financial measures" in earnings releases and financial statements.  Such adjusted financial measures are not required disclosures under GAAP or SEC rules.  Rather, the intended purpose of including such supplemental financial measures is to allow management to present an adjusted picture of the company's past or future financial performance.  These adjusted financial measures typically remove the effect of certain revenues and expenses that may be non-recurring or not part of the company's core operations.

92.      As Symantec represented in its May 10, 2017 Form 8-K, regarding its fiscal year 2017 financial results, "***investors benefit from the presentation of non-GAAP financial measures . . . to facilitate a more meaningful evaluation of our current operating performance and comparisons to our past operating performance***."  Investors, analysts, and other market-makers focused heavily on Symantec's adjusted metrics during the Class Period.  Moreover, Defendants used these adjusted metrics almost exclusively when describing Symantec's performance, as well as planning and forecasting future periods.

93.      In addition, because of the importance of the adjusted numbers, Symantec uses them to determine executive compensation, including bonuses, stock grants, and the amount of those bonuses and stock grants.  Symantec set adjusted financial metric targets and corresponding compensation payouts for each fiscal year.

94.      Due to companies' increased reliance on adjusted metrics, the SEC has issued rules, regulations, and guidance that apply when a company publicly discloses or releases financial information that includes an adjusted measure.   Among others, Regulation G (17 C.F.R. § 244.100), which applies to the disclosure of adjusted measures, prohibits a company from making public an adjusted financial measure that is misleading or omits to state a material fact. 17 C.F.R. § 244.100(b) provides:

> A registrant, or a person acting on its behalf, ***shall not make public a non-GAAP financial measure that,*** taken together with the information accompanying that measure and any other accompanying discussion of that measure, ***contains an***

*untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading*.

95.     SEC Regulation S-K, Item 10 (17 C.F.R. § 229.10) further prohibits a company from filing with the SEC an adjusted measure that adds back expenses that are related to the Company's ordinary course of business (*i.e.*, recurring).  17 C.F.R. § 229.10(e)(1)(ii)(B), provides:

A registrant must not: (B) Adjust a non-GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the nature of the charge or gain is such that it is *reasonably likely to recur within two years or there was a similar charge or gain within the prior two years*.

96.     The SEC also publishes Compliance & Disclosure Interpretations ("C&DIs") containing questions and answers relating to adjusted financial measures.  Question and Answer 100.01 provides:

**Question:** Can certain adjustments, although not explicitly prohibited, result in a non-GAAP measure that is misleading?

**Answer:** Yes.  *Certain adjustments may violate Rule 100(b) of Regulation G because they cause the presentation of non-GAAP measures to be misleading.* For example, presenting a performance measure that excludes normal, recurring, cash operating expenses necessary to operate a registrant's business could be misleading.

97.     It is thus a violation of SEC Regulation G and Regulation S-K for a company to report adjusted financial measures that are misleading, omit to state a material fact necessary to make them not misleading, and/or exclude expenses in an adjusted measure that are related to the company's ordinary course of business.

98.     In addition, the SEC's Division of Corporate Finance published the following excerpt addressing the disclosure of adjusted financial measures: "If management is presenting the non-GAAP calculation as an alternative or pro forma measure of performance, *the staff discourages adjustments to eliminate or smooth items characterized as nonrecurring, infrequent, or unusual*."  For example, it would be misleading for a company to exclude rent because it is an ongoing expense.  As relevant here and detailed further in Section VI below, Symantec improperly excluded ongoing consulting charges and other continuing costs from its

adjusted measures, rendering those stated metrics misleading and in violation of SEC Regulations G and S-K.

### 2. Defendants Inflated Symantec's Adjusted Revenue Through Improper Revenue Recognition Practices

99.  Symantec's non-GAAP revenue metric consisted of its reported GAAP revenue, adjusted for deferred revenue that had been written down in connection with Symantec's acquisitions (referred to as the "deferred revenue fair value adjustment").

100.  All of the improper revenue recognition practices set forth in Section V(A) above rendered Symantec's adjusted revenue metric inflated, and false and misleading, because it included revenue that did not meet the criteria for revenue recognition under GAAP.

### 3. Symantec Reported "Transition Costs" As Adjusted Measures Throughout The Class Period

101.  Another metric that Symantec used throughout the Class Period for executive compensation was its non-GAAP operating income metric, which the Company calculated by subtracting Symantec's adjusted operating expenses from Symantec's adjusted operating income. The Company's adjusted expenses removed Symantec's "transition costs," which Symantec described as costs that the Company did not incur "in the ordinary course of business."  In Symantec's financial statements, including, for example, its 4Q2017 Form 8-K, Defendants told investors that Symantec reported non-GAAP financial measures, excluding charges such as transition costs "to facilitate a more meaningful evaluation of our current operating performance and comparisons to our past operating performance."

### 4. Defendants Inflated And Misclassified Recurring Costs As "Transition Costs"

102.  Throughout the Class Period, Defendants improperly recorded continuing non-transition operating expenses, such as General and Administrative expenses, as "transition costs" and adjusted their operating income metric for those purported "transition costs."  In reality, the purported "transition costs" were recurring operating expenses that Symantec had incurred in the ordinary course of its business.  Defendants' misclassification of non-transition related costs,

such as General and Administrative expenses, as "unique" transition costs was particularly misleading to investors because it gave a false impression of the value of the Company's business operations. Indeed, many investors discount the importance of one-time events to focus on a company's long-term business potential, which many investors believe is better represented by management's adjustments to the company's reported GAAP financial results. In addition, by virtue of classifying certain operational expenses as "transition costs," such as the costs associated with the implementation of internal cloud-based software, Defendants were able to strategically capitalize these costs over a period of time, rather than record them as expenses when they were incurred as required. In turn, Defendants were able to minimize current period operational expenses and spread the charges out over a longer period.

103. Symantec's improper classification of such costs as nonrecurring "transition costs" violated SEC rules and regulations that prohibit adjustments to "eliminate or smooth items characterized as nonrecurring, infrequent or unusual." Moreover, SEC Regulation S-K specifically prohibits a company from filing with the SEC a non-GAAP measure that adds back expenses that are related to the ordinary course of business, as Symantec did here.

104. As detailed further in Section VI below, Symantec's improper adjustment for recurring costs rendered false and misleading Symantec's adjusted operating income, as well as Symantec's descriptions of "transition costs" in its financial statements. Indeed, Symantec's descriptions of "transition costs" evolved over time. For example, Symantec acknowledged at various points in its 2017 Form 10-K that "transition costs" were not actually nonrecurring: "we expect *continuing* significant transition costs associated with the implementation of a new enterprise resource planning system" and "we incurred $94 million in *continuing operations* transition expense." Thus, Defendants knew that these so-called "transition costs" were recurring, but nonetheless wrongly accounted for such costs as if they were non-recurring and falsely told investors that Symantec did not incur such costs "in the ordinary course of business."

105. Symantec's reported transition costs increased dramatically during the Class Period, as reflected in the chart below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15    106.    Moreover, with respect to Q2 2018, in its November 3, 2017 Form 10-Q, Symantec

16  reported that transition costs had increased to $76 million, and that the Company had incurred

17  $120 million in transition costs over the past two quarters.  As a result, the Company stated that it

18  had actually incurred $44 million in transition costs in Q1 2018, when it had previously reported

19  in its 1Q2018 Form 10-Q filed on August 4, 2017, that transition costs for the quarter were

20  $28 million.  Symantec provided no explanation for raising its transition costs for Q1 2018 by

21  $16 million, or nearly 60%.

22    107.    In addition, when Symantec belatedly filed its Form 10-K for fiscal year 2018 on

23  October 28, 2018, Defendants revealed that Symantec had incurred $272 million in transition costs

24  for fiscal year 2018, as opposed to the $94 million it reported for fiscal year 2017.  As reflected in

25  the chart below, this represented a nearly 200% year-over-year increase in transition costs:

26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13



14   108.   In Symantec's 2017 Form 10-K, Symantec listed a number of its competitors,

15   broken out by product market.  Symantec's stated competitors in more than one product market

16   include: Cisco Systems, Inc.; Dell EMC; Division of Dell Technologies, Inc.; IBM Corporation;

17   McAfee, Inc.; Microsoft Corporation; and Zscaler, Inc.   Each of these companies, with the

18   exception of Zscaler, Inc., had multiple acquisitions over the past few years.  Accordingly, although

19   Symantec's self-identified peers incurred the same types of costs as Symantec, none of these

20   companies made adjustments to operating income similar to the "transition costs" adjustment made

21   by Symantec.

22   109.   Symantec's ineffective internal controls enabled the improper adjustments for

23   "transition costs."  On September 24, 2018, the Company admitted:

24       The Audit Committee noted relatively ***weak and informal processes with respect***
25       ***to some aspects of the review, approval and tracking of transition and***
    ***transformation expenses***.  The Audit Committee also observed that beginning in
26       the second quarter of fiscal year 2018 (ended September 29, 2017), the Company
    initiated a review by an outside accounting firm of, and took other steps to enhance,
27       the Company's policies and procedures regarding non-GAAP measures.

28

110. Symantec's former VP and CSO confirmed that the Company was classifying continuing costs as "transition costs." Symantec's former VP and CSO explained that he/she had a lot of insight and exposure to Symantec's classification of project costs as transformative or transition costs that could be excluded from non-GAAP income because a huge number of projects that Symantec was attempting to do that for fell under the CIO (his/her former boss), and because significant ERP [enterprise resource planning] projects, significant cloud infrastructure projects, and many of the security issues that he/she was personally responsible for were pushed into that bucket.

111. Symantec's former VP and CSO explained that they were under incredible scrutiny at the budget level, and one way to maintain operational budget was to classify some of these projects as transformational. The option to classify projects as transformational was available to them and increasingly widely used. It was suggested that they consider using that option so as not to have to fund through their operational run budget. According to Symantec's former VP and CSO, "it was being quite aggressively used."

112. Symantec's former VP and CSO explained that there were a number of things that were not going to get done unless they were classified as transformational, and Symantec started using this bucket more following the Blue Coat acquisition. He/she further explained that the practice of classifying costs as transformational or transformative, and specifically using a transformational bucket and capitalizing the labor under that, definitely accelerated following the Blue Coat acquisition. If labor could be capitalized under that, it would be. As Symantec's former VP and CSO stated, "the numbers were huge" in that bucket; they were in at least the high tens of millions.

113. Symantec's former VP and CSO further explained that some of his/her projects that would normally be put through as operational run projects were now being put into this transformational bucket and could be capitalized. Symantec's former VP and CSO stated that the process of classifying costs as transformative "was used as a mechanism to be able to get large pieces of work done that otherwise wouldn't fit into operational budgets, knowing that you would pay the price when depreciation hits in the future." In his/her opinion, this practice was aggressive.

Symantec's former VP and CSO explained that costs in the transformative bucket were being capitalized but would then depreciate, which would show as a hit against operational budget in future years. They were essentially smoothing out the hit over multiple years, rather than taking it all at once.

114.    Symantec's former VP and CSO further explained that Jordan (CIO) worked closely with a member of the Finance team on the process of classifying costs as transformation costs. Jordan was under a lot of pressure and scrutiny from Defendants Clark and Noviello. Based on Symantec's former VP and CSO's personal conversations with Jordan, he/she knew that she was under tremendous scrutiny from Noviello to justify her job and explain cost management in IT. Symantec's former VP and CSO confirmed that more costs were moved in the direction of transformative or transformational costs once Blue Coat came in.

115.    Symantec's former VP and CSO further explained that Jordan had the incentive to want to get things done, and classifying project costs as transformation or transformative was a mechanism through which to do it. Jordan was pressing or pushing employees to consider opportunities to classify costs this way, especially in her infrastructure space where a big amount of her spend occurred. Jordan herself was under pressure from the management team to do the same. There was constant budget pressure during this period, and there was especially pressure when it would have been a poor financial move to stop a project.

116.    For example, Symantec's former VP and CSO stated that one type of project they were classifying as transformative or transitional was the building of a private cloud using Cisco technology. This was an extension of Jordan's data center strategy of where they were going to be in the next 4-5 years. Symantec's former VP and CSO looked at that as an extension of what they had to do in terms of operational run, and he/she questioned whether it was transformative for the business.

117.    In sum, Symantec's former VP and CSO confirmed that many things were put in the transformation/transformative bucket that were questionable as to whether they were really transformation or for ongoing run. There was a significant uptick in the usage of transformational

costs and the Company's ability to spread costs out, and he/she had questions about the appropriateness of the decisions.

### 5. Defendants Inflated Symantec's Non-GAAP Operating Margins And EPS

118.    In addition to reporting adjusted revenue and adjusted operating income, Defendants reported additional metrics dependent on these figures.  These dependent adjusted metrics included adjusted operating margin, which measures profitability by indicating how much of each dollar of revenues is left over after both costs of goods sold and operating expenses are considered (*i.e.*, Operating Margin = Operating Income / Revenue).  Further, Symantec provided adjusted EPS, which represents the portion of a Company's profit allocated to each share of common stock (*i.e.*, EPS = Operating Income – Preferred Dividends / Weighted Average Common shares).

119.    As a result of Defendants' misstating their adjusted operating income, Defendants similarly falsely represented their adjusted operating margin and EPS.

### C. As A Result Of Their Accounting Manipulations, Executives Received Large Payouts In 2017 And 2018

120.    The Company disclosed its executive compensation targets and payouts for fiscal year 2017 in its Form 10-K/A filed with the SEC on July 25, 2017, and in its August 16, 2017 Proxy Statement.  Under the Company's fiscal year 2017 executive compensation plan, executives received specified levels of compensation based on their achievement of a percentage of the fiscal year 2018 adjusted revenue target of $4.040 – $4.120 billion and an adjusted operating income target of $1.143 billion.

121.    As illustrated by the charts below, the levels of compensation were as follows:

a.      For adjusted revenue: (a) at the achievement level of between $4.04 billion to $4.12 billion adjusted revenue, an executive would be awarded up to a funding level of 100% of the award; and (b) above the $4.12 billion target level, funding increased incrementally, up to a cap of 150% based on a maximum achievement level of $4.162 billion.

b.      For adjusted operating income: (a) at the threshold achievement level of 95.4% of the adjusted operating income target, an executive would be awarded 50% of their possible target compensation as proposed by the Company; (b) above the threshold achievement level, the funding level increased incrementally, up to a funding level of 100% of the award at a target achievement level of 100%; and (c) above the target achievement level, funding increased incrementally, up to a cap of a 150% funding based on a maximum achievement level of at least 109.1% of the target.



122.    Importantly, for non-GAAP revenue, there was zero award compensation if the adjusted revenue fell below the threshold achievement level of $4.04 billion.  There was also zero award compensation if non-GAAP operating income fell below the threshold achievement level of 95.4%.

123.    As set forth in the chart below, for fiscal year 2017, ended March 31, 2017, the Company represented in its August 16, 2017 Proxy Statement that it reached a 100% achievement on its revenue target, or $4.086 billion.  The Company further represented that it reached a 104.7% achievement on its operating income target, or $1.197 billion.[9]  The Company approved a payout of 111.5%.

---

[9] Defendants calculated their adjusted operating income and adjusted revenue metrics differently for compensation purposes than they did for earnings releases.  Specifically, as set forth in Symantec's August 16, 2017 Proxy Statement, Defendants excluded certain "website security and

**Fiscal 2017**

| | Target ($)(millions) | Actual ($) (millions) | Achievement (%) | Funding (%) |
|---|---|---|---|---|
| Operating Income | 1,143 | 1,197 | 104.7 | 125.8 |
| Revenue | 4,040 - 4,120 | 4,086 | 100 | 100.0 |
| Fiscal 2017 Funding | | | | 111.5 |

124.    As a result, under the fiscal year 2017 executive compensation plan, Defendant Clark received bonus compensation in the amount of $743,333 (111.5% of his target amount of $666,667) and Defendant Noviello received bonus compensation in the amount of $479,673 (111.5% of his target amount of $430,200), as set forth in the chart below:

| Name | Non-GAAP Operating Income Funding & Non-GAAP Revenue Funding (%) | Individual Performance Modifier Funding (%) | Total Payout as % of Target Opportunity (%) | Payout Amount ($) |
|---|---|---|---|---|
| Gregory C. Clark | 111.50 | n/a | 111.50 | 743,333 |
| Nicholas R. Noviello | 111.50 | 100 | 111.50 | 479,673 |

125.    The "transition costs" for fiscal year 2017 amounted to $94 million, or 7.3% of Symantec's total adjusted operating income for the year.  Importantly, the difference between (i) the $1.1 billion that Symantec needed to hit 95.4% of the target and receive any target compensation at all, and (ii) the $1.197 billion that Symantec reported for fiscal year 2017 executive compensation purposes, which allowed Symantec to achieve 104.7% of the target, was $107 million.  Accordingly, the "transition costs" line item comprised 87.9% of the $107 million Symantec needed to achieve its executive compensation target.  Without the inflated "transition costs" metric, Defendants would have received far less compensation for fiscal year 2017.

---

PKI results" and "certain litigation contingencies and settlements" from their executive compensation calculations, which were included in their earnings releases.  As relevant here, transition costs were excluded in both the earnings releases and the executive compensation calculations.

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-02902-WHA                                                                    -39-

126.     In addition to cash incentives, Defendants Clark and Noviello also received equity incentive awards under their fiscal year 2017 executive compensation plan, including Performance-based Restricted Stock Units ("PRUs").  As reflected in the Company's 2018 Annual Report, under the Company's fiscal year 2017 executive compensation plan, executives received specified levels of PRUs based on the Company's achievement of a percentage of the adjusted 2018 non-GAAP operating income target of $1.56 billion.  For fiscal year 2018, the Company represented that it reached a 109.29% achievement on its adjusted non-GAAP operating income target, or $1.705 billion.  This resulted in a payout of 268.2% of target under the FY 2017 PRUs.  According to the terms of the FY 2017 PRUs, 250% of the plan payout was earned at the end of the fiscal year, and the additional 18.2% is eligible to be earned at the end of fiscal 2019, provided the executive is employed by Symantec through the end of fiscal 2019.

127.     Thus, as set forth in the table below, due to Defendants' manipulations of the Company's adjusted operating income metric set forth above, Defendant Clark received a total of over ***$41.5 million*** in Symantec stock at the end of fiscal year 2018, and is eligible to receive an additional $3 million in Symantec shares at the end of fiscal year 2019 under the FY 2017 PRUs plan.  Defendant Noviello received nearly ***$10.5 million*** in Symantec stock at the end of fiscal year 2018, and is poised to receive $764,398 in additional Symantec stock at the end of fiscal year 2019.

### FY 2017 PRU Plan

| Executive | PRU Target # | Target PRU Value at Grant Date | Eligible & Earned PRUs At End Of Fiscal 2018 | Actual Value of PRUs Earned At End Of Fiscal 2018 | Remaining PRUs To Be Received At End Of Fiscal 2019 | Value of Remaining PRUs To Be Received At End Of Fiscal 2019 |
|---|---|---|---|---|---|---|
| Clark | 961,670 | $16,636,891 | 2,404,175 | $41,592,228 | 175,024 | $3,027,914 |
| Noviello | 242,774 | $4,199,990 | 606,935 | $10,499,975 | 44,185 | $764,383 |

128.     In addition, in designing the FY 2018 PRUs plan, Symantec's Compensation Committee chose Symantec's reported fiscal year 2018 non-GAAP EPS to determine the number of PRUs to be awarded in year one of the plan.  For fiscal year 2018, Symantec's non-GAAP EPS target under the FY 2018 PRUs was $1.64 per share, with a threshold performance level of $1.56 per share.  In Symantec's 2018 Annual Report, the Company reported that it achieved a fiscal year

2018 non-GAAP EPS of $1.56 per share, or 95.2% of this metric, resulting in the threshold level having been achieved and 50.5% of the FY18 Year One Shares (defined below) becoming eligible to be earned at the end of the FY 18 PRU Performance Period (*i.e.*, the end of fiscal year 2020).

129.    Thus, as set forth in the table below, due to Defendants' manipulation of the Company's non-GAAP EPS, Defendant Clark is eligible to receive 85,768 Symantec shares with a value at grant date (June 9, 2017) of nearly $3 million at the end of fiscal year 2020.  Similarly, Defendant Noviello is eligible to receive over 40,000 Symantec shares with a value at grant date of over $1.3 million at the end of fiscal year 2020.

**FY 2018 PRU Plan**

| Executive | PRU Target # in Year One | Target PRU Year One Value at Grant Date | PRUs Eligible To Be Earned at end of fiscal 2020 | Actual Value of PRUs Eligible To Be Earned At End Of Fiscal 2020 |
|---|---|---|---|---|
| **Clark** | 169,837 | $5,828,806 | 85,768 | $2,943,547 |
| **Noviello** | 79,257 | $2,720,100 | 40,025 | $1,373,651 |

### D.    Defendants Manipulated Costs To Indicate The Success Of Acquisitions

130.    Defendants consistently described both the Company's GAAP revenue and non-GAAP metrics to investors as indicative of Symantec's growth and continued success. Analysts and other market participants focused heavily on Symantec's adjusted metrics, particularly its revenue and EPS.  By manipulating these metrics, Defendants were not only able to meet compensation targets, they were able to falsely assure the market that the Blue Coat and LifeLock acquisitions, which they heavily promoted to investors as "transformative" and composing the future of Symantec, were successful, and that Symantec was on track to achieve its cost-reduction goals.

131.    For example, on May 10, 2017, Symantec filed a Form 8-K and issued a press release to announce its fourth quarter and fiscal year 2017 results.  In the press release, the Company reported quarter and annual GAAP revenues, both companywide and for the Enterprise Security segment: "Q4 GAAP revenue $1.115 billion, up 28% year over year"; "Fiscal Year 2017

(FY17) GAAP revenue $4.019 billion, up 12% year over year"; "Q4 Enterprise Security segment GAAP revenue up 40%; [and] FY17 Enterprise Security segment GAAP revenue up 22%."

132.     On the same day, Jefferies reported that "non-GAAP operating margin of 26.7% was ahead of consensus 26%," and "non-GAAP EPS was in-line at $0.28." Jefferies further wrote that "mgmt is tracking ahead on cost efficiencies." Significantly, Jefferies also noted that analysts and other market participants had to rely on Symantec to accurately report the impact of the Blue Coat and LifeLock acquisitions on its accounting: "Cash flow from operations of $313 was below consensus of $359 million, but we note this metric is difficult for the Street to model well given accounting adjustments related to the Blue Coat and LifeLock acquisitions." Barclays Capital similarly wrote on May 11, 2017, "4Q17 results roughly in line against high expectations," as "SYMC reported 4Q17 non-GAAP revenue/EPS of $1,176M/$0.28 vs. Street's $1,181M/$0.28."

133.     Defendants and analysts also continued to credit Blue Coat and the new leadership of Defendants Clark and Noviello with Symantec's reported success. For example, on May 10, 2017, Defendant Clark specifically attributed the Company's revenue growth to the successful integration of Blue Coat: "***The industrial logic of combining Symantec and Blue Coat is proving out***, with Enterprise Security growing organically year over year and Blue Coat cloud subscription revenue growing 67%. . . . ***We are on-track to deliver long-term, sustainable growth and industry-leading profitability as the new Symantec***."

134.     On May 11, 2017, Cowen & Company similarly wrote that Blue Coat "finally provides [Symantec] with a legitimate network security presence, as well as stronger footing in the cloud. Moreover, we believe the influx of leadership talent at SYMC was much needed, and that CEO Greg Clark is a great fit."

135.     The market continued to focus throughout the Class Period on Symantec's GAAP and reported non-GAAP results as a measure of the Company's financial success, as well as the success of the Blue Coat acquisition and the leadership of Defendants Clark and Noviello. For example, on August 2, 2017, Symantec reported its Q1 2018 results on Form 8-K. In the accompanying press release, the Company promoted its GAAP revenue growth, stating, "Q1 GAAP revenue $1.175 billion, up 33% year over year." In the subsequently issued Quarterly

Report filed on Form 10-Q, the Company specifically attributed the revenue growth to Blue Coat's and LifeLock's contributions: "Revenue increased by 33%, driven by a 34% and 31% increase in revenue from our Enterprise Security and Consumer Digital Safety segments, respectively, primarily due to the acquisitions of Blue Coat, Inc. ('Blue Coat') and LifeLock, Inc. ('LifeLock')."

136.     On August 3, 2017, JPM Securities LLC echoed Defendants' remarks in a report entitled, "A Good Management Team in a Good Space":

> We maintain our Market Outperform rating on Symantec and raise our price target to $36 from $35 after the company reported strong F1Q18 results yesterday, including non-GAAP EPS of $0.33 (consensus $0.31) on revenue of $1.23B (consensus $1.20B), and guided above expectations for FY18 non-GAAP EPS and revenue – leaving the stock flat in the aftermarket. ***Both enterprise and consumer segments came in ahead of expectations as the integration of Symantec, Blue Coat, and LifeLock seems to be working and as the sales force restructuring went smoothly, in our opinion.***

137.     Barclays Capital similarly observed on August 3, 2017, "Revenue of ~$1.3B was ahead of our estimate by ~21M, with both consumer and enterprise exceeding our estimates."  In the same report, Barclays Capital wrote: "Management noted they remain ahead of schedule with the $580M of cost efficiencies from SYMC, Blue Coat and LifeLock, which helped drive the upside in the quarter and we think makes the margin ramp this year more linear than previously thought."

138.     On November 1, 2017, Symantec released its financial results for Q2 2018 on Form 8-K.  In the Company's press release, Defendants again focused on the Company's year-over-year GAAP revenue growth: "Q2 GAAP revenue $1.240 billion, up 27% year over year."  In the later-filed Form 10-Q, the Company again identified the Blue Coat and LifeLock acquisitions as the catalysts for the reported revenue growth: "Revenue increased by 27%, driven by a 20% and 37% increase in revenue from our Enterprise Security and Consumer Digital Safety segments, respectively, ***primarily due to the contributions from the acquisitions of Blue Coat, Inc. ('Blue Coat') and LifeLock, Inc. ('LifeLock'), respectively***."

139.     The next day, on November 2, 2017, Credit Suisse stated, "$0.40 non-GAAP EPS on $1.276bn revenue compares with $0.42/$1.276bn consensus," and "[o]n an adjusted basis,

1  FY18 guidance was essentially maintained, as was longer term mid-to-high single digit growth

2  targets for F18/19."

3      140.    On January 31, 2018, the Company announced its financial results for Q3 2018 on

4  Form 8-K, together with a press release.  As in previous quarters, the Company emphasized its

5  growing year-over-year GAAP revenue: "Q3 GAAP revenue $1.209 billion, up 16% year-over-

6  year."  Further, in detailing the financial highlights for the past nine months in the Company's

7  later-filed Quarterly Report, Defendants emphasized that "Revenue increased by 25% compared

8  to the corresponding period in the prior year, driven by a 15% and 38% increase in revenue from

9  our Enterprise Security and Consumer Digital Safety segments, respectively, primarily due to the

10  contributions from the acquisitions of Blue Coat and LifeLock."

11      141.    Evercore ISI further observed in a report dated February 1, 2018, that "non-GAAP

12  EPS saw outperformance in the quarter" and that the Company also saw "upside to non-GAAP

13  margins from further cost control."

14      **E.**    **Violations Of Symantec's Codes Of Conduct**

15      **1.**    **Symantec's Codes Of Conduct**

16      142.    Symantec's Code of Conduct, which was publicly available on Symantec's website

17  throughout the Class Period, further obligated Symantec employees to "accurately and completely

18  record any financial information related to Symantec's revenues and expenses."  The version of

19  the Code of Conduct posted on Symantec's website since July 29, 2017 stated:

20  SPEAK THE TRUTH

21  We do what we say we will do.  We speak the truth and are honest in our dealings.

22  FINANCE AND ACCOUNTING PRACTICES

23  As a publicly traded company, Symantec adheres to strict accounting PRINCIPLES
   and STANDARDS of financial reporting.  ***You must accurately and completely record***
24  ***any financial information related to Symantec's revenues and expenses.***  The Audit
   Committee is directly responsible for the appointment, compensation, and oversight of
25  the work of the Company's independent auditors and work cooperatively with the
   Company's independent auditors in their review of the Company's financial statements
26  and disclosure documents.  Violations of laws associated with accounting and financial
   reporting can damage Symantec's REPUTATION, and can also result in fines,
27  penalties, and even imprisonment.  You should promptly report to the Chief Financial
   Officer, General Counsel or the Audit Committee of the Board of Directors any conduct

28

that you believe to be a violation of law or business ethics or of any provision of this Code, including any transaction or relationship that reasonably could be expected to give rise to such a conflict.

143.     The Company's Code of Ethics (also known as the Financial Code of Ethics) for Symantec's CEO and senior financial officers, including the Company's principal financial officer and principal accounting officer, was also publicly available on the Symantec's website throughout the Class Period.  The Code of Ethics likewise obligated Symantec employees to, among other things: (i) "Communicate information in a manner that ensures full, fair, accurate, timely and understandable disclosure in reports and documents that Symantec files with, or submits to, government agencies and in other public communications"; and (ii) "Comply with applicable laws, rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies."

144.     Defendant Clark stated that "corporate responsibility goals have remained an *important part of our business success*, demonstrating our unique culture, our inspiring mission[.]"  The Company's website further provides that "*The very nature of our business* – assuring the security, availability, and integrity of our customers' information – *requires a global culture of responsibility.  Ethical conduct and integrity are the building blocks of Symantec's business success*."  In addition, the Company's website states that "[t]he reputation of Symantec is a valuable business asset, and ethical and legal conduct at all levels of our business is essential for our continued success."  Accordingly, the Company assures investors that "[e]mployees are required to complete ethics and compliance training and sign a statement acknowledging that they have received, read, and agree to abide by the Code.  Employees recertify their agreement to comply with Code provisions annually."

145.     Accordingly, Symantec's manipulation of its financial results violated Symantec's internal revenue recognition policy, and the SEC principles set forth in Section V(A)-(B) above, as well as the Company's Codes of Conduct.

1

2

### 2.    Widespread Code Of Conduct And Ethical Violations During The Class Period

3       146.    In its September 24, 2018 earnings release, the Company admitted to Code of

4   Conduct violations at Symantec: "The Audit Committee also reviewed certain allegations

5   concerning, and identified certain behavior inconsistent with, the Company's Code of Conduct

6   and related policies.  The Audit Committee referred these matters to the Company for, and the

7   Company intends to take, appropriate action."  Multiple former Symantec employees confirmed

8   that Blue Coat imposed additional unethical accounting practices at Symantec following the

9   acquisition.  For example, Symantec's former VP and CSO thought that Symantec was one of the

10  most ethical companies prior to Blue Coat, but after the acquisition, there was "a palpable feeling

11  of lessening of corporate ethics and our concern for the community at large."  Symantec became a

12  really uncomfortable place to work.  According to Symantec's former VP and CSO, Blue Coat

13  employees brought a "toxic culture" with them.

14      147.    Symantec's former VP and CSO explained that the Blue Coat executives (including

15  Defendants Clark and Noviello) were notorious for being "pretty freewheeling" with many of their

16  practices as a private company.  Blue Coat's processes were immature, and they were geared

17  toward maximizing the return of either an IPO or acquisition.  Blue Coat's processes were not

18  good for a company like Symantec.  Despite this, oftentimes leadership insisted that their Blue

19  Coat processes should be adopted going forward.

20      148.    Symantec's former Manager Bill and Collect-Finance similarly recounted that

21  he/she "frequently" saw Code of Conduct violations at Symantec, and more so in the years after

22  the Blue Coat acquisition.  The former Manager Bill and Collect-Finance stated that "Blue Coat

23  was definitely where things were swept under the rug, and you weren't allowed to ask questions,

24  particularly within the finance realm, and things weren't as clean as they should have been."

25      149.    Symantec's former Senior Manager, Pricing & Licensing, similarly stated that

26  he/she was fed up because the Company no longer had the level of honesty and integrity he/she

27  was used to after Blue Coat came in.  There was a conflict between legacy Symantec and Blue

28  Coat employees, who came in with completely different philosophies.  Symantec's former Senior

---

Manager, Pricing & Licensing, explained that Blue Coat acted as if it were a startup almost, and it did not have all the procedures and policies in place that a public company needs.  Once Blue Coat came in, they just started ousting people from the top down and it was "almost like a hostile takeover."  According to Symantec's former Senior Manager, Pricing & Licensing, Blue Coat was a tight knit, small company that had its own people and was not interested in learning best practices from Symantec.  It wanted to turn Symantec's culture into its culture.  As Symantec's former Senior Manager, Pricing & Licensing explained, after Blue Coat came in and the Blue Coat executives assumed leadership, Symantec's management practices absolutely lacked integrity and honesty. Moreover, it was common knowledge that if you raised accounting issues and disagreed with management, your job would be at risk.

### F.    The Individual Defendants Took Advantage Of Symantec's Inflated Stock Price To Sell Their Own Shares For Nearly $20 Million

150.    The Company's stated Insider Trading Policy "prohibits our directors, officers, employees and contractors from purchasing or selling Symantec securities while in possession of material, non-public information[,]" and "from short-selling Symantec stock or engaging in transactions involving Symantec-based derivative securities, including hedging transactions."

151.    In violation of Symantec's stated policy and the Exchange Act, Defendants Clark, Noviello, and Garfield unloaded their own shares for *nearly $20 million* in insider trades.  In total, during the Class Period: (i) Defendant Noviello made approximately *$12.89 million* in insider sales; (ii) Defendant Clark made approximately *$6 million* in insider sales; and (iii) Defendant Garfield made approximately *$873,657* in insider sales.  The sales made by each of the Individual Defendants are illustrated in the following chart:

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|
| NOVIELLO | 5/15/2017 | 27,741 | $32.45 | $900,154 |
| NOVIELLO | 7/12/2017 | 10,034 | $30.00 | $301,020 |
| NOVIELLO | 8/28/2017 | 14,925 | $30.00 | $447,750 |
| NOVIELLO | 9/7/2017 | 7,688 | $30.00 | $230,640 |
| NOVIELLO | 11/6/2017 | 375,000 | $29.38 | $11,018,400 |
| **Totals** | | **435,388** | | **$12,897,964** |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|
| CLARK | 8/28/2017 | 186,433 | $30.00 | $5,593,251 |
| CLARK | 8/31/2017 | 13,567 | $30.00 | $407,010 |
| **Totals** | | **200,000** | | **$6,000,261** |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|
| GARFIELD | 5/23/2017 | 18,069 | $29.39 | $531,032 |
| GARFIELD | 6/2/2017 | 11,397 | $30.06 | $342,626 |
| **Totals** | | **29,466** | | **$873,657** |

152.    These stock sales are suspicious in amount and in timing.  Indeed, as reflected in the graph below, during the prior period of similar length,[10] neither Defendant Clark nor Defendant Noviello sold <u>any</u> Symantec shares they owned or controlled.  Similarly, during the prior period of similar length, Defendant Garfield sold 20,947 shares for proceeds of $434,061, approximately 50% of his Class Period sales.

---

[10] Defendants Clark and Noviello joined Symantec in August 2016, and Defendant Garfield left Symantec in October 2017.  The "prior period" for each of the Defendants is thus limited to the days that they were at Symantec.

**Shares Sold by Defendants Clark, Garfield and Noviello**



153.    Defendants Clark and Noviello enacted some or all of their trades pursuant to Rule 10b5-1 trading plans that ***they adopted during the Class Period*** when they were already in possession of material, nonpublic information.  For example, Defendant Noviello adopted a new Rule 10b5-1 plan during the Class Period on September 13, 2017, shortly before his sale of 375,000 shares for over $11.018 million in gross proceeds on November 6, 2017.  His previous Rule 10b5-1 trading plan was adopted in March of 2017, thereby suggesting that Defendant Noviello took advantage of his knowledge of material non-public information and adopted a new plan to enact his November trades.  Additionally, Defendant Clark enacted his trades pursuant to a Rule 10b5-1 trading plan adopted on May 31, 2017, during the Class Period, and while in possession of material non-public information.

154.    Moreover, Defendant Clark's sales of Symantec securities were also suspicious in amount compared to his total holdings of Symantec common stock and exercisable Symantec options as the shares Clark sold represent approximately 5% of the shares that he held at the

beginning of the Class Period.[11]   Defendant Noviello's sales of Symantec securities were suspicious in amount compared to his total holdings of Symantec common stock and exercisable Symantec options, as the shares Noviello sold represent approximately 53.4% of the shares that he held during the Class Period.[12]   Defendant Garfield's sales of Symantec securities were suspicious in amount compared to his total holdings of Symantec common stock and exercisable Symantec options, because Garfield sold 100% of his shares immediately upon vesting.  Thus, Garfield never built up any holdings during the Class Period.

### G.      The Truth Is Revealed

155.    On May 10, 2018, after market hours, Symantec released its fiscal fourth quarter 2018 earnings.[13]   While both the Enterprise Security and Consumer Digital Safety segments' fourth quarter results exceeded the Company's guidance and analysts' expectations, the news was greatly overshadowed by Symantec's concurrent announcement that the Audit Committee of the Board of Directors had commenced an internal investigation due to concerns raised by a former employee and that it had voluntarily contacted the SEC.   Symantec also announced that it retained independent counsel and other advisors to assist it in its investigation and would provide additional information to the SEC as the investigation proceeded.   Given the investigation, the Company informed investors that its "financial results and guidance may be subject to change," and that it is "unlikely that the investigation will be completed in time for the Company to file its annual report . . . in a timely manner."

---

[11] In addition to the 200,000 shares that Defendant Clark sold during the Class Period, he forfeited shares to satisfy tax withholding requirements, and transferred shares off of the books and into various "independent trusts" purportedly for the benefit of family members.  Clark sold, forfeited or transferred a total of 1,771,990 shares during the Class Period, comprising 44.4% of the total amount of shares and exercisable options that Clark held at the beginning of the Class Period.

[12] Defendant Noviello also forfeited shares during the Class Period.  Noviello sold or forfeited a total of 530,083 shares during the Class Period, comprising 65% of the total amount of shares and exercisable options that Noviello held at the beginning of the Class Period.

[13] In announcing the Company's quarterly results, Symantec's practice throughout the Class Period was to issue a press release and Form 8-K and host an earnings call with analysts shortly after the market closed that day.  Within the next several days following the earnings press release, the Company issued its more detailed Quarterly Report on Form 10-Q.

156.   In the financial results for Q4 2018 filed after close on that same day, May 10, 2018, on Form 8-K, Symantec changed its description of "transition costs" in its "Explanation of Non-GAAP Measures and Other Items."   Defendants no longer described such transition costs as "continuing."   Instead, Symantec attempted to justify the removal of such transition costs in calculating the Company's adjusted operating income: "We exclude restructuring, transition and other costs from our non-GAAP results as we believe that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current operating performance."

157.   Later that same day, Symantec held an earnings call with investors to discuss its results for Q4 2018.   On the call, Defendants refused to comment on the internal investigation other than it "does not relate to any security concern or breach with respect to our products or systems."   Defendants announced that the Company would be reducing its guidance on expected revenue, operating margin and earnings per share for the next quarter and the entire fiscal year of 2019 well below the Company's prior estimates and analyst consensus.   Defendants blamed the continued shift to ratable sales in the Enterprise segment given the adoption of cloud solutions in favor of on-premise appliances.   After providing their prepared remarks, Defendants cancelled the question and answer session and refused to conduct follow-up calls with investors and analysts.

158.   Analysts were blindsided by the Company's revelation of the internal investigation and immediately began expressing doubt about the Company's reported historical results and management's fiscal year 2019 guidance.   Andrew J. Nowinski and James E. Fish, analysts at Piper Jaffray, for example, reported on May 10, 2018, that "[w]e believe this investigation creates too much uncertainty to have confidence in management's FY19 guidance, as this could affect historical results and future demand trends."   Jefferies analyst John DiFucci noted that "*it is difficult for us to accept the company's guidance at face value given the ongoing investigation and [the] lack of Q&A with management*," and added that "[w]hile we understand that a mix-shift is a headwind to reported revenue, *we continue to struggle to understand this as the singular explanation for Enterprise segment weakness*." (Emphasis in original).   In commenting on the Company's refusal to field analyst questions, Anne M. Meisner, an analyst at Susquehanna

Financial Group, LLLP, stated in a note to clients on May 11, 2018, "We believe this raises a red flag as it relates to the potential severity of this issue."  Analysts Gregg Moskowitz, Michael Romanelli and Matthew Broome at Cowen & Company remarked, "this is undoubtedly a serious matter, and it could be awhile before transparency and investor confidence improves."  Stephens analyst Jonathan Ruykhaver remarked, "We wonder if 1) something is fundamentally wrong with the Enterprise segment, or 2) guidance was dramatically haircut in case something comes of the internal investigation which would likely impact the Enterprise business instead of the Consumer business."

159.    On this news, Symantec stock declined on heavy trading over 33%, from $29.18 per share on May 10, 2018, to $19.52 per share on May 11, 2018, representing the worst day of trading in Symantec stock in almost 17 years and erasing roughly $6 billion of market capitalization.

160.    On May 14, 2018, in response to the dramatic drop in the price of its shares and demand for further transparency, Symantec released an updated statement regarding the Audit Committee's ongoing internal investigation.  The Company explained that the Audit Committee's internal investigation related to concerns raised by a former employee regarding the "[C]ompany's public disclosures, including commentary on historical financial results; its reporting of certain non-GAAP measures, including those that could impact executive compensation programs; certain forward-looking statements; stock trading plans; and retaliation."  While the Company also stated that it did not expect the investigation to have a "material adverse impact on its historical financial statements," Symantec again acknowledged that "[t]he [C]ompany's financial results and guidance may be subject to change."  Symantec also said nothing about the veracity of the Company's other statements that are the subject of the internal investigation, such as Symantec's public "commentary on historical financial results," the Company's purported "forward-looking statements," as well as matters pertaining to executive compensation programs.

161.    Shortly thereafter, Symantec hosted a conference call with investors to provide "more information" about the internal investigation and the Company's fiscal year 2019 financial guidance and fiscal year 2020 financial outlook.  But on the call, Defendant Clark did little more

than acknowledge the investigation.   Defendant Clark explained on the call that Company executives "can't answer any questions about the investigation," and instructed investors to read a prepared statement, issued before the call.

162.   Paulo Santos ("Santos"), an analyst and trading expert at Seeking Alpha, concluded that given the Company's disclosures, "[t]here's a good chance Symantec will find a level of exaggeration in the previously-used non-GAAP adjustments," including for recurring operating costs.[14]  Santos added:

> If Symantec finds that some non-GAAP adjustments were indeed not called for, their removal will still have consequences.  When you look at Symantec's earnings estimates, those are based on Symantec's non-GAAP reporting.  Were Symantec to remove some of those non-GAAP adjustments, and immediately it would start reporting lower non-GAAP earnings.  Even with no change to its historical financial statements and accounting practices. . . .  Symantec was always pretty expensive (for a stagnated business) when it came to GAAP measures, and only the non-GAAP adjustments made it look more reasonable.[15]

163.   Other analysts were in accord.  Anne Meisner of Susquehanna Financial Group, LLLP noted that "the potential for the investigation to conclude that non-GAAP numbers were presented inappropriately would not likely be favorable for the current executive team."  Similarly, in a note to clients, Greg Moskowitz of Cowen & Company warned clients that "we continue to have fundamental concerns," and to "avoid the shares."

164.   On May 16, 2018, *Probes Reporter*, which provides commentary and analysis on public company interactions with investors and with the SEC, reported that, contrary to the Company's statement that it had voluntarily contacted the SEC regarding the whistleblower's expressed concerns, the SEC was already investigating Symantec as early as April 17, 2018.  The *Probes Reporter* published a letter dated April 17, 2018, that it had received from the SEC in response to the *Probes Reporter*'s request for information concerning Symantec pursuant to the Freedom of Information Act.  In the letter, the SEC denied the request, explaining that it was

---

[14] Paulo Santos, *Symantec: Parsing the Details*, Seeking Alpha (May 15, 2018), *available at* https://seekingalpha.com/article/4174098-symantec-parsing-details.

[15] *Id.*

withholding the information requested under federal exemptions protecting from disclosure records compiled for law enforcement purposes the release of which could reasonably be expected to interfere with enforcement activities.  The *Probes Reporter* explained that this letter likely meant that the SEC had contacted Symantec and asked it to voluntarily produce certain information as part of an informal inquiry.[16]

165.    On May 31, 2018, Symantec announced that it had received a deficiency notice from NASDAQ stating that, as a result of failing to timely file its annual report on Form 10-K for the year ended March 30, 2018, Symantec was not in compliance with NASDAQ listing rules. The notice explained that Symantec had 60 calendar days from the date of the letter to submit a plan to regain compliance, and that if the plan was accepted by NASDAQ, Symantec would have until November 26, 2018 (*i.e.*, 180 days) to regain compliance.

166.    On May 31, 2018, Credit Suisse analyst Brad Zelnick issued a report summarizing opinions the firm had received from Ron Kiima, former assistant chief accountant for the SEC.  In the report, Mr. Kiima explained that following the May 10, 2018 announcement of the internal investigation, he had concerns about, among other things, Symantec's revenue recognition and M&A accounting.  Following the Company's May 14, 2018 embellishment, Mr. Kiima understood the investigation to concern the Company's non-GAAP adjustments, including those relating to restructuring, transition or other costs removed from Symantec's reported adjusted metrics.

167.    On August 2, 2018, Symantec released its Q1 fiscal year 2019 earnings and held a conference call with investors, announcing an expansion of the internal investigation and delivering another quarter of disappointing results.  As for the Audit Committee investigation, the Company said that the investigation was still "ongoing."   Defendants stated that while the Company did not anticipate a material adverse impact on its historical financial statements for Q3

---

[16] John P. Gavin, CFA, *Investors Are Right To Worry About Symantec: It Appears The SEC Has Been Investigating Since At Least April*, Probes Reporter (May 16, 2018), *available at* https://seekingalpha.com/article/4174685-investors-right-worry-symantec-appears-sec-investigating-since-least-april.

fiscal year 2018 and earlier, Q4 fiscal year 2018 and subsequent periods going forward remain open from an accounting perspective and are "subject to adjustment for material updates."

168.   Defendants stated that implied billings fell $110 million shy of management's expectations and declined by $203 million year-over-year, to $996 million, or nearly 20% lower. Enterprise implied billings also declined by $203 million year-over-year, to only $453 million (31% decline), while Consumer Safety implied billings were flat.  The Company attributed the billings miss to pipeline management issues isolated to North America that resulted in elongated deal closure rates.  The Company also announced that it intended to cut 8 percent of its global workforce (or 1,000 employees) to reduce costs.  The Company further issued reduced revenue and earnings guidance for its second fiscal quarter and 2019 fiscal year that fell short of analysts' expectations.  In particular, the Company said it expected revenue in the range of $4.64 billion to $4.76 billion in the fiscal year, which was lower than the median forecast of $4.84 billion among analysts.  It also said it expected earnings per share of 8 cents, compared to market forecasts of 17 cents.

169.   Analysts were "highly disappointed" by Symantec's reported results, questioned the veracity of the Company's justifications for the miss, and expressed a lack of confidence in management's guidance.  Analysts at William Blair, for example, stated, "We view the magnitude of the miss as troubling and another sign that the company is seeing deterioration in its core businesses . . . [and] are perplexed by the attribution of the miss largely to pipeline management, given the magnitude of the shortfall.  In our view, the company appears to be structurally challenged . . . .  In our view, the company needs to take more tangible steps to right the ship and provide more transparency on the challenges.  Our confidence level in the prediction of a return to growth in 2020 is not high."  Similarly, BTIG noted, "Mgmt. harped on the fact that a fuller, more integrated suite of products has led to longer sales cycles (specifically in the Americas) and that it's typical for most deals close in the last 3 weeks of the quarter. CEO Clark also mentioned on the call that numerous deals that had slipped in 1Q had since closed in 2Q.  We find these comments hard to reconcile with the lowering of FY19 guide after just one quarter."

170.    In an August 3, 2018 report, Willian Fitzsimmons of Morningstar Equity Research wrote that, after "scour[ing] Symantec's financial results for irregularities . . . investors should be aware of the two speculative theories that could have triggered the audit":

> [W]e've noticed an expansion in the spread between both GAAP and non-GAAP results.  It seems the restructuring line item of its income statement has increased, and it could be in the realm of possibility that management may have inflated restructuring expenses, by placing expenses that would have typically been regular operating expenses into this line item.  Whether an expense falls in the restructuring line item versus regular operating expense (S&M, R&D, or G&A) has no bearing on GAAP profitability, but when calculating non-GAAP Net Income, restructuring expenses are added back into the results.  Thus, it is within the realm of possibility that management inflated the restructuring line item to produce a better-looking non-GAAP EPS metric, allowing the firm to hit stock-based compensation targets.

171.    In response to these disclosures, Symantec stock declined nearly 8%, from $20.88 per share on August 2, 2018, to $19.25 per share on August 3, 2018, erasing roughly $1 billion of market capitalization.

## H.    **The Aftermath**

172.    On August 10, 2018, NASDAQ issued another notice stating that, as a result of not having timely filed its quarterly report on Form 10-Q for the quarterly period ended June 29, 2018, Symantec was not in compliance with NASDAQ Listing Rule 5250(c)(1).  In response, Symantec submitted a plan to the NASDAQ Staff and NASDAQ granted Symantec until November 26, 2018, to regain compliance.

173.    On September 24, 2018, Symantec announced that its Audit Committee, independent legal counsel, and a forensic accounting firm, had concluded their internal investigation into Symantec's improper accounting.  The announcement was carefully worded but disclosed numerous facts confirming Defendants' accounting misconduct.

174.    First, the Company admitted to internal control deficiencies, characterizing the controls as "relatively weak and informal processes" with respect to some aspects of the review, approval and tracking of transition and transformation expenses.

175.    Second, the Company admitted that it had identified certain behavior inconsistent with the Company's Code of Conduct and related policies, that these matters had been referred to the Company, and that the Company intended to take appropriate action.

176.   Third, the Company stated that in addition to the matters announced in May 2018, the Audit Committee had reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018, when $12 million of the $13 million should be deferred.  Accordingly, Symantec admitted that it must revise the financial results it disclosed on both May 10, 2018, and August 2, 2018, to take into account this deferral and any other financial adjustments required as a result of this revision.

177.   Fourth, the Company disclosed that over a year ago, in the quarter ending September 29, 2017, "the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures."

178.   Fifth, Symantec announced that it would be making structural changes to its internal management.  While no terminations of senior Symantec executives have been recommended as a result of the investigation, Symantec announced that it will appoint a separate CAO, appoint a separate Chief Compliance Officer reporting to the Audit Committee, and adopt enhanced internal controls.

179.   Sixth, Symantec stated that it intended to belatedly file its annual financial report on or before October 27, 2018 – approximately five months late.

180.   Finally, the Company disclosed that the SEC had commenced a formal investigation into Symantec's accounting.

181.   On October 26, 2018, Symantec filed its Annual Report for 2018 on Form 10-K. The Annual Report disclosed that in October 2017, the Company's Compensation Committee adjusted the executives' non-GAAP operating income and non-GAAP revenue targets downward from $1.857 billion and $5.210 billion, respectively, to $1.707 billion, and $5.007 billion, respectively.  Despite these significant downward adjustments, the Company admitted that it did not achieve the incremental threshold levels set for the non-GAAP operating income and non-GAAP revenue under the fiscal year 2018 Executive Annual Incentive Plan.  Accordingly, no cash payouts were made to Symantec's named executive officers under the payout formula for the fiscal year 2018 Executive Annual Incentive Plan.

182.    Moreover, the Annual Report disclosed that Defendants Clark and Noviello, and other members of the executive management, had "elected to forego" equity awards and salary increase for fiscal year 2019:

> Subsequent to the announcement of fiscal 2018 performance results, fiscal 2019 guidance, and the Audit Committee Investigation, Symantec's stockholders experienced a substantial decline in the Company's stock price. In this context, Mr. Clark, in consultation with the Compensation Committee, elected to forego a fiscal 2019 equity award. Mr. Clark also determined, in consultation with the Compensation Committee, that none of the Company's NEOs [Named Executive Officers] would receive a base salary increase for fiscal 2019.

183.    Nevertheless, Defendants received windfall equity incentive awards due to manipulating financial results to hit targets in the plan. The fiscal year 2017 PRUs were funded at 268.2% of a target, based on fiscal year 2018 adjusted non-GAAP operating income results that were ahead of the original goals and delivered achievement of 109.29% of target. In particular, the fiscal year 2018 non-GAAP operating income target under the fiscal year 2017 PRUs was $1.56 billion, and the Company achieved $1.705 billion in adjusted non-GAAP operating income in fiscal year 2018, resulting in the achievement of 109.29% of target, with funding at 268.2% of target, 250% of which was earned and vested at the end of fiscal year 2018. As a result, Defendants Clark and Noviello received nearly $52.1 million in performance-based equity awards at the end of fiscal 2018 and will receive a total of 219,209 additional shares of Symantec at the end of fiscal 2019 with a value at grant date (June 29, 2016) of nearly $3.8 million as a result of Symantec exceeding its fiscal 2018 adjusted non-GAAP operating income target.

184.    Moreover, the fiscal year 2018 PRUs were structured so that 50% of the awards were eligible to be earned based on fiscal year 2018 adjusted EPS ("FY2018 Year One Shares"). The Company achieved adjusted EPS of $1.56 per share, or 95.2% of this metric, resulting in the threshold level having been achieved and 50.5% of the FY2018 Year One Shares (25.25% of the total FY18 PRUs) becoming eligible to be earned at the end of fiscal year 2020. Accordingly, Clark and Noviello are eligible to receive 125,793 Symantec shares with a value at grant date (June 9, 2017) of more than $4.3 million at the end of fiscal 2020.

185.     In the aftermath of the Company's announcement of the investigation, several high-level Symantec executives with significant roles in the Blue Coat and LifeLock integration efforts have departed the Company.  These departures include: (1) Francis C. Rosch, Symantec's former Executive Vice President for Consumer Digital Safety, who was principally responsible for managing the integration of LifeLock into Symantec's Consumer Digital Safety business segment and achieving the Company's project cost savings synergies; (2) Joe McPhillips, the Company's former Director of Channel Sales for Symantec's Pacific region and who came over from Blue Coat; and (3) Brian Kenyon, the former Chief Strategy Officer who had served in that role since August 2016 since coming over through acquisition of Blue Coat.

## VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

186.     Throughout the Class Period, Defendants Symantec Corporation, Gregory S. Clark, Nicholas R. Noviello, and Mark S. Garfield made false and misleading statements in which they misrepresented or omitted material facts concerning Symantec's financial and operating results, including in (a) presentations and commentary on Symantec's historical financial results; (b) statements of adjusted measures; (c) affirmations of effective internal controls for financial reporting; and (d) certifications pursuant to SOX attesting to the accuracy of Symantec's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

### A.     Fourth Quarter Fiscal Year 2017 And Fiscal Year 2017

187.     On May 10, 2017, after market hours, the Company filed with the SEC its quarterly report for the fourth quarter and fiscal year ended March 31, 2017, on Form 8-K.  On May 19, 2017, Symantec filed with the SEC its Annual Report on Form 10-K signed by Defendants Clark, Noviello, and Garfield.  As set forth below, the 4Q2017 Form 8-K and the 2017 Form 10-K contained materially false and misleading statements about (i) reported revenue; (ii) adjusted GAAP metrics for revenue, expenses and operating income; and (iii) effective internal controls for financial reporting.

1

### 1.   Improper Recognition Of Revenue

2      188.    In its Forms 8-K and 10-K, Symantec reported quarterly GAAP revenue of $1.115

3 billion and fiscal year 2017 GAAP revenue of $4.019 billion.  On the Company's Consolidated

4 Balance Sheet, the Company reported a deferred revenue balance of $2.353 billion as of March 31,

5 2017.

6      189.    In the section of the 2017 Form 10-K entitled "Notes to the Consolidated Financial

7 Statements," Defendants affirmed, "The accompanying consolidated financial statements of

8 Symantec and our wholly-owned subsidiaries are prepared in conformity with generally accepted

9 accounting principles in the United States ('U.S. GAAP')."  Defendants also set forth the

10 Company's policy for revenue recognition, which provides, among other things, "We recognize

11 revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed

12 or determinable, and collectability is probable."

13      190.    Defendants' statements regarding the Company's reported revenue, deferred

14 revenue, and compliance with GAAP and its internal revenue recognition policy, as set forth above

15 in ¶¶188-89, were false and misleading and omitted material facts.  Throughout the Class Period,

16 Symantec improperly recognized revenue in violation of GAAP.  Section V(A)-(B).  Contrary to

17 GAAP, Symantec recognized revenue on sales at period-end that did not have a signed contract,

18 did not go through required approval channels, contained unapproved extended terms, or where

19 the customer was unable or unwilling to pay.  Defendants also improperly accelerated the

20 recognition of deferred revenue when such revenue had not met the criteria for revenue recognition

21 under GAAP.  Consequently, Symantec's reported fourth quarter fiscal year 2017 and fiscal year

22 2017 GAAP revenue in the Company's Forms 8-K and 10-K were overstated, the Company's

23 reported deferred revenue for those same periods was understated, the Company's 2017 Form 10-

24 K was not prepared in accordance with GAAP, and the Company was not complying with its

25 internal revenue recognition policy.

26

27

28

1

2. **Manipulating Adjustments Of GAAP**
   **Measures To Non-GAAP Measures**

2

3        191.    In the Company's 4Q2017 Form 8-K, Defendants supplemented Symantec's

4   reported GAAP financial results with a presentation of Symantec's adjusted financial measures.

5   Symantec reported non-GAAP revenue for Q4 2017 of $1.176 billion and $4.163 billion for fiscal

6   year 2017.  The Company also reported non-GAAP operating income for Q4 2017 of $314 million

7   and $1.194 billion for fiscal year 2017.

8        192.    In the Company's 4Q2017 Form 8-K and 2017 Form 10-K, Defendants presented

9   the Company's Condensed Consolidated Statements of Operations, wherein the Company reported

10  "Restructuring, separation, transition, and other" expenses for Q4 2017 of $72 million, and $273

11  million for the entire fiscal year.  In Note 4 to the Consolidated Financial Statements in the 2017

12  Form 10-K, the Company provided further information regarding the nature of this line item

13  expense, including a description of the type of costs that the Company recorded as "transition

14  costs," and represented that the Company had incurred $94 million in so-called transition costs for

15  fiscal year 2017:

16      Note 4.  Restructuring, Separation, Transition, and Other Costs

17      . . . Transition costs primarily consist of consulting charges associated with the
        implementation of new enterprise resource planning systems and costs to automate
18      business processes.

19                                              . . .

20      We incurred $94 million in continuing operations transition expense during fiscal
        2017.
21

22       193.    In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP

23  Measures," the Company explained how its adjusted financial measures for Q4 2017 and fiscal

24  year 2017 were derived, including Symantec's adjusted operating expenses and operating income.

25  With respect to the Company's adjusted operating expenses, the "Reconciliation of Selected

26  GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, separation,

27  transition, and other," removing operating expenses of $72 million for Q4 2017 and $273 million

28  for fiscal year 2017.

194.    In the "Explanation of Non-GAAP Measures and Other Items" attached as Appendix A to the 4Q2017 Form 8-K, Defendants explained their reasoning for making the "Restructuring, separation, transition and other" adjustment, stating that the Company removed this expense because these costs, including the Company's transition costs, were purportedly "discrete events" and costs not incurred in the "ordinary course of business":

> Restructuring, separation, transition and other: We have engaged in various restructuring, separation, transition, and other activities over the past several years that have resulted in costs associated with severance, facilities, transition, and other related costs. . . . Transition and associated costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes. . . . ***Each restructuring, separation, transition, and other activity has been a discrete event based on a unique set of business objectives or circumstances, and each has differed from the others in terms of its operational implementation, business impact and scope. We do not engage in restructuring, separation, transition, or other activities in the ordinary course of business***.

195.    Defendants used its adjusted measures to inform investors about Symantec's financial condition.  For example, on May 10, 2017, Defendants held a quarterly earnings call, during which Defendant Clark emphasized the Company's "strong" financial performance and outlook, highlighting the Company's adjusted revenue and operating margins:

> Enterprise Security profitability has improved dramatically with Q4 fiscal year 2017 operating margins up 17 points year-over-year.  Consumer Security revenue growth performed better than our guidance and LifeLock came in above our revenue expectations as well.  Overall, we continue to perform ahead of plan on our cost efficiencies and synergies.  Total company margins were at the high end of our guidance.  And as a result, we delivered EPS at the high end of our guidance, including LifeLock.
>
> . . .
>
> Consumer Security exceeded the high end of our revenue guidance on an organic basis and LifeLock performed above revenue expectations with strong underlying growth metrics.  LifeLock renewal rates increased year-over-year and cumulative ending numbers were up 8% year-over-year.  This is an impressive result amidst the significant acquisition and integration activity.

196.    Similarly, Defendant Noviello also emphasized the Company's adjusted operating margin on the call, representing the increasing margin was the product of the Company's execution on its cost-savings initiatives and synergies:

Our fourth quarter non-GAAP revenue was $1.176 billion[.]

. . .

Non-GAAP operating margin for the fourth quarter was 27%. . . .  Operationally, our strong non-GAAP operating margin was driven by continued execution against our cost-savings initiatives and synergies.

Fully diluted non-GAAP earnings per share was $0.28 . . . .  Excluding LifeLock, fully diluted non-GAAP earnings per share was $0.29, at the high end of our $0.27 to $0.29 guidance range.

. . .

Enterprise non-GAAP operating margin was 16%, up 17 points year-over-year.

. . .

Our Consumer Security segment non-GAAP . . . operating margin was 42%.

. . .

Including LifeLock, non-GAAP operating margin remained at 29%.  Non-GAAP EPS was $1.18, including a $0.01 headwind from LifeLock, which is an increase of 15% year-over-year and above our original guidance of $1.06 to $1.10 provided in May 2016.

197.    Defendants' presentation and commentary regarding Symantec's reported adjusted measures, including the Company's net revenues and operating expenses, and statements regarding the Company's "Restructuring, separation, transition, and other" expenses and "transition costs" as set forth above in ¶¶191-96, were false and misleading and omitted material facts.

(a)    As described above, throughout the Class Period, Defendants improperly recognized revenue.  Section V(A)-(B).  Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy.  Consequently, Symantec's reported fourth quarter fiscal year 2017 and fiscal year 2017 adjusted revenue in the Company's Form 8-K was overstated.

(b)    Defendants overstated Symantec's adjusted operating income.   Section V(B).  Defendants recorded General and Administrative costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Separation, Transition, and

Other Costs" line item.  The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket. Moreover, by virtue of the "Restructuring, separation, transition and other" adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business.  Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, separation, transition and other" line item expenses were misstated. Moreover, Defendants' reported adjusted operating income for Q4 2017 and for fiscal year 2017, as well as other reported adjusted metrics dependent on these figures, such as operating margin and EPS, as set forth in the Company's 4Q2017 Form 8-K and Defendants' commentary, were also misstated.

198.    Securities analysts reacted positively to Symantec's apparent success in meeting or exceeding its non-GAAP earnings estimates.  For example, analysts at Evercore ISI highlighted the Company's "Non-GAAP operating margin of ~36-37%" and management's "Continued success with cost reductions."  Similarly, analysts at Piper Jaffray noted, "The company is clearly making progress in both the Enterprise and Consumer segments, with Blue Coat and LifeLock both performing in-line with expectations."  Further, Joseph Bonner of Argus observed, "Fourth-quarter non-GAAP revenue rose 35% year-over-year to $1.176 billion, well above the high end of management guidance range and the consensus estimate of $1.080 billion."

### 3.    False Internal Controls And SOX Certifications

199.    In the section of the 2017 Form 10-K titled, "Controls and Procedures," Defendants affirmed that Defendants had evaluated Symantec's internal control over financial reporting, that the Company's internal control over financial reporting was effective, and that there were no changes in the Company's internal control over financial reporting during the quarter ended March 31, 2017, that materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

200.    In addition, the 2017 Form 10-K contained certifications pursuant to SOX Sections 302 and 906 signed by Defendants Clark and Noviello attesting to the accuracy of financial reporting, the disclosure of material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

201.    Defendants' statements regarding the Company's internal control over financial reporting and in their SOX certifications were false and misleading.   In truth, Defendants maintained ineffective internal controls over financial reporting, including for the recognition of revenue and review, approval and tracking of transition and transformation expenses.  In addition, contrary to their SOX certifications, Defendants knew that the 2017 Form 10-K contained untrue statements of material fact and that the financial statements and other financial information included in the 2017 Form 10-K did not fairly present in all material respects the financial condition, results of operations and cash flows of Symantec for fiscal year 2017.   Moreover, Defendants failed to disclose all significant deficiencies and material weaknesses in the design and operation of Symantec's internal control over financial reporting likely to adversely affect Symantec ability to record, process, summarize and report financial information, as well as the financial fraud that Defendants and other employees with significant roles in Symantec's internal control over financial reporting were committing.

**B.    First Quarter Fiscal Year 2018 Results**

202.    On August 2, 2017, Symantec filed with the SEC its financial results for the first quarter fiscal year 2018 for the period ending June 30, 2017, and supplemental financial information and commentary by Defendant Noviello on Form 8-K.  On August 4, 2017, Symantec filed with the SEC its quarterly report for the first quarter fiscal year 2018 for the period ending on June 30, 2017, on Form 10-Q, which was signed by Defendants Clark and Noviello.  As set forth below, the 1Q2018 Form 8-K and 1Q2018 Form 10-Q contained materially false and misleading statements about (i) reported revenue; (ii) adjusted revenue, operating expenses and operating income; and (iii) effective internal controls for financial reporting.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.   Improper Recognition Of GAAP Revenue

203.    In the 1Q2018 Form 8-K and 1Q2018 Form 10-Q, Symantec reported quarterly GAAP revenue of $1.175 billion.  On the Company's Condensed Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.329 billion as of June 30, 2017.

204.    In the section of the 1Q2018 Form 10-Q titled, "Notes to Condensed Consolidated Financial Statements," Symantec affirmed that its financial statements were prepared in accordance with GAAP.  Likewise, in the section entitled "Critical Accounting Policies And Estimates," Defendants confirmed Symantec's adherence to its stated revenue recognition policies by affirming there "have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements during the three months ended June 30, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017."

205.    Defendants' statements regarding the Company's reported revenue, deferred revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above in ¶¶203-04, were false and misleading and omitted material facts.  Throughout the Class Period, Symantec improperly recognized revenue in violation of GAAP.  Section V(A)-(B).  Contrary to GAAP, Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP.  Consequently, Symantec's reported first quarter fiscal year 2018 GAAP revenue in the Company's Forms 8-K and 10-Q was overstated, the Company's reported deferred revenue for those same periods was understated, the Company's 1Q2018 Form 10-Q was not prepared in accordance with GAAP, and the Company was not complying with its internal revenue recognition policy.

2.      **Manipulating Adjustments Of**
        **GAAP Measures To Non-GAAP Measures**

206.    In the Company's 1Q2018 Form 8-K, Defendants supplemented Symantec's reported GAAP financial results with a presentation of Symantec's adjusted financial measures. The Company reported non-GAAP revenue for Q1 2018 of $1.228 billion and non-GAAP operating income (also referred to as net income) of $221 million.

207.    In the Company's 1Q2018 Form 8-K and 1Q2018 Form 10-Q, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the Company reported "Restructuring, transition, and other" expenses for the first quarter of fiscal year 2018 of $88 million.  In Note 4 to the Consolidated Financial Statements in the 1Q2018 Form 10-Q, the Company provided further information on the nature of this line item expense, including a description of the type of costs that the Company recorded as "Transition Costs," and represented that it had incurred $28 million in transition costs over the first quarter fiscal year 2018:

> Note 4.  Restructuring, Transition and Other Costs
>
> . . . Transition costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes.
>
> [W]e expect continuing significant transition costs associated with the implementation of a new enterprise resource planning system and costs to automate business processes.
>
> Restructuring, transition and other costs summary
>
> For the three months ended June 30, 2017 we incurred the following restructuring, transition and other costs:

| (In millions) | June 30, 2017 | |
|---|---|---|
| Severance and termination costs | $ | 27 |
| Other exit and disposal costs | | 32 |
| Asset write-offs | | 1 |
| Transition costs | | 28 |
| Total restructuring, transition and other | $ | 88 |

208.    In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," the Company explained how its adjusted measures for Q1 2018 were derived, including the Company's adjusted operating expenses and operating income.   As for the Company's adjusted expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, transition and other," removing operating expenses of $88 million for Q1 2018.

209.    In the "Explanation of Non-GAAP Measures and Other Items," attached as Appendix A to the 1Q2018 Form 8-K, Defendants explained their reasoning for making the "Restructuring, transition and other" adjustment, stating that the Company removed this expense because these costs, including its transition costs, were purportedly "discrete events" and costs not incurred in the "ordinary course of business":

> Restructuring, transition and other:  We have engaged in various restructuring, transition and other activities over the past several years that have resulted in costs associated with severance, facilities, transition, and other related costs. Transition and associated costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes. . . . ***Each restructuring, transition and other activity has been a discrete event based on a unique set of business objectives or circumstances, and each has differed from the others in terms of its operational implementation, business impact and scope. We do not engage in restructuring, transition or other activities in the ordinary course of business***.

210.    Defendants used these adjusted measures to inform investors about Symantec's financial condition.  On August 2, 2017, Defendants held a quarterly earnings call during which Defendant Noviello made the following statements regarding the Company's first quarter fiscal year 2018 financial results, promoting the Company's adjusted operating margin and EPS:

> Operating margin for the first quarter was 31%, above our guided range of 27% to 29%, driven by top line outperformance and continued execution against our cost savings initiatives and synergies.  We remain ahead of schedule to achieve our expected net cost efficiencies as well as our expected Blue Coat and LifeLock cost synergies, which gives us further confidence around our guidance and the significant increase in operating margins we expect this year. . . .  Fully diluted earnings per share was $0.33, above our $0.28 to $0.32 guidance range.

> Enterprise Security operating margin was 17%, up 11 points year-over-year, driven by our cost savings initiatives.

Q1 FY '18 Consumer Digital Safety operating margin was 47%, driven in part by
top line growth and the faster realization of LifeLock synergies.

211.    Defendants' presentation and commentary regarding Symantec's reported
non-GAAP financial measures, including the Company's non-GAAP net revenues and non-GAAP
operating expenses, and statements regarding the Company's "Restructuring, transition, and other"
expenses and "transition costs" as set forth above in ¶¶206-10 were false and misleading and
omitted material facts.

(a)    As described above, throughout the Class Period, Defendants improperly
recognized revenue.  Section V(A)-(B).  Symantec recognized revenue on sales at period-end that
did not have a signed contract, did not go through required approval channels, contained
unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants
also improperly accelerated the recognition of deferred revenue when such revenue had not met
the criteria for revenue recognition under the Company's internal revenue recognition policy.
Consequently, Symantec's reported first quarter fiscal year 2018 adjusted revenue in the
Company's Form 8-K was overstated.

(b)    Defendants overstated Symantec's adjusted operating income.   Section V(B).
Defendants recorded General and Administrative costs and other non-transition activity expenses
as transition related costs and reported them under the "Restructuring, Transition and Other Costs"
line item.  The Company routinely characterized enterprise resource projects that would normally
be put through as operational run projects into the transformational cost bucket.  Moreover, by
virtue of the "Restructuring, transition and other" adjustment, Defendants removed the entirety of
the Company's transition costs from the Company's adjusted operating expenses, despite the fact
that this line item consisted of continuing and recurring operating expenses incurred in the ordinary
course of business.  Consequently, Defendants' description of Symantec's transition costs was
misleading and the Company's reported transition costs and the "Restructuring, separation,
transition and other" line item expenses were misstated.  Moreover, Defendants' reported adjusted
operating income for Q1 2018, as well as other reported adjusted metrics dependent on this figure,

such as operating margin and EPS, as set forth in the Company's 1Q2018 Form 8-K and Defendants' commentary, were also misstated.

212.    Analysts responded positively to Symantec's "strong" first quarter non-GAAP financial results, which exceeded the Company's guidance.  For example, analysts at Barclays Capital noted, "1Q revenue ahead of expectations on broad strength.  Revenue of ~$1.3B was ahead of our estimate by ~$21M, with both consumer and enterprise exceeding our estimates. . . . EPS also beat expectations as SYMC remains ahead of plan on cost synergies.  EPS of $0.33 was $0.02 ahead of us and the Street, as operating margin was nearly 300 bps above our forecast." BTIG remarked, "we're finally on the cusp of growth.  FY1Q saw growth in both segments with improved profitability.  Encouragingly, FY18 should mark the year that Symantec metaphorically pours more fuel on the fire, and firmly accelerates into a new reality of revenue and profitability expansion.  We continue to have confidence that this management team can execute and meet and likely exceed street expectations going forward.  Maintain Buy."

### 3.    False Internal Controls And SOX Certifications

213.    In the section of the 1Q2018 Form 10-Q titled, "Controls and Procedures," Defendants affirmed that Defendants had evaluated Symantec's internal control over financial reporting, that the Company's internal control over financial reporting was effective, and that there were no changes in the Company's internal control over financial reporting during the quarter ended June 30, 2017, that materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

214.    In addition, the 1Q2018 Form 10-Q contained certifications pursuant to SOX Sections 302 and 906 signed by Defendants Clark and Noviello attesting to the accuracy of financial reporting, the disclosure of material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

215.    Defendants' statements regarding the Company's internal control over financial reporting and in their SOX certifications were false and misleading.   In truth, Defendants maintained ineffective internal controls over financial reporting, including for the recognition of revenue and review, approval and tracking of transition and transformation expenses.  In addition,

contrary to their SOX certifications, Defendants knew that the 1Q2018 Form 10-Q contained untrue statements of material fact and that the financial statements and other financial information included in the 1Q2018 Form 10-Q did not fairly present in all material respects the financial condition, results of operations and cash flows of Symantec for the first quarter fiscal year 2018. Moreover, Defendants failed to disclose all significant deficiencies and material weaknesses in the design and operation of Symantec's internal control over financial reporting likely to adversely affect Symantec's ability to record, process, summarize and report financial information, as well as the financial fraud that Defendants and other employees with significant roles in Symantec's internal control over financial reporting were committing.

### C.      August 8, 2017 Item 5.02 On Form 8-K

216.    On August 8, 2017, Symantec filed Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers with the SEC on Form 8-K, announcing that Defendant Garfield, its Senior Vice President and CAO, resigned from his position effective August 7, 2017.  The Company stated, "Mr. Garfield has agreed to continue to serve in an advisory capacity with the Company through October 2017. ***Mr. Garfield[']s decision to leave the Company was not due to any disagreement relating to the Company[']s management, policies, or practices.***  Nicholas R. Noviello, the Company[']s Executive Vice President and Chief Financial Officer, assumed the responsibilities of Principal Accounting Officer effective August 7, 2017."

217.    Defendants' statements in the Form 8-K filed on August 8, 2017, were false and misleading and omitted material facts.  Mr. Garfield's decision to leave the Company was due to his disagreement relating to the Company's accounting policies and practices.  Such policies and practices directly impacted the Company's public disclosures, including commentary on historical financial results, its reporting of adjusted measures, including those that could impact executive compensation programs, certain forward-looking statements, stock trading plans and retaliation. Notably, the Company did not include the same explanation – that the departure "was not due to any disagreement relating to the Company[']s management, policies, or practices" – in the announcement of other executive departures.

D. **August 16, 2017 Proxy Statement**

218.    On August 16, 2017, the Company filed a Schedule 14A with the SEC ("2017 Proxy Statement"), which set forth the Company's executive compensation practices and philosophy. The 2017 Proxy Statement stated that the Company's executive compensation programs provided "direct alignment with stockholders" and that the Company uses "responsible pay policies to reinforce strong governance and enhance shareholder alignment."   The 2017 Proxy Statement discussion of executive compensation states, in relevant part:

**OUR EXECUTIVE COMPENSATION PHILOSOPHY AND PRACTICES**

The overriding principle driving our compensation programs continues to be our belief that it benefits our employees, customers, partners and stockholders to have management's compensation tied to our near- and long-term performance. Our pay programs reward achievement of challenging performance goals that align with our business strategy.  We measure shorter-term results, though the majority emphasis is placed on long-term equity compensation that provides direct alignment with stockholders.  We use responsible pay policies to reinforce strong governance and enhance stockholder alignment.

| Base Salary | Annual Incentives | Long-Term Incentives |
|---|---|---|
| • Aligned with role, contributions, and competitive market practice <br> • Supports attraction and retention of talent | • 50% Revenue (non-GAAP) <br> • Encourages overall company growth, a key shareholder value driver | • 70% Performance Units (PRUs)* <br> • Special 1-time design that reinforces the multi-year business transformation and aligns to stockholder value generation* <br> • Measures Operating Income (non-GAAP) at the end of fiscal 2018 to assess achievement of growth and cost reduction goals |
| **Pay Policies** | 50% Operating Income (non-GAAP) <br> • Provides a strong focus on cost control, aligns with shareholder value growth | • 30% time-vested restricted stock units (RSUs) <br> • Promotes retention and shareholder alignment |
| • Ownership guidelines <br> • No hedging/pledging <br> • Clawback policy <br> • Double-trigger equity | | |

219.    The 2017 Proxy Statement also stated, "Fiscal 2017 Performance.  Our non-GAAP operating income was 105% of the targeted performance level, and our non-GAAP revenue was 100% of the targeted performance level."   The 2017 Proxy Statement further stated "Incentive Award Outcome.  Our non-GAAP operating income metric funded at 125.8% of target and non-GAAP revenue funded at 100% of target.  The approved funding level was 111.5% of target, slightly below the formulaic payout."

220.    Defendants' statements regarding the Company's Executive Compensation programs, as set forth above in ¶¶218-19 were false and misleading and omitted material facts. Defendants inflated the Company's adjusted revenues and operating income through improper accounting practices and deceptive adjustments, allowing Defendants to meet their annual incentive targets.  Consequently, the Company's executive compensation program was not tied to the Company's actual near- and long-term performance, was not aligned with shareholder interests, and was not a responsible pay policy to reinforce strong governance and enhance stockholder alignment.  Moreover, contrary to Defendants' representations, the Company had not in fact achieved the stated adjusted revenue and operating income targets.

**E.      Second Quarter Fiscal Year 2018 Results**

221.    On November 1, 2017, Symantec filed with the SEC its financial results for the second quarter fiscal year 2018 for the period ending September 29, 2017, and supplemental financial information and commentary by Defendant Noviello on Form 8-K.  On November 3, 2017, Symantec filed with the SEC its Quarterly Report for the second quarter fiscal year 2018 on Form 10-Q for the period ending September 29, 2017, which was signed by Defendants Clark and Noviello.  As set forth below, the 2Q2018 Form 8-K and 2Q2018 Form 10-Q contained materially false and misleading statements about (i) reported revenue; (ii) adjusted revenue, operating expenses and operating income; and (iii) effective internal controls for financial reporting.

**1.      Improper Recognition Of GAAP Revenue**

222.    In the 2Q2018 Form 8-K and 2Q2018 Form 10-Q, Symantec reported quarterly GAAP revenue of $1.240 billion.  On the Company's Condensed Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.041 billion as of September 29, 2017.

223.    In the section of the 2Q2018 Form 10-Q titled, "Notes to Condensed Consolidated Financial Statements," Symantec affirmed that its financial statements were prepared in accordance with GAAP.  Likewise, in the section entitled "Critical Accounting Policies And Estimates," Defendants confirmed Symantec's adherence to its stated revenue recognition policies by affirming there "have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements

during the six months ended September 29, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017."

224.    Defendants' statements regarding the Company's reported revenue, deferred revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above in ¶¶222-23, were false and misleading and omitted material facts.  Throughout the Class Period, Symantec improperly recognized revenue in violation of GAAP.  Section V(A)-(B).  Contrary to GAAP, Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP.  Consequently, Symantec's reported second quarter fiscal year 2018 GAAP revenue in the Company's Forms 8-K and 10-Q were overstated, the Company's reported deferred revenue for the same period was understated, the Company's 2Q2018 Form 10-Q was not prepared in accordance with GAAP, and the Company was not complying with its stated revenue recognition policy.

### 2.    Manipulating Adjustments Of GAAP Measures To Non-GAAP Measures

225.    In the 2Q2018 Form 8-K, the Company supplemented its reported GAAP financial results with a presentation of Symantec's adjusted financial measures.  The Company reported non-GAAP revenue for Q2 2018 of $1.276 billion and non-GAAP operating income of $435 million.

226.    In the Company's 2Q2018 Form 8-K and 2Q2018 Form 10-Q, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the Company reported "Restructuring, transition and other" expenses for the second quarter of fiscal year 2018 of $97 million.  In Note 4 to the Consolidated Financial Statements in the 2Q2018 Form 10-Q, the Company provided further information on the nature of this line item expense, including a description of the type of costs that the Company deems "Transition Costs," and represented that

it had incurred a quarterly expense of $76 million in transition costs and $120 million over the past two quarters:

Note 4.  Restructuring, Transition and Other Costs

Our restructuring, transition and other costs and liabilities consist primarily of severance, facilities, transition and other related costs. . ... Transition costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems, costs to automate business processes and costs associated with divestitures of our product lines and businesses.

. . .

[W]e expect continuing significant transition costs[.]

. . .

Restructuring, transition and other costs summary

Our restructuring, transition and other costs are presented in the table below:

| (In millions) | Three Months Ended September 29, 2017 | | | Six Months Ended September 29, 2017 | | |
|---|---|---|---|---|---|---|
| Severance and termination benefit costs | $ | 12 | | $ | 39 | |
| Other exit and disposal costs | | 1 | | | 17 | |
| Asset write-offs | | 8 | | | 9 | |
| Transition costs | | 76 | | | 120 | |
| Total | $ | 97 | | $ | 185 | |

. . .

Restructuring, transition and other

. . . During the first six months of FY18, we also incurred additional divestiture costs as a result of the divestiture of our WSS and PKI solutions, as well as costs associated with our other transition and transformation programs including the implementation of a new enterprise resource planning system and costs to automate business processes.

227.    In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," the Company explained how its adjusted financial measures for Q2 2018 were derived, including Symantec's adjusted operating expenses and operating income.  As for the Company's adjusted operating expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP

Measures" reflects an adjustment for "Restructuring, separation, transition, and other," removing operating expenses of $97 million for Q2 2018.

228.    In the "Explanation of Non-GAAP Measures and Other Items," attached as Appendix A to the 2Q2018 Form 8-K, Defendants explained their reasoning for making the "Restructuring, transition and other" adjustment, stating that the Company removed this expense because these costs, including its transition costs, were purportedly "discrete events":

> Restructuring, transition and other: . . .  We have also engaged in various transition and other activities which resulted in related costs primarily consisting of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes . . . . *Each restructuring, transition, and other activity has been a discrete event based on a unique set of business objectives or circumstances, each has differed from the others in terms of its operational implementation, business impact and scope, and the amount of these charges has varied significantly from period to period*.

229.    Defendants reported these adjusted financial measures to investors as indicative of Symantec's financial condition.  On November 1, 2017, Defendants held a quarterly earnings call during which Defendant Noviello promoted the Company's adjusted financials, including operating margins, operating expenses and EPS:

> *Operating margin for the second quarter was 34%,* at the low end of our prior guidance range of 34% to 36%.  *Overall spending finished the quarter on track* – finished on track for the quarter despite increased marketing cost in our Consumer Digital Safety segment and headwinds from M&A and divestiture-related costs, which totaled approximately $20 million.
>
> . . .
>
> *Fully diluted earnings per share was $0.40, at the low end of our prior guidance range*, impacted by the mix of lower in-quarter recognized revenue versus deferred revenue in our Enterprise Security segment and approximately $0.02 from the combination of increased marketing costs in our Consumer Digital Safety segment and headwinds from M&A and divestiture-related costs.

230.    Defendants' presentation and commentary regarding Symantec's reported non-GAAP financial measures, including the Company's non-GAAP net revenues and non-GAAP operating expenses, and statements regarding the Company's "Restructuring, transition and other" expenses and "transition costs" as set forth above in ¶¶225-29, were false and misleading and omitted material facts.

(a)     As described above, throughout the Class Period, Defendants improperly recognized revenue.  Section V(A)-(B).  Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy.  Consequently, Symantec's reported second quarter fiscal year 2018 adjusted revenue in the Company's Form 8-K was overstated.

(b)     Defendants overstated Symantec's adjusted operating income.   Section V(B).  Defendants recorded General and Administrative costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Transition and Other Costs" line item.  The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket.  Moreover, by virtue of the Restructuring, transition and other adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business.  Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, transition and other" line item expenses were misstated.  Moreover, Defendants' reported adjusted operating income for Q2 2018, as well as other reported adjusted metrics dependent on this figure, such as operating margin and EPS, as set forth in the Company's 2Q2018 Form 8-K and Defendants' commentary, were also misstated.

231.    Analysts reported that Symantec's non-GAAP financial results were "in line" with the Company's guidance and the Street's expectations.  For example, analysts at Evercore ISI commented, "SYMC reported in line results for total non-GAAP revenue, non-GAAP operating margin, and non-GAAP EPS:  $1,276M, 34.1%, and $0.40 came roughly in line with our ($1,280, 35.0%, $0.41) and street numbers ($1,279M, 35.5%, $0.42) for 3Q."

### 3.     False Internal Controls And SOX Certifications

232.    In the section of the 2Q2018 Form 10-Q titled, "Controls and Procedures," Defendants affirmed that Defendants had evaluated Symantec's internal control over financial reporting, that the Company's internal control over financial reporting was effective, and that there were no changes in the Company's internal control over financial reporting during the quarter ended September 29, 2017, that materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

233.    In addition, the 2Q2018 Form 10-Q contained certifications pursuant to SOX Sections 302 and 906 signed by Defendants Clark and Noviello attesting to the accuracy of financial reporting, the disclosure of material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

234.    Defendants' statements regarding the Company's internal control over financial reporting and in their SOX certifications were false and misleading.   In truth, Defendants maintained ineffective internal controls over financial reporting, including for the recognition of revenue and review, approval and tracking of transition and transformation expenses.  In addition, contrary to their SOX certifications, Defendants knew that the 2Q2018 Form 10-Q contained untrue statements of material fact and that the financial statements and other financial information included in the 2Q2018 Form 10-Q did not fairly present in all material respects the financial condition, results of operations and cash flows of Symantec for Q2 2018.  Moreover, Defendants failed to disclose all significant deficiencies and material weaknesses in the design and operation of Symantec's internal control over financial reporting likely to adversely affect Symantec ability to record, process, summarize and report financial information, as well as the financial fraud that Defendants and other employees with significant roles in Symantec's internal control over financial reporting were committing.

### F.     Third Quarter 2018 Results

235.    On January 31, 2018, Symantec filed with the SEC its financial results for the third quarter fiscal year 2018 for the period ending December 29, 2017, and supplemental financial information and commentary by Defendant Noviello on Form 8-K.   On February 2, 2018,

Symantec filed with the SEC its Quarterly Report on Form 10-Q for the period ending December 29, 2017, which was signed by Defendants Clark and Noviello.  As set forth below, the 3Q2018 Form 8-K and 3Q2018 Form 10-Q contained materially false and misleading statements about (i) reported revenue; (ii) adjusted revenue, operating expenses and operating income; and (iii) effective internal controls for financial reporting.

### 1.    Improper Recognition Of GAAP Revenue

236.    In the 3Q2018 Form 8-K and 3Q2018 Form 10-Q, Symantec reported quarterly GAAP revenue of $1.209 billion.  On the Company's Condensed Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.151 billion as of December 29, 2017.

237.    In the section of the 3Q2018 Form 10-Q titled, "Notes to Condensed Consolidated Financial Statements," Symantec affirmed that its financial statements were prepared in accordance with GAAP.  Likewise, in the section entitled "Critical Accounting Policies And Estimates," Defendants confirmed Symantec's adherence to its stated revenue recognition policies by affirming, "There have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements during the nine months ended December 29, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017."

238.    Defendants' statements regarding the Company's reported revenue, deferred revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above in ¶¶236-37, were false and misleading and omitted material facts.  Throughout the Class Period, Symantec improperly recognized revenue in violation of GAAP.  Section V(A)-(B).  Contrary to GAAP, Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP.  Consequently, Symantec's reported third quarter fiscal year 2018 GAAP revenue in the Company's Forms 8-K and 10-Q were overstated, the Company's reported deferred revenue for

the same period was understated, the Company's 3Q2018 Form 10-Q was not prepared in accordance with GAAP, and the Company was not complying with its stated revenue recognition policy.

2.      **Manipulating Adjustments Of**
        **GAAP Measures To Non-GAAP Measures**

239.    In the 3Q2018 Form 8-K, the Company supplemented its reported GAAP financial results with a presentation of Symantec's adjusted financial measures.  In particular, the Company reported non-GAAP revenue for Q3 2018 of $1.234 billion and non-GAAP operating income of $463 million.

240.    In the Company's 3Q2018 Form 8-K and 3Q2018 Form 10-Q, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the Company reported "Restructuring, transition and other" expenses for the third quarter of fiscal year 2018 of $93 million.

241.    In Note 4 to the Consolidated Financial Statements in the 3Q2018 Form 10-Q, the Company provided further information on the nature of this line item expense, including a description of the type of costs that the Company deems "Transition Costs," and represented that it had incurred a quarterly expense of $75 million in transition costs and $195 million over the past three quarters:

Note 4.  Restructuring, Transition and Other Costs

Transition costs are incurred in connection with Board of Directors approved discrete strategic information technology transformation initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes. In addition, transition costs include expenses associated with divestitures of our product lines.

Restructuring, transition and other costs summary

Our restructuring, transition and other costs are presented in the table below:

| (In millions) | Three Months Ended December 29, 2017 | | | Nine Months Ended December 29, 2017 | | |
|---|---|---|---|---|---|---|
| Severance and termination benefit costs | $ | 11 | | $ | 50 | |
| Other exit and disposal costs (benefit) | | (2) | | | 15 | |
| Asset write-offs | | 9 | | | 18 | |
| Transition costs | | 75 | | | 195 | |
| Total | $ | 93 | | $ | 278 | |

242.   In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," the Company explained how its adjusted financial measures for Q3 2018 were derived, including Symantec's adjusted operating expenses and operating income. As for the Company's adjusted operating expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, transition and other," removing operating expenses of $93 million for Q3 2018.

243.   In the "Explanation of Non-GAAP Measures," attached as Appendix A to the 3Q2018 Form 8-K, Defendants explained their reasoning for making the "Restructuring, transition and other" adjustment, stating that the Company removed this expense because these costs, including its transition costs, were purportedly "discrete events":

> Restructuring, transition and other costs: . . . Transition costs are associated with formal discrete strategic information technology initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes. In addition, transition costs include expenses associated with our divestitures. *We exclude restructuring, transition and other costs from our non-GAAP results as we believe that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current operating performance, and that excluding these charges facilitates a more meaningful evaluation of our current operating performance and comparisons to our past operating performance*.

244.   Defendants used these adjusted measures to inform investors about Symantec's financial condition. On January 31, 2018, Defendants held a quarterly earnings call during which Defendant Clark hyped Symantec's third quarter fiscal year 2018 adjusted operating margin, notwithstanding the Enterprise business segment's revenue shortfall:

> For Q3, even with our Enterprise revenue shortfall, we performed well against other financial metrics. Operating margin exceeded our guidance as we realized continued cost efficiencies. EPS benefited from those cost efficiencies as well as

from U.S. tax reform. And we generated strong cash flow from operations, which should benefit going forward from our strong business momentum, deferred revenue and the drop-off in costs associated with our restructuring initiatives.

. . .

Now let me turn to our Consumer Digital Safety business which had a strong quarter. Recall that only 18 months ago, this business was in decline, with decreasing retention rates and ARPU. Today, our Consumer Digital Safety business has been transformed. Revenue in the third quarter was at the high end of our guidance range, with an organic growth rate of 4% year-over-year in constant currency. ***We experienced 53% operating margins and an increased ARPU.***

245.    On the call, Defendant Noviello further touted the Company's adjusted revenue, operating margin and EPS:

***Our third quarter revenue was $1.234 billion***.  This was comprised of Consumer Digital Safety revenue at the high end of our prior revenue guidance range and Enterprise Security revenue below the low end of our prior revenue guidance range.

. . .

***Operating margin for the third quarter was 38%, above the high end of our prior guidance range of 36% to 37%.***  The higher operating margin was the result of continued cost and operating efficiencies, including the completion of the net cost reduction and synergy programs we discussed last quarter across the business.

***Fully diluted earnings per share was $0.49, $0.03 above the high end of our prior guidance range***.

246.    Defendants' presentation and commentary regarding Symantec's adjusted financial measures, including the Company's adjusted revenues and operating expenses, and statements regarding the Company's "Restructuring, transition and other" expenses and "transition costs" as set forth above in ¶¶239-45, were false and misleading and omitted material facts.

(a)    As described above, throughout the Class Period, Defendants improperly recognized revenue.  Section V(A)-(B).  Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy.

Consequently, Symantec's reported third quarter fiscal year 2018 adjusted revenue in the Company's Form 8-K was overstated.

(b)    Defendants overstated Symantec's adjusted operating income.   Section V(B). Defendants recorded General and Administrative costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Transition and Other Costs" line item.  The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket.  Moreover, by virtue of the Restructuring, transition and other adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business.  Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, transition and other" line item expenses were misstated.  Moreover, Defendants' reported adjusted operating income for Q3 2018, as well as other reported adjusted metrics dependent on this figure, such as operating margin and EPS, as set forth in the Company's 3Q2018 Form 8-K and Defendants' commentary, were also misstated.

247.    Analysts relied on the Company's reported non-GAAP financial results in communicating their insight about Symantec to their clients.  For example, analysts at Evercore ISI stated, "Total non-GAAP revenue, non-GAAP operating margin, and non-GAAP EPS of $1,234M, 37.5%, and $0.49 vs. our ($1,265M, 36.4%, $0.44) and street numbers ($1,266M, 36.6%, $0.44) for 3Q were below expectations on the top-line but ahead on non-GAAP operating margins and non-GAAP EPS.  FCF came in at $261M versus our prior estimate of $105M and consensus of $67M."

### 3.    False Internal Controls And SOX Certifications

248.    In the section of the 3Q2018 Form 10-Q titled, "Controls and Procedures," Defendants affirmed that Defendants had evaluated Symantec's internal control over financial reporting, that the Company's internal control over financial reporting was effective, and that there were no changes in the Company's internal control over financial reporting during the quarter

ended December 29, 2017, that materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

249.    In addition, the 3Q2018 Form 10-Q contained certifications pursuant to SOX Sections 302 and 906 signed by Defendants Clark and Noviello attesting to the accuracy of financial reporting, the disclosure of material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

250.    Defendants' statements regarding the Company's internal control over financial reporting and in their SOX certifications were false and misleading.    In truth, Defendants maintained ineffective internal controls over financial reporting, including for the recognition of revenue and review, approval and tracking of transition and transformation expenses.  In addition, contrary to their SOX certifications, Defendants knew that the 3Q2018 Form 10-Q contained untrue statements of material fact and that the financial statements and other financial information included in the 3Q2018 Form 10-Q did not fairly present in all material respects the financial condition, results of operations and cash flows of Symantec for Q3 2018.  Moreover, Defendants failed to disclose all significant deficiencies and material weaknesses in the design and operation of Symantec's internal control over financial reporting likely to adversely affect Symantec ability to record, process, summarize and report financial information, as well as the financial fraud that Defendants and other employees with significant roles in Symantec's internal control over financial reporting were committing.

G.    **Fourth Quarter 2018 Results**

251.    On May 10, 2018, Symantec filed with the SEC its financial results for the fourth quarter fiscal year 2018 and full fiscal year 2018 for the period ending March 30, 2018, and supplemental financial information and commentary by Defendant Noviello on Form 8-K.  As set forth below, the 4Q2018 Form 8-K contained materially false and misleading statements about (i) reported revenue; and (ii) adjusted revenue, operating expenses and operating income.

1.    **Improper Recognition Of GAAP Revenue**

252.    In the 4Q2018 Form 8-K, Symantec reported quarterly GAAP revenue of $1.222 billion and GAAP revenue of $4.846 billion for the full fiscal year 2018.  On the Company's

Condensed Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.356 billion as of March 30, 2018.

253.    Defendants' statements regarding the Company's reported revenue, deferred revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above in ¶252, were false and misleading and omitted material facts.   Throughout the Class Period, Symantec improperly recognized revenue in violation of GAAP.   Section V(A)-(B).   Contrary to GAAP, Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.   Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP.   Consequently, Symantec's reported fourth quarter fiscal year 2018 GAAP revenue in the Company's 4Q2018 Form 8-K was overstated, the Company's reported deferred revenue for the same period was understated.   On September 24, 2018, the Audit Committee first announced that it had reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018, but $12 million of the $13 million should have been deferred.

### 2.    Manipulating Adjustments Of GAAP Measures To Non-GAAP Measures

254.    In the 4Q2018 Form 8-K, the Company supplemented its reported GAAP financial results with a presentation of Symantec's adjusted financial measures.   The Company reported non-GAAP revenue for Q4 2018 of $1.234 billion and $4.972 billion for the full fiscal year 2018. The Company also reported non-GAAP operating income for Q4 2018 of $451 million and $1.726 billion for the full fiscal year 2018.

255.    In the Company's 4Q2018 Form 8-K, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the Company reported "Restructuring, transition and other" expenses for the fourth quarter of fiscal year 2018 of $139 million and $417 million for the full fiscal year of 2018.

256.    In Appendix A to the Form 8-K entitled "Explanation of Non-GAAP Measures," the Company provided further information on the nature of this line item expense, including a description of the type of costs that the Company recorded as "Transition Costs":

> *Transition costs are associated with formal discrete strategic information technology initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes.  In addition, transition costs include expenses associated with our divestitures*.

257.    In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," the Company explained how its adjusted financial measures for Q4 2018 and the full fiscal year 2018 were derived, including Symantec's reported non-GAAP operating expenses and non-GAAP operating income.   As for the Company's adjusted operating expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, transition and other," eliminating non-GAAP operating expenses of $139 million for Q4 2018 and $417 million for the full fiscal year 2018.

258.    In the "Explanation of Non-GAAP Measures," Defendants explained their reasoning for making the "Restructuring, transition and other" adjustment, stating that the Company removed this expense because these costs, including its transition costs, were purportedly "incremental to core activities that arise in the ordinary course of [Symantec]'s business":

> Restructuring, transition and other costs:  . . . Transition costs are associated with formal discrete strategic information technology initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes. In addition, transition costs include expenses associated with our divestitures.  *We exclude restructuring, transition and other costs from our non-GAAP results as we believe that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current operating performance, and that excluding these charges facilitates a more meaningful evaluation of our current operating performance and comparisons to our past operating performance*.

259.    Defendants reported these adjusted financial measures to investors as indicative of Symantec's financial performance.

260.    On May 10, 2018, Defendants held a quarterly earnings call during which Defendant Clark promoted Symantec's fourth quarter and full fiscal year 2018 adjusted financial results, which purportedly exceeded the Company's guidance:

> We were pleased with our performance in the fourth quarter and FY '18, delivering operating results across the business above the guidance levels we provided on our last earnings call.  We're also pleased that we exceeded our full year EPS guidance based on our second half performance and good results from our cost control initiatives.
>
> In Q4, our total revenue was driven by performance in both Enterprise Security and Consumer Digital Safety.  Our operating margin exceeded our guidance as a result of revenue growth and continued cost and operating efficiencies.

261.    On the earnings call, Defendant Noviello echoed Clark's sentiment and provided further color regarding the Company's fourth quarter and fiscal year adjusted 2018 financial results:

> As Greg mentioned in his comments, we were pleased with our performance in the fourth quarter, with both Enterprise Security and Consumer Digital Safety revenues above our prior guidance.
>
> . . .
>
> Total company operating margin for the fourth quarter was 36.5%.  The year-over-year improvement in operating margin was the result of higher revenue and continued cost and operating efficiencies.  Fully diluted earnings per share was $0.46, primarily driven by higher operating income.
>
> . . .
>
> Operating margin for the full fiscal year 2018 was 34.7% as compared to 28.7% in fiscal year 2017.  ***This year-over-year improvement reflects our top line revenue growth as well as operating efficiencies***. Fully diluted earnings per share was $1.69, up 43% year-over-year.

262.    Defendants' presentation and commentary regarding Symantec's adjusted financial measures, including the Company's adjusted revenues and operating expenses, and statements regarding the Company's "Restructuring, transition and other" expenses and "transition costs" as set forth above in ¶¶254-61, were false and misleading and omitted material facts.

(a)    As described above, throughout the Class Period, Defendants improperly recognized revenue.  Section V(A)-(B).  Symantec recognized revenue on sales at period-end that

did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy. Consequently, Symantec's reported fourth quarter fiscal year 2018 adjusted revenue in the Company's Form 8-K was overstated.

(b)    Defendants overstated Symantec's adjusted operating income.   Section V(B). Defendants recorded General and Administrative costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Transition and Other Costs" line item. The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket. Moreover, by virtue of the Restructuring, transition and other adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business. Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, transition and other" line item expenses were misstated. Moreover, Defendants' reported adjusted operating income for Q4 2018, as well as other reported adjusted metrics dependent on this figure, such as operating margin and EPS, as set forth in the Company's 4Q2018 Form 8-K and Defendants' commentary, were also misstated.

## VII.    ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

263.    Numerous additional facts give rise to a strong inference that the Individual Defendants knew, or were deliberately reckless in not knowing, that: (i) Defendants were improperly recognizing revenue, including revenue that should have been deferred, in violation of GAAP; (ii) in violation of SEC rules and regulations, Defendants improperly characterized costs that were incurred in the ordinary course of business as "transition costs," and adjusted those costs as part of Symantec's non-GAAP measures; and (iii) Symantec's internal controls for financial reporting were not effective during the Class Period. The Individual Defendants therefore knew

facts or were deliberately reckless in not knowing facts making their statements as set forth above in Section VI false and misleading.

264.   ***Defendant Garfield left Symantec due to improper revenue recognition practices and ineffective internal controls, after he closed the books for fiscal year 2017 in exchange for a pay package.***   As described above, Defendant Garfield, as the Chief Accounting Officer, oversaw all accounting-related areas at Symantec, including internal controls, accounting policies, and acquisition accounting.   Defendant Garfield (a) left the Company due to revenue recognition concerns and due to the way that Symantec was recognizing revenue under the leadership of Defendant Clark and Defendant Noviello; (b) was really unhappy with aggressive accounting practices that were being implemented under Noviello and was uncomfortable that the practices were not lining up to Symantec's controls; and (c) ultimately signed off on the books for the prior fiscal year (2017) in exchange for a pay package.   These facts support a strong inference that Defendants knew or recklessly disregarded that Symantec's internal controls were not effective and that Symantec's stated revenue metrics, and purported compliance with GAAP and its own revenue recognition policy, were false and misleading.

265.   ***The Individual Defendants directed the accounting manipulations that gave rise to the false statements, including improper revenue recognition and the improper classification of "transition costs."***   As discussed above, Defendants Clark and Noviello directed the manipulation of Symantec's financials, and encouraged employees to improperly recognize revenue.  Defendant Clark made lots of references in meetings to Symantec's ability and flexibility to shift and record revenue, and that he talked about their ability to manipulate or adjust revenue by various periods or a year.  Clark specifically discussed this issue at senior leader meetings with executives which occurred approximately monthly, and Clark's views on "opportunities" to be "flexible" with respect to revenue recognition were not a secret.   Moreover, Symantec's former Manager Bill and Collect-Finance explained with respect to Symantec's practice of pushing deals through that he/she frequently received calls from the highest executive staff, including Defendant Garfield, telling them to release those orders or to allow them to go out.  There would be a fight about it, but Garfield would indicate that the order to do so had come from someone else above

him, and quote Defendant Clark or Defendant Noviello. In addition, Symantec's former Account Manager confirmed that Defendant Clark knew and approved of deals that were booked in Q4 2017 and moved to Q1 2018, including one $13 million deal with Verizon, which involved a SOX violation.

266. Moreover, Defendants manipulated and directed the manipulation of the "transition costs" component of Symantec's restructuring, separation, transition, and other costs line item as result of pressure from Defendants Clark and Noviello. Symantec's former VP and CSO explained that Jordan (CIO) was under a lot of pressure and scrutiny from Defendants Clark and Noviello, that she was under tremendous scrutiny to justify her job and explain cost management in IT, and that more costs were moved in the direction of transformative or transformational costs once Blue Coat came in. The Individual Defendants' personal involvement in directing the accounting manipulations at issue supports scienter.

267. ***Defendants implemented significant structural management changes after the end of the Class Period.*** As discussed above, on September 24, 2018, the Company announced that it would change the structure of its internal management, including appointing a separate Chief Accounting Officer and a separate Chief Compliance Officer reporting to the Audit Committee. Defendants' structural changes, particularly in combination with their admission that Symantec needed to enhance its internal controls, supports a strong inference that Defendants knew (or recklessly disregarded) that Symantec's internal controls were not effective during the Class Period.

268. ***The fundamental accounting principle at issue is straightforward and was known by the Individual Defendants.*** As explained in detail above, the fundamental accounting principle at issue in this case is straightforward: companies must recognize revenue consistently with GAAP only when certain criteria are met and in the period that revenue is realized. This principle has been part of GAAP for decades. Additionally, the prohibition on adjusting non-GAAP performance measures such as operating expenses by eliminating or smoothing items identified as non-recurring, infrequent or unusual, when the nature of the charge is such that it is a recurring expense incurred in the ordinary course of business has been a well-accepted accounting principle

for over the past fifteen years and has been the subject of SEC guidance regarding the appropriate use of or references to non-GAAP measures in public statements or disclosures.   Further, Defendants Clark, Noviello, and Garfield have decades of professional experience in accounting and finance and would understand this concept.   Moreover, Symantec employed many other experts and highly qualified personnel in accounting and finance whose knowledge and experience they could readily draw upon.

269.   Additionally, Blue Coat had previously communicated multiple times with the SEC before becoming a private company on the use of adjusted measures in assessing performance for the purpose of executive compensation, and the SEC had asked Blue Coat for clarification and additional disclosure on how it used its adjusted measures in assessing performance.   Thus, Blue Coat and its former executives were aware of the importance of and SEC requirement that companies make truthful and complete disclosures to investors concerning adjusted metrics and executive compensation.

270.   ***The ease with which the Company's Audit Committee and consultants determined that Symantec had weak internal controls and had improperly recognized revenue supports scienter.***   As described above, Defendants announced on May 10, 2018, that Symantec's Audit Committee had commenced an internal investigation due to concerns raised by a former employee, that the SEC had been contacted, and that Symantec had retained independent counsel and other advisors to assist it in its investigation and would be providing additional information to the SEC as the investigation proceeded.   By September 24, 2018, Symantec announced that the Audit Committee, independent legal counsel, and a forensic accounting firm had already concluded their internal investigation into Symantec's improper accounting.   Within a little over four months after its announcement of the initiation of an investigation, Defendants admitted: (i) to weak and informal processes with respect to some aspects of the review, approval and tracking of transition expenses; (ii) to behaviors inconsistent with the Company's Code of Conduct; (iii) that the Company recognized $12 million as revenue in the fourth quarter of fiscal year 2018 that should have been deferred, and the Company would have to restate its Q4 2018 and Q1 2019 financial statements; and (iv) that the Company's Board of Directors had adopted substantial

management changes, and "certain enhanced controls and policies related to the matters investigated."  The fact that outsiders quickly and easily determined that such accounting and internal control problems existed at Symantec supports a strong inference that Defendants knew facts or recklessly disregarded facts making their statements false and misleading.

271.  ***The temporal proximity between Defendants' false statements and omissions and revelations of the truth supports an inference of scienter.***  On January 31, 2018, Symantec filed with the SEC its financial results for the third quarter of fiscal year 2018.  This filing: (i) contained false and misleading statements concerning the Company's reported revenue, reported deferred revenue, compliance with GAAP, and internal revenue recognition policy; (ii) contained false and misleading adjusted measures and inflated "transition costs"; and (iii) falsely stated that the Company's internal control over financial reporting was effective.  Less than four months later, on May 10, 2018, the truth started to emerge when Symantec disclosed the initiation of an internal investigation and that the Company had contacted the SEC.  The close temporal proximity between the January 31, 2018 false statements and the May 10, 2018 disclosure supports a strong inference of Defendants' scienter.

272.  ***The Individual Defendants were highly involved in all key decisions at Symantec, including integrating Symantec and Blue Coat.***  Defendants were actively involved in the Blue Coat acquisition and post-close integration of the acquired entity.  Defendants controlled Symantec's financial processes and were personally involved in the preparation and reporting of Symantec's financial reports, including taking steps to ensure the financial statements and other financial information included in Symantec's reports fairly presented in all material respects the financial condition, results of operations, and cash flows of the Company.  Defendants were also personally responsible for establishing, designing, maintaining, and evaluating Symantec's internal controls over financial reporting.  In addition, Defendants had direct involvement in presenting their reported financial performance to investors, including formulating the financial communication strategy, setting guidance, drafting scripts, and performing Q&A with shareholders and analysts.  Defendants were further actively involved in the development of Symantec's executive compensation plans, including proposing financial performance goals tied off of

Symantec's reported non-GAAP measures to the Compensation Committee after taking into account factors such as historical performance, internal budgets, and their expectations for Symantec's performance.  Finally, Defendants had special knowledge regarding the nature and scope of the Company's reported transition costs as they affirmed that such costs were those presented to and approved by the Board of Directors.

273.    Defendants' significant personal involvement and control over these key decisions raises a strong inference that they knew, or were deliberately reckless in not knowing, about the Company's improper recognition and reporting of revenue, improper recording of continuing operating expenses incurred in the ordinary course of business as transition costs, and adjustment of these costs as part of Symantec's non-GAAP measures, as well as Symantec's materially weak and insufficient internal controls over financial reporting.

274.    ***The Individual Defendants held themselves out as knowledgeable about and involved in the accounting at issue.***  The Individual Defendants held themselves out in their public statements as personally familiar with the Company's integration and with its financials.  For example, during the Class Period, Defendant Clark regularly spoke to investors and securities analysts regarding, among other topics, Symantec's financial and operating results, professing to know what he was speaking about.  Further, on the Symantec website, Defendant Noviello held himself out as "lead[ing] the company's integration and transformation office, and the company's cost reduction program."  During the Class Period, Defendant Noviello regularly spoke to investors and securities analysts regarding, among other topics, Symantec's financial and operating results, professing to know what he was speaking about.  With regard to Defendant Garfield, the Chief Accounting Officer, Symantec's SEC filings stated that Garfield possessed "extensive expertise in financial reporting, accounting and finance function integrations, and Sarbanes-Oxley process management and compliance, and financial due diligence for all types of investments and acquisitions."

275.    ***Defendants Noviello and Clark brought Blue Coat's unethical practices and "toxic culture" with them to Symantec.***  According to former employees, the former Blue Coat executives, such as Defendants Clark and Noviello, were known for being "pretty freewheeling"

and Blue Coat brought their "toxic culture" with them to Symantec (according to Symantec's former VP and CSO). According to Symantec's former VP and CSO, Blue Coat systematically replaced the executives with their own people and processes, and many of the Blue Coat processes were not fit for a public company the size of Symantec. Symantec's former VP and CSO further confirmed that a number of investigations, led by Cameron Hoffman, head of investigations at Symantec, were opened about the Blue Coat leadership and unethical behavior, including the leveraging of Company expenses and resources, and how the Company was closing deals. Indeed, ethics concerns were so great that, according to Symantec's former VP and CSO, the Company published reports that showed who was behaving ethically and who was not and there was a steering committee around this. Further, according to Symantec's former Senior Manager, Pricing & Licensing, after Blue Coat came in and the Blue Coat executives assumed leadership, Symantec's management practices absolutely lacked integrity and honesty. Moreover, the former Senior Manager, Pricing & Licensing stated that it was common knowledge that if anyone raised accounting issues and disagreed with management, their job would be at risk.

276. ***Defendants affirmed Symantec's internal control over financial reporting and signed SOX certifications***. In Symantec's 2017 annual report on Form 10-K, along with each Form 10-Q filed during the Class Period, Defendants Clark and Noviello represented that (i) they were responsible for establishing and maintaining adequate internal control over financial reporting; (ii) they had conducted an evaluation of the effectiveness of Symantec's financial reporting; and (iii) they had concluded that Symantec's internal controls over financial reporting were effective at the reasonable assurance level throughout the Class Period. Moreover, in their certifications pursuant to SOX Sections 302 and 906, submitted with the Company's 2017 annual report on Form 10-K, along with each Form 10-Q filed during the Class Period, Defendants Clark and Noviello represented that (i) they had reviewed the Company's respective filings; (ii) the reports did "not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; (iii) the financial statements "fairly present in all material respects the financial condition, results of operations and cash flows" of Symantec; and (iv) the "information contained in the Report fairly presents, in all material respects,

the financial condition and results of operations of the Company." These types of public comments – through which the Individual Defendants held themselves out as knowledgeable on these subjects – further support a strong inference of scienter.

277. ***Defendants took undisclosed steps that show their knowledge of Symantec's fraudulent accounting practices***. As noted in Symantec's September 24, 2018 announcement of the completion of the Audit Committee investigation, unbeknownst to investors, beginning in the second quarter of fiscal year 2018 (ended September 29, 2017), the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures. Nevertheless, Defendants continued to report the Company's financial results, certified the accuracy of the information presented therein, and affirmed the internal controls over the Company's financial reporting. Such undisclosed steps raise an inference that Defendants knew of facts or recklessly disregarded facts making their statements false or misleading.

278. ***The accounting fraud concerned the Company's core products and key business areas.*** On August 1, 2016, Symantec acquired all of the outstanding common stock of Blue Coat for $4.67 billion. Immediately after the acquisition was completed, the Company identified Blue Coat's suite of network and cloud security products as <u>core</u> products within its Enterprise Security business segment. Indeed, in its May 19, 2017 Annual Report, the Company disclosed that by the period ending March 31, 2017, Blue Coat's revenues constituted 11% of Symantec's total consolidated revenues. Moreover, over the nine months ended December 29, 2017, the Company's Enterprise Security business segment increased revenue by over 15% compared to the corresponding period in the prior year, which the Company claimed was largely driven by the addition of Blue Coat. In February 2017, Symantec acquired LifeLock for approximately $2.3 billion. Immediately after the acquisition was completed, the Company identified LifeLock's proactive identity theft protection services for consumers as <u>core</u> products within its Consumer Digital Safety business segment. For the nine months ended December 29, 2017, revenue in the Company's Consumer Digital Safety segment increased 38%. Accordingly, Symantec's financial health was dependent in large part on the operations and financial performance of Blue Coat and

LifeLock.  The fact that the Company's accounting fraud materially affected Symantec's core products and both of its business segments supports a strong inference of the Defendants' scienter.

279.   ***Defendants admitted that Symantec had ineffective internal controls regarding transition costs during the Class Period***.  As described above, Defendants admitted in a September 24, 2018 press release that Symantec's Audit Committee "noted relatively weak and informal processes with respect to some aspects of the review, approval and tracking of transition and transformation expenses."  Further, Defendants admitted that Symantec had initiated a review by an outside accounting firm, and taken other steps to enhance, the Company's policies and procedures regarding adjusted measures, since the quarter ending September 29, 2017.  In addition, Defendants stated that in connection with the substantial structural changes to their senior management, they would be "adopting certain enhanced controls and policies related to the matters investigation."  Defendants' admissions support a strong inference that Defendants knew (or recklessly disregarded) that Symantec's internal controls were not effective during the Class Period, and that their resulting GAAP revenue and adjusted revenue and operating income metrics were false and misleading.

280.   ***Defendants admitted that Symantec had recognized revenue that should have been deferred during the Class Period and had to restate its Q4 2018 and Q1 2019 financial statements***.  As described above, on September 24, 2018, the Company announced that it had inappropriately recognized $13 million in the fourth quarter of fiscal year 2018, of which $12 million should have been deferred, and that the Company would have to revise its previously disclosed financial results for both Q4 2018 and Q1 2019.  Defendants' admission that Symantec recognized revenue that should have been deferred during the Class Period supports a strong inference that Defendants knew or recklessly disregarded that Symantec's stated revenue and deferred revenue metrics were false and misleading, that Symantec's financial statements did not comply with GAAP, and that Symantec was not following its stated revenue recognition policy during the Class Period.

281.   ***Executive compensation was based on the Company's achievement of certain adjusted metrics.***  As discussed above in ¶¶120-29, the Company disclosed that executive

compensation relied on meeting certain adjusted operating income, revenue, and EPS metrics. Thus, the Individual Defendants had an incentive to manipulate non-GAAP metrics in order to pocket millions of dollars. As a result of the manipulation of the adjusted metrics, under the fiscal year 2017 executive compensation plan, Defendants Clark and Noviello have to date received nearly $52.1 million in performance-based equity awards and will receive a total of 219,209 additional shares of Symantec at the end of fiscal year 2019 with a value at grant date (June 29, 2016) of nearly $3.8 million. Moreover, under the fiscal year 2018 executive plan, as a result of Defendants' manipulation, Defendants Clark and Noviello are eligible to receive 125,793 Symantec shares with a value at grant date (June 9, 2017) of over $4.3 million at the end of fiscal year 2020.

282. ***As discussed above, the Individual Defendants' insider sales during the Class Period were suspicious in timing and amount.*** During the Class Period, Defendant Noviello made approximately ***$12.89 million*** in insider sales, Defendant Clark made approximately ***$6 million*** in insider sales, and Defendant Garfield made approximately ***$873,657*** in insider sales. Each Defendant would have made substantially less had the stock price not been artificially inflated.

283. These sales are further suspicious in terms of amount and timing when compared with sales during the prior period of the same length. Indeed, during the prior period of similar length, neither Defendant Noviello nor Defendant Clark sold any shares they owned or controlled. Additionally, during the prior period of similar length, Defendant Garfield sold 20,947 shares for proceeds of $434,061, approximately 50% of his Class Period sales. Moreover, while certain of these sales were made pursuant to 10b5-1 plans, Defendants entered into those plans during the Class Period while they were in possession of material non-public information.

## VIII.   LOSS CAUSATION

284. Defendants' materially false and misleading statements and omissions artificially inflated the price of Symantec common stock before and during the Class Period and maintained inflation in the stock price. Partial disclosures revealed the relevant truth and removed the artificial inflation from the stock price.

285.     On May 10, 2018, after the market closed, Symantec filed a Current Report on Form 8-K with the SEC, disclosing that its Audit Committee had commenced an investigation "in connection with concerns raised by a former employee," that the Audit Committee had retained independent counsel and other advisors to assist in the investigation, and that the Company had contacted the SEC to advise the SEC of the investigation.  The Company also disclosed that the Company's financial results and guidance may be subject to change based on the outcome of the investigation.  The Company further disclosed that it was "unlikely that the investigation will be completed in time for the Company to file its annual report on Form 10-K for the fiscal year ended March 30, 2018 in a timely manner."  Later that same day, Symantec held an earnings call with investors to discuss the fourth quarter fiscal year 2018 results.  During the call, Defendant Clark reiterated the statements made in the Company's Form 8-K, and stated "because this is an ongoing matter, we will be unable to comment further on this topic during today's call and there will be no question-and-answer session following our prepared remarks."

286.     These partial disclosures caused Symantec's stock price to decline.  On May 11, 2018, the share price fell $9.66 per share, or approximately 33%.

287.     On August 2, 2018, after the market closed, Symantec filed a Current Report on Form 8-K with the SEC, disclosing that the Audit Committee's investigation, which remains "ongoing," now covers Symantec's reported fourth quarter of fiscal year 2018 results and that subsequent periods remain open periods from an accounting perspective, subject to adjustment for material updates.  The Company also disclosed resulting financial results below the Company's recent estimates for the first quarter of fiscal year 2019 and reduced guidance for revenue, operating income and earnings per share for the upcoming second quarter and the entire fiscal year of 2019.  Later that same day, Symantec held an earnings call with investors to discuss the fourth quarter fiscal year 2018 results.  Defendant Clark admitted a "slip of business in the quarter."  In response to an analyst's question as to whether "you saw any sort of negative customer reaction this quarter just around the headlines [on the audit investigation] and if that was maybe potentially impacting results," Defendant Clark stated "we cannot comment on the investigation.  I would say that Q1 had some negative press in the market during the quarter."

288.    These partial disclosures caused Symantec's stock price to decline.  On August 3, 2018, the share price fell $1.63, or approximately 8%.

## IX.    **THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

289.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles.  Moreover, none of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Symantec's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

290.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Symantec's financial accounting practices, financial condition, and internal controls, among others.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Symantec were insufficient to insulate Defendants from liability for their materially false and misleading statements.

291.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Symantec who knew that the statement was false when made.

1    **X.    THE PRESUMPTION OF RELIANCE**

2        292.    At all relevant times, the market for Symantec's common stock was efficient for

3    the following reasons, among others:

4        (a)    Symantec's stock met the requirements for listing, and was listed and actively

5            traded on the NASDAQ Stock Market, a highly efficient and automated market;

6        (b)    As a regulated issuer, Symantec filed periodic reports with the SEC and the

7            NASDAQ Stock Market;

8        (c)    Symantec regularly communicated with public investors via established market

9            communication mechanisms, including through regular dissemination of press

10            releases on the national circuits of major newswire services and through other wide-

11            ranging public disclosures, such as communications with the financial press and

12            other similar reporting services; and

13        (d)    Symantec was followed by numerous securities analysts employed by major

14            brokerage firms who wrote reports which were distributed to those brokerage firms'

15            sales force and certain customers.  Each of these reports was publicly available and

16            entered the public market place.

17        293.    As a result of the foregoing, the market for Symantec's common stock reasonably

18    promptly digested current information regarding Symantec from all publicly available sources and

19    reflected such information in the price of Symantec's common stock.  All purchasers of Symantec

20    common stock during the Class Period suffered similar injury through their purchase of Symantec

21    common stock at artificially inflated prices, and a presumption of reliance applies.

22        294.    A class-wide presumption of reliance is also appropriate in this action under the

23    United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S.

24    128 (1972), because the claims asserted herein against Defendants are predicated upon omissions

25    of material fact for which there is a duty to disclose.

26    **XI.    CLASS ALLEGATIONS**

27        295.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

28    Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or

otherwise acquired the common stock of Symantec between May 11, 2017, and August 2, 2018, inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Symantec; (iv) any firm or entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged; (vi) Defendants' liability insurance carriers; (vii) any affiliates, parents, or subsidiaries of Symantec; (viii) all Symantec plans that are covered by ERISA; and (ix) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such.

296.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Symantec shares were actively traded on the NASDAQ Stock Market.  As of August 2, 2018, there were approximately 621,539,000 shares of Symantec common stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds-of-thousands of members of the Class.  Class members who purchased Symantec common stock may be identified from records maintained by Symantec or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

297.   Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

298.   Lead Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

299.   Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

(c)      whether Defendants acted with scienter; and

(d)      the proper way to measure damages.

297.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

**XII.     CLAIMS BROUGHT PURSUANT TO**
        **SECTION 10(b), 20(a) AND 20(A) OF THE EXCHANGE ACT**

**COUNT I**

**For Violations Of Section 10(b) Of The Exchange Act And**
**SEC Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

300.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

301.     This Count is asserted on behalf of all members of the Class against Defendants Symantec, Clark, Noviello, and Garfield, for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

302.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

303.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts,

practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Symantec common stock during the Class Period.

304.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Symantec common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Symantec's GAAP and adjusted metrics in its financial statements, and accounting for those metrics, and the effectiveness of Symantec's internal controls; (b) artificially inflate and maintain the market price of Symantec common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Symantec common stock at artificially inflated prices and suffer losses when the true facts became known.

305.    Defendant Symantec is liable for all materially false and misleading statements made during the Class Period, as alleged above.  Defendants Clark, Noviello, and Garfield, as top executive officers of the Company during their respective tenures, are liable as direct participants in the wrongs complained of herein.  Defendants Clark, Noviello, and Garfield are liable for the false and misleading statements they personally made and/or signed, as alleged above.

306.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Symantec stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

307.     Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Symantec common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiff and the Class would not have purchased Symantec common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

308.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Symantec common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Clark, Noviello, And Garfield)

309.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

310.     This Count is asserted on behalf of all members of the Class against Defendants Clark, Noviello, and Garfield, for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

311.     During their tenures as officers and/or directors of Symantec, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶20-22.  By reason of their positions of control and authority as officers and/or directors of Symantec, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Symantec during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

312.     In their capacities as senior corporate officers of the Company, and as more fully described above in ¶¶20-22, Defendants Clark, Noviello, and Garfield, had direct involvement in the day-to-day operations of the Company.   Defendants Clark, Noviello, and Garfield signed certain of the Company's SEC filings during the Class Period and were directly involved in providing false information and certifying and approving the false statements disseminated by Symantec during the Class Period.  As a result of the foregoing, Defendants Clark, Noviello, and Garfield, as a group and individually, were controlling persons of Symantec within the meaning of Section 20(a) of the Exchange Act.

313.     As set forth above, Symantec violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

314.     By virtue of their positions as controlling persons of Symantec and as a result of their own aforementioned conduct, Defendants Clark, Noviello, and Garfield are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Symantec common stock.   As detailed above, during the respective times these Defendants served as officers and/or directors of Symantec, each of these Defendants was culpable for the material misstatements and omissions made by Symantec.

315.     As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Symantec common stock.

## COUNT III

### For Violation Of Section 20A Of The Exchange Act
### (Against Defendants Clark And Noviello)

316.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

317.     This Count is asserted pursuant to Section 20A of the Exchange Act against Defendants Clark and Noviello, on behalf of all persons who purchased Symantec common stock

contemporaneously with any sales of Symantec common stock by Defendant Noviello and Defendant Clark during the Class Period.

318.    As set forth in the paragraphs above, and as further set forth in the chart below, Defendant Clark and Defendant Noviello each committed underlying violations of Section 10(b) and Rule 10b-5 thereunder by selling Symantec common stock while in the possession of material, adverse, nonpublic information about, among other things, the Company's improper accounting manipulations and ineffective internal controls.   This conduct violated Section 20A of the Exchange Act.

| Defendants' Open Market Sales | | | |
|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price |
| Clark | 8/28/2017 | 186,433 | $30.00 |
| Clark | 8/31/2017 | 13,567 | $30.00 |
| Noviello | 5/15/2017 | 27,741 | $32.45 |
| Noviello | 7/12/2017 | 10,034 | $30.00 |
| Noviello | 8/28/2017 | 14,925 | $30.00 |
| Noviello | 9/7/2017 | 7,688 | $30.00 |
| Noviello | 11/6/2017 | 375,000 | $29.38 |

319.    Lead Plaintiff purchased shares of Symantec common stock on the same day or one day after sales of Symantec common stock made by Defendant Clark and Defendant Noviello while these Defendants were in possession of material, adverse, nonpublic information, as set forth in the chart below.   These sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

| Defendants' Open Market Sales | | | | Plaintiff's Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiff | Purchase Date | Shares Purchases | Price |
| Noviello | 8/28/2017 | 14,925 | $30.00 | SEB SICAV | 8/28/2017 | 201,927 | $29.59 |
| Noviello | 11/6/2017 | 375,000 | $29.38 | SEB Teknologifond | 11/7/2017 | 61,700 | $28.72 |
| Clark | 8/28/2017 | 186,433 | $30.00 | SEB SICAV | 8/28/2017 | 201,927 | $29.59 |

320.     Numerous other Class members also purchased Symantec common stock contemporaneously with Defendants' sales of stock during the Class Period based on material, adverse, nonpublic information.

321.     By virtue of their knowledge of material, adverse, nonpublic information, Defendant Clark and Defendant Noviello were duty bound not to benefit therefrom, a duty which they violated by selling their shares at inflated prices.

322.     Accordingly, under Section 20A of the Exchange Act, the Defendants named in this Count are each liable to Lead Plaintiff and the Class for all profits gained and losses avoided by them as a result of their stock sales.

## XIII.   PRAYER FOR RELIEF

323.     WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)     Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

324.     Lead Plaintiff demands a trial by jury.

Dated:  November 15, 2018                Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

*/s/ David R. Stickney*
DAVID R. STICKNEY

DAVID R. STICKNEY (Bar No. 188574)
(davids@blbglaw.com)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LUCAS E. GILMORE (Bar No. 250893)
(lucas.gilmore@blbglaw.com)
JACOB T. SPAID (Bar No. 298832)
(jacob.spaid@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:     (858) 793-0070
Fax:    (858) 793-0323

-and-

JEROEN VAN KWAWEGEN (admitted *pro hac vice*)
(jeroen@blbglaw.com)
REBECCA E. BOON (admitted *pro hac vice*)
(rebecca.boon@blbglaw.com)
JULIA K. TEBOR (admitted *pro hac vice*)
(julia.tebor@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 554-1400
Fax:    (212) 554-1444

*Counsel for Lead Plaintiff*
*SEB Investment Management AB*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

*/s/ David R. Stickney*
DAVID R. STICKNEY

DAVID R. STICKNEY (Bar No. 188574)
(davids@blbglaw.com)
12481 High Bluff Drive, Suite 300
San Diego, California 92130
Telephone: (858) 793-0070
Facsimile: (858) 793-0323

*Counsel for Lead Plaintiff*
*SEB Investment Management AB*

**CERTIFICATION PURSUANT TO
THE FEDERAL SECURITIES LAWS**

We, Hans Ek, and Rikard Andersson, on behalf of Lead Plaintiff SEB Investment Management AB ("SEB Investment Management"), acting on behalf of SEB Teknologifond, hereby certify, as to the claims asserted under the federal securities laws, that:

1.      We are authorized to execute this Certification on behalf of SEB Investment Management. We have reviewed the Consolidated Class Action Complaint For Violations Of The Federal Securities Laws with SEB Investment Management's legal counsel, and based on the legal counsel's knowledge and advice, authorize its filing.

2.      SEB Investment Management is the only entity with power and authority to bring suit to recover for investment losses on behalf of SEB Teknologifond. SEB Teknologifond is a fund organized under Swedish law that has no independent legal entity, and does not have the capacity to sue in, or be brought before, courts of law. Under Swedish law, SEB Investment Management, as the management company for SEB Teknologifond, is the only entity authorized and empowered to act on behalf of SEB Teknologifond.

3.      Neither SEB Investment Management nor SEB Teknologifond purchased the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

4.      The Court appointed SEB Investment Management as Lead Plaintiff on August 23, 2018. SEB Investment Management is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

5.      The transactions in the Symantec Corporation securities that are the subject of this action are set forth in the chart attached hereto.

6.      SEB Investment Management has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Bier v. Endo International, PLC*, No. 17-cv-03711 (E.D. Pa.)
   *Felix v. Symantec Corporation,* No. 18-cv-02902 (N.D. Cal.)

7.      SEB Investment Management will not accept payment for serving as a representative party on behalf of the Class beyond SEB Investment Management's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

SEB Investment Management has relied on the research and analysis of the Consolidated Class Action Complaint provided by legal counsel Bernstein Litowitz Berger & Grossmann LLP. The undersigned declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this $\underline{15}$ day of November 2018.

Hans Ek
Acting Chief Executive Officer
*On Behalf of SEB Investment Management*

Rikard Andersson
Head of Equities
*On Behalf of SEB Investment Management*

## SCHEDULE A

**SEB Teknologifond**
**Transactions in Symantec Corporation**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 11/2/2017 | 417,500 | 28.9193 |
| Purchase | 11/7/2017 | 61,700 | 28.7219 |
| Purchase | 12/11/2017 | 25,200 | 28.5927 |
| Purchase | 2/28/2018 | 45,500 | 26.7271 |
| Purchase | 7/25/2018 | 5,500 | 20.6941 |

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

We, Hans Ek, and Rikard Andersson, on behalf of Lead Plaintiff SEB Investment Management AB ("SEB Investment Management"), on behalf of the entity listed in Schedule A (the "SICAV"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.    We are authorized to execute this Certification on behalf of SEB Investment Management. We have reviewed the Consolidated Class Action Complaint For Violations Of The Federal Securities Laws with SEB Investment Management's legal counsel, and based on the legal counsel's knowledge and advice, authorize its filing.

2.    We are duly authorized to institute legal action on behalf of SEB Investment Management and the SICAV. SEB Investment Management is litigating the claims of the SICAV pursuant to an assignment.

3.    Neither SEB Investment Management nor the SICAV purchased the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

4.    The Court appointed SEB Investment Management as Lead Plaintiff on August 23, 2018. SEB Investment Management is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

5.    The transactions in the Symantec Corporation securities that are the subject of this action are set forth in the chart attached hereto.

6.    SEB Investment Management has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Bier v. Endo International, PLC*, No. 17-cv-03711 (E.D. Pa.)
*Felix v. Symantec Corporation,* No. 18-cv-02902 (N.D. Cal.)

7.    SEB Investment Management will not accept payment for serving as a representative party on behalf of the Class beyond SEB Investment Management's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

SEB Investment Management has relied on the research and analysis of the Consolidated Class Action Complaint provided by legal counsel Bernstein Litowitz Berger & Grossmann LLP. The undersigned declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this  15  day of November 2018.

Hans Ek
Acting Chief Executive Officer
*On Behalf of SEB Investment Management*

Rikard Andersson
Head of Equities
*On Behalf of SEB Investment Management*

## SCHEDULE A

**SEB Alternative Strategies SICAV**
**Transactions in Symantec Corporation**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 8/25/2017 | 3,300 | 29.5797 |
| Purchase | 8/28/2017 | 201,927 | 29.5883 |
| Purchase | 3/26/2018 | 50,000 | 26.0540 |
| Sale | 10/2/2017 | 52,000 | 32.8375 |
| Sale | 11/7/2017 | 23,300 | 28.7642 |