CAZ HASHEMI, State Bar No. 210239
chashemi@wsgr.com
JEROME F. BIRN, JR., State Bar No. 128561
jbirn@wsgr.com
CHERYL W. FOUNG, State Bar No. 108868
cfoung@wsgr.com
KAREN KWOK, State Bar No. 307464
kkwok@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

Attorneys for Defendant
Symantec Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES FELIX Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SYMANTEC CORPORATION, GREGORY S. CLARK, NICHOLAS R. NOVIELLO, and MARK S. GARFIELD,<br><br>Defendants. | CASE NO.: 3:18-cv-02902-WHA<br><br>**SYMANTEC CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Courtroom 12<br>Date: January 31, 2019<br>Time: 8:00 a.m. |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ..... 1

STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3)) ..... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 3

The Transformation Of Symantec's Business ..... 3

Symantec Thoroughly Disclosed Its Reliance On Non-GAAP Measures. ..... 3

The Audit Committee's Investigation And Conclusions ..... 4

The Allegations Of The Complaint ..... 6

THE STANDARDS APPLICABLE TO THIS REFORM ACT CASE ..... 6

ARGUMENT ..... 7

I. THE COMPLAINT DOES NOT PLEAD AN ACTIONABLE FALSE OR MISLEADING STATEMENT. ..... 7

A. Plaintiff Fails To Plead Specific Facts Showing That Symantec's Financial Statements Were False. ..... 7

1. Plaintiff Fails To Identify Specific Instances Of Improper Revenue Recognition. ..... 8

2. Plaintiff Fails To Plead Specific Instances Where Transition Costs Were Improperly Excluded From Non-GAAP Income. ..... 9

3. Plaintiff Pleads No Specific Facts That Internal Controls Were Ineffective. ..... 12

B. The Confidential Witnesses Offer No Meaningful Information Demonstrating That Defendants Made A False Statement Or Acted With Scienter. ..... 12

1. The Overall Failings Of All Confidential Sources. ..... 13

2. The Specific Failings Of Each Confidential Source. ..... 15

Former VP and Chief Security Officer (CSO). ..... 15

Strategic Account Manager, Verizon (Verizon SAM) ..... 16

Senior Financial Analyst (Analyst). ..... 17

Senior Manager, Pricing & Licensing (P&L Manager). ..... 18

Manager, Bill and Collect, Finance (Manger, Bill & Collect). ..... 19

C. Symantec's Proxy Statement Is Not Actionable Because It Disclosed The Use Of Non-GAAP Performance Targets In Great Detail. ........ 20

1. Symantec Disclosed Its Performance Under GAAP and Clearly Defined the Differences In Its Non-GAAP Metrics........ 20

2. Symantec Fully Disclosed Its Executive Compensation Practices. ........ 21

II. PLAINTIFF DOES NOT OTHERWISE PLEAD A STRONG INFERENCE OF SCIENTER........ 23

A. Defendants' Stock Trading Refutes Any Inference of Scienter........ 23

B. Mr. Garfield's Departure Cannot Support An Inference of Scienter. ........ 25

C. The Remaining Allegations Fail. ........ 26

D. The Competing Inferences Undermine Scienter. ........ 27

III. THE CLASS PERIOD SHOULD END ON MAY 10 FOR FAILURE TO PLEAD LOSS CAUSATION FOR THE AUGUST 2, 2018 DISCLOSURE........ 27

CONCLUSION ........ 28

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203 (S.D. Cal. 2005) ....................13

*Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014) ....................24

*Bao v. SolarCity Corp.*, No. 14-cv-01435-BLF, 2016 WL 54133 (N.D. Cal. Jan. 5. 2016) ....................19, 23

*Biotechnology Value Fund, L.P. v. Celera Corp.*, 12 F. Supp. 3d 1194 (N.D. Cal. 2013) ....................9

*Cho v. UCBH Holdings, Inc.*, No. C 09-4208-JSW, 2011 WL 3809903 (N.D. Cal. May 17, 2011) ....................24

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ....................7

*Graves v. AECOM*, No. LA CV16-06605 JAK (KSx), 2017 WL 5502774 (C.D. Cal. June 19, 2017) ....................15

*In re Apple Comput., Inc., Sec. Litig.*, No. C-01-3667 CW, 2003 WL 26111982 (N.D. Cal. Aug. 13, 2003), *aff'd on other grounds*, 127 F. App'x 296 (9th Cir. 2005) ....................8

*In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006 (9th Cir. 2005) ....................6, 8, 13, 14

*In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947 (9th Cir. 2017) ....................17

*In re Netflix, Inc. Sec. Litig.*, 964 F. Supp. 2d 1188 (N.D. Cal. 2013), *aff'd*, 647 F. App'x 813 (9th Cir. 2016) ....................14

*In re Netflix, Inc. Sec. Litig.*, No. 12-00225 SC, 2014 WL 212564 (N.D. Cal. Jan. 17, 2014), *aff'd*, 647 F. App'x 813 (9th Cir. 2016) ....................23

*In re Netflix, Inc. Sec. Litig.*, No. C04-2978- WHA, 2005 U.S. Dist. LEXIS 30992 (N.D. Cal. Nov. 18, 2005) ....................4, 9, 21

*In re Northpoint Commc'n Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991 (N.D. Cal. 2001) .................... *passim*

*In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014) ....................7, 14, 17, 19

*In re Rackable Sys., Inc. Sec. Litig.*,
No. C-09-0222 CW, 2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ....10

*In re Silicon Graphics Inc. Sec. Litig.*,
183 F.3d 970 (1999), *abrogated on other grounds, S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) ....23

*In re Silicon Graphics, Inc. Sec. Litig.*,
970 F. Supp. 746 (N.D. Cal. 1997) ....8

*In re U.S. Aggregates, Inc. Sec. Litig.*,
235 F. Supp. 2d 1063 (N.D. Cal. 2002) ....14

*Ironworkers Local 580-Joint Funds v. Linn Energy*, LLC,
29 F. Supp. 3d 400 (S.D.N.Y. 2014) ....11

*Karpov v. Insight Enters., Inc.*,
No. CV 09-856-PHX-SRB, 2010 WL 4867634 (D. Ariz. Nov. 16, 2010), *aff'd*, 471 F. App'x 607 (9th Cir. 2012) ....19

*Knox v. Yingli Green Energy Holding Co. Ltd.*,
No. 2:15-cv-04003-ODW, 2016 WL 6609210 (C.D. Cal. May 10, 2016) ....16, 17

*Lipton v. PathoGenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) ....24

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ....28

*Loos v. Immersion Corp.*,
762 F3d 880 (9th Cir. 2014) ....28

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) ....6, 7, 24, 25

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*,
No. 15 Civ. 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ....12

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ....15

*Plumley v. Sempra Energy*,
No. 3:16-cv-00512-BEN-AGS, 2017 WL 2712297 (S.D. Cal. June 20, 2017) ....24

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .... *passim*

*Romine v. Acxiom Corp.*,
296 F.3d 701 (8th Cir. 2002) ....8

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ....24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ....................................................................................................7

*Webb v. SolarCity Corp.*,
884 F.3d 844 (9th Cir. 2018)....................................................................6, 7, 14, 23

*Zamir v. Bridgepoint Educ., Inc.*,
No. 15-CV-408 JLS (DHB), 2018 WL 1258108 (S.D. Cal. Mar. 12, 2018) .......................27

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)........................................................................ *passim*

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. § 78u-4(a) *et seq*. ..........................................................................................1

15 U.S.C. § 78u-4(b)(1)(B) ..........................................................................................6

15 U.S.C. § 78u-4(b)(2)(A) ..........................................................................................7

15 U.S.C. § 78u-4(b)(3)(A) ..........................................................................................7

Fed. R. Civ. P. 9(b)..........................................................................................................1

Fed. R. Civ. P. 12(b)(6) ...................................................................................................1

17 C.F.R. § 229.10(e)(i) ...................................................................................................9

17 C.F.R. § 229.10(e)(1)(ii)(B) .......................................................................................10

17 C.F.R. § 244.100 (a)(1) ................................................................................................9

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on January 31, 2019, at 8:00 a.m., before The Honorable William H. Alsup, United States District Court, Courtroom 12, 19th Floor, 450 Golden Gate Avenue, San Francisco, Defendant Symantec Corporation ("Symantec" or the "Company") will move to dismiss the Consolidated Class Action Complaint for Violations of Federal Securities Laws ("Complaint") pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u-4(a) *et seq*., and Fed. R. Civ. P. 9(b) and 12(b)(6). This Motion is based on this Notice of Motion and Motion; Memorandum of Points and Authorities; Symantec's Request for Judicial Notice and Notice of Incorporation By Reference; the Declaration of Cheryl W. Foung ("Foung Decl.") and accompanying exhibits; the [Proposed] Order; the pleadings, records and papers on file; oral argument; and, any other matters properly before the Court.

## STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3))

1. Does the Complaint allege an actionable false statement made with scienter under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5?

2. Does the Complaint allege specific facts demonstrating loss causation with respect to the August 2, 2018 disclosure, as required to state a claim under Section 10(b)?

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This securities class action is based on Symantec's announcement on May 10, 2018, that its Audit Committee was investigating various claims made by a former employee. Symantec's stock price declined and this lawsuit predictably followed. The Audit Committee performed an exhaustive investigation, assisted by independent counsel and an outside accounting firm. It concluded in September 2018 that: (i) there was no basis to restate any prior financial statements (revenue from a transaction representing less than 1% of preliminary 4Q18 revenue was deferred into 1Q19); and, (ii) no employment actions should be taken against any Section 16 officer. Symantec filed its 2018 annual report on Form 10-K on October 26, 2018, with its auditors concurring that Symantec's internal controls over financial reporting were effective as of March 31, 2018 and providing a clean audit opinion.

With the fog of the investigation lifted and the conclusions now known, Plaintiff struggles to posit a theory of fraud. Although Plaintiff alleges that Symantec violated various revenue recognition rules, its five sources offer nothing more than innuendo, rumor, and speculation. None demonstrates knowledge of revenue recognition rules, or refers to a single improperly recorded transaction. Plaintiff also alleges that Symantec was too aggressive in classifying certain costs as transitional or transformational and excluding them from non-GAAP financial measures. Given Symantec's fulsome and transparent disclosures about these costs, Plaintiff cannot show any deception. Moreover, only one source, with no background in accounting, addresses this issue but identifies no costs that were improperly classified. The sole specific cost that Plaintiff mentions (a multi-year infrastructure project) falls precisely within the type of transformational cost that Symantec disclosed it excluded from non-GAAP income.

Plaintiff's effort to concoct a claim based on a "clash of cultures" theory after Symantec acquired Blue Coat Systems, Inc. ("Blue Coat") in August 2016 and Blue Coat's executives took the helm of Symantec likewise fails for lack of specificity. Unsurprisingly, the post-acquisition integration of the companies created challenges for some employees, which may explain the sniping reported in the Complaint. There was significant change but no securities fraud.

Nor can Plaintiff base a claim on Symantec's compensation methodologies and use of non-GAAP metrics. Symantec continued its pre-Blue Coat acquisition practice of reporting both GAAP and non-GAAP financial measures; amply explained that it used non-GAAP metrics to give more transparent operational information to shareholders; provided the required reconciliations to GAAP; and, disclosed how it tied executive compensation to non-GAAP targets. Shareholders repeatedly endorsed the compensation methods in advisory say-on-pay votes.

The Complaint also fails to plead a strong inference of scienter. Conspicuously absent is the compelling fact that Symantec's new CEO (Gregory Clark) *purchased $40 million of Symantec stock* from his share of the Blue Coat proceeds at closing and agreed to a lock-up. After the acquisition, both Messrs. Clark and Noviello were immediately invested in millions of Symantec shares. They held more Symantec equity at the end of the Class Period than at the beginning and sold only small percentages of their available holdings. Because their interests

were aligned with Symantec's shareholders, it would be illogical to undertake actions to harm Symantec. These undisputed facts negate scienter and require dismissal as a matter of law.

## STATEMENT OF FACTS

**The Transformation Of Symantec's Business**. Symantec provides cyber security products, services, and solutions to more than 350,000 organizations and 50 million individuals worldwide. ¶ 23; Ex. 16: 227.[1] As Plaintiff alleges, Symantec experienced a significant transformation in the last three years. Symantec sold Veritas, a software storage and backup/recovery company, in January 2016 for $7 billion; acquired Blue Coat, a leader in the web and cloud security industry, in August 2016 for $4.65 billion; and acquired LifeLock, a consumer identity-protection company, in February 2017 for $2.3 billion. These significant changes solidified Symantec's status as one of the world's "most dominant providers of cybersecurity solutions." ¶¶ 2, 3, 27, 36. Mr. Clark, Blue Coat's former CEO, became Symantec's CEO upon the acquisition and Mr. Noviello, from Blue Coat, became Symantec's CFO on December 1, 2016. ¶¶ 2, 21; Ex. 8:133. Mark Garfield continued as Symantec's Chief Accounting Officer until August 7, 2017. ¶ 22. Symantec reported FY18 net revenues of $4.8 billion, up 34% from $3.6 billion for FY16. Ex. 16:228.[2]

**Symantec Thoroughly Disclosed Its Reliance On Non-GAAP Measures**. Before the Blue Coat Acquisition and throughout the Class Period, Symantec publicly filed its financial statements under GAAP and also reported its performance under clearly-articulated non-GAAP metrics, including for revenue, operating income, operating margin, and EPS. Each quarter, Symantec reconciled its non-GAAP measures to GAAP.[3] For example, the day before the Class Period, Symantec disclosed for the three-month period ended March 31, 2017:

---

[1] ¶¶ 2, 3, 23-25, 27, 36, 39-40; Ex. 8:133. Exhibits are bates-stamped for the Court's convenience. All references to "¶" are to the Complaint. Emphasis is added unless noted otherwise.

[2] Symantec's fiscal year ends in March each year. For example, FY17 ended on March 31, 2017. The first, second, and third quarters of each fiscal year end in June, September, and December, respectively.

[3] *See*, *e.g.*, Ex. 2:21-28, 36-39; Ex. 4:56-57, 62-64; Ex. 9:144, 149, 151; Ex. 10:163, 168-170; Ex. 12:185, 191-193; Ex. 14:215-217.

| | GAAP (000s) | Non-GAAP (000s) |
|---|---|---|
| Net revenues | $1,115 | $1,176 |
| Gross margin | 76.8% | 83.2% |
| Operating expense | $1,034 | $664 |
| Net income | $(143) | $184 |
| Diluted net income per share | $(0.29) | $0.28 |

Ex. 2:36; *see also* Ex. 8:135.

Symantec has provided future financial guidance based on both GAAP and non-GAAP measures. It consistently disclosed and explained why it has used non-GAAP operating income, non-GAAP revenue, and non-GAAP EPS to set targets for executive compensation programs and to assess Symantec's performance. Ex. 18:269, 272. For example, the third page of Symantec's Proxy Statement (filed, Sept. 5, 2017) was devoted to "Use of GAAP and Non-GAAP Financial Information," stating:

> Our results of operations have undergone significant change due to the impact from a series of acquisitions, stock-based compensation, discontinued operations, restructuring, transition and other costs and other corporate charges. To help our readers understand our past financial performance and our future results, we supplement the financial results that we provide in accordance with generally accepted accounting principles, or GAAP, with non-GAAP financial measures.

Ex. 8:132. Symantec explained that it was providing non-GAAP metrics to be transparent with investors, because management "regularly uses...supplemental non-GAAP...to understand, manage and evaluate [the] business and [to] make operating decisions." *Id.*[4] As this Court noted in another case involving non-GAAP metrics, "the critical key to understanding defendants' methodology was adequately and repeatedly disclosed" and "[given the company's] regular disclosure of the calculation...defendants cannot be said to have failed to disclose this material information." *In re Netflix, Inc. Sec. Litig.,* No. C04-2978 WHA, 2005 U.S. Dist. LEXIS 30992, at *26 (N.D. Cal. Nov. 18, 2005).

**The Audit Committee's Investigation And Conclusions**. On May 10, 2018, Symantec disclosed that its Audit Committee ("AC") had "commenced an internal investigation in connection with concerns raised by a former employee," and "retained independent counsel and

---

[4] Symantec also routinely explained its publication of non-GAAP measures during quarterly conference calls. *See, e.g.*, Ex. 5:77.

other advisors to assist in its investigation." Ex. 12:186; ¶ 9. Symantec "voluntarily contacted the Securities and Exchange Commission to advise that an internal investigation is underway" and has been cooperating with the SEC. Ex. 12:186. Symantec warned that its Form 10-K for FY18 likely would be delayed. *Id.*; ¶ 9. Although Symantec reported preliminary results for 4Q18 and FY18, it cautioned that its "financial results and guidance may be subject to change based on the outcome of the Audit Committee investigation." Ex. 12:186. On May 14, 2018, Symantec explained that a former employee had raised concerns regarding public disclosures about historical financial results, reporting of certain non-GAAP measures impacting executive compensation, forward-looking statements, stock trading plans, and retaliation. *See* Ex. 13:198; ¶ 160. On August 2, 2018, Symantec reported its preliminary financial results for 1Q19. These results were below its prior guidance and the stock price declined. Contrary to Plaintiff's allegations (¶ 10), Symantec made no further disclosures about the AC investigation, other than to report that it was "ongoing." Ex. 14:209. *See infra* at 27-28.

On September 24, 2018, Symantec announced the completion of the AC's investigation and its conclusions. Although finding "relatively weak and informal processes with respect to some aspects of the review, approval and tracking of transition and transformation expenses," the AC noted that Symantec, since 2Q18, had "initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures." Ex. 15:221; *see* ¶¶ 109, 174, 177. Significantly, the AC determined that there would be no restatement of historical financial results; other than the immaterial deferral impacting preliminary 4Q18 results, there were no adjustments to previously reported non-GAAP metrics. Ex. 15:221. Notably, the AC did not recommend any employment actions or claw-back of compensation against Messrs. Clark, Noviello, or any Section 16 executive officer. *Id.* Separate from financial reporting issues, the AC identified certain behavior inconsistent with Symantec's Code of Conduct, which was referred to Symantec for appropriate action. *Id.* at 222; ¶ 175. The AC recommended enhanced internal controls and procedures, including re-filling as separate positions Chief Accounting Officer and Chief Compliance Officer, and clarifying the Code of Conduct and related policies. Ex. 15:222; ¶ 178.

On October 26, 2018, Symantec filed its Form 10-K for FY18.  ¶ 181.  Significantly, management concluded that the internal controls over financial reporting were effective, and its outside auditors (KPMG) agreed, stating that Symantec "maintained, in all material respects, effective internal control over financial reporting as of March 30, 2018."  Ex. 16:232.  Indeed, Symantec and its auditors did not identify any material weaknesses in their evaluation of internal controls over financial reporting.

**The Allegations Of The Complaint**.  The Complaint names as Defendants Symantec, Messrs. Clark, Noviello, and former CAO Mr. Garfield.  ¶¶ 19-22.  It asserts that Defendants made false and misleading statements in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 from May 11, 2017 to August 2, 2018 in Symantec's annual and quarterly SEC filings, press releases, and earning calls concerning GAAP reported revenue and non-GAAP metrics including revenue, operating expenses and income, and the adequacy of internal controls.  ¶¶ 1, 186.  Plaintiff alleges that Symantec's FY17 Proxy Statement, describing its executive compensation practices (¶¶ 218-220), was false for the same reasons.  Plaintiff alleges that the Form 8-K (filed, Aug. 8, 2017) reporting Mr. Garfield's departure was false (¶¶ 216-217).

## THE STANDARDS APPLICABLE TO THIS REFORM ACT CASE

To state a claim under Section 10(b) and Rule 10b-5, Plaintiff must plead specific facts showing: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Webb v. SolarCity Corp*., 884 F.3d 844, 850 (9th Cir. 2018) (citation omitted).  To plead falsity, "the complaint shall specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  If "an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); *In re Daou Sys., Inc. Sec. Litig*., 411 F.3d 1006, 1014 (9th Cir. 2005).  The Reform Act imposes "formidable pleading requirements," including "exacting requirements for pleading 'falsity'" and "the pleading of specific facts" indicating why those statements were false.  *Metzler Inv. GMBH v. Corinthian*

*Colls., Inc.*, 540 F.3d 1049, 1054-55, 1070 (9th Cir. 2008).

A plaintiff must also "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Scienter requires deliberate recklessness or conscious misconduct. *Id.* Deliberate recklessness "is an extreme departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SolarCity*, 884 F.3d at 851 (citation omitted). Where, as here, Plaintiff relies on sources to establish scienter, the sources "must be described with sufficient particularity to establish their reliability and personal knowledge" and their purported information must "be indicative of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).

In weighing scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). Only factual allegations that are "compelling," "persuasive," "effective," and "powerful" support a strong inference. *Id.* "A complaint will survive...only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. This "bar set by *Tellabs* is not easy to satisfy." *SolarCity*, 884 F.3d at 855. Courts consider scienter allegations holistically. *Id.* A complaint not meeting these requirements "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3)(A).

## ARGUMENT

## I. THE COMPLAINT DOES NOT PLEAD AN ACTIONABLE FALSE OR MISLEADING STATEMENT.

### A. Plaintiff Fails To Plead Specific Facts Showing That Symantec's Financial Statements Were False.

Plaintiff alleges that Symantec's financial statements were false because of improper revenue recognition, manipulation of non-GAAP operating expenses by improperly excluding routine costs as transition costs to increase executive compensation, and inadequate internal

controls.[5]  Because Plaintiff offers no specific instances, only the hearsay, rumor, and speculation of its sources, Plaintiff fails to establish falsity.

### 1.    Plaintiff Fails To Identify Specific Instances Of Improper Revenue Recognition.

The Complaint includes a generic section on "GAAP Revenue Recognition Principles" followed by a list of Symantec's supposed violations.  Plaintiff alleges that all of the challenged financial statements were false because Symantec recognized revenue on sales that i) did not have a signed contract, ii) did not go through required approval channels, or iii) contained unapproved extended terms where collectability was not probable or where the customer was unable or unwilling to pay.  Plaintiff also claims that Symantec improperly recognized deferred revenue from an acquired company.  *See* ¶¶ 43-59; *see also* ¶ 190 (2017 Form 10-K); ¶ 205 (1Q18); ¶¶ 223-224 (2Q18); ¶¶ 237-238 (3Q18); ¶ 253 (4Q18).  These allegations fail because Plaintiff pleads *no specific examples* that any of this ever occurred.  *See Daou*, 411 F.3d at 1016 (allegations of improper revenue recognition require basic details such as approximate amount of overstatement, products involved, dates of transactions, and identities of customers involved).

The only specific transaction alleged is the one the AC itself identified—the immaterial deferral of $12 million for one contract from 4Q18 to 1Q19.  ¶¶ 62, 176; Ex. 15:221.  This deferral reduced revenues for 4Q18 by less than 1%—from $1.222 billion to $1.210 billion.  Ex. 12:184, 185; Ex 16:229.  Such an inconsequential change is immaterial as a matter of law.  *See In re Apple Comput., Inc., Sec. Litig.*, No. C-01-3667 CW, 2003 WL 26111982 (N.D. Cal. Aug. 13, 2003), *aff'd on other grounds*, 127 F. App'x 296, 304 (9th Cir. 2005) (Apple's miss of $2 billion revenue projection by $130 million (less than 10%) immaterial).[6]  Moreover, Plaintiff fails to plead

---

[5] The allegedly false statements include: Symantec's Form 10-K for FY17;  its press releases, conference calls and quarterly reports on Form 10-Q for 1Q18, 2Q18, and 3Q18; and its press release and conference call reporting preliminary results for 4Q18.  *See* ¶¶ 187 & 195 (4Q17); ¶¶ 202 & 210 (1Q18); ¶ 221 (2Q18); ¶¶ 235 & 244 (3Q18); and ¶¶ 251 & 260 (preliminary 4Q18 and FY18 results).

[6] *See In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 765-66 (N.D. Cal. 1997) (revenues only five percent below market expectations were "immaterial as a matter of law"); *Romine v. Acxiom Corp.*, 296 F.3d 701, 706-08 (8th Cir. 2002) (1% reduction in quarterly revenue not material).

specific facts tying this deferral to any of the alleged violations of GAAP.

Lacking specific transactions, Plaintiff erroneously contends that Symantec's September 24 press release "admitted" that its financial statements for 4Q18 and 1Q19 would "be restated" (¶ 62; *see* ¶¶ 270, 280). That is false: there has been no restatement. *See Biotechnology Value Fund, L.P. v. Celera Corp.*, 12 F. Supp. 3d 1194, 1201-02 (N.D. Cal. 2013) ("at least one central allegation—concerning the...email...is *not* as plaintiff claims" where the document did not mention much less challenge the subject study). The results for 4Q18 and FY18 announced on May 10 were only preliminary, and less than 1% of revenue was later deferred into 1Q19. *See* Ex. 12:184; Ex. 14:209 (4Q18 "and subsequent periods remain open periods from an accounting perspective, subject to adjustment for material updates"). As the AC found, and as KPMG concurred, there was no basis for a restatement.

### 2. Plaintiff Fails To Plead Specific Instances Where Transition Costs Were Improperly Excluded From Non-GAAP Income.

Plaintiff claims that Symantec violated Regulation G and SEC disclosure rules because it misleadingly excluded certain costs (classified as restructuring, separation, and transition costs) from non-GAAP income, thereby presenting misleadingly favorable non-GAAP metrics and enabling executives to meet compensation targets keyed to non-GAAP metrics.[7]

This argument fails. Symantec complied with Regulation G, applicable to statements not filed with the SEC, such as conference calls or press releases (¶¶ 94, 96-97). Regulation G permits the use of non-GAAP metrics if they are presented with the "most directly comparable [GAAP] financial measure" and are accompanied by a reconciliation to GAAP and sufficient facts so that the presentation is not misleading. 17 C.F.R. § 244.100 (a)(1); *see* 17 C.F.R. § 229.10(e)(i). Symantec complied with these requirements. *See Netflix*, 2005 U.S. Dist. LEXIS 30992, at *30-31 (no violation of Regulation G or Regulation S-K, Item 10, where reconciliation of non-GAAP to GAAP was not misleading, company's calculation disclosed "all the inputs," "add[ed] back in stock-based compensation" and other metrics and explained utility).

---

[7] *See* ¶¶ 91-98; 191-195 (4Q17 and FY17); ¶¶ 206-210 (1Q18); ¶¶ 241-244 (3Q18); and ¶¶ 255-262 (4Q18).

Plaintiff's reliance on Regulation S-K, Item 10(e) (17 C.F.R. § 229.10(e)(1)(ii)(B)) is mistaken because it does not apply to the costs at issue. Item 10(e), which applies to non-GAAP measures in financial statements filed with the SEC, provides that recurring costs should not be misleadingly classified as non-recurring and excluded from non-GAAP financial metrics. It prohibits the "adjust[ment of] a non-GAAP performance measure to eliminate or smooth *items identified as non-recurring... when... it is reasonably likely to recur*[.]" ¶ 95. Although Plaintiff accuses Symantec of "wrongly account[ing] for [transition] costs as if they were non-recurring" (¶ 104; *see* ¶¶ 91, 268), *Symantec did not report or identify its costs as "non-recurring" and Plaintiff cites none.*[8]

Highlighting Plaintiff's confusion, the Complaint notes that the SEC's Division of Corporation Finance provides "rent" as an example of a recurring cost that should not be excluded. ¶ 98. *But Plaintiff provides no example of a routine "recurring" cost—like "rent"—that Symantec treated as non-recurring*. Instead, Symantec disclosed that it was evaluating and excluding from non-GAAP metrics costs related to "restructuring or transition" activities. These are costs "unrelated to the Company's core operations" that are not reflective of current operating performance. Ex. 2:16, 35. For example, at the start of the Class Period, Symantec explained what it was doing and why in detail:

> Transition and associated costs primarily consist of consulting charges associated with the *implementation of new enterprise resource planning systems* and costs to automate business processes. Additionally, other costs primarily consist of asset write-offs and advisory fees incurred in connection with restructuring events. Each restructuring, transition and other activity has been a discrete event based on a unique set of business objectives or circumstances, and each has differed from the others in terms of its operational implementation, business impact and scope. *We do not engage in restructuring, transition or other activities in the ordinary course of business.*

*Id*. at 31. Symantec repeated similar disclosures throughout the Class Period. *See* Ex. 11:176 ("Transition costs are incurred in connection with Board of Directors approved *discrete strategic information technology transformation initiatives* and primarily consist of consulting charges

[8] *Cf. In re Rackable Sys., Inc. Sec. Litig*., No. C-09-0222 CW, 2010 WL 3447857, at *1 n.3 (N.D. Cal. Aug. 27, 2010) (Rackable states it "excludes from its non-GAAP gross margin...and net income 'certain nonrecurring items...because such times are not related to the...ongoing core operating performance'").

associated with our enterprise resource planning and supporting systems and costs to automate business processes."); Ex. 4:65; Ex. 9:152-153; Ex. 10:171; Ex. 12:194; Ex. 14:218.

Symantec's decision to exclude from non-GAAP metrics the costs associated with large-scale ERP systems and information technology initiatives made perfect sense, given its transformation through the divestiture of Veritas and acquisitions of Blue Coat and LifeLock. Disclosing non-GAAP metrics gave investors a more transparent understanding of Symantec's operations at a time of significant change. Costs associated with massive new ERP systems, IT system consolidations, asset write-offs, or restructurings following major acquisitions *concern long-term strategic planning and investment*, not the routine operation of the business. Plaintiff claims that because such costs were "continuing" (*i.e.*, incurred over more than one quarter) they were "recurring" costs akin to rent. ¶ 98. That is baseless. The integration costs for Blue Coat and LifeLock were discrete events; they were neither "recurring" just because they spanned more than one quarter, nor "reasonably likely to recur within two years." *Id.* The costs associated with Symantec's transformative effort were properly disclosed and excluded from non-GAAP metrics.

Plaintiff's only "specific" example underscores the propriety of Symantec's classification. The sole source who even addresses such costs—the former VP and Chief Security Officer ("CSO")—asserts that his boss (the Chief Information Officer) referred to the "building of a private cloud using Cisco technology" where Symantec would "be in the next 4-5 years." ¶¶ 116, 110 ("significant cloud infrastructure projects"). The transformative building of a cloud over five years falls precisely within what Symantec described as "*transition costs...incurred in connection with Board of Directors approved discrete strategic information technology transformation initiatives*[.]" ¶ 241. The fact that transformative projects take time and associated costs span years do not render them routine "recurring" costs. ¶¶ 156, 104. Plaintiff's failure to cite a single instance where Symantec misclassified routine costs as transition costs compels dismissal of this allegation. *See Ironworkers Local 580-Joint Funds v. Linn Energy*, LLC, 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014) (dismissing; "Plaintiffs are unable to identify a single instance in which [defendant's] disclosures of how it calculated adjusted EBITDA...were incorrect").

Plaintiff tries to argue falsity by claiming that Symantec's competitors did not make

adjustments "similar to [Symantec's] 'transition costs' adjustment." ¶ 108. Yet, Plaintiff fails to plead a single fact demonstrating that such a comparison is warranted. Plaintiff fails to plead that the alleged peers acquired companies with the size and complexity of Blue Coat and LifeLock ($4.65 and $2.3 billion, respectively), divested a company analogous to Veritas ($7 billion), or allege that the "peers" otherwise transformed their business as Symantec has done.

Plaintiff also ignores that the classification of transition costs in the context of non-GAAP performance measures is a highly judgmental exercise, like many accounting determinations. *See, e.g.*, *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15 Civ. 6034 (RJS), 2016 WL 5794774, at *12 (S.D.N.Y. Sept. 30, 2016) (report of EBITDA, a non-GAAP metric, not required to employ "industry standard" methodology where no right formula or definition to non-GAAP metrics exists). Plaintiff offers no facts that Defendants exercised their judgment unreasonably, much less recklessly.

**3. Plaintiff Pleads No Specific Facts That Internal Controls Were Ineffective**.

Plaintiff alleges that each of the challenged financial statements is false because Symantec lacked adequate controls over financial reporting. ¶¶ 199-201, 213-215, 232-234, 248-250. Yet, Plaintiff does not allege that the failure of any specific control led to a material misstatement of any financial statement. At best, Plaintiff points to the less than 1% reduction in preliminary revenue for 4Q18. But the fact that Symantec made this adjustment before filing its financial statements shows Symantec's controls worked. It is undisputed that Symantec's auditors concurred with management that the internal controls were effective with no material weaknesses. Ex. 16:230-231; ¶ 199. Plaintiff simply ignores the AC's conclusions and KPMG's audit opinion. ¶¶ 57-59, 199, 201. That the AC recommended enhancements to existing controls is unsurprising and does not suggest that existing controls were inadequate.

**B. The Confidential Witnesses Offer No Meaningful Information Demonstrating That Defendants Made A False Statement Or Acted With Scienter**.

Plaintiff relies on five unnamed sources, purportedly former Symantec employees or contractors, to allege both that Defendants made false statements and acted with scienter. Confidential source information "must be described with sufficient particularity to establish their

reliability and personal knowledge," and the information itself must be indicative of scienter." *Zucco*, 552 F.3d at 995 (citations omitted). Courts look to "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged..., the coherence and plausibility of the allegations, the number of sources, the reliability...and similar indicia." *Id.* at 995. Here, in addition to the vagueness and insufficiency of each source's allegations, the sources all suffer from the same fundamental defects that courts routinely find inadequate.

**1. The Overall Failings Of All Confidential Sources.**

*First*, not a single source is alleged to be an accountant, to be involved in revenue recognition decisions, or to have participated in the preparation of publicly-reported financial information. Sources must be "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." *Daou*, 411 F.3d at 1015; *see Zucco*, 552 F.3d at 996-97 (human-resources employee with no firsthand knowledge of finance department had no basis for claim that "decisions about what to capitalize were made...by highly-placed finance employees"). Because the Complaint fails to describe any source's responsibilities and functions in detail, the Court cannot infer that any source participated in or understood revenue recognition, cost accounting, or the use of non-GAAP measures. Merely reciting the source's job title is insufficient. *See In re Northpoint Commc'n Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 1000 (N.D. Cal. 2001) (no identity of "what the specific duties...were").

*Second*, not a single source cites a specific example of an improper accounting entry that had a material impact on the challenged financial statements. To state a claim for accounting fraud, Plaintiff must plead facts showing that Defendants "prepared the fraudulent financial statements and that the alleged financial fraud was material"; a court must be able to discern "'whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.'" *Daou*, 411 F.3d at 1016-17 (citations omitted); *see Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1212, 1214 n.2 1209, 1211 (S.D. Cal. 2005) (same).

*Third*, while Plaintiff contends the "Individual Defendants directed the accounting

manipulations that gave rise to the false statements" (¶ 265), no source directly reported to or had a direct conversation with any individual defendant about revenue recognition or the preparation of the financial statements, or in which any individual defendant directed an improper accounting entry. *See Zucco*, 552 F.3d at 988, 998 (notwithstanding restatement, sources lacking direct contact with individual defendants do not have "reliable personal knowledge of the defendants' mental state" and are inadequate to support scienter); *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062-63 (9th Cir. 2014) 759 F.3d at 1062-63 (finding inadequate witnesses who lacked "direct access to the executives" and "first-hand knowledge regarding what the individual defendants knew"); *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) (accounting fraud claim not corroborated by CW statements where no CW had "any first-hand knowledge of [defendant's] accounting decisions"). Four sources (¶¶ 69, 73, 75, 81) are not alleged to have worked at corporate headquarters, where the financial statements were prepared.

  *Fourth*, not a single source was employed for the entire fourteen-month Class Period,[9] and none has personal knowledge of any practices when they were not employed.[10] *See Zucco*, 552 F.3d at 996 (rejecting CWs not employed during time period who have only secondhand information about accounting practices). Because none was employed after October 2017, for example, no source can provide information concerning the third or fourth quarters of FY18. ¶¶ 64, 68, 71, 75, 81. Indeed, three of the five sources were employed only for the first few months of the Class Period (1Q18) (¶¶ 64, 68, 75).

---

  [9] *See* ¶ 64 (Chief Security Officer, present "through June 2017", approximately two months); ¶ 68 (Senior Manager, Pricing & Licensing, present "until June 2017", approximately two months); ¶ 75 (Senior Financial Analyst, present "from May 2017 to July 2017," three months); ¶ 71 (Manager, Bill and Collect-Finance, Americas, present "until October 2017"); ¶ 81 (Account Manager, present "until October 2017").

  [10] *See NVIDIA*, 768 F.3d at 1061, 1062 (rejecting CWs who either stopped working long before problem arose or worked in unrelated area); *In re Netflix, Inc. Sec. Litig.*, 964 F. Supp. 2d 1188, 1198 (N.D. Cal. 2013) (CWs not employed by Netflix at relevant time), *aff'd*, 647 F. App'x 813 (9th Cir. 2016). Because the confidential witnesses offer no specifics about their period of employment, they cannot support an inference that supposedly improper actions may have occurred after their employment. *Cf. SolarCity Corp.*, 884 F.3d at 851 n.1 (court may consider CWs not employed during class period if pre-class period information confirms what defendant should have known during class period).

*Fifth,* the "most direct way to show" that a statement was knowingly false "is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Local 144 v. Oracle Corp*., 380 F.3d 1226, 1230 (9th Cir. 2004); *see Northpoint*, 184 F. Supp. 2d at 997 (report may show "information directly at odds with an alleged misrepresentation"). No source refers to an internal document or report. *See Intuitive*, 759 F.3d at 1063 ("negative characterizations of reports...without specific reference to the contents of those reports, are insufficient"). These overall failings render each confidential source inadequate. Each source's information is no more than inadequate gossip, innuendo, or rank speculation.

**2. The Specific Failings Of Each Confidential Source**.

**Former VP and Chief Security Officer (CSO)**. Plaintiff's allegation that Symantec improperly excluded certain costs from non-GAAP metrics relies almost entirely on one confidential source, the CSO. ¶¶ 197(b), 211(b), 230(b), 246(b), 262(b). The CSO's job was to execute an information security program to protect Symantec, its people, infrastructure, assets and data. No facts are alleged showing he was involved in accounting or had responsibilities or even training that indicates knowledge of revenue recognition, cost accounting, or GAAP or non-GAAP financial measures. He was employed for only the first month of the Class Period. ¶ 64. Despite these failings as a source, he is the centerpiece of the Complaint, which devotes eight paragraphs to his supposed concerns about costs. ¶¶ 110-117.

The *CSO does not identify a single cost that allegedly was misclassified*. He offers only that "things…put in the transformation…bucket…were questionable." ¶ 117. His speculative references (¶¶ 110-113) to "a huge number of projects," "incredible scrutiny at the budget level," supposedly "operational" projects "now being put into this transformational bucket," and the "increasingly widely used" transformational bucket beg the question: what specifically is he talking about and how did he know it was improper, let alone fraudulent? *See Zucco*, 552 F.3d at 997-98 (rejecting that "some expenses not directly related to a program were charged to that program"; CWs provided no "particulars of the alleged transgressions").[11]

---

[11] *See Graves v. AECOM*, No. LA CV16-06605 JAK (KSx), 2017 WL 5502774, at *8-9 (C.D. Cal. June 19, 2017) (CW lacks knowledge of practice impacting non-GAAP metric).

Indeed, the only example he provides—the "building of a private cloud using Cisco technology" that could require 4-5 years (¶¶ 114-116)—is exactly the type of transition cost that Symantec disclosed, *i.e.*, "strategic information technology transformation initiatives." Ex.11:176. While he speculates about cost-control pressure on his boss (the CIO), the CSO does not even contend that his boss committed any improprieties. *See Zucco*, 552 F.3d at 997 (rejecting CW hearsay statement failing to specify nature of allegedly improper entries).

With respect to revenue recognition, the CSO offers only vague generalities, nothing specific. For example, Mr. Clark allegedly talked about the ability to be flexible in "shift[ing] and record[ing] revenue because it was a hardware business." ¶ 65. What precisely does this even mean, why is it improper, and when did it occur? He cannot even state the dates of any related "meetings," or whether he attended such meetings. *See Northpoint*, 184 F. Supp. 2d at 1001 (witness omits "who attended the meeting, what the payments were, when they were made, or what representations [were] made"). He does not identify any instance where Mr. Clark required any employee to improperly record revenue. His meaningless statements like "Clark's views on 'opportunities' to be 'flexible'...were not a secret" cannot support a claim. ¶¶ 66, 265.

The CSO asserts that Symantec opened a "number of investigations...about the Blue Coat leadership and unethical behavior, including the leveraging of Company expenses and resources, and how the Company was closing deals." ¶¶ 67, 275. He offers nothing to suggest these investigations concerned Defendants or any specifics about the matters investigated. Further undermining this statement is that the AC's investigation found no wrongdoing by Defendants.

**Strategic Account Manager, Verizon (Verizon SAM)**. The Verizon SAM asserts that the Head of Global Sales, Mr. Tchejeyan, "made a personal, verbal deal" to "give Verizon $1 million off of the entire transaction" in order to close a deal in 4Q17. ¶¶ 83, 84. Apparently, Mr. Tchejeyan's involvement overrode the normal approval process and caused consternation for her because the discount ("renewal rate") was too high. Plaintiff does not allege, however, that the Head of Global Sales lacked the authority to offer a discount or suggest any accounting issue at all. The Verizon SAM's job, which is to drive "all net new purchases" (¶ 82), sounds like a sales role. She is not alleged to have accounting knowledge. *See Knox v. Yingli Green Energy Holding*

*Co. Ltd.*, No. 2:15-cv-04003-ODW (MRWx), 2016 WL 6609210, at *12 (C.D. Cal. May 10, 2016) (rejecting alleged improper revenue recognition; CWs not alleged to have "had anything to do with deciding...when revenue was recognized for accounting purposes".)

She claims that the deal was "technically booked" in 4Q17, but later discovered it had been backed out and booked in 1Q18. ¶¶ 85-86. Unperturbed by the supposed ethical violations she describes, the Verizon SAM then admits she wrote "a justification to Defendant Clark documenting the order numbers for Q4 to prove that it actually booked in Q4, [so that she] received credit for the deal as a Q4 deal at the Q4 rate." ¶ 87. Then, after having been paid for this purportedly unethical deal, she claims to have been sufficiently upset to quit. ¶ 81. All she has identified is a discount approved by the Head of Global Sales concerning a deal that apparently was not booked for revenue in the quarter in question for unknown but presumably sufficient reasons. Having admitted justifying the booking of this deal in Q4 for Mr. Clark, the Verizon SAM contends that "Defendant Clark knew and approved of deals that were booked in Q4 2017 and moved to Q1 2018, including one $13 million deal with Verizon, which involved a SOX violation." ¶ 265. The Verizon SAM does not explain why Mr. Clark should have rejected her "justification" and therefore known that his approval "involved a SOX violation."[12]

The Verizon SAM's other information, that "the booking of a Q4 deal in Q1 happened to about five Symantec Account Managers" (¶ 86), or that her boss requested entry into verbal agreements "which would be grounds for termination...2-3 more times" (¶ 90) is just more unsubstantiated speculation. No specifics of any of these supposed deals are provided. *See NVIDIA*, 768 F.3d at 1061 (rejecting CW who provides no specific examples).

**Senior Financial Analyst (Analyst)**. The Analyst, who worked on a temporary contract basis from May to July 2017 (¶ 75), was "tasked with transitioning the merger/acquisition...of Watchful Software." ¶ 75. Watchful Software is a company that Symantec acquired in May 2017. The Analyst, who does not profess to have any knowledge of accounting or post-

---

[12] *See In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 953 (9th Cir. 2017) (CW "statements 'fail to demonstrate the level of detail required to establish personal knowledge of Defendants' alleged state of mind'"; "CW4 at no point alleges that he informed [individual defendants] or other management that the Wallet application was not PCI compliant") (citation omitted).

acquisition adjustments, suggests that Symantec may have improperly discounted Watchful's deferred revenue and recognized it up front. ¶¶ 75-76. Notably, she does not mention the amount involved—presumably an immaterial amount since the entire acquisition was so immaterial that the purchase price was not disclosed.[13] In any event, Plaintiff does not cite to any relevant accounting standard that allegedly was violated. Instead, the write-down of acquired deferred revenue that the Analyst describes is called for under relevant accounting literature. *See* Accounting Standards Codification ("ASC") 805-20-30-1, Business Combinations ("acquirer shall measure the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree at their acquisition-date fair values").

**Senior Manager, Pricing & Licensing (P&L Manager)**. The P&L Manager claims to have information concerning fraudulent revenue recognition. Plaintiff does not describe her job responsibilities and does not claim she had a role in revenue recognition. ¶ 68. In fact, she worked in the Springfield, Oregon office, where no technical accounting or revenue function allegedly occurred, and was employed for less than two months during the Class Period. Nonetheless, she reports that "Symantec was trying to figure out a way to change from a subscription model to a licensing model," and she "knew from a person who had been on [her] team" that "they were changing a lot of those models." ¶ 68. Plaintiff does not allege that anything is wrong with a licensing model or in convincing a customer to make such a change.

The P&L Manager further asserts she is "sure that people were trying to shove revenue through at the end of the quarter," and claims that "a few people" had been asked by an unidentified former Blue Coat Vice President to book orders at quarter-end that "would not be processed, just to meet numbers" and that were backed out after the end of the quarter. ¶¶ 69-70. This multi-layered hearsay allegation is meaningless because these "people" and the transactions involved are never specified. The Ninth Circuit rejects such "unsubstantiated statements without substance or context." *Intuitive*, 759 F.3d at 1063; *Zucco*, 552 F.3d at 997 ("triple hearsay" does

[13] *See Intuitive*, 759 F.3d at 1061-63 (statement that "100% that hospitals were cutting back" omits "how many hospitals were cutting back, how much and when...or whether they were cutting back on system placement or recurring revenue sources").

not "pass muster").[14] Moreover, alleging that "revenue" was shoved in to "meet numbers" and then backed out is consistent with innocent conduct, such as where a company scrutinizes orders after quarter end to determine what should or should not be recognized as revenue. She allegedly knew of problems because "everyone was working long hours together and all sat together" (¶ 69), which again epitomizes uninformed gossip. In sum, she does not identify any transaction, any person involved, or claim to have any knowledge of revenue recognition or what in fact was recorded as revenue in any quarter.

**Manager, Bill and Collect, Finance (Manager Bill & Collect)**. The Manager Bill & Collect was based in Springfield, Oregon until her employment ended in October 2017. ¶¶ 71, 79. Her job responsibilities are not described, other than to say she "had a background in sales"; she does not profess any accounting knowledge and is not alleged to have been involved in revenue recognition determinations. ¶ 71. Like the other sources, her information suffers from a fatal lack of specificity. She offers no more than generalities and hearsay. She refers to an unidentified $6 million deal in January 2016—*before* the Blue Coat acquisition—that "they were allowed to bring it in about two quarters ahead of time"; she claims that "deals like that occurred every quarter after the Blue Coat acquisition," including "deals improperly being pushed through [in] millions of dollars." ¶ 72. She identifies no specific deal, its terms, or why revenue recognition was improper. *See NVIDIA*, 768 F.3d at 1060 (rejecting CW allegations that were "unspecific and speculative"). She suggests that a "sales rep forced" customers to sign deals by providing "extended terms" (¶ 73)—a confused allegation implying only that a salesperson offered terms to close a deal that were disclosed to finance. She assumes "revenue had to have been recognized improperly" because she heard that a Symantec business unit that has since been was sold "is still trying to get paid for deals" done by Symantec. ¶ 73. She offers no specifics about any deal,

---

[14] *See NVIDIA*, 768 F.3d at 1060 (rejecting CW allegations that were "unspecific and speculative"); *Bao v. SolarCity Corp.*, No. 14-cv-01435-BLF, 2016 WL 54133, at *6 (N.D. Cal. Jan. 5, 2016) (rejecting CW allegations based on "vague hearsay"); *Karpov v. Insight Enters., Inc.*, No. CV 09-856-PHX-SRB, 2010 WL 4867634, at *7 (D. Ariz. Nov. 16, 2010) (witness who interacted with sales team and allegedly acquired awareness of problems related to trade credit accounting "appears to be based on inadmissible hearsay"), *aff'd*, 471 F. App'x 607 (9th Cir. 2012).

amounts owed, collected or outstanding at any time. She clearly has no visibility into Symantec's accounts receivable which, in fact, were high quality: for FY18, Symantec reported a bad debt expense of only 0.6% of its account receivable balance. *See* Ex. 16:233.

**C. Symantec's Proxy Statement Is Not Actionable Because It Disclosed The Use Of Non-GAAP Performance Targets In Great Detail.**

Plaintiff alleges that Symantec's 2017 Proxy Statement falsely stated that "executive compensation programs provided 'direct alignment with stockholders'" and that Symantec used "responsible pay policies to reinforce strong governance and enhance shareholder alignment." ¶ 218. Plaintiff alleges these statements were false because Defendants improperly recognized revenue and misleadingly excluded transformation costs from non-GAAP operating income, thereby allowing executives "to meet their annual incentive targets." ¶ 220; *see* ¶¶ 118-124. This claim fails because, as described above, Plaintiff fails to show that any revenue was improperly recognized or that any transition cost was incorrectly excluded from non-GAAP operating income. Symantec disclosed in detail its reliance on non-GAAP performance measures for executive compensation and the specific compensation vehicles used.

**1. Symantec Disclosed Its Performance Under GAAP and Clearly Defined the Differences In Its Non-GAAP Metrics.**

Each quarter, Symantec published charts reconciling non-GAAP metrics to its GAAP equivalent in the financial statements. Symantec explained that it was providing non-GAAP metrics because it believed this information gave investors a more transparent view of the operations of the business:

> We believe our presentation of non-GAAP...taken together with corresponding GAAP financial measures, provides meaningful supplemental information regarding the Company's operating performance.... Our management team uses these non-GAAP financial measures in assessing our operating results...planning, forecasting and analyzing future periods.... [T]hese non-GAAP financial measures also facilitate comparisons of our performance to prior periods[.]

Ex. 9:152. Among the more significant items excluded for purposes of non-GAAP metrics were stock-based compensation charges, which are routinely excluded by many technology companies, and transition and restructuring costs. As described *supra*, Symantec defined transition costs,

explained why they were excluded from non-GAAP operating income, and specified the amounts excluded.[15] Such transparent disclosure neutralizes any claim. *See Netflix*, 2005 U.S. Dist. LEXIS 30992, at *20, *25, *26-28 (where data was disclosed there was "no false statement"; "raw data that would have allowed investors and analysts to calculate churn *using the methods preferred by plaintiffs* were disclosed by Netflix").

**2. Symantec Fully Disclosed Its Executive Compensation Practices.**

Although the Complaint challenges the August 16, 2017 Proxy as false and misleading, that document is consistent with proxies and disclosures before the Class Period. It cannot be disputed that Symantec explained its executive compensation philosophy and set forth its compensation policies in sufficient detail. The 2017 Proxy devoted over 40 pages to a detailed description of executive compensation. Ex. 7:87-128.

Symantec's compensation practices and philosophy preceded the Blue Coat acquisition. Symantec has long been committed to "pay-for-performance" and "governance best practices." *See, e.g.*, *id*. at 85; Ex. 18:266, 268. Its compensation policies are designed to "reward performance that meets predetermined goals." Ex. 18:265; Ex. 7:85. Symantec seeks advice from outside compensation consultants and evaluates its compensation practices against a relevant peer group. Ex. 7:85, 105. Each year, consistent with good corporate governance practices, Symantec submits its executive compensation to an annual advisory say-on-pay vote by shareholders. *Id*. at 91. During the Class Period, shareholders overwhelmingly voted in favor of Symantec's executive compensation methodology. Ex. 19: 278 (87% in favor in FY17).

During the Class Period, Symantec's executives were eligible to receive a salary, cash bonuses, and equity. The majority of equity compensation for executives was through grants of performance-based restricted stock units ("PRUs"). The PRUs were to be earned over time only if Symantec achieved "targeted non-GAAP operating income" over a two to three year period. Ex. 7:86, 90. Executive officers were also eligible for cash bonuses through the annual incentive

---

[15] *See, e.g.*, Ex. 11:176 (transition costs are incurred under Board approved discrete strategic information technology transformation initiatives and primarily consist of consulting charges associated with enterprise resource planning and supporting systems, costs to automate business processes, and expenses associated with divestitures of product lines).

plan.[16] Like the PRUs, the bonuses were based on achieving non-GAAP performance targets. Ex. 7:90; *see id*. at 85, 89, 94 (showing how metrics are defined and formula for compensation). Executive officers also were granted Restricted Stock Units ("RSUs"), which vested based on continued employment. Ex. 7:98-99, 101. All performance targets were disclosed to investors, as were the specific amounts granted to the executives, the amounts vested, and their estimated value. *Id*. at 92-102; Ex. 19:279-291.

Symantec further disclosed that Messrs. Clark's and Noviello's pre-existing Blue Coat options were assumed by Symantec. In addition, based on the rise in Symantec's stock price after the deal was announced and before closing, they were granted additional restricted stock units and performance based restricted stock units by Blue Coat, which converted into Symantec awards; the PRUs would vest based on Symantec's achievement of its performance metrics at the end of FY18. Ex. 1:4; Ex. 8:135. Mr. Clark was granted PRUs and RSUs valued at $38.7 million; Mr. Noviello was granted RSUs and PRUs by Blue Coat that were valued at $8.2 million. Ex. 7:101.

Mr. Clark's ownership of Symantec shares is consistent with Symantec's long-standing policy requiring its senior executive officers to satisfy stock ownership requirements to ensure they "have a financial stake in [the] company." Ex. 7:110. Mr. Clark overwhelmingly satisfied his requirement for FY17 (192,369 shares) as he held 2,742,733 shares as of August 1, 2017 and holds 2,901,511 shares as of October 10, 2018. Ex. 7:111; Ex. 19: 292. Mr. Noviello held 15,425 shares as of August 1, 2017, and timely satisfied his requirement for FY18, holding 363,952 shares as of October 10, 2018. Ex. 19:292.[17] Symantec's executive compensation philosophy and the particulars of its methodology were fully and transparently disclosed to shareholders. Ex. 7:93, 95, 97, 101, 102, 114, 119-122. Plaintiff's assault on their compensation is baseless.

---

[16] Like his predecessor, Mr. Clark was eligible for 100% of his annual base salary of $1 million; this was disclosed before the Class Period and shareholders approved it through the annual say-on-pay vote. Ex. 18: 268, 270-271, 273, 274; Ex. 19:278.

[17] Mr. Noviello has until August 2020 to meet his threshold requirement. *Id*.; Ex. 7:111.

## II. PLAINTIFF DOES NOT OTHERWISE PLEAD A STRONG INFERENCE OF SCIENTER.

Plaintiff's failure to plead scienter provides an independent basis for dismissal.[18] Neither defendants' stock trading, Mr. Garfield's departure, nor the miscellany of recycled assertions (*see* ¶¶ 263-282) give rise to a strong inference of scienter.

### A. Defendants' Stock Trading Refutes Any Inference of Scienter.

Plaintiff alleges that the individual defendants' sales of Symantec stock during the Class Period[19] give rise to a strong inference of scienter. However, stock sales are "suspicious" only if they are "dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005 n.24 (citations omitted). To evaluate stock sales, the court must consider: "(1) the amount and percentage of shares sold; (2) the timing of the sales; and (3) whether sales were consistent with insiders' prior trading history." *Id*. at 1005 (citation omitted). Plaintiff presents a thoroughly misleading picture of the stock sales by ignoring the vested shares, RSUs, and options that each held but did not sell. Properly viewed in context, their sales refute scienter.

On August 1, 2016, when the Blue Coat acquisition closed, Mr. Clark entered a Reinvestment Agreement. Ex. 17:238-261. He *reinvested $40 million of his own money to acquire 2,329,520 shares of Symantec stock*, which he agreed would be locked up for an extended period. Ex. 1:5; Ex. 17:241, 252. This enormous purchase clearly aligned Mr. Clark's interests with those of Symantec's shareholders and undermines any belief that he intended to harm Symantec. *See SolarCity*, 2016 WL 54133, at *7 (chairman purchased 2.1 million shares and CEO purchased 107,000 shares "which weighs against an inference of scienter"); *SolarCity*, 884 F.3d at 856 (affirmed notwithstanding restatement for lack of scienter; "both [CEO and Chairman]

---

[18] *See In re Netflix, Inc. Sec. Litig.*, No. 12-00225 SC, 2014 WL 212564, at *2 (N.D. Cal. Jan. 17, 2014), *aff'd*, 647 F. App'x 813 (9th Cir. 2016).

[19] Messrs. Clark and Noviello did not join Symantec until Blue Coat was acquired in 2016 and their stock transactions must be viewed in that context. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987-88 (1999), *abrogated on other grounds, S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008).

purchased additional stock during the Class Period").[20]

In addition, Mr. Clark *held far more vested shares at the end of the Class Period* (5,273,634) than at the start of the Class Period (207,312). Similarly, Mr. Noviello's *vested holdings increased during the Class Period*. Mr. Noviello held or was vested in 1,165,119 shares at the end of the Class Period, compared to 370,945 shares at the beginning. These facts similarly belie scienter.[21]

Plaintiff argues that Messrs. Clark and Noviello inflated transition costs in order to meet non-GAAP targets set for performance-based equity awards. *See* ¶ 126. *But these Defendants did not sell the PRUs they were granted*, which negates Plaintiff's rhetorical attacks and cannot support an inference of fraud. Moreover, the sales that Defendants did make were modest. Mr. Clark sold shares only once during the Class Period: at the end of August 2017, he exercised some of his old Blue Coat options assumed by Symantec and sold approximately 200,000 shares. At that time, his sales represented only about 4.6% of his available holdings.[22] Mr. Noviello sold 6.96%, 2.63%, 1.58%, 0.78% and 35.15% of his available holdings in May, July, August, September and November 2017, respectively; overall, he sold 27% of his available holdings measured as of the end of the Class Period.[23] These sales are not suspicious. *See Metzler*, 540

---

[20] *See Cho v. UCBH Holdings, Inc.*, No. C 09-4208-JSW, 2011 WL 3809903, at *17 (N.D. Cal. May 17, 2011) (purchases by insiders strongly "weigh[] against an inference of scienter").

[21] *See Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1042-43 (N.D. Cal. 2012) (no scienter; "Defendants held more stock…at the end of the class period than…at the beginning"), *aff'd*, 561 F. App'x 598 (9th Cir. 2014); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (no scienter where officer holds onto most of his company's stock).

[22] Available holdings are shares and vested equity (options, RSUs, and PRUs) held as of a specific date, such as the date of a sale in question. *See Ronconi v. Larkin*, 253 F.3d 423, 435 n.25 (9th Cir. 2001) (exercisable options should be considered in calculating the percentage of shares sold). The percentage calculation for Mr. Clark is: shares sold during the Class Period (200,000) divided by available holdings as of the date of sale (4,391,189), equals 4.6%. *See* Ex. 21:307-308, 310, 312, 315, 318-319, 321-322. His calculation properly excludes 591,622 shares forfeited for taxes as RSUs vested. *See Plumley v. Sempra Energy*, No. 3:16-cv-00512-BEN-AGS, 2017 WL 2712297, at *12 (S.D. Cal. June 20, 2017). Also properly excluded are 1,222,938 shares that were transferred outside of his control to an irrevocable trust because he did not obtain a personal benefit. *See* Ex. 21:310, 315, 324-325, 327-328, 330.

[23] The overall percentage calculation for Mr. Noviello is: shares sold during the Class Period (435,388) divided by the sum of shares sold (435,388) and available holdings at the end of the Class Period (1,600,507), equals 27%. The calculation for his sales on specific dates is simply the amount sold on that date divided by his available pre-sale holdings on that date. His

(continued...)

F.3d at 1058, 1067 (CEO "sold only 37% of his total stock holdings during the Class Period"; "we typically require larger sales amounts-and corroborative sales by other defendants-to allow insider trading to support scienter") (citation omitted). In addition, their sales are not suspicious because they were made under nondiscretionary Rule 10b5-1 plans. *See Metzler*, 540 F.3d at 1067 & n.11.

Mr. Garfield's sales also are not suspicious. He had a regular practice of selling stock before the Class Period (selling 24,595 shares) and during the Class Period (selling 29,466 shares).[24] All of his Class Period sales were made pursuant to a Rule 10b5-1 trading plan he entered into on February 6, 2017, before the Class Period. *Id.* Plaintiff improperly ignores Mr. Garfield's consistent pattern of pre-Class Period sales. *See Intuitive*, 759 F.3d at 1064 (rejecting stock sale allegations for failure to plead prior trading history).

**B. Mr. Garfield's Departure Cannot Support An Inference of Scienter**.

Mr. Garfield resigned from Symantec effective August 7, 2017.[25] The 8-K announcing his departure stated that his "decision to leave...was not due to any disagreement relating to the Company['s] management, policies, or practices." ¶ 216. Plaintiff alleges this statement was false because Mr. Garfield resigned "due to revenue recognition concerns" and his "disagreement relating to the Company's accounting policies and practices," yet "sign[ed] off on the books for the prior financial year (2017) in exchange for a package." ¶¶ 77, 217. Plaintiff does not explain how Mr. Garfield's signature on the Form 10-K dated May 10, 2017 is linked to a pay package on his departure *three months later*. This allegation relies on the CSO, who *left two months before Mr. Garfield resigned.* The CSO does not allege he spoke to Mr. Garfield about his departure. Instead, the CSO relies on hearsay garnered from two other former employees—a former Deputy

---

(...continued from previous page)
calculation excludes 3,784,617 shares forfeited for taxes as RSUs vested. *See* Ex. 22:334, 337, 339-340, 342, 344, 346-347, 349, 351, 353, 355, 357, 359, 361, 363-364, 366, 368, 370-371, 373-374.

[24] *See* Ex. 23:377-378, 380, 382, 384, 386-387, 389-390. *See Metzler*, 540 F.3d at 1058, 1067 (CFO's sales of 100% of total holdings not suspicious where he consistently sold as options vested including before class period) (citation omitted); *Northpoint*. 184 F. Supp. 2d at 1002 (stock sales "are not significantly out of line with their past sales history").

[25] Accordingly, no claim may be asserted against Mr. Garfield for any statements made *after* he left Symantec. The last financial statement he signed was the 2017 Form 10-K, filed on May 19, 2017. Ex. 3:47.

General Counsel and the former head of physical security—that Mr. Garfield left because of unspecified "concerns." ¶ 77. The CSO does not specify how either of these people knew the allegedly true reason for Mr. Garfield's departure. *See* ¶ 78 (it was "common knowledge" among unidentified "senior VPs and EVPs" that Mr. Garfield was "very unhappy" with accounting practices).[26] The CSO does not identify a single accounting entry that Mr. Garfield supposedly disagreed with that was part of a financial statement he signed. These allegations cannot support a strong inference that Mr. Garfield signed financial statements he disagreed with in exchange for a compensation package.

Even further removed is the speculation of the Manager Bill & Collect, who worked in Oregon. She states that "*someone* on Garfield's team...brought *something* forward" and that "*bad numbers* were reported" (¶79) but does not identify a single specific order improperly brought forward, the customer or amount, or a single instance of improper revenue recognition impacting a single challenged financial statement. She claims to know that Mr. Garfield "received a big payout" because Symantec, a company of 11,000 employees in 35 countries, "had a *very family-like mentality and is a small community*." *Id*. Relying on unidentified "*legitimate* conversations," she pronounces "Garfield knew *things* that people did not want him to know." ¶ 80. She asserts in contradictory fashion that Mr. Garfield, knowing of "bad numbers" and taking a "big payout," then blew the whistle on himself by "tipp[ing] off the Audit Committee." ¶¶ 79, 80.[27] Such rampant speculation lacks the requisite specific facts showing that anything untoward occurred in connection with Mr. Garfield's departure.

**C. The Remaining Allegations Fail**.

Plaintiff offers a litany of recycled and repackaged "additional allegations" of scienter. *See* ¶ 264 (Mr. Garfield's departure); ¶¶ 265-266 (improper accounting directed by defendants); ¶ 267 (enhancing internal controls); ¶¶ 268-269 (violation of non-GAAP standards for transition

---

[26] *See Northpoint*, 184 F. Supp. 2d at 1001 (rejecting scienter allegations that executives had knowledge based on positions and access to non-public information).

[27] *See id.* at 1000 (CW allegation that customer refused to pay bills contradicts allegation that the customer paid some bills).

costs); ¶¶ 270, 279 (internal controls found effective without material weaknesses); ¶ 271 (temporal proximity inapposite); ¶¶ 272-274 (financial reports); ¶ 275 (innuendo about post-acquisition "toxic" culture); ¶ 276 (disagreement with financial statements); ¶ 277 (enhancement of controls); ¶ 278 (core accounting violation); 280 (immaterial deferral not connected to supposed accounting violations); ¶ 281 (thorough disclosure of reliance on non-GAAP metrics for executive compensation); ¶¶ 282-283 (defendants' stock trading). All fail because Plaintiff has not pleaded specific facts of falsity or knowledge of falsity. Courts also routinely reject scienter based on allegedly false Sarbanes-Oxley certifications. *See* ¶¶ 199-201, 213-215; *Zucco*, 552 F.3d at 1003-04 (required certifications add nothing to scienter calculus) (collecting cases).

### D. The Competing Inferences Undermine Scienter.

Courts must "'take into account plausible opposing inferences' that could weigh against a finding of scienter." *Zucco*, 552 F.3d at 1006. The only plausible inference is that Symantec responded promptly and thoroughly to the former employee's claims. It launched an investigation under the auspices of the AC and independent legal and accounting advisors, who concluded after months of work that no restatement was required, that Symantec's internal controls over financial reporting were effective for FY18 without any material weaknesses, and that no employment action should be taken against any individual defendant.[28] That Symantec's outside auditors concurred, rendering a clean audit opinion for FY18, also negates any inference of fraud.

## III. THE CLASS PERIOD SHOULD END ON MAY 10 FOR FAILURE TO PLEAD LOSS CAUSATION FOR THE AUGUST 2, 2018 DISCLOSURE.

The initial complaints ended the class period on May 10, 2018, when Symantec announced the AC investigation and its stock price fell from $29.18 to $19.52. Ex. 20:296. The Complaint extends the Class Period to August 2, 2018, alleging that Symantec made a further corrective disclosure by announcing an "expansion of the internal investigation," causing the stock price to

[28] The AC's recommended control enhancements provide no inference of scienter. *See Zamir v. Bridgepoint Educ., Inc.*, No. 15-CV-408 JLS (DHB), 2018 WL 1258108, at *10 (S.D. Cal. Mar. 12, 2018) (plan to improve internal controls shows that "Defendant recognized issues and attempted to correct them" and raises no inference of scienter).

decline a further 7.8%. ¶ 167. But Symantec did not disclose anything new about the investigation on August 2. Symantec stated only that "the investigation is ongoing." Ex. 14:209. The stock price declined because Symantec announced that it had missed its guidance for 1Q19, was reducing its guidance for FY19, and was implementing an 8% reduction in force. ¶ 168. Because no corrective disclosure revealed the "truth" about any alleged misstatements on August 2, there is no loss causation and the Class Period should end on May 10. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (plaintiff must demonstrate "economic loss was caused by the defendant's misrepresentations, rather than some intervening event").[29]

**CONCLUSION**

For the reasons stated, the Complaint should be dismissed.

Dated: December 26, 2018

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI

By: /s/ Caz Hashemi
Caz Hashemi

---

[29] *See Loos v. Immersion Corp.*, 762 F3d 880, 888, 890 (9th Cir. 2014) (no loss causation where company's reports did "not reveal any information from which revenue accounting fraud might reasonably be inferred"; "corrective disclosure" must reveal falsity of prior statements).