1

2

3

4

5

6          IN THE UNITED STATES DISTRICT COURT

7

8          FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   SEB INVESTMENT MANAGEMENT
     AB, individually and on behalf of all
11   others similarly situated,                              No. C 18-02902 WHA

12                  Plaintiff,

13         v.                                                 **ORDER RE MOTIONS
                                                              TO DISMISS**
14   SYMANTEC CORPORATION,
     GREGORY S. CLARK, NICHOLAS R.
15   NOVIELLO, and MARK S. GARFIELD,

16                  Defendants.
                                                    /
17

18                              **INTRODUCTION**

19         In this securities action, defendants have filed three motions to dismiss for failure to

20   state a claim.  For the following reasons, the motions are **GRANTED**.

21                               **STATEMENT**

22         At all relevant times, defendant Symantec Corporation sold cybersecurity products and

23   services.  In early 2016, following a ten-year period of disappointing financial results and

24   changes in leadership, Symantec divested Veritas Software, a company it had paid $13.5 billion

25   to acquire in 2005.  Symantec hoped to save approximately $400 million in costs by the end of

26   fiscal year 2018 as a result of the divestiture.  Shortly thereafter, in June 2016, Symantec

27   announced the $4.65 billion acquisition of a privately-held network-security firm called Blue

28   Coat Systems, Inc.  After the deal closed, Blue Coat's management team took control of

     Symantec, with defendants Gregory Clark and Nicholas Noviello taking over as Symantec's

CEO and CFO, respectively. Several other members of Blue Coat's top management team also assumed high-level roles at Symantec. Defendant Mark Garfield, Symantec's Chief Accounting Officer prior to the Blue Coat acquisition, continued on in his role. In November 2016, Symantec announced its acquisition of a consumer identity-protection company called LifeLock, Inc. Symantec described these as transformative acquisitions which would lead to cost savings and growth. In this connection, Symantec increased its revenue and income targets for executive compensation (Consolidated Compl. ¶¶ 19–40).

In May 2017, Symantec filed with the SEC Forms 8-K and 10-K announcing its quarterly results for the fourth quarter and for fiscal year 2017 (Symantec's fiscal year ends March 31). Symantec reported quarterly GAAP revenue of $1.115 billion and fiscal year 2017 GAAP revenue of $4.019 billion. The Company also reported a deferred revenue balance of $2.353 billion as of March 31, 2017. In the Form 10-K, signed by CEO Clark, CFO Noviello and CAO Garfield, defendants affirmed that Symantec's financial statements were GAAP compliant. In a press release and earnings call, CEO Clark attributed Symantec's increased revenue to cost-saving initiatives and synergies related to the Blue Coat and LifeLock acquisitions. These revenues exceeded CEO Clark and CFO Noviello's 2017 executive compensation plan targets and they accordingly receive tens of million of dollars in equity awards. Defendants continued to report Symantec's strong financial performance and the success of the Blue Coat and LifeLock acquisitions throughout fiscal year 2018 (*id.* ¶¶ 131–40, 183, 187–89, 195–96).

According to confidential sources who previously worked at Symantec, however, the leadership shakeup that followed the Blue Coat acquisition resulted in negative changes in Symantec's policies and practices concerning financial reporting. Specifically, these sources allege, defendants began to improperly recognize revenue in violation of GAAP and to improperly record ordinary operating expenses as "transition costs." These confidential sources further posit that CAO Garfield's resignation from Symantec in August 2017 was due his concerns surrounding these improper practices. Although CAO Garfield originally refused to

sign off on the books for fiscal year 2017, he allegedly agreed to do so in exchange for a
financial package upon his resignation (*id.* ¶¶ 64–90).

On May 10, 2018, Symantec announced that the Audit Committee had commenced an
internal investigation and had voluntarily contacted the SEC after a former employee raised
unspecified concerns. Following the announcement, Symantec's stock declined by over 33
percent, erasing roughly six billion dollars of market capitalization. On May 14, Symantec
released an updated statement regarding the investigation, explaining that the concerns raised
by the former employee related to the "company's public disclosures, including commentary on
historical financial results; its reporting of certain non-GAAP measures, including those that
could impact executive compensation programs; certain forward-looking statements; stock
trading plans; and retaliation" (*id.* ¶¶ 155–60).

Prior to the conclusion of the investigation, individuals filed two lawsuits in this district
on behalf of themselves and a putative class of similarly-situated investors. An August 2018
order consolidated the two actions and appointed SEB Investment Management AB as lead
plaintiff in the consolidated action (Dkt. No. 75).

Also in August 2018, Symantec released its earnings for the first quarter of fiscal year
2019. At the same time, it announced that the internal investigation was "ongoing."
Symantec's stock price dropped another eight percent (Consolidated Compl. ¶¶ 167, 288).

At the conclusion of its investigation in September 2018, the Audit Committee
announced that it had found "'relatively weak and informal processes' with respect to some
aspects of the review, approval and tracking of transition and transformation expenses" and had
identified "behavior inconsistent with the Company's Code of Conduct." Although there would
be no restatement of historical financial results, the investigation uncovered that $12 million of
a $13 million transaction previously recognized as revenue in the fourth quarter of fiscal year
2018 should be deferred (which deferral would impact preliminary results previously
announced for that quarter). The Audit Committee also announced that Symantec would be
adopting enhanced controls and appointing a separate Chief Accounting Officer and Chief
Compliance Officer to report to the Audit Committee. Finally, Symantec also announced that in

September 2017 it had "initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures" (*id*. ¶¶ 167–85).

In October 2018, an order approved SEB's selection of lead counsel. A consolidated complaint followed and defendants timely filed the instant motions to dismiss. Symantec has filed its own motion to dismiss, CEO Clark and CFO Noviello move separately but join in Symantec's motion, and CAO Garfied also moves separately while joining in Symantec's motion (Dkt. Nos. 88, 103, 112–15). This order follows full briefing and oral argument.

## ANALYSIS

### 1.    SECTION 10(b) & RULE 10b-5.

To state a claim under Section 10(b) of the Securities Exchange Act of 1934, plaintiff must plead: (i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of a security; (iv) reliance; (v) economic loss; and (vi) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Because "'falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA," *In re Daou Systems, Inc.*, 411 F.3d 1006, 1014–15 (9th Cir. 2005), this order generally considers the falsity and scienter requirements together.

Defendants challenge falsity, scienter and loss causation. According to the consolidated complaint, defendants reported financial results that violated GAAP for revenue recognition, reported misleading non-GAAP adjustments by recording standard operating costs as "transition costs," and issued false and misleading statements about Symantec's internal controls, the reasons for CAO Garfield's departure from the company, and Symantec's executive compensation programs (Consolidated Compl. ¶¶ 60–61, 102, 199–201, 218–19).

### A.    Revenue Recognition.

Under GAAP and Symantec's revenue recognition policy, revenue could not be recognized unless it was realized or realizable and earned. According to the complaint, however, Symantec recognized revenue on period-end sales that (i) did not have signed

4

contracts, (ii) did not go through the appropriate approval channels, (iii) contained unapproved extended terms, and/or (iv) were to customers who were unable or unwilling to pay, all of which resulted in overstated reported revenue and understated deferred revenue. Also according to the complaint, these practices were later born out when, in September 2018, the Audit Committee identified a transaction where $13 million had been recognized as revenue in the fourth quarter of fiscal year 2018 but for which $12 million should have been deferred to the following quarter. Symantec thereafter revised its preliminary financial results to take into account this deferral (Consolidated Compl. ¶¶ 60–62).

The parties agree that our court of appeals articulated the applicable pleading standard in *Daou*, 411 F.3d at 1016–17 (internal citations, brackets and quotation marks omitted):

> When pleading irregularities in revenue recognition, plaintiffs should allege (1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or company employees involved in the transactions. Plaintiffs need not allege each of those particular details, but they must allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue.

Where, as here, the consolidated complaint relies on the allegations of confidential witnesses, "the complaint must also pass two additional hurdles: 'First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter.'" *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144–45 (9th Cir. 2017) (citations omitted). To determine whether the complaint has done so, courts look to "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), as amended (Feb. 10, 2009) (citations and internal quotation marks omitted). The allegations in

the consolidated complaint fail to meet this standard with respect to plaintiff's claim of improper revenue recognition.

As an initial matter, the consolidated complaint alleges sufficient facts to establish the general reliability and personal knowledge of the confidential witnesses with respect to the company's revenue recognition practices. Although none of the confidential sources is alleged to be an accountant or otherwise involved in revenue recognition decisions or the preparation of publicly-reported financial information, such allegations are unnecessary where the sources are otherwise "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." *Daou*, 411 F.3d at 1015.

The complaint first cites a former vice president and chief security officer who worked at Symantec's headquarters for 7.5 years. For the first 3.5 years of his tenure as CSO, this source reported to Symantec's chief information officer, Sheila Jordan, who in turn reported to CFO Noviello after the Blue Coat acquisition. During the last six months of his tenure, the CSO reported to Symantec's general counsel, Scott Taylor. According to this source, he recalled meetings where CEO Clark regularly made references to the "flexibility" of shifting and recording revenue for large hardware purchases and that CEO Clark talked frequently about their ability to manipulate revenue by various periods or a year. By virtue of his position, this witness could credibly relay CEO Clark's behavior and messaging observed firsthand during leadership meetings. The precise dates of the meetings, moreover, are not of great importance since it is alleged that they occurred "approximately monthly" (Consolidated Compl. ¶¶ 64–67).

A second confidential source, a former senior manager of pricing and licensing who worked at Symantec in various roles between September 1999 and June 2017, heard that at quarter-end an unnamed vice president, formerly of Blue Coat, asked the order processing team "to put a bunch of orders through, when they knew that the orders would not be processed, just to meet numbers and then after end of quarter, back them out." The same vice president directed managers in the order management group to put orders through at the end of the quarter even where the company did not have a signed contract. The source said she learned of these

issues because at quarter-end everyone was working long hours and all sat together (*id.* ¶¶ 68–70).

A third source — a former senior financial analyst who worked at Symantec on a contract basis from May 2017 to July 2017 transitioning the merger of Symantec with Watchful Software — observed that while Watchful Software had "a lot of deferred revenue . . . Symantec discounted that deferred revenue to approximately 50% and recognized it all upfront" (*id.* ¶¶ 75–76).

Yet another source — a former manager of bill and collect-finance who held the position from January 2014 until October 2017 and reported to Toni Doveri — said that Symantec brought in millions of dollars worth of "half baked" deals two to three quarters in advance to make its numbers, including a transaction in January 2016 where Symantec brought in a six million dollar deal two quarters ahead of time to make its numbers. This witnesses received emails from customers who said "that they did not want to sign the deal with Symantec, but the sales rep forced them to." She "frequently received calls from the highest executive staff, such as Defendant Garfield, telling them to release those order or to allow those orders to go out." CAO Garfield indicated, moreover, that the order had come from above him and would quote CEO Clark or CFO Noviello (*id.* ¶¶ 71–74).

The consolidated complaint cites another confidential witnesses who worked as a former strategic account manager for Verizon from December 2013 until October 2017, and who was responsible for driving all net new purchases as well as maintaining and overseeing renewals of existing solutions. According to her, in the fourth quarter of fiscal year 2017, Symantec's head of global sales made a verbal agreement with Verizon, without any approvals, to give Verizon a one million dollar discount on a $13 million deal. While the deal technically booked in the fourth quarter, it appeared as if someone manually changed the booking in the system to go into first quarter of the following fiscal year (*id.* ¶¶ 81–90).

As set forth above, the consolidated complaint alleges the confidential sources' job titles, their dates of employment and, in some instances, the executive to which the witness reported and a description of their job responsibilities. The five witnesses also provided

consistent accounts of defendants' allegedly improper revenue recognition practices within their respective roles. Three of the five confidential sources, moreover, directly communicated with the individual defendants in connection with the particular accounting practices at issue. The consolidated complaint has accordingly alleged sufficient facts regarding the reliability and personal knowledge of these confidential witnesses.

Nevertheless, plaintiff has not provided sufficient facts for a "court to discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue" as required by our court of appeals. *Daou*, 411 F.3d at 1020 (citation omitted). Importantly, "although overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud, the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." *Id.* at 1018. Even assuming that defendants violated GAAP by improperly recognizing revenue in the manner described by the confidential witnesses, plaintiff has not alleged sufficient facts to show how these violations would have been material in light of Symantec's overall financial situation.

The consolidated complaint pleads only one specific example of improper revenue recognition. Yet, as plaintiff does not dispute, this particular transaction is the transaction the Audit Committee identified as resulting in the deferral of only $12 million from the fourth quarter of fiscal year 2018 to the first quarter of fiscal year 2019, reducing the company's fourth quarter revenues by less than one percent from $1.222 billion to $1.210 billion (Dkt. No. 112-2 at 184–85, 229). Symantec's subsequent revision of its financial results to reflect this deferral shows that the originally-announced results were incorrect, but is insufficient to show materiality. To be sure, materiality is not just the number but also the despicability of the practice. An improper accounting practice could therefore be material even if the numbers themselves are not material. Here, however, the allegations in the complaint are too vague to allege such a despicable practice.

While a plaintiff need not allege specific examples of accounting fraud to survive motion to dismiss, it still must allege sufficient information such that the district court can

determine whether the GAAP violations constituted a "significant inflation of revenue." *Daou*, 411 F.3d at 1016–17 (citation omitted). Although plaintiff argues that "[m]ultiple former employees . . . describe how the scope and magnitude of the identified accounting impropriety was in fact much larger than the Audit Committee admitted," Opp. at 17, this argument is not sufficiently supported by the allegations in the consolidated complaint. At most, one confidential witness described "a bunch of" or "numerous" orders of unspecified amounts being pushed through at quarter-end, a second witness described "millions of dollars" worth of deals being pushed through, with one such deal occurring over a year before the putative class period, and a third witness describing "about five" instances where unspecified fourth quarter deals were booked in the first quarter of the following fiscal year (Consolidated Compl. ¶¶ 69–74). To be sure, the lack of a restatement does not immunize defendants from a claim of securities fraud. And, it may be true that the Audit Committee failed to disclose the full extent of the improper revenue recognition at issue. The consolidated complaint, however, fails to allege sufficient particular facts to plausibly suggest as much. Because plaintiff has not alleged a materially false or misleading statement in connection with revenue recognition, this order does not reach the issue of scienter.

### B. Transition Costs.

During the putative class period, Symantec reported certain non-GAAP financial measures, ostensibly to present an adjusted picture of the company's past and future financial performance. According to the consolidated complaint, these non-GAAP measures were false and misleading because Symantec recorded recurring operating expenses such as IT projects and security expenses as "restructuring" or "transition" costs. This allowed the company to remove such costs from its adjusted operating expenses, thereby inflating Symantec's non-GAAP metrics for adjusted operating income, operating margin and earnings per share (*id.* ¶¶ 102–19).

It is undisputed that Symantec's reported transition costs increased substantially throughout the putative class period, increasing from $20 million in the first quarter of fiscal year 2017 to $77 million in the fourth quarter of fiscal year 2018. According Symantec's

former VP and CSO, tens of millions of dollars in costs associated with enterprise resource planning projects, cloud infrastructure projects and security issues were "pushed into [the] bucket" of transition costs. The former VP and CSO explained that they were under "incredible scrutiny at the budget level, and one way to maintain operational budget was to classify some of these projects as transformational." It was accordingly suggested that they consider classifying projects as transformational "so as not to have to fund through their operational run budget." Moreover, the source explained, "some of his/her projects that would normally be put through as operational run projects were now being put into this transformational bucket" and classifying costs as transformative "was used as a mechanism to be able to get large pieces of work done that otherwise wouldn't fit into operational budgets." As an example of such a project, the former VP and CSO pointed to Symantec's building of private cloud technology (*id.* ¶¶ 110–16).

Following a review by an outside accounting firm hired before September 2017, the company revised its policies and procedures regarding non-GAAP measures. Ultimately, the Audit Committee concluded in September 2018 that the company had "relatively weak and informal processes with respect to some aspects of the review, approval and tracking of transition and transformation expenses." Moreover, the inflated non-GAAP metrics described above triggered lucrative performance-based equity executive compensation packages (*id.* ¶¶ 63, 101–17, 177). These allegations, taken as a whole, plausibly allege that defendants made materially false and misleading statements through the inflation of transition costs.

Defendants argue that Symantec's non-GAAP metrics were not misleading because the company disclosed that "[t]ransition costs are incurred in connection with Board of Directors approved discrete strategic information technology transformation initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes" (*id.* ¶ 241). Pointing to this disclosure, defendants argue that the "decision to exclude from non-GAAP metrics the costs associated with large-scale ERP systems and information technology initiatives made perfect sense, given [Symantec's] transformation through the divestiture of Veritas and acquisitions of Blue Coat

and LifeLock." These costs, Symantec argues, "concern[ed] long-term strategic planning and investment, not the routine operation of the business" (Dkt. No. 112 at 11) (emphasis removed). Whether these were transition costs connected to the divestiture of Veritas and integration of Blue Coat and LifeLock, or whether the costs instead related to operational run projects previously recorded as operational expenses as alleged in the complaint, presents factual questions that cannot be resolved on a motion to dismiss.

Defendants next argue that the consolidated complaint fails to sufficiently describe the former VP and CSO's responsibilities such that it can reasonably be inferred that this source understood the alleged cost accounting and use of non-GAAP measures. This order disagrees. According to the consolidated complaint, the former VP and CSO's boss was the chief information officer. The CIO and the confidential source were personally responsible for many of the projects at issue, including enterprise resource planning projects, cloud infrastructure projects, and security issues. Based on the confidential source's personal conversations with the CIO, who worked closely with a member of the finance team to classify costs, the source knew that the CIO was under pressure and scrutiny from CEO Clark and CFO Noviello to explain cost management in IT. Employees, in turn, were pushed to classify costs as "transformation costs" (Consolidated Complaint ¶¶ 110–15). Although the former VP and CSO only worked at Symantec until October 2017, these allegations plausibly suggest that the source's "conclusions about the inner workings of the company are not speculative but reasonably informed." *See In re LDK Solar Securities Litigation*, 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008). Plaintiff has therefore sufficiently alleged that defendants made materially false and misleading statements by inflating transition costs. As set forth below, however, sufficient allegations as to scienter are lacking.

Plaintiff argues in its opposition brief that the individual defendants "encouraged subordinates" to misclassify expenses (Opp. at 27). This argument, however, is not borne out by the allegations in the complaint. At most, plaintiff alleges that the misclassification of expenses *resulted* from "pressure from Defendants Clark and Noviello," not that the accounting manipulations were *directed* by the individual defendants. According to the former VP and

1  CSO, Symantec's CIO "was under a lot of pressure and scrutiny from Defendants Clark and

2  Noviello" and "was under tremendous scrutiny from Noviello to justify her job and explain cost

3  management in IT."  The same witnesses explained that "more costs were moved in the

4  direction of transformative or transformational costs once Blue Coat came in" (Consolidated

5  Compl. ¶ 114).  These allegations are an insufficient basis from which to infer scienter.

6        General allegations regarding "Blue Coat," "Blue Coat leadership" and "Blue Coat

7  employees" are also insufficient.  While the former VP and CSO claims that "a number of

8  investigations were opened about the Blue Coat leadership and unethical behavior," nothing in

9  the complaint ties these allegations to CEO Clark or CFO Noviello or to the accounting practice

10  at issue.  Similarly untethered to the individual defendants are allegations that the Audit

11  Committee "identified certain behavior inconsistent with the Company's Code of Conduct" or

12  that Blue Coat executives brought with them a "free-wheeling," "unethical" and "toxic"

13  approach to accounting and financial disclosure (*id.* ¶¶ 67–68, 146–49).

14                        **C.**     **Executive Compensation Program.**

15        Plaintiff summarily argues that the representations in Symantec's proxy statement that

16  its compensation program (a) was tied to the company's actual near- and long-term

17  performance, (b) was aligned with shareholder interests, and (c) was a responsible pay policy

18  reinforcing strong governance and enhancing stockholder alignment, were false and misleading

19  because the defendants' inflation of transition costs allowed them to report adjusted income and

20  margins which in turn triggered lucrative performance-based compensation packages for the

21  individual defendants and other executives at the company (Opp. at 11; Consolidated Compl. ¶¶

22  123–25).  Beyond reiterating allegations regarding defendants' improper accounting practices,

23  however, plaintiff fails to connect these accounting practices to the statements in Symantec's

24  proxy statement.  As plaintiff does not dispute, the 2017 proxy statement devotes over 40 pages

25  to a detailed description of executive compensation.  It has therefore failed to plead facts

26  showing that the proxy contained false and misleading information regarding Symantec's

27  executive compensation practices.

28

### D. Internal Controls.

Symantec's annual and quarterly SEC filings during the putative class period stated that Symantec's internal controls over financial reporting were effective and that there were no material changes in such internal controls during the relevant period. In addition, the company's 2017 Form 10-K contained SOX certifications signed by CEO Clark and CFO Noviello attesting to the accuracy of financial reporting, the disclosure of material changes to Symantec's internal control over financial reporting, and the disclosure of all fraud. These statements were allegedly false and misleading because defendants maintained ineffective internal controls over the recognition of revenue and the review, approval and tracking of transition and transformation expenses (Consolidated Compl. ¶¶ 199–201, 213–15, 232–34, 248–50).

Even assuming the Audit Committee's investigation and findings indicated that certain of Symantec's controls were inadequate, this order concludes that plaintiff has failed to set forth specific allegations suggesting that these internal controls were known to be ineffective (or that the individual defendants were deliberately reckless in not knowing) at the time the disclosures were made. As currently pled, the complaint lacks particular factual allegations giving rise to an inference of scienter more compelling than the inference that defendants were simply wrong in their assessment of the company's internal controls.

### E. CAO Garfield's Departure.

In announcing CAO Garfield's resignation in August 2017, Symantec issued a Form 8-K stating that his "decision to leave the Company was not due to any disagreement relating to the Company's management, policies or practices." The consolidated complaint's speculative allegations that the Form 8-K was false and misleading and omitted material facts because CAO Garfield instead left due to revenue recognition concerns, and only after accepting a payout for signing off on the books for fiscal year 2017, are insufficient to establish falsity (*id.* ¶¶ 216–17).

Plaintiff relies on the statements of two confidential witnesses. One witness, the former VP and CSO, left the company two months before CAO Garfield's departure. The witness

heard from "both Carolyn Herzog, former Deputy General Counsel, and John Eversole, former head of Physical Security and Executive Protection (who personally provided protection to Clark on many occasions)" that CAO Garfield "left the Company due to revenue recognition concerns and due to the way that Symantec was recognizing revenue under the leadership of Defendants Clark and Noviello." The former VP and CSO also allegedly "learned from multiple people who were part of the senior executive team that Garfield was really unhappy with the aggressive accounting practices that were being implemented" (*id.* ¶¶ 77–78).

The other witness, the former manager of bill and collect-finance, worked in Oregon (CAO Garfield worked in Mountain View). According to this witness, "someone on Garfield's team, possibly Maddy Gatto [], brought something forward prior to the numbers being released to the Street." The former manager bill and collect-finance explained that she "knew this information because Symantec had a very family-like mentality and is a small community; therefore, people were not afraid to talk to each other, and Springfield employees (in his/her office) are very connected to Mountain View (Symantec's headquarters), and employees travel there" (*id.* ¶¶ 79–80).

Neither source alleges that he or she spoke with CAO Garfield about his departure. Rather, both sources' "accounts are based on vague hearsay allegations and are not specific enough to extract a strong inference of scienter." *See Zucco,* 552 F.3d at 1002. At the pleading stage, hearsay statements are permissible but they still must together with all other circumstances alleged, give rise to a strong inference of scienter. Because the complaint lacks facts describing with particularity these sources' personal knowledge of the circumstances surrounding CAO Garfield's departure, their statements as to this issue are insufficient to establish falsity or scienter.

### F. Other Scienter Allegations.

The PSLRA toughened the already-stringent requirements for pleading fraud under FRCP 9(b). With respect to each act or omission alleged, the complaint must also state with particularity facts giving rise to a "strong inference" that the defendant acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2). In the Ninth Circuit, the required state of mind is

actual knowledge or "deliberate recklessness," or where the challenged statement is forward-looking, "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1); *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). In weighing scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324.

### *(1) Defendants' Stock Trading.*

The individual defendants' stock sales do not give rise to an inference that they acted with scienter. Unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter. Insider trading is suspicious, however, only when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989)). Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Ibid*.

CEO Clark sold 200,000 Symantec shares well before the end of the class period, representing 4.6 percent of his available holdings. CFO Noviello had more sales, selling 6.96, 2.63, 1.58, 0.78 and 35.15 percent of his available holdings in May, July, August, September and November 2017, respectively. Overall, he sold 27 percent of his available holdings measured at the end of the putative class period. Our court of appeals "has held that typically 'larger sales amounts' than 37% of a defendant's holdings are necessary to support scienter." *Wozniak v. Align Tech., Inc.*, Case No. 09-cv-3671, 2011 WL 2269418, at *14 (N.D. Cal. June 8, 2011) (Judge Maxine Chesney) (citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008)).

Although plaintiff disputes these calculation and argues a proper calculation of the individual defendants' stock trading should also include amounts forfeited for tax withholding purposes or transferred to independent trusts for the benefit of family members (Opp. at 32 n.11), its own complaint highlights the same numbers set forth by CEO Clark, alleging that he sold 200,000 shares which amounted to "approximately 5% of the shares that he held at the beginning of the Class Period" (Consolidated Compl. ¶¶ 151–54). In any event, even if a comparison of these individual defendants' stock trading before and during the putative class period were consistent with scienter, plaintiff does not contest that CEO Clark and CFO Noviello held *more* stock at the end of the class period than at the beginning because they accumulated a significant amount of vested shares. This strongly rebuts an inference of scienter. *See Applestein v. Medivation, Inc.*, Case No. 10-cv-00998, 2011 WL 3651149, at *8 (N.D. Cal. Aug. 18, 2011) (Judge Edward Chen).

CAO Garfield, in turn, sold 29,466 shares during the class period. Although his sales increased as compared to before the class period, the sales took place according to pre-determined 10b5–1 trading plans and therefore "rebut [ ] an inference of scienter." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008).

### *(2)* *Compensation Incentives.*

Plaintiff next argues that a strong inference of scienter is supported by the allegation that the individual defendants received significant compensation incentives as a result of their accounting manipulations. To the contrary, "it is common for executive compensation, including stock options and bonuses, to be based partly on the executive's success in achieving key corporate goals." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012). Our court of appeals has therefore cautioned against concluding "that there is fraudulent intent merely because a defendant's compensation was based in part on such successes." *Ibid.* Plaintiff relies on the district court's decision in *In re Cornerstone Propane Partners, L.P.*, 355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005). There, however, Judge Marilyn Patel explained that where a compensation program "specifically and directly tied executive bonuses to the very instrument used to commit the alleged fraud," such allegations may "squarely contribute to a

strong inference of scienter, however they are legally and factually insufficient to carry that burden alone." *Id.* at 1092. So too here. Although the individual defendants' compensation incentives are a factor in the scienter analysis, as set forth below, even when viewed holistically, plaintiff's allegations regarding scienter are insufficient.

### *(3)    Remaining Allegations.*

Plaintiff next asserts a hodgepodge of allegations that it contends supports of inference of scienter, including: (1) the existence of unspecified investigations into "the Blue Coat leadership and unethical behavior," (2) that the company retained an outside accounting firm to evaluate policies and procedures regarding Symantec's reporting of non-GAAP results, (3) the Audit Committee's appointment of a separate Chief Accounting Officer and Chief Compliance Officer, (4) executive departures, (5) the amount of time between Symantec's allegedly false financial results for the third quarter of fiscal year 2018 and the Audit Committee's announcement of its internal investigation, (6) that the individual defendants "held themselves out as knowledgeable about and involved in" financial reporting, (7) that the Audit Committee finished its investigation within four months, and (8) that the individual defendants signed SOX certifications throughout the putative class period (Consolidated Compl. ¶¶ 67, 109, 173–80, 267–75).[*]

Plaintiff's allegations, whether viewed separately or holistically, are insufficient to raise an inference of scienter that is as "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *See Tellabs*, 551 U.S. at 314. Specifically, the consolidated complaint fails to raise an inference that is as compelling as the opposing inference that Symantec simply announced an investigation into, and then thoroughly investigated, a former employee's claims of improper accounting practices, later recommending control enhancements to address those concerns. The consolidated complaint therefore fails to sufficiently allege scienter under the

---

[*] Plaintiff also argues that CAO Garfield's departure and "payout" raises a strong inference of scienter. As set forth above, however, plaintiff has not plausibly alleged that CAO Garfield knowingly signed a false financial statement in exchange for a payout. This allegation accordingly fails to support an inference of scienter.

PSLRA.  This order therefore does not reach defendants' arguments regarding loss causation.  Defendants' motions to dismiss the Section 10(b) claim is **GRANTED**.

### 2. CONTROL PERSON LIABILITY.

Section 20(a) of the Exchange Act makes certain "controlling" individuals also liable for violations of Section 10(b) and its underlying regulations.  A prima facie case under Section 20(a) requires:  (1) a primary violation of federal securities law, and (2) that the defendant exercised actual power or control over the primary violator.  *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (internal quotations omitted).  As discussed above, the complaint fails to adequately allege a primary claim for securities fraud.  Defendants' motions to dismiss this claim are **GRANTED**.

### 3. SECTION 20A.

Section 20A(a) of the Exchange Act imposes liability on parties who engage in insider trading, for "damages suffered by individuals who trade contemporaneously with the insider."  *Johnson v. Aljian*, 490 F.3d 778, 779 n.9 (9th Cir. 2007).  Insider trading is defined as "purchasing or selling a security while in possession of material, nonpublic information."  15 U.S.C. § 78t–1(a).  Because the complaint fails to allege an underlying violation of Section 10(b), there can be no insider trading liability under Section 20A.  *In re VeriFone Securities Litigation*, 11 F.3d 865, 872 (9th Cir. 1993).  Defendants' motions to dismiss this claim are also **GRANTED**.

### 4. NOTICE OF INCORPORATION BY REFERENCE AND REQUEST FOR JUDICIAL NOTICE.

#### A. Incorporation by Reference.

Defendants argue that sixteen documents — consisting of SEC filings, earnings call transcripts, a press release and historical stock prices — are incorporated into the complaint by reference and should therefore be considered in connection with its motion to dismiss.  Plaintiff opposes consideration of several of these documents, but does not dispute that Exhibits 3–6, 8–13 and 20–23 are appropriately considered.  These documents with therefore be considered under the incorporation by reference doctrine.

18

Plaintiff first challenges Exhibit 1 — an excerpt of Symantec's Form 8-K filed with the SEC on June 14, 2016, which refers to CEO Clark's agreement to purchase 2,329,520 shares of Symantec stock for approximately $40 million in connection with the Blue Coat acquisition — arguing that the Form 8-K is not incorporated by reference because it is not even referenced in the complaint. This order agrees. Paragraph 27, upon which defendants rely, merely alleges that "[o]n June 12, 2016, Symantec announced that it was acquiring Blue Coat, a leader in the web and cloud security industry, for $4.65 billion." The complaint therefore does not "refer[] extensively to the document." Nor does the document "form[] the basis of the plaintiff's claim," as it "merely creates a defense to the well-pled allegations in the complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). This document will therefore not be considered under the incorporation by reference doctrine.

With respect to Exhibits 2, 7, 14 and 15 — Forms 8-K and 10-K, a proxy statement and a press release — plaintiff does not dispute that these documents are extensively quoted throughout the complaint. Rather, plaintiff argues that defendants improperly ask the undersigned to assume the truth of the matters asserted in the documents. To be sure, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint," but that does not preclude consideration of the document under the incorporation by reference doctrine for any purpose. *Id.* at 1003. These documents are therefore considered within the constraints set forth by our court of appeals.

## B. Judicial Notice.

Federal Rule of Evidence 201(b) permits courts to take judicial notice of any fact "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." While a court may take judicial notice of matters of public record at the motion to dismiss stage, it cannot take judicial notice of disputed facts contained in such public records. *Khoja*, 899 F.3d at 999.

Defendants request judicial notice of seven documents. Plaintiff does not object to Exhibits 19–23, which are excerpts of Symantec's October 29, 2018 proxy statement, the individual defendants' Forms 3 and 4, and Symantec's closing stock price history for the period

of May 10, 2017, through September 25, 2018. Because these documents are appropriate subjects of judicial notice, *see Metzler Inv. GMBH*, 540 F.3d at 1064 n.7, defendants' unopposed request is **GRANTED**.

Although plaintiff concedes that Exhibits 17 and 18 are documents which themselves are susceptible to judicial notice, it argues that defendants improperly seek judicial notice of these documents "for ulterior purposes." Defendants offer Exhibit 17 — a "reinvestment agreement" entered into between CEO Clark and Symantec — "to show Greg Clark's investment in Symantec." Yet, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999. While the fact that CEO Clark *agreed* to purchase 2,329,520 is judicially noticeable, this order declines to accept as true defendants' contention based on this document that CEO Clark did, in fact, make such an investment. While CEO Clark's stock holdings may be gleaned from the unchallenged and judicially noticeable Form 4s, such information cannot be judicially noticed from Exhibit 17.

Defendants offer Exhibit 18 — excerpts from Symantec's proxy statement filed with the SEC on September 9, 2016 — "to show Symantec's disclosures relating to its executive compensation practices." While this order takes judicial notice of the fact that such disclosures were made, it declines to take judicial notice of the truth of such disclosures. As set forth above, plaintiffs dispute the accuracy of the statements set forth in the September 9 proxy statement, namely that Symantec's executive compensation program provided "direct alignment with stockholders" and that Symantec used "responsible pay policies to reinforce strong governance and enhance shareholder alignment." Accordingly, to the extent set forth above only, defendants' request for judicial notice is **GRANTED**. The request is otherwise **DENIED**.

## CONCLUSION

For the foregoing reasons, the motions to dismiss are **GRANTED**. Plaintiff may file a motion on the normal 35-day track seeking leave to file an amended pleading that might save its claims. Such a motion is due by **JULY 11 AT NOON**. A proposed amended complaint must be appended to that motion. Furthermore, the motion should clearly explain how the amendments

cure the deficiencies identified in this order, as well as any others raised in defendants' motions but not addressed herein. If the proposed amendments do not address these deficiencies, they will not be allowed. Plaintiff should plead its best case.

**IT IS SO ORDERED.**

Dated: June 14, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE