# Exhibit 1
# REDACTED

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1  **BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
2  JONATHAN D. USLANER (Bar No. 188574)
   (jonathanu@blbglaw.com)
3  2121 Avenue of the Stars, Suite 2575
   Los Angeles, CA 90067
4  Tel:    (310) 819-3472

5  JEROEN VAN KWAWEGEN (*pro hac vice*)
   (jeroen@blbglaw.com)
6  JEREMY ROBINSON (*pro hac vice*)
   (jeremy@blbglaw.com)
7  REBECCA E. BOON (*pro hac vice*)
   (rebecca.boon@blbglaw.com)
8  JULIA K. TEBOR (*pro hac vice*)
   (julia.tebor@blbglaw.com)
9  1251 Avenue of the Americas
   New York, NY 10020
10 Tel:    (212) 554-1400

11 *Counsel for Lead Plaintiff*
   *SEB Investment Management AB*

12

13              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
14

15 | SEB INVESTMENT MANAGEMENT AB,    | Case No. 3:18-cv-02902-WHA |
   individually and on behalf of all others
16 similarly situated,                | ECF CASE |

17              Plaintiffs,           | **LEAD PLAINTIFF'S NOTICE OF**
                                      | **AMENDED MOTION AND AMENDED**
18        v.                          | **MOTION FOR LEAVE TO FILE A**
                                      | **FIRST AMENDED COMPLAINT, AND**
19 SYMANTEC CORPORATION, GREGORY      | **MEMORANDUM OF POINTS AND**
   S. CLARK, NICHOLAS R. NOVIELLO,    | **AUTHORITIES IN SUPPORT**
20 and MARK S. GARFIELD,              | **THEREOF**

21              Defendants.           | CLASS ACTION

22                                    | Date: August 21, 2019
                                      | Time: 8:00 a.m.
23                                    | Dept.: Courtroom 12, 19th Floor
                                      | Judge: Honorable William H. Alsup
24

25

26

27

28

NOTICE OF AMENDED MOT. AND AMENDED MOT. FOR LEAVE TO FILE THE FAC
No. 3:18-cv-02902-WHA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

NOTICE OF AMENDED MOTION AND AMENDED MOTION ............................................... 1

STATEMENT OF THE ISSUES ................................................................................................ 2

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 2

    I.      INTRODUCTION .................................................................................................... 2

    II.     SUMMARY OF THE AMENDED ALLEGATIONS ........................................... 3

    III.    PROCEDURAL BACKGROUND ......................................................................... 6

    IV.    ARGUMENT ............................................................................................................ 7

          A.    Under Rule 15(a)'s Lenient Standard And Because Justice So Requires, The Court Should Grant Lead Plaintiff Leave To File The FAC .............................................................................................................. 7

          B.    The Proposed Amendment Is Not Futile ................................................. 8

               1.    Legal Standards For Pleading Scienter And Materiality ................ 8

               2.    The FAC Alleges That Defendants Knew Or Recklessly Disregarded That Reported Transition Costs Were Misleading ......................................................................................... 9

               3.    The FAC Alleges That The Revenue Manipulations Were Material ............................................................................................. 16

               4.    The FAC Alleges Scienter For The Revenue Recognition Misconduct ................................................................................... 21

               5.    The FAC Alleges A Strong Inference Of Garfield's Scienter ........................................................................................ 22

               6.    The FAC Alleges A New Category Of Actionable Misstatements Concerning The Purportedly "Transformative" Blue Coat Integration ...................................... 24

          C.    The Proposed Amendment Is Timely And No Bad Faith Or Prejudice Exists ......................................................................................... 25

    V.     CONCLUSION ...................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

CASES                                                                    PAGE(S)

3

*In re Adaptive Broadband Sec. Litig.*,
4        2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ..........................................15

5    *Align Tech., Inc. v. Strauss Diamond Instruments., Inc.*,
         2019 WL 861422 (N.D. Cal. Feb. 22, 2019) .......................................7
6
     *In re Atossa Genetics Inc. Sec. Litig.*,
7        868 F.3d 784 (9th Cir. 2017) ............................................................9

8    *Basic Inc. v. Levinson*,
         485 U.S. 224 (1988) .........................................................................8
9
     *Better v. YRC Worldwide Inc.*,
10       2012 WL 4433500 (D. Kan. Sept. 25, 2012) ...................................23

11   *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
12       875 F. Supp. 2d 359 (S.D.N.Y. 2012) .............................................20

13   *In re Countrywide Fin. Corp. Sec. Litig.*,
         588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...........................................20
14
     *In re Daou Systems, Inc.*,
15       411 F.3d 1006 (9th Cir. 2005). ..................................................4, 19

16   *Erickson v. Corinthian Colleges, Inc.*,
17       2015 WL 12732435 (C.D. Cal. Apr. 22, 2015) ...............................19

18   *In re Extreme Networks, Inc. Sec. Litig.*,
19       2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)............................24, 25

20   *Freudenberg v. E*Trade Financial Corp.*,
         712 F. Supp. 2d 171 (S.D.N.Y. 2010)...............................................12
21
     *Ganino v. Citizens Utilities Co.*,
22       228 F.3d 154 (2d Cir. 2000)........................................................17, 18

23   *Griggs v. Pace Am. Grp., Inc.*,
24       170 F.3d 877 (9th Cir. 1999) .............................................................7

25   *Hefler v. Wells Fargo & Co.*,
         2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) .............................11, 12
26
     *In re Intuitive Surgical Sec. Litig.*,
27       2017 WL 363269 (N.D. Cal. Jan. 25, 2017)....................................25

28

---

*Lee v. Postmates Inc.*,
   2018 WL 4961802 (N.D. Cal. Oct. 15, 2018) ................................................................8

*In re LendingClub Sec. Litig.*,
   254 F. Supp. 3d 1107 ...................................................................................................15

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ........................................................................13

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) ................................................9

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ......................................................................19

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ............................................................................. *passim*

*In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*,
   221 F. Supp. 2d 1090 (N.D. Cal. 2002) (Alsup, J.) ....................................................20

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ........................................................................................8

*SEB Investment Mgmt. AB v. Symantec Corp.*,
   2019 WL 2491935 (N.D. Cal. June 14, 2019) .................................................. *passim*

*SEC v. Das*,
   2010 WL 4615336 (D. Neb. Nov. 4, 2010) .................................................................18

*SEC v. Fuhlendorf*,
   2011 WL 999221 (W.D. Wash. Mar. 17, 2011) ...........................................................9

*SEC v. Leslie*,
   2012 WL 116562 (N.D. Cal. Jan. 13, 2012) ....................................................9, 17, 18

*Shaev v. Baker*,
   2017 WL 1735573 (N.D. Cal. May 4, 2017) .........................................................11, 12

*Siemers v. Wells Fargo & Co.*,
   2007 WL 1140660 (N.D. Cal. Apr. 17, 2007) (Alsup, J.) .......................................9, 21

*Tellabs, Inc v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ......................................................................................................8

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ......................................................................11

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)..................................................................................8

*In re UTStarcom, Inc. Sec. Litig.*,
  2006 WL 8431368 (N.D Cal. Mar. 1, 2006).......................................25

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ...............................................................8, 24

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
  2017 WL 66281 (N.D. Cal. 2017) .......................................................15

*In re Zillow Grp., Inc. Sec. Litig.*,
  2019 WL 1755293 (W.D. Wash. Apr. 19, 2019)................................15

**OTHER AUTHORITIES**

Fed. R. Civ P  15(a)(2)....................................................................................2, 7

## NOTICE OF AMENDED MOTION AND AMENDED MOTION

PLEASE TAKE NOTICE that on August 21, 2019, at 8:00 a.m., before The Honorable William H. Alsup, United States District Court for the Northern District of California, Courtroom 12, 19th Floor, 450 Golden Gate Avenue, San Francisco, Lead Plaintiff SEB Investment Management AB ("Lead Plaintiff") will respectfully move this Court for an entry of an Order in the above-captioned action (the "Action"), pursuant to Federal Rule of Civil Procedure ("Rule") 15(a) and the Court's June 14, 2019 Motion to Dismiss Order (the "MTD Order"),[1] granting Lead Plaintiff leave to file the First Amended Consolidated Class Action Complaint (the "FAC"), which is attached as **Exhibit A** to the accompanying Declaration of Rebecca E. Boon ("Boon Decl."). The FAC amends the prior complaint filed on November 15, 2018 (the "CAC"). For ease of reference, a redline comparing the FAC to the CAC is attached as **Exhibit B** to the Boon Decl.

The relief sought in this amended motion is a Court order granting Lead Plaintiff leave to file the FAC, which pleads valid claims for violations of the federal securities laws. The FAC also addresses the deficiencies that the Court identified in the MTD Order, including by adding new facts contributing to a strong inference of Defendants'[2] scienter, additional facts demonstrating the materiality of Defendants' revenue recognition misconduct and additional misstatements that Defendants made to investors, including misrepresentations touting the success of the Blue Coat integration. This motion is based on this Notice and Amended Motion, the within Memorandum of Points and Authorities, the accompanying Boon Decl. (and exhibits thereto), the pleadings and other filings in this action, and such other written or oral argument permitted by the Court.

This Motion amends the motion filed on July 11, 2019. As detailed below and in Lead Plaintiff's July 11 motion, this amendment is necessary because of the public disclosure of new relevant facts, in combination with Defendants' delay tactics.

---

[1] The "MTD Order" refers to *SEB Investment Mgmt. AB v. Symantec Corp.*, 2019 WL 2491935 (N.D. Cal. June 14, 2019). "¶__" refers to the paragraphs of the FAC.

[2] "Defendants" are Symantec Corporation ("Symantec" or the "Company") and "Individual Defendants" Gregory S. Clark (former CEO), Nicholas R. Noviello (former CFO), and Mark S. Garfield (former CAO).

WHEREFORE, Lead Plaintiff respectfully submits that this amended Motion should be permitted, and it should be granted leave to file its amended pleading in this action, the FAC.

**STATEMENT OF THE ISSUES**

Whether to grant Lead Plaintiff leave to file the FAC pursuant to Rule 15(a) and the MTD Order when the FAC adequately pleads that Defendants violated the federal securities laws and remedies the deficiencies raised in the MTD Order?

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Lead Plaintiff's proposed amendment is well-justified under the liberal regime established by Rule 15, which states that courts should "freely give leave [to amend] when justice so requires." *See* Fed. R. Civ. P. 15(a)(2). The FAC also addresses the issues that the Court identified in the MTD Order, while remaining well-grounded in Lead Plaintiff's central theory of fraud, which erased over ***$7 billion*** in shareholder value when it came to light.

***The Amendment Is Not Futile***. The proposed amendment is not futile because the FAC states valid claims for violations of the federal securities laws, including by adding new facts to remedy the deficiencies that the Court noted in the MTD Order. In broad strokes, the amendment has three main components. <u>First</u>, the FAC adds additional facts establishing a strong inference of Defendants' scienter, including, for example, the fact that Defendant Clark was personally involved in approving the transition costs that the Court previously held were adequately alleged to be improperly inflated. <u>Second</u>, the FAC includes new facts demonstrating the materiality of Defendants' revenue recognition misconduct, including, for example, the fact that the $12 million in revenue that Defendants ***admitted*** was improperly recorded in 2018 represented ***20%*** of Symantec's reported $49 million in operating income for 2018. <u>Third</u>, the FAC includes additional misstatements, including Defendants' misrepresentations touting the success of the Blue Coat integration. Thus, the amendment should be permitted.

***The Amendment Is Timely***. Lead Plaintiff timely filed this amended motion and the proposed FAC in accordance with the MTD Order and as promptly as possible after the unsealed

1    complaint in the related Derivative Action was filed,[3] given Defendants' delay tactics and refusal

2    to timely confirm that they would not seek emergency review of this Court's Unsealing Order.[4]

3    Lead Plaintiff has engaged in no undue delay.

4         ***There Is No Bad Faith Or Prejudice***.  The proposed amendment is not made in bad faith

5    and will not prejudice Defendants.  Lead Plaintiff has in good faith followed this Court's directive

6    to "plead its best case."  Defendants will suffer no prejudice from the amendment, as no case

7    deadlines have been set, discovery has not commenced, and the proposed amendment asserts the

8    same central theory of misconduct over the same time period.

9    **II.    SUMMARY OF THE AMENDED ALLEGATIONS**

10        As the Court is aware, this securities class action arises from Defendants' alleged

11   misrepresentations, including their manipulation of key financial metrics contrary to GAAP and

12   non-GAAP accounting rules, in order to convince investors that the purportedly "transformative"

13   Blue Coat acquisition was successful and to achieve executive compensation targets.  When a

14   whistleblower revealed Defendants' deceptive accounting practices in 2018, the Company's Audit

15   Committee and the SEC launched investigations.  With this news, Symantec's stock price plunged,

16   erasing over $7 billion in market capitalization and causing investors to suffer substantial damages.

17        On June 14, the Court issued the MTD Order, which identified certain deficiencies in the

18   CAC and allowed Lead Plaintiff to move for leave to amend.  Lead Plaintiff respectfully submits

19   that the FAC remedies the deficiencies described in the MTD Order, as summarized below.

20        First, with respect to inflated transition costs, the Court held that the CAC sufficiently

21   alleged falsity, but fell short of alleging a strong inference of the Individual Defendants' scienter.

22   *See* MTD Order, at *6.

23        To address this deficiency, the FAC contains new and detailed factual allegations

24   supporting a strong inference of scienter, including that (a) as a Board member, Defendant Clark

25   personally approved the specific transition costs at issue, which Defendants have admitted (¶¶173-

26   _____

27   [3] The "Derivative Action" refers to *Lee v. Clark, et al.*, No. 3:19-cv-02522-WHA, and the
     "Derivative Complaint" refers to Derivative Action ECF No. 24, filed July 16, 2019.

28   [4] The "Unsealing Order" refers to Derivative Action ECF No. 23.

76, 439); (b) Defendants Clark, Noviello, and/or Garfield were focused on and personally involved in discussions held at the level of Symantec's Board and Audit Committee concerning *inter alia* non-GAAP adjustments, "transition costs" and the accounting for those costs, and "errors in financial reporting and recording," including "significant" deficiencies related to and misstatements in Symantec's Fiscal Year ("FY") 2017 10-K (¶¶177-95, 441); (c) by September 29, 2017, Defendants Clark and Noviello were specifically aware of the need to "enhance" Symantec's "policies and procedures regarding non-GAAP measures," and the issues were so serious that Symantec hired Ernst & Young ("EY"), an outside accounting firm, and was actively implementing "remedial measures" to address issues with respect to its "usage, policies, and controls related to [non-GAAP measures]" (¶¶196-205, 441, 457); (d) Defendants Clark and Noviello (and numerous other executives who came over from Blue Coat) left Symantec shortly after the end of the Class Period under suspicious circumstances, which the market concluded were directly connected to the circumstances of the Audit Committee investigation, the SEC investigation, and this Action, and which Symantec evasively failed to address (¶¶302-12, 446); and (e) that Broadcom recently lowered its price for Symantec by $1 billion in the middle of due diligence. (¶¶313-19, 447). These facts were not previously before the Court in the CAC.

Second, the Court held that the CAC failed to allege that Defendants' revenue recognition manipulations were material and called for Lead Plaintiff to plead additional facts showing that they "constituted widespread and significant inflation of revenue," as discussed in *In re Daou Systems, Inc.*, 411 F.3d 1006, 1020 (9th Cir. 2005). MTD Order, at *4.

To address this deficiency, the FAC pleads new facts establishing the existence and materiality of the revenue recognition violations, which collectively demonstrate that Defendants' tactics to inflate revenue **totaled over $103 million at a minimum** and were otherwise "widespread and significant." To start, the FAC explains that the $12 million in revenue that Defendants **admitted** was improperly recorded in Q4 2018 was a material percentage – **approximately 20%** – of Symantec's operating income for 2018, which Symantec admitted was a "key metric." ¶¶69-70, 464. *See No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,

320 F.3d 920, 929, 935 (9th Cir. 2003) ("*America West*") (misstatement of operating income by 10% was material).

In addition, the FAC includes additional details concerning Defendants' misconduct provided by former employees, including those which the Court already credited as reliable and having the requisite personal knowledge. *See* MTD Order, at *3-4.

Specifically, Lead Counsel went back to those former employees and obtained significant additional detail. For example, Symantec's former Account Manager, credited by the Court, elaborated that six "double-digit" million-dollar deals (including his/her Verizon deal worth $13 million) were ***double-booked*** in Q4 2017 and Q1 2018. ¶¶122-36, 465. These deals were material because, even at the minimum "double-digit" million-dollar level – *i.e.*, $10,000,000 each plus the $13,000,000 Verizon deal – they collectively amounted to $63 million, which was ***17%*** of Symantec's non-GAAP operating income for Q1 2018. ¶133. *See America West*, 320 F.3d at 935. This amount was also highly material to Defendants Clark and Noviello's executive compensation because, absent the extra $63 million, their targets would not have been met. Indeed, Defendants exceeded their bonus target by only $46 million and, thus, this estimated $63 million was essential to their doing so. ¶¶134-36.

Moreover, the FAC includes accounts from new, equally-reliable, former employees with personal knowledge of Defendants' accounting misconduct, who collectively describe at least an additional $28 million in revenue recognition violations in 2017 and 2018, ██████████████████ ████████████████████████████████████████████████████████████ ████████████ *See* ¶¶81-115, 296.

Further, the FAC highlights additional facts confirming that Defendants' misconduct was material, including that revenue recognition violations were widespread and occurred in multiple separate Symantec offices across the U.S.; that Symantec's stock price dropped 33% in response to the announcement of the Audit Committee investigation; that following the revelations of the fraud, multiple senior executives were terminated, ***including Defendants Clark and Noviello***; and that Broadcom recently lowered its price for Symantec by $1 billion due to new facts uncovered

1     in due diligence and the "organizational disruption and distraction" and "turbulence" left in the

2     wake of Defendant Clark's departure and the Audit Committee investigation.  ¶¶466-69.

3         Third, the FAC contains additional allegations concerning Defendants' statements touting

4     to investors the success of the integration of the Blue Coat acquisition with "extremely low"

5     attrition.  In reality, as multiple former Symantec employees confirmed, the integration was a

6     disaster with employees "leaving in droves." ¶¶246-52.

7 **III.**    **PROCEDURAL BACKGROUND**

8         On November 15, 2018, Lead Plaintiff filed the CAC, and briefing and oral argument on

9     Defendants' motions to dismiss was completed on January 31, 2019.  During oral argument,

10    Defendants conceded that Lead Plaintiff should be able to amend its pleading.[5]

11         On June 14, 2019, the Court issued the MTD Order, granting Defendants' motions to

12    dismiss, and allowing Lead Plaintiff to file the present motion.  ECF No. 137.

13         On June 17, 2019, this Court granted Symantec's motion to relate the Derivative Action to

14    this Action.  ECF No. 138.  The Derivative Complaint is largely modeled on the CAC, and contains

15    additional facts elicited from documents produced to the Derivative Plaintiffs (but not Lead

16    Plaintiff) that are redacted.

17         On June 25, 2019, Lead Plaintiff filed a motion to unseal the Derivative Complaint on the

18    principal basis that Defendants failed to meet their burden to show "compelling reasons" to restrict

19    public access to the redacted information.  ECF No. 139.  On July 3, 2019, the Court denied that

20    motion because Lead Plaintiff was not a party to the Derivative Action.  ECF No. 144.

21         On the same day, the Court entered the Unsealing Order, which unsealed the majority of

22    the Derivative Complaint.  The Unsealing Order instructed the Derivative Plaintiffs to "file a

23    revised version of the complaint consistent with this order on the public docket by July 18, 2019

24    at noon unless our court of appeals grants emergency relief postponing compliance."

25         On July 7, 2019, Lead Counsel asked Defendants to consent to a two-week extension of

26

27    [5] *See, e.g.,* January 31, 2019 Tr.  (Boon Decl., **Exhibit C**), at 32:22-33:1 (Defense Counsel: "They
can have another shot at it.  The Ninth Circuit obviously favors amendment.").

28

the filing date for this motion to July 25, 2019.  Boon Decl. ¶3.  Defendants refused to consent, indicating that they would oppose any such extension.  *Id.*[6]

On July 9, 2019, seeking to promptly file the unsealed Derivative Complaint in compliance with the Court's Unsealing Order, counsel for the Derivative Plaintiffs asked Defendants whether they were seeking emergency relief to block operation of the Court's Unsealing Order.  *Id*. ¶4. Even though Defendants had not taken any steps to do so in the week following the Unsealing Order, Defendants nevertheless refused to confirm that they would not seek such relief.  *Id.* ¶5. Instead, Defendants said on July 10 that they were still reviewing their options.  *Id.*

As a result, the unsealed Derivative Complaint was not filed until July 16, 2019.  *Id.* ¶7. By this amended Motion, Lead Plaintiff seeks leave to file an updated version of the FAC that includes new facts from the Derivative Complaint that corroborate the fraud, along with additional new facts that came to light after Lead Plaintiff filed its motion on July 11, including that Broadcom recently lowered its price for Symantec by $1 billion, which may cause the deal to collapse.  *Id.*

## IV.   ARGUMENT

### A.   Under Rule 15(a)'s Lenient Standard And Because Justice So Requires, The Court Should Grant Lead Plaintiff Leave To File The FAC

Federal Rule of Civil Procedure 15(a)(2) states that courts "should freely give leave [to amend] when justice so requires" and this rule "is to be applied with extreme liberality."  *Align Tech., Inc. v. Strauss Diamond Instruments., Inc.*, 2019 WL 861422, at *1 (N.D. Cal. Feb. 22, 2019); *see Griggs v. Pace Am. Grp., Inc.,* 170 F.3d 877, 880 (9th Cir. 1999) (noting that inferences should be drawn "in favor of granting the motion").  Additionally, courts should only decline to grant leave to amend if there is strong evidence of "undue delay, bad faith or dilatory motive," "repeated    failure    to    cure    deficiencies,"    "undue    prejudice    to    the    opposing    party,

---

[6] Defendants did so even though the N.D. Cal. Guidelines for Professional Conduct state that lawyers should "agree to reasonable requests for extensions of time" and "should be committed to the notion that the strategy of refusing reasonable requests for extensions of time is inappropriate." *See* https://www.cand.uscourts.gov/professional_conduct_guidelines at Sections 4(a) and (d).

1  or "futility of amendment, etc." *Lee v. Postmates Inc.*, 2018 WL 4961802, at *10 (N.D. Cal. Oct.

2  15, 2018).[7]  As set forth below, Lead Plaintiff should be granted leave to file the FAC.

### B.     The Proposed Amendment Is Not Futile

4      The proposed amendment is not futile because the FAC contains additional facts that

5  establish a strong inference of the Individual Defendants' scienter and demonstrate the materiality

6  of Defendants' revenue recognition manipulations, which considered holistically with the rest of

7  the FAC adequately state claims that Defendants violated the federal securities laws.  In addition,

8  the FAC contains a new category of false and misleading statements concerning the purportedly

9  "transformative" Blue Coat acquisition and success of the integration.

### 1.     Legal Standards For Pleading Scienter And Materiality

11      The applicable legal standards are well known to the Court and set forth in Lead Plaintiff's

12  Opposition to Defendants' Motion to Dismiss (ECF No. 118, "Opp."), accordingly, Lead Plaintiff

13  only briefly summarizes them here.[8]

14      Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud,

15  but also deliberate recklessness." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir.

16  2016).  In this Circuit, "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct

17  under Rule 10b-5" of the Exchange Act.  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694,

18  708 (9th Cir. 2012).  The inference of scienter "need not be irrefutable … or even the most

19  plausible." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  In evaluating

20  scienter allegations, the "inquiry … is whether all of the facts alleged, taken collectively, give rise

21  to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation,

22  meets that standard." *Id.*  at 322-23; *see VeriFone*, 704 F.3d at 703 (a "holistic review" is required).

23      Further, the Supreme Court has squarely held that materiality is "an inherently fact-specific

24  finding," *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988), that is "peculiarly one[] for the trier of

25  fact," *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  As such, Lead Plaintiff's

---

26  [7] Unless otherwise indicated, all internal citations and quotations in caselaw have been omitted, and all emphasis in quotation marks has been added.

27  [8] Lead Plaintiff expressly incorporates herein the arguments that it made in its Opposition brief.

28

1    allegations need only "raise a reasonable expectation that discovery will reveal evidence satisfying

2    the materiality requirement." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011). *See*

3    *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 794 (9th Cir. 2017) (same). The key question

4    in assessing materiality at the pleading stage is whether the misstated or omitted information would

5    have been "important to investors" or "significant in the total mix of information for making an

6    investment decision." *See, e.g.*, *Siemers v. Wells Fargo & Co.*, 2007 WL 1140660, at *6-8 (N.D.

7    Cal. Apr. 17, 2007) (Alsup, J.).

8        Importantly, courts in this District assess the materiality of metrics in financial statements

9    both qualitatively and quantitatively. The opinion in *SEC v. Leslie* is instructive on this point.

10   2012 WL 116562 (N.D. Cal. Jan. 13, 2012). There, Judge Fogel refused to find that a $6.4 million

11   adjustment was immaterial – even ***at the summary judgment stage***. The Court explained: "[T]he

12   concept of 'materiality' is not limited to a percentage of a company's total profits, but rather

13   requires assessment of qualitative and quantitative factors so that even quantitatively small

14   amounts can still present a materially misleading picture of a company's health." *Id.* at *6.[9] This

15   Court recognized this well-accepted principle in the MTD Order by noting, for example,

16   "materiality is not just the number but also the despicability of the practice." MTD Order, at *5.

17       As set forth below, the FAC pleads facts, including new information, that considered

18   holistically adequately plead scienter and materiality.

19              2.    **The FAC Alleges That Defendants Knew Or Recklessly Disregarded
                      That Reported Transition Costs Were Misleading**

20
        In the MTD Order, the Court held that Lead Plaintiff "sufficiently alleged that defendants
21
     made materially false and misleading statements by inflating transition costs." MTD Order, at *6.
22
     However, the Court also found that "sufficient allegations as to scienter are lacking." *Id.* To
23
     remedy this issue, the FAC contains five categories of new factual allegations that support a strong
24
     inference of the Individual Defendants' scienter with respect to the misstated transition costs.
25
        <u>First</u>, the FAC alleges that Defendant Clark served as a member of Symantec's Board of
26

27   _____
     [9] *See SEC v. Fuhlendorf*, 2011 WL 999221, at *7 (W.D. Wash. Mar. 17, 2011) ("quantifying…the
     magnitude of a misstatement is only the beginning of an analysis of materiality"); Opp. at 19-20.
28

Directors throughout the Class Period. Importantly, as detailed below, Defendants have **admitted** that "transition costs" were approved by Symantec's Board during the Class Period. Accordingly, there is a strong inference that, in personally approving the transition costs as a Board member, Defendant Clark knew (or recklessly disregarded) that the transition costs were inflated and misclassified during the Class Period. ¶¶173-76.

Specifically, in Symantec's Form 10-Q for Q3 2018, Defendants **admitted** *inter alia*: "Transition costs are incurred in connection with **Board of Directors approved** discrete strategic information technology transformation initiatives." Defendants admitted the same in Symantec's 2018 Form 10-K. ¶174.

Further, in filings submitted to the Court in this Action, Defendants likewise **admitted** that the "transition costs" referred to in the above quotation were the **same** transition costs described by Symantec's former VP and CSO, which this Court already credited as adequately alleging improper inflation. MTD Order, at *5-6. For example, Symantec stated in its opening brief:

> [T]he former VP and Chief Security Officer ("CSO")—asserts that his boss (the Chief Information Officer) referred to the "building of a private cloud using Cisco technology" where Symantec would "be in the next 4-5 years." ¶¶116, 110 ("significant cloud restructure projects"). The transformative building of a cloud falls precisely within what Symantec describes as "*transition cost…incurred in connection with Board of Directors approved discrete strategic information technology transformation initiatives* [.]" ¶241.

ECF No. 112, at 10-11 (emphasis added by Defendants); *see also* ECF No. 121, at 9-10 (Symantec Reply Brief repeating the same point). The Individual Defendants, including Defendant Clark himself, joined this argument. *See* ECF Nos. 114, 115, 123, 124. In sum, Defendants conceded that Defendant Clark was directly and personally involved in approving the transition costs that this Court has already held were sufficiently pled to be inflated by Symantec. ¶175.[10] New facts

---

[10] Defendants previously argued that this disclosure precluded a finding that Symantec's non-GAAP metrics were misleading. *See* ECF No. 112, at 11. The Court rejected Defendants' argument as raising a fact issue inappropriate for determination on the pleadings. MTD Order, at *6 ("Whether these were transition costs connected to the divestiture of Veritas and integration of Blue Coat and LifeLock, or whether the costs instead related to operational run projects previously recorded as operational expenses as alleged in the complaint, presents **factual questions that**

revealed in the unsealed Derivative Complaint confirm that the Board knew about and approved these transition costs.  *See* ¶181 ("T&T [transition and transformation] expenditures expected to exceed Board Approved Range"); ¶188 ("Board would need to retain discretion…to take into account the impact of… transition and transformation projects").

Thus, Defendants' own admissions, corroborated by new unsealed facts, powerfully establish Defendant Clark's scienter for the inflated transition costs.  Indeed, the fact that Defendant Clark approved these initiatives gives rise to a strong inference that he knew (or recklessly disregarded) that those initiatives were operational run projects that were previously recorded as operational expenses, as alleged in the FAC, and not nonrecurring "transition costs" properly excluded under GAAP.  *See, e.g.*, *Shaev v. Baker*, 2017 WL 1735573, at *10 (N.D. Cal. May 4, 2017) (admission by named defendant CEO that Board monitored sales integrity issues supports scienter); *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *10 (N.D. Cal. Feb. 27, 2018) (admission that named defendant/former CEO discussed the allegedly fraudulent activity in Board meetings supports strong inference of scienter); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045 (N.D. Cal. 2016).

<u>Second</u>, the documents quoted in the Derivative Complaint and discussed by the Court in the Unsealing Order confirm that Defendant Clark – as well as Defendants Noviello and Garfield – discussed "transition costs," the accounting for those costs, and "errors in financial reporting and recording," at the Board and Audit Committee level, including through presentations made by Defendant Noviello.  ¶¶177-95, 441.  For example, immediately prior to the start of the Class Period on May 8, 2017, Defendants Clark and Noviello were focused on the Company's reporting of non-GAAP measures, including how the "exclusion of normal, recurring cash expenses," such as the transition costs at issue in this case, could be "misleading adjustments" according to SEC guidance.  ¶¶189-90.

Further, on May 19, 2017 – just after the start of the Class Period here – Defendants Clark, Noviello, and Garfield attended an Audit Committee meeting where they reviewed and discussed

*cannot be resolved on a motion to dismiss*.").

"*errors in financial reporting and recording*" and "guidance on the use of non-GAAP measures." ¶¶191-93.  Indeed, Defendants Clark, Noviello, and Garfield were made aware that a "significant" internal control deficiency existed at Symantec, which had resulted in accounting deficiencies and misstatements in the 2017 Form 10-K.  *Id.*

Moreover, on October 31, 2017, at a Board meeting attended by Defendants Clark and Noviello where Noviello "discussed the usage of non-GAAP financial measures," the Board specifically requested that the Audit Committee be provided "an additional level of detail on the Transition & Transformation accounts (T&T) and non-GAAP items in future updates."  ¶198.

The fact that Defendants Clark, Noviello and/or Garfield were personally involved in discussions held at the level of Symantec's Board and Audit Committee concerning "errors in financial reporting and recording," which included "significant" deficiencies related to and misstatements in Symantec's 2017 Form 10-K,  as well as "transition costs" and the accounting for those costs, further supports a strong inference of each Defendant's scienter.  *See Hefler*, 2018 WL 1070116, at *10; *Shaev*, 2017 WL 1735573, at *10; *see also Freudenberg v. E*Trade Financial Corp.*, 712 F.  Supp.  2d 171, 198 (S.D.N.Y. 2010) ("meetings, where the problems at issue were directly discussed with Defendants, evidence scienter").

<u>Third</u>, as Symantec later admitted (in its September 24, 2018 Form 8-K), during Q2 2018 (which ended September 29, 2017), Symantec's Board, which included Defendant Clark, "initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures." *See* Unsealing Order at 4:11-13; 17-19.  The unsealed Derivative Complaint reveals that this outside accounting firm was EY. ¶¶196-203.  By October 31, 2017, Defendants Clark and Noviello were not only aware that Symantec had engaged EY, but that Symantec was actively implementing "remedial activities" to address issues with respect to its "usage, policies, and controls related to [non-GAAP measures]" as well as "*Transition & Transformation accounts*."  ¶198.  Moreover, during a November 16, 2017 Audit Committee meeting attended by Defendants Clark and Noviello where the sole item on the agenda was a discussion of EY's work on non-GAAP measures, EY delivered a presentation about

1  increased scrutiny from the SEC concerning non-GAAP reporting and changes that Symantec had

2  to make. ¶¶199-203.

3      Defendants Clark and Noviello were also aware that Symantec had hired an outside law

4  firm, Fenwick & West LLP, to analyze "the Company's use of non-GAAP financial measures,"

5  and attended an Audit Committee meeting on December 20, 2017 specifically to discuss that

6  analysis. ¶204.

7      The fact that Defendants Clark and Noviello were personally aware of a need to "enhance"

8  Symantec's "policies and procedures regarding non-GAAP measures," that the issues were so

9  serious that Symantec hired an outside accounting firm, EY, as well as an outside law firm, to

10 undertake a review, and the fact that Symantec was actively implementing "remedial measures"

11 to address issues with respect to its "usage, policies, and controls related to [non-GAAP

12 measures]" and "Transition & Transformation accounts" during the Class Period, powerfully

13 supports a strong inference of scienter. *See In re Marsh & McLennan Companies, Inc. Sec. Litig.*,

14 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006) (scienter based on misstatements "aggressively

15 support[ing] the Company's business practices" after commencement of an outside investigation).

16     Fourth, the FAC details how, starting shortly after the end of the Class Period and

17 continuing to-date, Symantec terminated virtually all of its executive team, ***including both***

18 ***Defendants Clark and Noviello***. ¶¶302-12. As set forth below, this rash of suspicious high-level

19 executive departures, which has continued to the date of this filing, supports a finding of scienter.

20     For example, on November 29, 2018, the Company announced that Michael Fey,

21 Symantec's President and Chief Operating Officer, had resigned "effective immediately." ¶303.

22 The media immediately questioned the circumstances surrounding Fey's resignation – but

23 Defendants tellingly refused to address those concerns. ¶304. Indeed, Symantec's former Account

24 Manager ███████████████████ confirmed that Fey left Symantec in connection with the

25 Audit Committee investigation. *Id.*

26     As set forth in the FAC, at the same time that Fey left Symantec, multiple other senior

27 executives left the Company. ¶305. However, as the market observed, Symantec "***didn't publicize***

28

*the other executive departures*" when it announced Fey's "resignation." *Id.* Symantec again refused to make any public comments on the departures. *Id.*

Then, on January 31, 2019, Symantec announced Defendant Noviello's resignation ostensibly to "pursue other opportunities." ¶306. The market again reacted to this news with concern, especially on the heels of the departure of Fey and other senior Symantec executives. For example, Trefis observed that the fact that there had been "*a spate of executive exits (the COO in November and now the CFO) while the audit committee review fades is not necessarily the most inspiring set of events for investors*." *Id.* Macquarie likewise reported that "CFO Nick Noviello will be stepping down over the coming months, *an outcome we view as reasonable following the co.'s Internal Audit Committee investigation, an ongoing SEC investigation, and a class action suit with allegations of accounting fraud*." ¶308. ████████████████████

████████████████████████████████████████ *Id.*

Next, as the FAC details, on May 9, 2019, the Company announced Defendant Clark's resignation without a permanent replacement. ¶309. Again, the market was concerned about the true circumstances of Defendant Clark's departure. Specifically, during a May 9, 2019 investor call, an analyst from Credit Suisse asked whether Clark's "*departure [is] in any way related to a disagreement with the Board or the company or in an[y] way related to either the still unresolved SEC investigation or any pending litigation against the company?*" *Id.* In response, Symantec's new interim president and CEO Richard Hill did not deny the connection and gave a startlingly evasive answer, starting with the statement: "*So I can't answer for Greg*." *Id.* Analysts took note of this evasiveness. For example, Credit Suisse observed that "Hill … *stopped short of* speaking on behalf of the entire board or *denying any nexus with ongoing litigation or the company's still unresolved SEC investigation*." ¶310.[11]

The departures of Symantec's top senior executives, *including Defendants Clark and*

---

[11] Multiple other senior executives who were formerly at Blue Coat departed Symantec, including: (a) Francis C. Rosch, former Executive VP; (b) Joe McPhillips, former Director of Channel Sales; (c) Brian Kenyon, former Chief Strategy Officer; (d) Marc Andrews, former Head of Global Enterprise Sales; and (e) Steve Schoenfeld, former SVP, Product Management. ¶¶311-12.

1   *Noviello*, particularly in combination with Symantec's admission that transition costs were

2   approved at the Board level, the new facts from the unsealed Derivative Complaint, and

3   Symantec's evasive answers and non-denials, support a strong inference of scienter. *See, e.g.*, *In

4   re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1121-22 (N.D. Cal. 2017 (Alsup, J.) (strong

5   inference of scienter "supported by the fact that CEO [] later resigned amid allegations that he

6   exploited the flaws in LendingClub's internal procedures regarding loan approval, loan data, and

7   financial reporting"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab.

8   Litig.*, 2017 WL 66281, at *14 (N.D. Cal. 2017); *In re Adaptive Broadband Sec. Litig.*, 2002 WL

9   989478, at *14 (N.D. Cal. Apr. 2, 2002) ("corporate reshuffling" supports scienter).  Further, as

10  alleged in the FAC, these terminations were connected to the Audit Committee investigation and

11  ongoing SEC investigation, as well as this Action.  ¶¶302-12.

12        Fifth, the fact that Broadcom lowered its price for Symantec by $1 billion in the middle of

13  due diligence further supports scienter.  As alleged in the FAC, Broadcom lowered its offer price

14  in response to uncovering new (as yet unidentified) information about Symantec, which may cause

15  the deal to collapse or close at a lower price.  ¶¶313-19.  Broadcom's ability to uncover a serious

16  problem at Symantec supports Defendants' knowledge (or reckless disregard) of it.  *See In re

17  Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *20 (W.D. Wash. Apr. 19, 2019) (inference of

18  scienter "particularly appropriate" where allegations include due diligence prior to a merger).

19        Finally, the above facts must be considered holistically with the FAC's multiple other

20  categories of factual allegations supporting a strong inference of scienter, including those that this

21  Court has already credited in the MTD Order.  *See* Opp. at 25-33.  For example, the Court credited

22  Defendants' compensation incentives as a factor in the scienter analysis.  MTD Order, at *9; *see

23  America West*, 320 F.3d at 944 (strong inference of scienter because defendants' eligibility for

24  stock options and executive bonuses was based principally on the company's financial

25  performance).  The manipulation of transition costs directly contributed to Defendants' ability to

26  achieve those compensation incentives, as further confirmed by the unsealed Derivative

27  Complaint.  ¶¶213-30; *see* ¶¶223-27 (former Principal Compensation Analyst describing "cost-

28

cutting measures" and increases to stock-based compensation done in order to increase operating income margin). Viewed holistically, the new and existing facts alleged in the FAC support a strong inference of scienter and remedy the issues raised in the MTD Order.

### 3. The FAC Alleges That The Revenue Manipulations Were Material

With respect to the revenue recognition violations, the Court previously credited the former employees in the CAC, holding that "sufficient facts" were alleged "regarding the reliability and personal knowledge of these confidential witnesses." MTD Order, at *4. However, the Court found that the revenue recognition allegations were "insufficient to show materiality" (with respect to the $12 million) or "too vague" to be material (with respect to the other alleged manipulations). *Id.* at *5. The FAC contains significant new facts demonstrating that the revenue recognition violations were material, widespread and significant, and despicable, as summarized below.

<u>First</u>, the FAC explains that the $12 million in revenue that Defendants ***admitted*** was improperly recorded in 2018 was material to Symantec's "key" financial metrics on both a yearly and quarterly basis. ¶¶69-71, 464. On a yearly basis, Symantec reported $49 million in operating income for FY 2018, which Symantec identified as a "Key Financial Metric."[12] ¶69. Given that the $49 million would be reduced by the $12 million deferred to Q1 2019, this means that Symantec's full year 2018 operating income was reduced by approximately ***20%*** (*i.e.*, the $49 million reported operating income would have been $61 million without the improperly recorded $12 million). *Id.* In other words, deferring the $12 million in improperly recognized revenue had a 20% impact on Symantec's reported GAAP operating income for FY 2018. *Id.* A 20% impact is material to investors.

Indeed, this exact point was made by Watchdog Research, an independent research provider that "identif[ies] red flags, issues and other anomalies in financial reporting." ¶70. For example, a Watchdog Report on Symantec titled "What happened?," states:

> Any irregularities in accounting are material because they raise questions about the potential for failure or weakness in the personnel and/or systems used for a company's accounting. In [Symantec's] case, it might seem a $12 million revenue

---

[12]Form 10-K for FY Ended March 30, 2018 (the "2018 10-K"), at 36 ("Key Financial Metrics").

recognition issue would be immaterial. But that would be **false**. Symantec reported $49 million in operating income in 2018. If the $49 was reduced by the $12 million, that still means the $12 million had an impact of 20% on operating income – excluding any millions spent on the investigation! *Id.* (emphasis in original).

The $12 million was also material to Symantec's quarterly financial metrics for Q4 2018 (*i.e.*, the quarter from which the revenue should have been deferred). ¶71. For example, in its 2018 10-K, Symantec reported revised figures for Q4 2018 that reduced gross profits by a full $12 million on a dollar-for-dollar basis. *Id.* Thus, the $12 million likewise impacted Symantec's operating income on a dollar-for-dollar basis. *Id.* Critically, the $12 million was ***double or 200%*** of Symantec's reported $6 million in operating income for Q4 2018. *Id.* In other words, following the Audit Committee investigation and deferral of the $12 million, Symantec's reported operating income for Q4 2018 had to be reduced by ***67 percent.*** *Id.*

Accordingly, the admitted $12 million in improperly recorded revenue is both quantitatively and qualitatively material. *See America West*, 320 F.3d at 929, 935 (misstatement of operating income by 10% was material); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 (2d Cir. 2000) (reversing district court's decision that fees totaling 1.7% of company's revenue was immaterial as a matter of law, and finding such misrepresentation could be material depending on the facts); *Leslie*, 2012 WL 116562, at *6 ($6.4 million in accounting manipulations that had little or no measurable effect on company's bottom line not immaterial at summary judgment).

<u>Second</u>, on the revenue recognition point, this Court found that the CAC's allegations regarding information supplied by former employees were vague, including the allegations about a former Symantec Account Manager from Florida. *See* MTD Order, at *5. Following the MTD Order, Lead Counsel re-contacted this former Account Manager, who supplied additional facts and details demonstrating the materiality of Defendants' misconduct. Indeed, as set forth in the FAC, the former Account Manager described a $13 million deal with Verizon and five other "big" "double digit" million-dollar deals – all of which were ***double-booked*** in each of Q4 2017 and Q1 2018. ¶465. Even if these other five deals were the "double-digit" million-dollar minimum – *i.e.*, $10,000,000 each – the total improperly double-booked amounted to $63 million (*i.e.*, 5 x $10

1  million + $13 million = $63 million). *Id.* This estimated sum was material to Symantec's reported

2  financial results because it amounted to, for example, ***17%*** of Symantec's non-GAAP operating

3  income for Q1 2018 and ***5.4%*** of Symantec's reported net revenues for Q1 2018. *Id.*

4  These six deals were likewise material from the perspective of Defendants Clark and

5  Noviello's bonus targets for FY 2017 – as those targets would have been missed without the

6  additional improperly-recorded revenue. *Id.* To be sure, accordingly to Symantec's SEC filings,

7  Defendants exceeded their bonus target by only $46 million. ¶¶134-36. Thus, this estimated $63

8  million was essential to Defendants meeting their bonus target. *Id. See America West*, 320 F.3d

9  at 935; *Ganino*, 228 F.3d at 166; *Leslie*, 2012 WL 116562, at *6; *see also SEC v. Das*, 2010 WL

10  4615336, at *8 (D. Neb. Nov. 4, 2010) (executive compensation not immaterial as matter of law

11  because "investors may base investment decisions, at least in part," on compensation).

12  Further, in addition to new details from other former employees cited in the CAC, the FAC

13  includes accounts of Defendants' misconduct from newly-added former employees. *See* ¶¶81-

14  115, 223-27, 296. In that regard, the FAC alleges the new former employees' job titles, dates of

15  employment and a description of their job responsibilities and/or reporting lines, all of which

16  demonstrate that the new former employees are reliable and have personal knowledge of the

17  accounting manipulations attributed to them in the FAC, consistent with the MTD Order.

18  These new allegations describe, in as much detail as possible without the benefit of

19  discovery, widespread and significant accounting violations at Symantec, and corroborate the

20  accounts of the former employees that this Court has already credited in the MTD Order. For

21  example, ███████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████████ ¶¶81-

25  88, 296. *See also* ¶91 (former Regional Sales Manager describing April/May 2018 improperly

26  booked deal worth nearly $10 million); ¶93 (former Account Executive describing seeing one-two

27  deals per year subject to revenue manipulation and estimating $10 million in improper revenue

28

1   recognition for sales personnel in the field); ¶95 (former HealthCare Account Executive describing

2   $3 million deal booked without signed purchase order from the customer); ¶96 (former Business

3   Development Manager describing routine manipulation of deals over $250,000); ¶106 (former

4   Renewal Sales Representative describing $1 million deal with State of Michigan over three years

5   recognized all at once); ¶¶108, 110 (former Account Executive describing $1.7 million deal with

6   the school district in Houston closed early in April 2017 and approximately $2 million of renewals

7   brought in early for the East Coast in 2018).

8          Adding up the dollar amounts described by the new former employees amounts to over ***$28***

9   ***million*** in revenue recognition violations during the Class Period.  Combining these new violations

10  with the $12 million admitted by Defendants, and the $63 million described by the former Account

11  Manager, ***Symantec's revenue recognition manipulations during the Class Period amounted to***

12  ***over $103 million at a minimum***.  These allegations plausibly suggest that "the Audit Committee

13  failed to disclose the full extent of the revenue recognition at issue." MTD Order, at *5.  Tellingly,

14  none of these former employees were interviewed by Symantec's Audit Committee.  ¶293.

15         <u>Third</u>, even if the dollar amounts described above were insufficient to plead materiality

16  (and they are readily sufficient), the FAC contains additional new allegations which collectively

17  demonstrate that Defendants' revenue recognition violations were material.  Specifically, the FAC

18  alleges that at least 11 former employees interviewed by Lead Counsel in connection with their

19  investigation described revenue recognition improprieties at Symantec.  ¶466.  These former

20  employees worked in geographically diverse locations nationwide and covered different sales

21  regions spanning multiple states.  *Id.*  The fact that the revenue recognition manipulations were

22  widespread and occurred in multiple geographically diverse offices across the nation strongly

23  supports materiality.  *See Daou*, 411 F.3d at 1020 (test is whether the alleged GAAP violation

24  "constituted widespread and significant inflation of revenue"); *Erickson v. Corinthian Colleges,*

25  *Inc.*, 2015 WL 12732435, at *15 (C.D. Cal. Apr. 22, 2015) (allegations regarding widespread

26  fraudulent enrollment practices were material); *In re New Century*, 588 F. Supp. 2d 1206, 1226

27  (C.D. Cal. 2008) (widespread subprime lending rendered statements materially false).

28

Indeed, the widespread nature of the accounting manipulations rises to the level of "despicable," particularly in combination with Defendants' retaliation against whistleblowers and the fact that those manipulations occurred because of pressure by Defendants Clark and Noviello. ¶¶444-45; *In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*, 221 F. Supp. 2d 1090, 1102 (N.D. Cal. 2002) (Alsup, J.) ("facts pled regarding sham transactions—suggesting a pattern of shady revenue-recognition practices within NorthPoint—adequately support plaintiff's claim of fraud"); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1194 & n.77 (C.D. Cal. 2008) (crediting allegations from former employee that defendant "put pressure on employees on a regular basis to price risky loans in a way that would not take into account the extent of the risk of the loans presented").

Fourth, the market reaction to Symantec's Audit Committee investigation confirms materiality. ¶467. In response to Symantec's May 10, 2018 announcement that its Audit Committee had commenced an internal investigation due to concerns raised by a whistleblower and that the SEC had been alerted, Symantec's stock price dropped ***33%***. *Id.* In response to the August 2, 2018 announcement of additional information concerning the investigation, Symantec's stock price dropped ***8%***. *Id.* Together, these corrective disclosures erased over ***$7 billion*** in shareholder value. *Id.* These significant stock price declines further confirm the materiality of Defendants' misrepresentations. *America West*, 320 F.3d at 935 (even a slightly delayed stock drop "supports a finding of materiality"); *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368-69 (S.D.N.Y. 2012) (10% stock drop supports materiality).

Fifth, the numerous senior executive terminations, including of Defendants Clark and Noviello support materiality. ¶468. As set forth above, the fact that numerous executives were terminated in the wake of the Audit Committee investigation, including Defendants Clark and Noviello, further confirms the materiality of Defendants' misconduct. *Id.*

Sixth, the fact the Broadcom lowered its offer price for Symantec by $1 billion and the deal may collapse or close at a significantly lower price supports materiality. ¶469. The market attributed Broadcom's lower offer price to new facts that Broadcom discovered in due diligence,

and expressly noted that Symantec had not recovered from Clark's departure from the Company, the "organizational disruption and distraction," and "fundamental turbulence" that followed, or the internal investigations into Defendants' accounting misconduct. *Id.* On this news, Symantec stock dropped more than 15% intraday, while Broadcom stock rose over 3% intraday. *Id.*

In sum, a reasonable investor in Symantec stock would have found it important to know that Symantec employees in different Symantec locations across the U.S. witnessed revenue recognition violations which, in turn, created a false impression of the Company's financial performance; enabled the CEO and CFO to achieve millions of dollars in undeserved executive compensation; resulted in an Audit Committee investigation that found significant violations, and a 33% stock drop; and ultimately, led to the termination of virtually all of Symantec's senior executives, and the potential collapse of a $20 billion merger. Indeed, as this Court has observed in the materiality context, "***the integrity of management is always of importance to investors***." *See Siemers*, 2007 WL 1140660, at *8.

### 4. The FAC Alleges Scienter For The Revenue Recognition Misconduct

The Court did not reach the issue of scienter for the revenue recognition manipulations. MTD Order, at *5. For the reasons set forth in Lead Plaintiff's Opposition brief, the FAC alleges a strong inference of scienter with respect to the revenue recognition violations. *See* Opp. at 16-20. Indeed, as the Court noted in the MTD Order, "three of the five confidential sources, moreover, ***directly communicated with the individual defendants*** in connection with the particular accounting practices at issue." MTD Order, at *4.

Further, according to the former Account Manager, Defendant Clark was personally and directly involved in approving the six deals comprising an estimated $63 million in double-booked revenues. ¶440. Moreover, non-GAAP revenue was a key executive compensation target, and without the $63 million in misstated revenue, Defendants Clark and Noviello would not have achieved their executive compensation targets for FY 2017. ¶465; MTD Order, at *9 ("defendants' compensation incentives are a factor in the scienter analysis"). In addition, the Individual Defendants discussed non-GAAP metrics, including revenue, at the Board level. *See supra*, at 11-

12.  For example, as of January 30, 2017, even prior to the start of the Class Period, Defendant Clark was focused on non-GAAP revenue and deferred revenue recognition and made aware of at least one $180 million internal control error.  ¶¶185-86.  On May 8, 2017, the Audit Committee, including Defendant Clark, reviewed a presentation by Defendant Noviello on non-GAAP deferred revenue.  ¶189.  Defendants continued to be focused on revenue and deferred revenue throughout the Class Period.  *E.g.*, ¶¶194, 197.  The fact that the Individual Defendants discussed non-GAAP revenue and the accounting for it at the Board level prior to and during the Class Period supports a strong inference of their scienter.  Further, Defendants Clark and Noviello's knowledge that EY, "an outside accounting firm was retained to evaluate the wrongdoing," and that an outside law firm was retained to analyze "the Company's use of non-GAAP measures" further supports a strong inference of their scienter.  ¶¶196-205.  ████████████████████████████ ██████████████████████████    ¶297.

These facts, taken together with all of the other facts alleged in the FAC and described in Lead Plaintiff's opposition brief, support a strong inference of that the Individual Defendants knew about (or recklessly disregarded) the revenue recognition manipulations.  *See* Opp. at 27-28.

### 5.    The FAC Alleges A Strong Inference Of Garfield's Scienter

The FAC also contains new facts supporting a strong inference of Defendant Garfield's scienter.  To start, as set forth above, Defendant Garfield attended the May 19, 2017 Audit Committee meeting where Defendant Garfield personally reported "significant" deficiencies related to the 2017 10-K, and an ongoing need to "increase the experience level and number of employee accountants" to Defendants Clark and Noviello.  ¶191.

Moreover, the FAC contains additional new facts that support a strong inference that Defendant Garfield left Symantec due to improper revenue recognition practices and ineffective internal controls, but only after he closed the books for FY 2017 in exchange for a pay package.  Indeed, the unsealed Derivative Complaint confirms that Defendant Garfield was concerned about inadequate controls from the outset of the Blue Coat acquisition.  For example, on August 1, 2016, at an Audit Committee meeting attended by Defendant Clark, Defendant Garfield warned of issues

with Blue Coat management, including ensuring that "sufficient controls existed at Blue Coat" and risks concerning revenue recognition and the integration. ¶179.[13]

In addition, new former employees cited in the FAC confirmed the circumstances of Defendant Garfield's departure. A former Senior Manager, Pricing & Licensing at Symantec stated that he/she heard from multiple people that Garfield got paid a substantial amount to leave Symantec because he had legitimate information about improper financial dealings at Symantec. ¶121. The former Senior Manager heard that Garfield reported to executives at Clark's level something improper that had to do with revenue, like an accounting practice that was improper, and told executives that it was wrong, and they could not do it. *Id.* Garfield was "given a payout to keep quiet and move on." *Id.* The account of the former Senior Manager confirms the accounts of Symantec's former VP and CSO and Symantec's former Manager Bill and Collect-Finance that this Court already credited as reliable. *Id.*; *see* MTD Order, at *3.

Moreover, as alleged in the FAC, the former CSO heard about the circumstances of Defendant Garfield's departure from John Eversole, the former head of Physical Security and Executive Protection at Symantec, who was responsible for the executive protection program and personally did the majority of the protection of Clark himself. ¶116. At oral argument, Symantec's counsel specifically suggested that Lead Counsel should speak to Mr. Eversole.[14]

Lead Counsel spoke with Mr. Eversole several times recently. Boon Decl. ¶8. Mr. Eversole indicated that he had relevant information about Defendant Garfield's departure and was willing to share it with Lead Counsel, but he was concerned that Symantec might claim that his doing so would violate a non-disclosure agreement. *Id.* ¶9. As an initial matter, Symantec's insistence that employees sign nondisclosure agreements supports scienter. *See Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *10 (D. Kan. Sept. 25, 2012) (fact that "defendants insisted

---

[13] *See* ¶¶181-82 (10/31/16 Audit Committee meeting where Garfield discussed revenue treatment and issues raised in SEC comment letter); ¶183 (11/4/16 Audit Committee meeting where Garfield discussed "summaries of key observations for Symantec and Blue Coat").

[14] *See* Boon Decl. Ex. C (Tr. at 24:6-8 ("Defense Counsel: Then the question is, so did they speak to those two other sources? [*i.e.*, Mr. Eversole] I mean, they have the names … what happened there?").

on employees signing confidentiality agreements to keep secret the company's true adverse condition and the problems with and ultimate failure of the integration" supports scienter).

Given Mr. Eversole's concern, on July 3, 2019, Lead Counsel asked Symantec's counsel to confirm by July 5 that Symantec would not "retaliate or take any other action" against Mr. Eversole for sharing his relevant information.  Boon Decl. ¶10.  On July 5, Defendants said that they needed an extension to July 8 for their response.  *Id.*  That same day, Lead Counsel spoke to Mr. Eversole, who confirmed his continued cooperation.  *Id.*  On July 8, Defendants provided the requested confirmation, but immediately thereafter Mr. Eversole ceased cooperating and communicating with Lead Counsel.  *Id.*

### 6.     The FAC Alleges A New Category Of Actionable Misstatements Concerning The Purportedly "Transformative" Blue Coat Integration

The FAC also pleads a new category of misstatements, specifically, that Defendants made material misrepresentations concerning the success of the Blue Coat/Life Lock integration.

Indeed, the FAC describes several reliable former employees with personal knowledge of these events who confirmed that the integration was highly problematic.  ¶¶243-52.  For example, one former HR M&A Integration Leader from Sept. 2013 to June 2017 stated that there was a mass exodus of employees and that employees were "leaving in droves" and "fleeing."  ¶246.  Moreover, according to a former Senior Manager NPI Operations from May 2017 until Dec. 2017, the sales teams were not integrated – which directly contradicts Defendants' statements touting the success of the integration.  ¶251; *see In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *19 (N.D. Cal. Mar. 21, 2018) (statements that "Our sales force integration is complete, with all territories rationalized, and the team is aligned and executing" or that the companies were "fully integrated" were false and misleading where witnesses "paint[ed] a vastly different picture.").

Defendants Clark and Noviello knew or recklessly disregarded these integration problems and made contrary statements regarding the "significant progress" of the integrations and the "extremely low" attrition.  ¶¶245, 322, 352; *see VeriFone*, 704 F.3d at 708 (scienter alleged where difficulty of integration and downward pressure on gross margins in combination with statements

---

1    celebrating merger as a success made claims that defendants "innocently relied on the company's

2    optimistic models and projections implausible at best."). The inference of Defendant Noviello's

3    scienter is particularly strong as he admitted that he personally "***ran the integration of Blue Coat***

4    ***and Symantec before being named CFO,***" was "***still involved heavily in all of the pieces***" and

5    tracked "sales force attrition." ¶¶347, 377, 454. *See Extreme Networks, Inc.*, 2018 WL 1411129,

6    at *28 (scienter alleged where defendants made statements about "sales force integration" with

7    direct oversight over the sales teams). Thus, the FAC adequately alleges these misrepresentations.

8            **C.     The Proposed Amendment Is Timely And No Bad Faith Or Prejudice Exists**

9            Finally, Lead Plaintiff's motion should be granted because its proposed amendment is

10   timely, the Motion is made in good faith, and Defendants will not be prejudiced. First, Lead

11   Plaintiff filed its motion for leave in accordance with the MTD Order, and this amended Motion

12   and the proposed FAC were filed as soon as possible after the Derivative Complaint was unsealed,

13   given Defendants' unwillingness to confirm that they would not seek emergency review of the

14   Unsealing Order. Thus, there has been no undue delay on the part of Lead Plaintiff.

15           Second, this Motion is made in good faith following the Court's directive to Lead Plaintiff

16   to "plead its best case." MTD Order, at *11. Additionally, the proposed amendments will serve

17   to further clarify the allegations at issue. *In re Intuitive Surgical Sec. Litig.*, 2017 WL 363269, at

18   *2 (N.D. Cal. Jan. 25, 2017) (granting motion to amend where "the result of an amendment may

19   actually be beneficial to clarifying the allegations at issue").

20           Last, "[c]ourts in this District have found no prejudice when litigation is in its very early

21   stages and Defendants will have the opportunity to respond to the Amended Complaint." *In re*

22   *UTStarcom, Inc. Sec. Litig.,* 2006 WL 8431368, at *3 (N.D. Cal. Mar. 1, 2006). This is plainly

23   true here, as the case is still at the pleading stage. The proposed amendment further addresses the

24   same conduct over the same Class Period. Thus, Defendants will not be unduly prejudiced.

25   **V.     CONCLUSION**

26           For the reasons set forth above, Lead Plaintiff respectfully requests that this Court grant

27   Plaintiff's Amended Motion for Leave to File the FAC.

28

Dated: July 23, 2019

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

/s/ *Jeremy P.  Robinson*
JEREMY P.  ROBINSON

JONATHAN D. USLANER (Bar No. 188574)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars
Suite 2575
Los Angeles, CA 90067
Tel:   (310) 819-3472

JEROEN VAN KWAWEGEN (*pro hac vice*)
(jeroen@blbglaw.com)
JEREMY ROBINSON (*pro hac vice*)
(jeremy@blbglaw.com)
REBECCA E.  BOON (*pro hac vice*)
(rebecca.boon@blbglaw.com)
JULIA K.  TEBOR (*pro hac vice*)
(julia.tebor@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:   (212) 554-1400

*Counsel for Lead Plaintiff*
*SEB Investment Management AB*