IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEB INVESTMENT MANAGEMENT AB, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SYMANTEC CORPORATION, GREGORY S. CLARK, NICHOLAS R. NOVIELLO, and MARK S. GARFIELD,<br><br>Defendants. | No. C 18-02902 WHA<br><br>**ORDER RE MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT** |

**INTRODUCTION**

In this securities action, lead plaintiff moves for leave to file first amended complaint. To the extent stated below, the motion is **GRANTED**.

**STATEMENT**

Previous orders have stated the facts of this case. In short, defendant Symantec Corporation is a company that sells cybersecurity products and services. In early 2016, Symantec divested Veritas Software, a company it had acquired for $13.5 billion. In June 2016, Symantec announced the $4.65 billion acquisition of a privately-held network-security firm called Blue Coat Systems, Inc. Blue Coat's top management team then took control of Symantec, with defendants Gregory Clark and Nicholas Noviello assuming the positions of Symantec's CEO and CFO, respectively. Defendant Mark Garfield, Symantec's Chief Accounting Officer prior to the Blue Coat acquisition, continued on in his role. In November

2016, Symantec acquired Lifelock, Inc., a consumer identity-protection company for $2.3 billion. In connection with this acquisition, Symantec increased its revenue and income targets for executive compensation (Consolidated Compl. ¶¶ 19–40).

Symantec reported strong financial performance and the success of the Blue Coat and Lifelock acquisitions in its SEC filings for fiscal years 2017 and 2018. In the Form 10-K for the fiscal year 2017, defendants affirmed that Symantec's financial statements were GAAP compliant. These revenues exceeded CEO Clark and CFO Noviello's 2017 executive compensation plan targets and they accordingly received millions of dollars in equity awards (*id*. ¶¶ 131–40, 183, 187–89, 195–96).

The leadership shakeup that followed the Blue Coat acquisition resulted in negative changes in Symantec's policies and practices concerning financial reporting. Specifically defendants engaged in improper revenue recognition practices in violation of GAAP and improperly recorded ordinary operating expenses as "transition costs" (*id.* ¶¶ 64–90).

In May 2018, Symantec announced that its Audit Committee had begun an internal investigation. Symantec's stock declined by over 33 percent following the announcement (*id.* ¶¶ 159). Individuals then filed two lawsuits in this district on behalf of themselves and a putative class of similarly-situated investors. An August 2018 order consolidated the two actions and appointed SEB Investment Management AB as lead plaintiff in the consolidated action (Dkt. No. 75).

Also in August 2018, Symantec released its earnings for the first quarter of fiscal year 2019. At the same time, it announced the internal investigation was "ongoing." Symantec's stock price dropped another eight percent (Consolidated Compl. ¶¶ 167, 288).

In September 2018, Symantec concluded its investigation and announced that it found relatively weak and informal processes with respect to some aspects of the review. The investigation also uncovered that $12 million of a $13 million transaction previously recognized as revenue in the fourth quarter of fiscal year 2018 should have been deferred. Symantec also announced that in September 2017 it had "initiated a review by an outside accounting firm of,

and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures" (*id.* ¶¶ 167–85).

In October 2018, an order approved SEB's selection of lead counsel. A consolidated complaint followed and defendants filed motions to dismiss in December 2018, which were granted (Dkt. Nos. 88, 103, 114, 137). A June 2019 order granted a motion to relate *Lee v. Clark* (Case No. 18-cv-02902), a derivative action. In the derivative action, plaintiff moved to seal portions of the verified stockholder derivative complaint. A July 2019 order denied in part and granted in part the motion (Dkt. Nos. 15, 23). Following the unsealing of portions of the derivative complaint, plaintiff in the instant action filed an amended motion for leave to file a first amended complaint. Defendants oppose. This order follows full briefing and oral argument.

**ANALYSIS**

FRCP 15(a)(2) permits a party to amend its pleading with the court's leave, advising that "[t]he court should freely give leave when justice so requires." In ruling on a motion for leave to amend, courts consider: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) whether plaintiff has previously amended his complaint. *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990). For purposes of assessing futility on this motion, the legal standard is the same as it would be on a motion to dismiss under FRCP 12(b)(6). *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).

To state a claim under Section 10(b) of the Securities Exchange Act of 1934, plaintiff must plead: (i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of a security; (iv) reliance; (v) economic loss; and (vi) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).

The proposed first amended complaint seeks to amend by including new facts demonstrating the materiality of defendants' revenue recognition misconduct, adding new details regarding scienter, and alleging misrepresentations regarding the Blue Coat integration.

3

1. **REVENUE RECOGNITION.**

According to the proposed amended complaint, defendants engaged in various revenue recognition practices that violated GAAP. Such alleged improper revenue recognition practices include failure to defer revenue, double-booking sales, and recognizing revenue for sales in which a purchase order had not yet been issued.

**A. Materiality.**

The order granting defendants' motion to dismiss did so on the ground that plaintiff had not provided sufficient facts to demonstrate the materiality of defendants' improper revenue recognition practices. Plaintiff has now met the requirement for pleading materiality.

*First,* the previous complaint alleged defendants identified a transaction where $13 million had been recognized as revenue in the fourth quarter of fiscal year 2018 but for which $12 million should have been deferred to the following quarter. Defendants subsequently revised the preliminary financial results to take this deferral into account. The order granting defendants' motion to dismiss highlighted the fact that the deferral reduced the company's fourth quarter revenue by less than one percent, too tiny to show materiality.

Plaintiff has now added further allegations stating the $12 million materially affected Symantec's operating income. Specifically, Symantec reported $49 million of operating income for fiscal year 2018, which allegedly would have been reported as $61 million if defendants had not revised their preliminary financial results. This would have accordingly lowered operating income for the fiscal year by 20%. Plaintiff states the improper revenue deferral also materially impacted Symantec's 2018 fourth quarter financials as Symantec had to lower its operating income for that quarter by 67%. Although Symantec uses operating income as a key metric, there are other metrics used to gauge a company's financial position. That Symantec's improper revenue recognition practice may have materially affected operating income does not mean that it necessarily materially affected the company's overall financial position. Nonetheless, at this early stage in the litigation, plaintiff's additional allegations plausibly demonstrate the alleged misconduct materially impacted the company's overall financial position.

4

*Second,* the previous complaint alleged Symantec's head of global sales made a verbal agreement with Verizon to give Verizon a one million dollar discount on a $13 million deal. While the deal technically booked in the fourth quarter, it appeared as if someone manually changed the booking in the system so that it was booked in the first quarter of the following fiscal year as well. Similar incidents happened to five other Symantec Account Managers. Plaintiff has now added further details stating, among other things, a former Verizon strategic account manager believes defendant Clark was involved in double-booking "six double digit million-dollar deals which can be estimated to amount to a total of at least $63 million." As defendants argue, it is unclear from the face of the complaint if the revenue was indeed double booked or if the revenue was merely recorded in the first quarter of 2018 while the employee was compensated for the deal in the fourth quarter of 2017. Nonetheless, if at least $63 million was improperly recognized as plaintiff alleges, and this amount would have not only affected the operating income by 17%, but would have been dispositive in determining the individual defendants' bonuses, the newly added claims contribute to the materiality of the alleged improper revenue recognition practices.

*Third,* plaintiff has added new facts from various informants stating Symantec forced through deals in which a purchase order had not yet been received. For example, a former account executive alleged that when a customer told Symantec it would issue a purchase order a few days following the end of Symantec's fiscal quarter, Symantec's channel partner would write Symantec the purchase order right away and pay Symantec so that Symantec would not have to wait until the next quarter to book it. Another similar allegation in the proposed amended complaint details a situation in which a regional vice president was told to request a purchase order of at least $750,000 from a partner for a product that had not been ordered and which the regional vice president knew was not going to happen during that quarter.

Plaintiff estimates that as a result of these practices at least $10.75 million was improperly recognized (Br. Ex. A ¶¶ 82, 91). These allegations if true are concerning, but remain too vague. Plaintiff makes broad estimates regarding the impact of these improper practices. For example, plaintiff cites to a regional vice president who stated, the improper

recognition was for orders of "at least $750,000 but . . . would have gone up to tens of millions of dollars." Similarly, plaintiff contends, "if a salesperson in the field had 100 deals a year, and 1% were brought that way, approximately $10 million would be" improperly recognized. It is accordingly difficult to determine if these allegations "were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *In re Daou Systems, Inc.*, 411 F.3d 1006, 1020 (9th Cir. 2005). They accordingly do not contribute to the materiality of the alleged improper practices.

Plaintiff has finally added a number of other miscellaneous allegations regarding improper revenue recognition practices stating sales employees were encouraged to pull in as many deals as possible before a new quarter. The proposed amended complaint also alleges Symantec gave discounts to channel partners of three to five points or more to get customers to buy products at quarter-end or year-end. These new allegations merely suggest Symantec incentivized sales teams to close deals sooner. That is the American way. They accordingly do not contribute to the materiality of the alleged improper revenue recognition practices.

Even though some of the claims and the amounts alleged to have been improperly recognized in the first amended complaint are vague, plaintiff has met the requirement for pleading materiality at this stage, subject to proof at trial or summary judgment. In other words, we will have to decide whether the amounts alleged by plaintiff to have been improperly recognized are material.

**B.  Scienter.**

To adequately plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). That is, plaintiff must allege particularized facts supporting a strong inference that defendants made false or misleading statements intentionally or with deliberate recklessness. *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). A strong inference is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In evaluating scienter, the proper inquiry is not whether "any individual allegation, scrutinized in isolation, meets that

standard," but rather "whether all of the facts alleged, taken collectively" satisfy the scienter burden. *Id*. at 323. Our court of appeals has further held plaintiffs may meet their pleading burden as to scienter of a corporation by alleging facts creating a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter, even if that person is not a named defendant. *In re NVIDIA Corp. Sec. Litig*., 768 F.3d 1046 (9th Cir. 2014).

In regards to defendant Clark, the strongest example of his scienter is that, in regards to the Verizon deal, "Defendant Clark was the only person who had the authority to approve the account managers getting paid for the [alleged double-booked] orders in Q4." Specifically, the proposed amended complaint alleges an account manager "had to write a justification to Defendant Clark documenting the order numbers for Q4 to prove that it actually booked in Q4." Such allegations do not merely demonstrate defendant Clark's personal involvement in the approval of employee compensation, but that he was made aware of when certain orders were booked and accordingly, the corresponding effect it had on revenue depending on when it was booked. Plaintiff has thus adequately pled scienter regarding revenue recognition as to defendant Clark.

In regards to defendant Garfield, plaintiff alleges he resigned in August 2017 due to revenue recognition concerns. Specifically, plaintiff states Symantec's former VP and CSO "learned from multiple people who were part of the senior executive team that Garfield was really unhappy with the aggressive accounting practices that were being implemented." The proposed amended complaint also alleges "Garfield reported to executives at Defendant Clark's level something improper that had to do with revenue" and that he was "given a payout to keep quiet and move on." Even assuming these allegations are true they are still too vague and speculative to meet the pleading burden as to his scienter. It is unclear what alleged improper revenue recognition practices defendant Garfield knew about and what, if any, of these practices he knowingly or recklessly approved. This order concludes that plaintiff has failed to set forth the necessary particularized allegations demonstrating defendant Garfield's scienter as to improper revenue recognition.

7

In regards to defendant Noviello, the proposed amended complaint makes few specific allegations regarding his scienter. Plaintiff alleges defendant Garfield would quote defendant Noviello when he told the Manager Bill and Collect-Finance to preemptively push through purchase orders. In addition, plaintiff argues defendant Noviello gave a presentation regarding deferred revenue (non-GAAP) trends. These generalized statements do not allege with enough particularity that defendant Noviello knew of the specific aforementioned improper revenue recognition practices and approved them. This order concludes that plaintiff has failed to set forth the necessary particularized allegations demonstrating defendant Noviello's scienter as to improper revenue recognition.

Beyond the allegations regarding the aforementioned individual defendants, the proposed amended complaint also alleges that various other Symantec employees participated in approving improper revenue recognition practices. For example, in regards to the allegation that Symantec forced through deals in which a purchase order had not yet been received, a regional vice president stated that he received text messages from David Auslander at the instruction of Michael Fey, Steve Tchejeyan, and Marc Andrews to do so. Furthermore, the complaint also alleges Tchejeyan was the one who made the verbal deal with Verizon that ultimately led to the corresponding double-booked deal. Combined with the allegations regarding defendant Clark, the proposed amended complaint offers sufficiently detailed facts to plead scienter as to Symantec's improper revenue recognition.

### 2. TRANSITION COSTS.

According to the proposed amended complaint, defendants improperly recorded continuing non-transition operating expenses and recurring operating expenses as transition costs. This allowed the company to remove such costs from its adjusted operating expenses, thereby inflating Symantec's non-GAAP metrics for adjusted operating income, operating margin, and earnings per share. The order dismissing plaintiff's original complaint did so on the ground that scienter was not adequately pled, specifically that the complaint alleged the misclassification of expenses resulted from pressure from defendants, not that they had directed

8

the misclassification. Plaintiff has now added further details and allegations to support the claim of scienter as to transition costs.

*First,* plaintiff points to Symantec's retention of Ernst & Young and Fenwick & West to enhance Symantec's non-GAAP measures. Our court of appeals has held that the retention of outside firms is not necessarily sufficient to support an inference of scienter. Here, the proposed amended complaint only claims that the board commenced investigations and recommended control enhancements in response to Ernst & Young and Fenwick & West's findings. There is no indication the investigation was specifically related to transition costs or that defendants were made aware of any specific issues regarding transition costs. Such allegations do not contribute to a finding of scienter. *Second,* the proposed amended complaint alleges that Broadcom lowered its price for Symantec by one billion dollars due to discovery of negative information during due diligence to support a finding of scienter. The causality between this allegation and the alleged misconduct is weak as it is unclear what Broadcom even discovered, and thus does not contribute to an inference of scienter. *Third,* plaintiff alleges the departure of defendants Garfield, Noviello, Clark, and numerous other executive level employees suggest they left in connection with the allegations in the instant action. Executive turnover is a normal part of corporate acquisitions. However, the timing of the departures as well as the fact that at least eleven executives departed following the Audit Committee investigation is uncharacteristic and thus contributes to scienter.

Plaintiff also makes allegations specific to each individual defendant regarding their scienter. As to defendant Clark, plaintiff alleges he was a board member during the class period and was directly and personally involved in approving the transition costs at issue. Defendants argue none of the allegations demonstrate defendant Clark considered and approved the classification of specific transition expenses. However, Symantec's Form 10-Q for the third quarter of 2018 states "transition costs are incurred in connection with Board of Directors approved discrete strategic information technology transformation initiatives." This statement indicates board members like defendant Clark were at aware and participated in the approval of initiatives related to transition costs. Furthermore, defendant Clark was present at various

9

meetings in which transaction costs and their impact on other financial measures were specifically discussed. These allegations accordingly give rise to a strong inference that even if defendant Clark did not know how exactly the transition costs in question were being recorded, he was aware of and took part in approving them. Because of this, plaintiff has sufficiently pled scienter as to defendant Clark.

As to defendant Noviello, the primary new allegations in the proposed amended complaint are that he was present at multiple Audit Committee and board meetings in which transition costs and financial reporting errors were discussed. For example, plaintiff cites to a January 2017 meeting attended by defendants Clark and Noviello prior to the class period in which defendant Noviello gave a presentation regarding non-GAAP revenue and operating income basis as well as the impact of transition costs on non-GAAP operating income. He was also present at an October 2017 meeting in which remedial activities were discussed and in which the board requested further detail on transition and transformation accounts. Similarly, the primary new allegations regarding defendant Garfield are that he was present at meetings in which financial reporting errors were discussed. Plaintiff cites to a May 2017 Audit Committee meeting attended by all three individual defendants in which they reviewed and discussed "errors in financial reporting and recording." They also discussed the use of non-GAAP measures. Plaintiff has not sufficiently alleged scienter as to either of these individual defendants in regards to transition costs. The proposed amended complaint at most only alleges they separately discussed transition costs and errors in financial reporting at various meetings, not that the deficiencies in question were related to the classification of transition costs or that the they had approved them. The tenuous connection between the subjects discussed at these meetings does not support a strong inference that defendants Noviello and Garfield knew, approved, or recklessly disregarded the alleged improper manipulation of transition costs.

Scienter requires particularized facts supporting a strong inference defendants made false or misleading statements intentionally or recklessly. When viewed holistically with plaintiff's previous factual allegations of scienter, the proposed amended complaint does not

adequately plead scienter as to defendants Noviello or Garfield, but does as to defendants Clark and Symantec.

### 3. LOSS CAUSATION.

For loss causation, plaintiff must demonstrate a causal connection between the alleged misconduct and the economic loss suffered. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1121 (9th Cir. 2013). Defendants argue there was no loss causation following the stock price drop on May 10, 2018, because the August 2 disclosure alleged in the proposed first amended complaint merely stated the Audit Committee investigation was ongoing. Defendants contend the disclosure was not a corrective one regarding misstatements and thus could not have caused the August 3 stock decline. However, what defendants miss is that the disclosure also stated the 2018 fourth quarter results were subject to the Audit Committee's investigation and thus could plausibly have caused the stock decline. Given the low burden for pleading loss causation, plaintiff has sufficiently pled loss causation on August 2.

### 4. INTEGRATION SUCCESS.

Plaintiff has now added new allegations claiming Symantec made false, positive statements regarding its integration with Blue Coat. Importantly, here, even if the alleged "exodus of employees" and lack of integration of the sales teams indicate that defendants' representations concerning the success of the integration were false, plaintiff has failed to show they are material. The proposed amended complaint does not adequately plead with specificity the extent to which these alleged misrepresentations affected the financial position of the company. Plaintiff has thus not sufficiently pled its integration claim.

### 5. JUDICIAL NOTICE AND INCORPORATION BY REFERENCE.

#### A. Judicial Notice.

Federal Rule of Evidence 201(b) permits courts to take judicial notice of any fact "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." While a court may take judicial notice of matters of public record at the motion to dismiss stage, it cannot take judicial notice of

11

disputed facts contained in such public records. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

Defendants request judicial notice of eight documents (Exhibits 6, 7, 12–16, 21), which are excerpts of Symantec's Form 10-Q and Form 8-K for various time periods between 2016 and 2019. Plaintiff does not object to Exhibits 16 and 21. Because these documents are the appropriate subjects of judicial notice, defendants' unopposed request is **GRANTED**.

Plaintiff challenges Exhibits 6 and 7 on the grounds that defendants seek to judicially notice the documents to inappropriately dispute plaintiff's allegations regarding the materiality of defendants' revenue recognition practices. This order takes judicial notice of the fact that such disclosures were made and the revenue amounts cited by defendants in their opposition brief (Opp. at 12).

Plaintiff also challenges Exhibits 12 and 13, arguing that defendants use the exhibits improperly to ask for judicial notice of the truth of the matter asserted that KPMG knowingly accepted defendants Clark and Noviello's signatures with awareness of their actions in connection with improper accounting practices. This order agrees and will take judicial notice of the existence of the documents and the fact that defendants Clark and Noviello signed them, but declines to take judicial notice of the truth of the matter that KPMG would not have accepted the signatures if they were aware of wrongdoing.

Plaintiff challenges Exhibits 14 and 15 on the grounds that defendants use the exhibits to improperly ask for judicial notice of the truth of the matter asserted that the transition after the Blue Coat acquisition would be "disruptive" and that Symantec could be expected to reduce and close certain facilities. This order agrees and will take judicial notice of the existence of the documents and the fact that such statements were made, but not the truth of the matter.

**B.     Incorporation by Reference.**

It is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint, but that does not preclude consideration of the document under the incorporation by reference doctrine for any purpose. *Khoja,* 899 F.3d at 1003.

12

Defendants have requested twelve documents, consisting of various excerpts from Symantec's Form 8-K, 10-K, and 10-Q for various time periods between 2017 and 2019 to be incorporated by reference (Exhibits 1–5, 9, 11, 17–20, 22). Plaintiff does not dispute that Exhibits 9, 11, 17–20, and 22 are appropriately considered. These documents will therefore be considered under the incorporation by reference doctrine.

Plaintiff challenges Exhibits 1 and 2 on the grounds that defendants improperly ask the undersigned to assume the truth of the matters asserted because the documents are used to dispute the fact that the $12 million was material to Symantec's operating income. Exhibit 2, however, is not solely used to dispute this allegation, but also to support the fact that defendants Clark and Noviello signed Symantec's Form 10-K filed in October 2018 and that two of the pulled in deals cited by plaintiff constituted an immaterial amount of the FY17 and FY18 revenue. This order will consider Exhibit 2 incorporated by reference to the extent defendants ask for it to assert the truth of the matter that the document was signed by defendants Clark and Noviello. This order will also decline to consider Exhibits 1 and 2 incorporated by reference to the extent defendants seek to use them assert the truth of the matter that the alleged improper revenue recognitions practices were immaterial, but will consider the documents incorporated by reference to the extent they are used to assert the financial metrics cited in defendants' opposition (Opp. at 4, 5, 10, 12). .

Plaintiff challenges Exhibit 3 on the grounds that defendants improperly ask the undersigned to assume the truth of the matters asserted because they are used solely to dispute the fact that defendant Clark did not possess sufficient scienter. This order agrees and the document will not be considered under the incorporation by reference doctrine.

Plaintiff challenges Exhibits 4 and 5 on the grounds that defendants improperly ask the undersigned to assume the truth of the matters asserted because they are used solely to dispute the fact that the alleged improper revenue recognition practices were material. Again, this order will not consider the documents incorporated by reference to the extent defendants seek to use them for the purpose asserting the truth of the matter that the alleged improper revenue recognitions practices were immaterial. It will, however, consider Exhibits 4 and 5

13

incorporated by reference to the extent defendants ask for them to assert the financial metrics cited in their opposition (Opp. at 10).

## CONCLUSION

For the foregoing reasons, plaintiff's motion for leave to file a first amended complaint is **GRANTED** to the extent stated above. An amended complaint pursuant to this order shall be filed by **OCTOBER 17 AT NOON**. Further leave to amend would be futile. Defendants shall file their answer by **NOVEMBER 7 AT NOON**.

**IT IS SO ORDERED.**

Dated: October 2, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE