1  **BERNSTEIN LITOWITZ BERGER**
   **& GROSSMANN LLP**
2  JONATHAN D. USLANER (Bar No. 256898)
   (jonathanu@blbglaw.com)
3  2121 Avenue of the Stars, Suite 2575
   Los Angeles, CA 90067
4  Tel:    (310) 819-3472

5  JEROEN VAN KWAWEGEN (*pro hac vice*)
   (jeroen@blbglaw.com)
6  JEREMY ROBINSON (*pro hac vice*)
   (jeremy@blbglaw.com)
7  REBECCA E. BOON (*pro hac vice*)
   (rebecca.boon@blbglaw.com)
8  JULIA K. TEBOR (*pro hac vice*)
   (julia.tebor@blbglaw.com)
9  1251 Avenue of the Americas
   New York, NY 10020
10 Tel:    (212) 554-1400

11 *Counsel for Lead Plaintiff*
   *SEB Investment Management AB*

12

13           **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
14

15 | SEB INVESTMENT MANAGEMENT AB, | Case No. 3:18-cv-02902-WHA |
   individually and on behalf of all others
16 similarly situated,                  | ECF CASE |

17                 Plaintiff,            | **FIRST AMENDED** |
                                         | **CONSOLIDATED CLASS ACTION** |
18          v.                           | **COMPLAINT FOR VIOLATIONS** |
                                         | **OF THE FEDERAL SECURITIES** |
19 SYMANTEC CORPORATION and              | **LAWS** |
   GREGORY S. CLARK,
20                                       |
                 Defendants.            | DEMAND FOR JURY TRIAL |
21

22                                       | Dept.: Courtroom 12, 19th Floor |
                                         | Judge: Honorable William Alsup |
23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 7

III.    PARTIES ............................................................................................................. 8

        A.      Lead Plaintiff ........................................................................................... 8

        B.      Defendants ............................................................................................... 8

IV.     BACKGROUND TO SYMANTEC AND ITS  EFFORTS TO EFFECT A
        BUSINESS TURNAROUND .............................................................................. 10

        A.      Symantec's Business .............................................................................. 10

        B.      Symantec Acquires Blue Coat And LifeLock And Promotes These
                "Transformative Acquisitions" To Investors ......................................... 11

V.      DEFENDANTS MANIPULATED SYMANTEC'S FINANCIAL
        RESULTS THROUGHOUT THE CLASS PERIOD ......................................... 15

        A.      Defendants' Revenue Recognition Practices Violated GAAP, And
                Symantec's Internal Controls Were Ineffective During The Class
                Period ...................................................................................................... 16

                1.      GAAP Revenue Recognition Principles .................................... 16

                2.      GAAP Deferred Revenue Principles ......................................... 19

                3.      Symantec's Obligation To Maintain Effective Internal
                        Controls Over Financial Reporting ........................................... 19

                4.      Defendants Improperly Recognize Revenue At Period-End
                        To Make Their Numbers ........................................................... 20

                5.      Garfield Leaves Symantec Due To Improper Revenue
                        Recognition Practices And Ineffective Internal Controls,
                        But Only After He Closes The Books For 2017 ........................ 36

                6.      Defendant Clark Learns That Deals Involving SOX
                        Violations Were Improperly Booked At Year-End .................... 38

        B.      Defendants' Manipulation Of Reported Transition Costs Was
                Misleading And Violated SEC Rules And Regulations ......................... 44

                1.      Additional Accounting Principles For Adjusted Financial
                        Measures ................................................................................... 44

                2.      Defendants Inflated Symantec's Adjusted Revenue
                        Through Improper Revenue Recognition Practices .................... 46

3.      Symantec Reported "Transition Costs" As Adjusted Measures Throughout The Class Period ........................... 46

4.      Defendants Inflated And Misclassified Recurring Costs As "Transition Costs" ........................... 46

5.      Defendants Knew Or Recklessly Disregarded That Symantec's Reported "Transition Costs" Were Inflated And Misclassified During The Class Period ........................... 54

6.      Symantec's Description of "Transition Costs" Was Materially Misleading ........................... 67

7.      Defendants Inflated Symantec's Non-GAAP Operating Margins And EPS ........................... 68

C.    As A Result Of Their Accounting Manipulations, Executives Received Large Payouts In 2017 And 2018 ........................... 69

D.    Defendants Manipulated Costs To Indicate The Success Of Acquisitions ........................... 76

E.    Defendants Misrepresented The Success Of The Purportedly "Transformative" Blue Coat/Life Lock Integration To Investors ........................... 79

F.    Violations Of Symantec's Codes Of Conduct ........................... 81

1.      Symantec's Codes Of Conduct ........................... 81

2.      Widespread Code Of Conduct And Ethical Violations During The Class Period ........................... 82

G.    Defendant Clark and Noviello Took Advantage Of Symantec's Inflated Stock Price To Sell Their Own Shares For Nearly $20 Million ........................... 84

H.    The Truth Is Revealed ........................... 86

I.    Symantec's Audit Committee Investigation Confirmed Defendants' Misconduct ........................... 93

J.    The Audit Committee Investigation Was Cursory and Inadequate ........................... 94

K.    Symantec Retaliated Against Whistleblowers ........................... 96

L.    Defendants Did Not Receive Incentive Payments, Compensation Increases Or Equity Awards ........................... 96

M.    Suspicious Executive Departures ........................... 97

N.    Broadcom Lowers Its Price For Symantec By $1 Billion After Due Diligence ........................... 100

VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ........................... 102

A.    Fourth Quarter Fiscal Year 2017 And Fiscal Year 2017 .................................... 102

      2.    Improper Recognition Of Revenue and Misstated Cash
            Flow ........................................................................................... 103

      3.    Manipulating Adjustments Of GAAP Measures To Non-
            GAAP Measures ........................................................................ 105

      4.    False Internal Controls And SOX Certifications ..................................... 109

B.    First Quarter Fiscal Year 2018 Results ............................................................ 110

      2.    Improper Recognition Of GAAP Revenue .............................................. 110

      3.    Manipulating Adjustments Of GAAP Measures To Non-
            GAAP Measures ........................................................................ 111

      4.    False Internal Controls And SOX Certifications ..................................... 115

C.    August 8, 2017 Item 5.02 On Form 8-K ........................................................... 116

D.    August 16, 2017 Proxy Statement ................................................................... 116

E.    Second Quarter Fiscal Year 2018 Results ....................................................... 118

      1.    Improper Recognition Of GAAP Revenue .............................................. 118

      2.    Manipulating Adjustments Of GAAP Measures To Non-
            GAAP Measures ........................................................................ 119

      3.    False Internal Controls And SOX Certifications ..................................... 123

F.    Third Quarter 2018 Results .............................................................................. 124

      1.    Improper Recognition Of GAAP Revenue .............................................. 124

      2.    Manipulating Adjustments Of GAAP Measures To Non-
            GAAP Measures ........................................................................ 125

      3.    False Internal Controls And SOX Certifications ..................................... 130

G.    Fourth Quarter 2018 Results ........................................................................... 131

      1.    Improper Recognition Of GAAP Revenue .............................................. 132

      2.    Manipulating Adjustments Of GAAP Measures To Non-
            GAAP Measures ........................................................................ 132

VII.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ..................... 135

VIII.  ADDITIONAL ALLEGATIONS CONCERNING DEFENDANTS'
       WIDESPREAD AND SIGNIFICANT INFLATION OF REVENUE.......................... 148

IX.    LOSS CAUSATION............................................................................................ 150

X.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR........................ 151

XI.     THE PRESUMPTION OF RELIANCE ........................................................ 152

XII.    CLASS ALLEGATIONS .......................................................................... 153

XIII.   CLAIMS BROUGHT PURSUANT TO SECTION 10(B), 20(A) AND
        20(A) OF THE EXCHANGE ACT .......................................................... 154

COUNT I  FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE
        ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER
        (AGAINST ALL DEFENDANTS) ............................................................ 154

COUNT II  FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE
        ACT (AGAINST DEFENDANT CLARK) .................................................. 156

COUNT III  FOR VIOLATION OF SECTION 20A OF THE EXCHANGE ACT
        (AGAINST DEFENDANT CLARK) ......................................................... 158

XIV.   PRAYER FOR RELIEF ........................................................................ 159

XV.    JURY DEMAND .................................................................................. 159

Lead Plaintiff SEB Investment Management AB, by and through its undersigned counsel, brings this action pursuant to Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other persons or entities who purchased or otherwise acquired securities of Symantec Corporation ("Symantec" or the "Company") during the period from May 11, 2017 to August 2, 2018, inclusive (the "Class Period") and were damaged thereby (the "Class"). Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based on the ongoing independent investigation of its undersigned counsel, including from the following sources: (i) Symantec's public filings with the SEC; (ii) research reports from securities and financial analysts; (iii) Company press releases and reports; (iv) Company website and marketing materials; (v) news and media reports concerning the Company and other facts related to this action; (vi) price and volume data for Symantec securities; (vii) consultation with experts; (viii) accounts from former Symantec employees; (ix) additional materials and data concerning the Company and industry as identified herein; (x) accounting rules, regulations, and guidance; (xi) disclosures from companies that Symantec identified in its financial statements as its peers; and (xii) documents quoted in the recently unsealed complaint in a related derivative action, described further below.

# I.   **INTRODUCTION**

1.      This securities class action arises from Defendants' material misrepresentations to investors, including through their manipulation of financial results tied to lucrative executive compensation bonus and equity packages. Defendant Symantec, together with its top officers – Defendant Gregory S. Clark, Symantec's former Chief Executive Officer ("CEO") and Director ("Clark" and, together with Symantec, "Defendants"), as well as former Chief Financial Officer ("CFO") Nicholas R. Noviello ("Noviello"), and former Chief Accounting Officer ("CAO") Mark S. Garfield ("Garfield") – reported financial results that violated Generally Accepted Accounting Principles ("GAAP") and also reported non-GAAP adjustments, which analysts and investors closely followed throughout the Class Period, that were materially false and misleading. When a

whistleblower revealed Defendants' deceptive accounting practices, the Company's Audit Committee and the SEC launched investigations. With this news and the later disclosure of the results of the Audit Committee investigation, Symantec's stock price plunged, erasing billions in market capitalization and causing investors to suffer substantial damages.

2. Since then, Symantec has cleaned house at the executive level, ousting a litany of its top officials, including Defendant Clark and Noviello.[1] Accordingly, Lead Plaintiff brings this action under Sections 10(b), 20(a), and 20A of the Exchange Act on behalf of purchasers of Symantec common stock during the Class Period.

3. Symantec provides cybersecurity products and services, including its flagship Norton Antivirus software. The Company emerged in the 1990s as a world leader in cybersecurity software, but starting in 2005, the Company's performance steadily declined over the following decade. In an effort to transform the Company and restore its revenue growth and market share, Symantec announced in 2016 the acquisition of Blue Coat Systems, Inc. ("Blue Coat"), a privately-held network security firm. Blue Coat's CEO Gregory Clark became CEO and a Director of Symantec. Clark stocked nearly the entire C-suite with former Blue Coat executives, including Symantec's Chief Operating Officer, Chief Financial Officer, Chief Strategy Officer, Chief Technology Officer, and Head of Worldwide Sales. These and additional Blue Coat leaders imported a free-wheeling culture with deficient controls over revenue recognition and accounting. The unethical practices that arrived with Blue Coat led to scores of employees leaving Symantec. One such employee was Symantec's former CAO, Garfield, who resigned due to his

---

[1] As set forth below, in addition to ousting both Defendant Clark and CFO Noviello, Symantec terminated the employment of the following former senior officers: Michael Fey (President and Chief Operating Officer); Michael Williams (Chief Marketing Officer); Bradon Rogers (Senior Vice President); Marc Andrews (Head of Global Sales); Denny Young (Vice President of Operations at Enterprise Security); Bryan Barney (SVP, GM of Enterprise Security); Javed Hasan (SVP, Endpoint, IAAS & Datacenter products); Steve Schoenfeld (SVP, Product Management); Francis C. Rosch (Executive Vice President for Consumer Digital Safety); Joe McPhillips (Director of Channel Sales for Symantec's Pacific region); and Brian Kenyon (Chief Strategy Officer). Analysts linked many of these suspicious executive departures directly to the financial improprieties and investigations alleged below. *See infra* ¶¶299-309.

concerns surrounding revenue recognition and privately received a pay package in exchange for endorsing Symantec's reported financial results for fiscal year 2017.[2]

4.    After acquiring Blue Coat, Symantec announced the acquisition of LifeLock, Inc. ("LifeLock"), a consumer identity-protection company.  Defendants promoted the two acquisitions as "transformative," positioning Symantec to reinvigorate its stagnate Enterprise and Consumer business segments, benefit from synergies and other cost savings initiatives, and emerge as the most dominant provider of cybersecurity solutions.

5.    The Class Period begins on May 11, 2017, the day after Defendants reported the Company's Q4 2017 results.  Defendants emphasized the Company's "strong" financial performance and outlook, highlighting the Company's reported revenue, and emphasizing the Company's adjusted operating margin.  Such margins, Defendants said, resulted from the Company's execution of previously announced cost-savings initiatives and synergies related to the Blue Coat and LifeLock acquisitions.

6.    Defendants' assurances impressed analysts and investors.  For example, on May 11, 2017, Greg Moskowitz of Cowen & Company wrote that Blue Coat "finally provides the co. [Symantec] with a legitimate network security presence, as well as stronger footing in the cloud.  Moreover, we believe the influx of leadership talent at SYMC was much needed, and that CEO Greg Clark is a great fit."

7.    Defendants' false and misleading representations regarding Symantec's performance artificially inflated Symantec's stock price.  Contrary to GAAP and the Company's internal revenue recognition policy, Symantec recognized revenue on sales that did not have signed contracts, did not go through the appropriate approval channels, contained unapproved extended terms, or were to customers who were unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met GAAP's revenue recognition criteria.

---

[2] Symantec reports pursuant to a 52/53-week fiscal year ending on the Friday closest to March 31. For example, Symantec's fiscal year 2017 consisted of 52 weeks, ending on March 31, 2017.

8.     The fact that Defendants issued materially misleading financial results has been confirmed by multiple sources.  To start, following a cursory internal investigation designed to hide and whitewash Defendants' misconduct, Symantec eventually ***admitted*** that $12 million in revenue had been improperly and prematurely recorded in the fourth quarter of 2018 (4Q18), when it should have been deferred to the first quarter of 2019 (1Q19).  Given that Symantec reported $49 million in operating income for 2018 (after deferral of the $12 million) – which Symantec described in SEC filings as a "Key Financial Metric" – Defendants' admission means that a material 20% of the Company's operating income for fiscal year 2018 had been improperly recorded.  As noted by an independent "watchdog" research provider, the claim that "a $12 million revenue recognition issue would be immaterial" for Symantec "would be **false**."  *See infra* ¶67.

9.     Further, numerous former employees contacted in connection with Lead Plaintiff's investigation confirmed that Defendants engaged in widespread financial improprieties.  In particular, a former Symantec Account Manager from Florida described how a $13 million dollar deal with Verizon – and ***five other "big" "double digit" million dollar deals*** – were double-booked in each of the fourth quarter of 2017 (4Q17) and the first quarter of 2018 (1Q18).  Even if those other five deals were the "double-digit" minimum – *i.e.*, $10,000,000 each – the total improperly double-booked amounted to at least $63 million (*i.e.*, 5 x $10 million + $13 million = $63 million).  As explained below in ¶119, this total was material to Symantec's reported financial results because it amounted to, for example, an estimated ***17%*** of Symantec's non-GAAP operating income for 1Q18.  These deals were likewise material from the perspective of Defendant Clark's and former CFO Noviello's bonus targets for fiscal 2017.  Indeed, without the extra $63 million in 4Q17, Defendant Clark and other top executives, including Noviello would have missed their bonus target.  *See infra* ¶130-33.  Critically, Defendant Clark was ***personally*** involved in approving these six improperly double-booked deals.  *See infra* ¶119.

10.     Defendants also misled investors concerning the Company's adjusted operating income.  For example, Defendants improperly recorded ongoing costs as "transition costs" and removed them from their adjusted operating expenses to inflate Symantec's adjusted operating income and metrics tied to this figure, including operating margin and earnings per share.  These

1  metrics, in turn, determined the compensation of senior executives at Symantec, including

2  Defendant Clark.  Tellingly, Defendants publicly ***admitted*** that, as a member of Symantec's Board

3  of Directors, Defendant Clark was personally and directly involved in approving these transition

4  costs, which powerfully establishes a strong inference of his scienter.  *See infra* ¶¶172-73.  Further,

5  facts revealed in related derivative litigation coupled with a recent order by the Court unsealing

6  parts of the derivative complaint, confirm that Defendant Clark, along with Noviello and Garfield

7  were personally involved in discussions and meetings concerning the accounting problems at the

8  heart of the fraud alleged here, including *inter alia* non-GAAP adjustments, "transition costs" and

9  the accounting for those costs, and the hiring of an outside accounting firm, Ernst & Young ("EY")

10  to review the Company's "policies and procedures regarding non-GAAP measures."  Indeed, on

11  May 19, 2017 (near the very start of the Class Period), Defendant Clark, as well as Noviello and

12  Garfield, attended a Symantec Audit Committee meeting where they reviewed and discussed

13  "errors in financial reporting and recording," including "significant" deficiencies related to

14  Symantec's Fiscal Year 2017 10-K and "misstated Cash Flow from Investing Activities and Cash

15  Flow from Operations by [millions of dollars] for 5+ years."  *See infra* ¶¶188-89.  By October 31,

16  2017, Defendants were not only aware that a "significant" internal control deficiency existed, but

17  that Symantec had engaged EY and was actively implementing "remedial measures" to address

18  issues with respect to its "usage, policies, and controls related to [non-GAAP measures]."  *See*

19  *infra* ¶195.

20      11.    Defendants' manipulations of Symantec's non-GAAP metrics allowed them to

21  exceed their 2017 executive compensation plan targets.  Defendant Clark and former CFO

22  Noviello obtained nearly $52.1 million in equity awards and were due to receive nearly $4 million

23  more based on their purported achievement of non-GAAP compensation metrics.  Moreover,

24  Defendants were able to assure the market that Symantec's recent and purportedly "transformative

25  acquisitions" of non-public Blue Coat and LifeLock were successful, that Symantec was achieving

26  cost synergies, and that the Company had emerged, as promised, as "the leading pure play cyber

27  security company" in the world.

28

12. Investors started to learn the truth on May 10, 2018, when the Company announced, after market close, that the Audit Committee of the Board of Directors had commenced an internal investigation due to concerns raised by a former employee and contacted the SEC. Given the investigation, the Company informed investors that its "financial results and guidance may be subject to change," and that it is "unlikely that the investigation will be completed in time for the Company to file its annual report . . . in a timely manner." On this news, Symantec stock declined on heavy trading by over 33%, from $29.18 per share on May 10, 2018, to $19.52 per share on May 11, 2018, representing the worst day of trading in Symantec stock in almost 17 years and erasing roughly $6 billion of market capitalization.

13. On August 2, 2018, Symantec announced additional details of the internal investigation and disappointing financial results that followed the cessation of accounting manipulation. Morningstar Equity Research correctly observed that in prior quarters "management may have inflated restructuring expenses," a line item that included transition costs, "by placing expenses that would have typically been regular operating expenses into this line item."

14. All told, Symantec's stock lost over $7 billion in shareholder value during the Class Period, and the shares remain down approximately 40% from their Class Period high.



**Symantec Stock Price**

May 10, 2018
Company announces delay of 2018 Annual Report due to internal investigation.
*Shares fall 33.1% costing investors $6 billion.*

August 2, 2018
Symantec expands scope of Audit Committee Investigation.
*Shares fall 7.8% costing investors $1 billion*

Class Period: 5/11/2017 to 8/2/2018

15.   In the aftermath, Symantec announced that its Audit Committee and consultants had concluded their internal investigation into Symantec's improper accounting.   In this announcement, Defendants **admitted**:

- weak and informal processes with respect to some aspects of the review, approval, and tracking of transition expenses;

- that the Audit Committee had identified certain behavior inconsistent with the Company's Code of Conduct and related policies, that these matters had been referred to the Company, and that the Company intended to take appropriate action;

- that the Audit Committee had identified an additional transaction in which $12 million of $13 million recognized as revenue in the fourth quarter of fiscal year 2018 should have been deferred;

- that the Company would have to revise its previously disclosed financial results for both Q4 2018 and Q1 2019;

- that Symantec had brought in an outside accounting firm, and taken other steps to enhance, the Company's reported non-GAAP measures, since the quarter ending September 29, 2017;

- that in the wake of the internal investigation, Symantec would be making substantial structuring changes to its internal management, including appointing a separate Chief Accounting Officer and a separate Chief Compliance Officer reporting to the Audit Committee, and adopting enhanced internal controls; and

- that the SEC had commenced an investigation into Symantec's accounting.

16.   As a result of Defendants' financial manipulations and in the wake of the ensuing investigation and litigations, Defendant Clark's employment at Symantec has now been terminated – along with Noviello and numerous other former Blue Coat and Symantec executives.

17.   By this action, investors seek redress pursuant to the federal securities laws.

## II.   <u>JURISDICTION AND VENUE</u>

18.   This action arises under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a)), and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated under the Exchange Act.

19.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c).  At all relevant times, Symantec conducted business in this District and maintained its headquarters in this District at 350 Ellis Street, Mountain View, California 94043.  In addition, many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

21.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of national securities exchanges.

## III.   PARTIES

### A.     Lead Plaintiff

22.     Lead Plaintiff SEB Investment Management AB ("SEB" or "Lead Plaintiff") is a Swedish limited liability company that manages investment funds.  SEB serves as the investment manager for SEB Teknologifond, a fund organized under Swedish law that has no independent legal identity and does not have the capacity to bring lawsuits.  SEB is the only entity authorized and empowered to act on behalf of SEB Teknologifond.  SEB is also the investment manager for SEB Alternative Strategies SICAV ("SEB SICAV") and obtained a valid assignment of SEB SICAV's claims.

### B.     Defendants

23.     Defendant Symantec is a corporation organized under Delaware law and headquartered at 350 Ellis Street, Mountain View, California 94043.  Symantec's stock trades on the NASDAQ Stock Market under the symbol "SYMC".  The Company sells cybersecurity products and services and has operations in more than 35 countries.  The Company's historical operating segments include Consumer Security and Enterprise Security.  Symantec's Consumer Security products include a range of Norton-branded products and services to protect customers within their personal computing and mobile environments.  Symantec's Enterprise Security products include threat protection, website security, and other products and services.  These two business segments accounted for virtually all of the Company's revenues and profits during the

Class Period.  Throughout the Class Period, Symantec disseminated SEC filings, press releases, investor presentations, and additional reports.

24.     Defendant Gregory S. Clark ("Clark") was the CEO and a director of Blue Coat from 2011 to August of 2016.  He became Symantec's CEO when it acquired Blue Coat.  Since August 1, 2016, Clark has served as Symantec's CEO and a member of Symantec's Board of Directors.  During the Class Period, Clark made materially false and misleading statements and omissions about Symantec's financial performance, stated metrics, and internal controls for financial reporting, in the Company's public filings, at investor presentations, and during conference calls.  Clark also was present at and participated in earnings calls when other Defendants made materially false and misleading statements or omissions on these subjects, which Clark knew to be false and misleading, yet failed to correct.  Clark executed certifications relating to Symantec's false and misleading reports on the Company's May 19, 2017 Form 10-K, August 4, 2017 Form 10-Q, November 3, 2017 Form 10-Q, and February 2, 2018 Form 10-Q SEC filings. Clark also directly participated in and controlled the management and day-to-day operations of the Company and had actual knowledge of confidential proprietary information concerning the Company and its business, operations, and financial performance.  Further, Clark shared primary responsibility for ensuring that the Company's SEC filings and other public statements or releases were complete, accurate, and did not omit material information necessary under the circumstances to make them not misleading.  Because of his position of control and authority, his ability to exercise power and influence over Symantec's conduct, and his access to material inside information about Symantec during the Class Period, Defendant Clark was a controlling person within the meaning of Section 20(a) of the Exchange Act.

25.     On May 9, 2019, Symantec announced that Defendant Clark's employment at the Company had been terminated.

IV.   **BACKGROUND TO SYMANTEC AND ITS**
      **EFFORTS TO EFFECT A BUSINESS TURNAROUND**

A.   **Symantec's Business**

26.     Symantec is based in Mountain View, California, and provides consumer and enterprise security software products and services.  Symantec emerged as a leader in the security software industry when it released its Norton Antivirus software in 1990.  The Company historically operated in two segments: Consumer Security and Enterprise Security.  Symantec's Consumer Security products are directed to individuals and include a range of Norton-based products and services for personal computing and mobile environments.  The Enterprise Security side of the business is directed to entire business operations or enterprises, and includes various threat protection and website security products, among others.

27.     By 2005, Symantec's security business had substantially slowed down.  In order to address this decline, Symantec determined to change its business strategy to focus on both security technology (as it had in the past), and on software storage/availability technologies.  To facilitate the new strategy, Symantec paid $13.5 billion to acquire Veritas Software, a leader in the software storage and backup/recovery industries.

28.     Symantec's dual strategy of focusing on both security and software storage/availability technologies was unsuccessful.  Between 2005 through 2015, Symantec underperformed its peers.  The Company's Enterprise and Consumer businesses declined, and Symantec reported disappointing financial results, leading to a series of management changes.  The Board of Directors demanded that Enrique Salem step down as CEO in July 2012 and replaced him with Board of Directors Chairman Steve Bennett.  Less than two years later, in March 2014, Symantec ousted Bennett and named Michael Brown ("Brown") as interim CEO and President of the Company, formally confirming Brown in that role in September 2014.  Due to pressure from shareholders, in late 2014 Symantec determined to divest its Veritas Software business; Symantec closed the divesture transaction in early 2016.  However, on April 29, 2016, after the Company had reported a series of disappointing financial quarterly results, Symantec's Board of Directors requested that Brown step down as CEO.

**B.**    **Symantec Acquires Blue Coat And LifeLock And**
**Promotes These "Transformative Acquisitions" To Investors**

29.    Shortly after Symantec's divestiture of Veritas Software, Symantec announced on February 4, 2016, that it was targeting cost savings of approximately $400 million to be achieved by the end of its fiscal year 2018 (ended March 31, 2018).

30.    On June 12, 2016, Symantec announced that it was acquiring Blue Coat, a leader in the web and cloud security industry, for $4.65 billion.  The acquisition closed on August 1, 2016.  Industry commentators have since explained the unusual and "concerning" features of the transaction and subsequent integration.[3]

31.    First, following completion of the transaction, Blue Coat's top management team, including  Blue Coat CEO, Defendant Clark;  Blue Coat CFO, Noviello;  Blue Coat Chief Technology Officer, Hugh Thompson; Blue Coat Chief Operating Officer ("COO"), Michael Fey; Blue Coat Chief Marketing Officer, Michael Williams; and Blue Coat Chief of Staff, Matt MacKenzie, all assumed the identical posts at Symantec.[4]  Analysts noted the "rare" occasion in which a large public company like Symantec chooses to replace its entire top management team with the management of a just-acquired, smaller, private company like Blue Coat.  Moreover, at least one analyst has observed, "Plugging in a C-suite from a recent acquisition certainly seems like a risk factor for dysfunction, as it could set up an 'us' versus 'them' war in the ranks.  Such a highly politicized environment can create a toxic culture that leads to mistakes, cover ups, and outright wrongdoing."[5]

32.    Second, Symantec acquired Blue Coat from private equity manager, Bain Capital ("Bain"), a firm with a business model and reputation for restructuring investee companies and engineering their financials to facilitate fast exits.  Bain purchased Blue Coat in 2015 for $2.4

---

[3] *See, e.g.*, Carson Block, *Symantec Cold Read: Where Were The Short Sellers On Symantec?*, Forbes (May 13, 2018), *available at* https://www.forbes.com/sites/cblock/2018/05/13/symantec-cold-read-where-were-the-short-sellers-on-symantec/#6c5107141fdf.

[4] Several of these executives have since been ousted by Symantec, including Defendant Clark, Mr. Noviello, Mr. Fey and Mr. Williams.

[5] *Id.*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 3:18-cv-02902-WHA                                                                    -11-

billion.  Bain owned Blue Coat for only one year before selling it to Symantec for $4.9 billion – a 100% return on Bain's investment.  Thus, as one analyst has noted, "in addition to the general concern of bringing in a new C-suite from an acquired company, the C-suite from such a PE-itized company seems a non-obvious choice for a replacement C-suite, given that Blue Coat seems to fit the PE profile of being managed for an exit."[6]

33.     Symantec promoted its acquisition of Blue Coat as advancing Symantec's profitability and growth.  For example, in Symantec's August 1, 2016 press release announcing the Blue Coat closing, new CEO Clark stated:

> With our increased scale, portfolio and resources, *large enterprises can now look to Symantec as a single strategic source for integrated solutions across endpoints,*[7] *cloud and infrastructure to defend against sophisticated attacks and create a stronger, more cost-efficient security posture*.

34.     In the same August 1, 2016 press release, Symantec Chairman Dan Schulman reiterated:

> *Nearly two years ago, we announced our intention to become the leading pure play cyber security company.  Today, that intention becomes a reality*, as we combine Symantec's leadership in endpoint, email, data loss prevention and datacenter security with Blue Coat's strength in cloud security with the #1 market share position at the secure web gateway.

35.     Analysts viewed the Blue Coat acquisition positively.  For example, on August 1, 2016, Jefferies concluded, "We Remain Positive on the Deal Overall," stating that "We see logical product synergies as SYMC makes a push to become more of a security 'platform' across endpoints, web security, and more," but noting that "significant execution risk remains."  Jefferies also viewed the arrival of Defendant Clark and Michael Fey to Symantec positively: "Greg Clark (appointed CEO) and Michael Fey (appointed COO) bring with them a very strong track record from Blue Coat, where they and their team are largely credited with modernizing Blue Coat's products, reigniting growth, and positioning for shifts to cloud and mobile."

---

[6] *Id.*

[7] "Endpoint" security is a term in the software industry that refers to protecting a business network when it is accessed by remote devices.  Endpoint software is installed on network servers and remote devices.

36.     MKM Partners similarly observed on August 2, 2016, that "Positive Investor Sentiment Could Continue," as "Investors have been enthusiastic about the Bluecoat [sic] deal as reflected by the 18% increase in SYMC shares since the announcement as compared to 6% for NASDAQ.  F1Q17 EPS upside potential and the reiteration of the acquisition's benefits could potentially boost the shares in the near term."

37.     On August 4, 2016, the Company held an earnings conference call to discuss its results for the first quarter of fiscal year 2017.  During that call, now-former Symantec CFO Thomas Seifert, described the acquisition as creating "$550 million in cost efficiencies and Blue Coat integration synergies," which included $150 million in annual synergies from the Blue Coat acquisition, and an additional $400 million in net cost savings.

38.     The Blue Coat acquisition directly impacted Symantec's equity compensation plan for management.  Defendants explained in the Company's September 5, 2017 Form 14A filed with the SEC, that Symantec "Revised goals upward [for its Annual Incentive Plan] to reflect Blue Coat . . . impact[.]"   The Company increased the revenue and income targets for executive compensation.  In addition, Symantec's Compensation Committee revised their performance metric for "Equity Incentives" for executives to be tied to adjusted operating income.  The revisions are summarized in the graphic below, and described in more detail *infra* at ¶¶220-27 provided by Symantec's former Principal Compensation Analyst.



39.     On November 20, 2016, Symantec announced that it had entered into an agreement to acquire identity-protection software company LifeLock for $2.3 billion.  Defendants represented to investors that LifeLock would transform Symantec's consumer business segment and create organic growth.  For example, Defendant Clark stated in Symantec's November 20, 2016 press release:

> As we all know, consumer cybercrime has reached crisis levels.  LifeLock is a leading provider of identity and fraud protection services, with over 4.4 million highly-satisfied members and growing.   With the combination of Norton and LifeLock, we will be able to deliver comprehensive cyber defense for consumers. . . .  ***This acquisition marks the transformation of the consumer security industry*** from malware protection to the broader category of Digital Safety for consumers.

40.     Symantec's Chairman of the Board of Directors, Dan Schulman, similarly stated in the Company's November 20, 2016 press release: "With the acquisition of LifeLock, Symantec

adds a new dimension to its protection capabilities to address the expanding needs of the consumer marketplace."

41. Defendants further announced during a November 21, 2016 conference call that in addition to the previously announced $550 million in cost efficiencies and Blue Coat synergies, Defendants expected annual cost synergies from the LifeLock acquisition of $30 million by the end of Symantec's fiscal year 2018, increasing to over $80 million by the end of fiscal year 2020.

42. Analysts viewed the LifeLock acquisition positively. For example, on November 21, 2016, in a report entitled, "Norton Joins the Transformation Train via LifeLock," BTIG stated that the LifeLock acquisition "mark[ed] the third and (we believe) final step in the evolution of the 'new' Symantec. Now, the consumer business joins the transformation train, started by the Veritas divestiture and continued by the Blue Coat acquisition." BTIG further wrote, "We are hesitant to point to revenue synergies as a material long term tail wind here, but do like the deal for a simple reason: it returns the consumer business back to growth." Cowen & Company similarly wrote on November 21, 2016, "No Slowdown in Symantec M&A Train; Acquires LifeLock for $2.3b."

43. Symantec closed the LifeLock acquisition on February 9, 2017.

## V. DEFENDANTS MANIPULATED SYMANTEC'S FINANCIAL RESULTS THROUGHOUT THE CLASS PERIOD

44. Under the new leadership of Defendant Clark and former CFO Noviello – both of whom have now been terminated from the Company – Symantec manipulated financial metrics throughout the Class Period to meet executive compensation targets and to persuade the market that the Blue Coat and LifeLock acquisitions had positively transformed Symantec's revenue and growth.

45. As detailed below, Defendants manipulated Symantec's reported financial results in two ways. First, Defendants improperly recognized revenue, including revenue that should have been deferred, in violation of GAAP. Such tactics resulted in misleading, overstated GAAP and adjusted revenue numbers. Second, Defendants improperly recorded operating expenses that were incurred in the ordinary course of business as "transition costs," and adjusted those costs as part of Symantec's non-GAAP measures in violation of SEC rules and regulations. Defendants'

misclassification of transition costs allowed them to report inflated adjusted operating income metrics.  Defendants' internal controls over financial reporting were ineffective during the Class Period, enabling the improper accounting manipulations.

**A.      Defendants' Revenue Recognition Practices Violated GAAP, And Symantec's Internal Controls Were Ineffective During The Class Period**

**1.      GAAP Revenue Recognition Principles**

46.      GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements.  The SEC has the statutory authority to codify GAAP and has delegated that authority to the Financial Accounting Standards Board.  SEC Regulation S-X (17 C.F.R. Part 210) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.  During the Class Period, Symantec represented that its financial statements were presented in conformity with GAAP.

47.      Symantec is required under GAAP to recognize revenue only when certain criteria are met, and in the period when those criteria are met.  A company violates GAAP when it misleadingly shifts revenue from one period to another for the purpose of making one period look better.  The use of such accounting manipulations is often tied to an entity's need to achieve or report predetermined financial results.

48.      Arbitrarily moving and recording revenue from one period to another is misleading because recognizing revenue in the proper period is a GAAP requirement and is critical to the transparency and accuracy of financial statements.  Indeed, accounting literature places significant emphasis on the fact that one of the goals of financial statements based on accrual accounting, which is an accounting method that records revenues when earned and expenses when they are incurred, "is to account in the periods in which they occur for the effects on an entity of transactions and other events and circumstances."  This is done through the use of the "matching principle" – matching revenue to the period to which it relates.  Financial Accounting Standards Board Concepts Statement ("FASCON") No. 6.  At all relevant times, Symantec's accounting was (purportedly) accrual accounting.  Moreover, accounting guidance requires that in order for

financial information to be useful, it must be relevant and faithfully represent what it purports to represent.  FASCON No. 8.

49.     Accounting Standards Codification ("ASC") 605-10-25-1 provides that revenue may be recognized when it is realized or realizable and earned.  ASC Topic 605 provides, in relevant part: "Revenue and gains are realized when products (goods or services), merchandise or other assets are exchanged for cash or claims to cash. . . .  [R]evenue and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash." Additionally, ASC Topic 605 states:

> Revenue is not recognized until earned. . . .  [A]n entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by revenues.

50.     ASC 985-605-25-3, Software Not Requiring Significant Production, Modification, or Customization, establishes basic revenue recognition criteria for software licenses.  ASC 985-605-25-3 provides:

> If the arrangement does not require significant production, modification, or customization of software, revenue shall be recognized when all of the following criteria are met:
>
> a.  Persuasive evidence of an arrangement exists;
>
> b.  Delivery has occurred;
>
> c.  The vendor's fee is fixed or determinable; and
>
> d.  Collectability is probable.

51.     With respect to subpart (a), ASC 605-25-16 further states:

> If the vendor operates in a manner that does not rely on signed contracts to document the elements and obligations of an arrangement, the vendor should have other forms of evidence to document the transaction (for example, a purchase order from a third party or online authorization).  If the vendor has a customary business practice of using written contracts, evidence of the arrangement is provided only by a contract signed by both parties.

52.     ASC 958-605-25-21 further reiterates with regard to customer acceptance, "After delivery, if uncertainty exists about customer acceptance of the software, license revenue shall not be recognized until acceptance occurs."

53.     With regard to Subpart 3(d), whether collectability is probable, ASC 985-605-25-34 provides that "any extended terms in a software licensing arrangement may indicate that the fee is not fixed or determinable."

54.     Consistent with the accounting rules set forth above, Defendants included Symantec's revenue recognition policy in the Company's financial statements.   That policy provided, among other things, "We recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability is probable."

55.     KPMG, Symantec's audit firm during the Class Period, issued guidance regarding Revenue from Contracts with Customers: "Under current SEC guidance, if an entity's customary business practice is to have, in addition to meeting the other criteria, a contract signed by both parties before it concludes that persuasive evidence of an arrangement exists, the entity does not recognize revenue until a written sales agreement is finalized – including being signed by both the customer and the entity . . . ."   The same KPMG guidance states, "Under current SEC guidance and U.S. GAAP for software entities, consideration in a contract has to be fixed or determinable in order for the entity to recognize revenue."

56.     Accordingly, under GAAP and Symantec's revenue recognition policy, and consistent with the guidance provided by Symantec's auditor, revenues must not be recognized (i) unless and until the vendor has documentation of the transaction (such as a purchase order), or the underlying contract and agreement is executed and is in the hands of management prior to the end of an accounting period; (ii) if uncertainty exists about customer acceptance of the software; and/or (iii) if extended terms in the software licensing arrangement indicate that the fee is not fixed or determinable.

1

2.      **GAAP Deferred Revenue Principles**

2

57.     Deferred revenue, or payments that a company receives for products or services

3

that are to be delivered or performed in the future, is a liability.  Deferred revenue is recorded when

4

a company bills a customer before satisfying GAAP's revenue recognition criteria.  As noted

5

above, these criteria include that delivery of the goods or service has occurred (*e.g.*, an exchange

6

has taken place).

7

58.     Recognizing deferred revenue that is not realized or realizable and earned violates

8

GAAP, and renders the subject financial statements misleading.

9

3.      **Symantec's Obligation To Maintain Effective**
        **Internal Controls Over Financial Reporting**

10

11

59.     Symantec was also obligated under Section 404 of the Sarbanes-Oxley Act of 2002

12

("SOX") to maintain effective internal controls.[8]  Specifically, SOX Section 404 requires

13

Symantec to assess its internal controls over financial reporting, and disclose whether or not such

14

controls are effective, including the identification of any "material weaknesses" in those controls.

15

Section 404 further requires Symantec's CEO and PAO to personally certify the effectiveness of

16

Symantec's internal controls each quarter.

17

60.     A "material weakness" is a deficiency or combination of deficiencies in a

18

company's internal control over financial reporting, which creates a reasonable possibility that a

19

material misstatement of the company's annual or interim financial statements will not be

20

prevented or detected on a timely basis.  A company's internal control over financial reporting

21

cannot be considered effective if one or more material weakness exists.  Internal controls that

22

23

24

_____

25

[8] In early 2003, the SEC staff issued the Report Pursuant to Section 704 of the Sarbanes-Oxley

26

Act of 2002 (the "Section 704 Report").  In compiling the information for the Section 704 Report, the SEC staff studied enforcement actions filed during the period of July 31, 1997 through July 30, 2002.  The greatest number of enforcement actions related to improper revenue recognition.  A

27

common theme in these enforcement actions related to "side letters," or verbal side agreements, that were not considered in recognizing revenue.  *See also* SEC FRR 104, "The Significance of

28

Oral Guarantees to the Financial Reporting Process."

impact significant accounting estimates or critical accounting policies are generally considered to be higher risk.

61.     Company management is further required to ensure that testing procedures are performed to assess the operating effectiveness of the company's internal controls.  If management is aware or determines that the design or operation of a control does not allow management or company employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis, this means that a control deficiency exists.  Management is then required to evaluate the control deficiency to ascertain the likelihood that the deficiency or combination of deficiencies could result in a significant deficiency or a material weakness.

62.     All significant deficiencies and material weaknesses must be reported to the company's audit committee.  Moreover, a single material weakness renders the company's internal controls ineffective, and any material weakness must be publicly disclosed.  Significantly, the SEC has observed that disclosures regarding management's remediation efforts "may call into question the validity and completeness of the material weaknesses disclosed."

### 4.     Defendants Improperly Recognize Revenue At Period-End To Make Their Numbers

63.     Throughout the Class Period, Defendants engaged in improper revenue recognition practices in violation of GAAP and Symantec's own stated revenue recognition policy.  Among other things, Defendants recognized revenue at period-end on sales that did not have signed contracts, did not go through the appropriate approval channels, contained unapproved extended terms, and/or for which customers could not or would not pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met GAAP's revenue recognition criteria.

64.     Symantec's improper revenue recognition practices violated GAAP and Symantec's own stated revenue recognition policy because revenue may not be properly recognized under GAAP unless it is realized or realizable and earned.  The revenue recognition criteria are not met (i) unless and until the vendor has documentation of the transaction (such as a purchase order), or the underlying contract and agreement is executed and is in the hands of

management prior to the end of an accounting period; (ii) if uncertainty exists about customer acceptance of the software; and/or (iii) if extended terms in the software licensing arrangement indicate that the fee is not fixed or determinable.  As detailed further below, Symantec's practices made its reported GAAP revenue and deferred revenue false and misleading.  Symantec's representations that it complied with GAAP and its internal revenue recognition policy, as well as the Company's representations about effective internal controls, were likewise false and misleading.  Overstated GAAP revenue allowed Symantec employees to project increased growth and achieve higher revenue compensation targets.

65.     On September 24, 2018, Symantec *admitted* that it had recognized revenue that should have been deferred in its earnings releases for the fourth quarter of fiscal year 2018 and first quarter of fiscal year 2019, and that those financial statements would be restated accordingly:

> [T]he Audit Committee reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018 (which is still an open period).  After subsequent review of the transaction, the Company has concluded that ***$12 million of the $13 million should be deferred***.  Accordingly, the previously announced financial results for the fourth quarter of fiscal year 2018 and the first quarter of fiscal year 2019 (ended June 29, 2018) ***will be revised to take into account this deferral and any other financial adjustments required as a result of this revision***.

66.     This $12 million in revenue (and related gross profit) that Defendants *admitted* was improperly recorded was material to Symantec's reported financial results on both a yearly and quarterly basis.  First, on a yearly basis, Symantec reported $49 million in operating income for fiscal year 2018, which Symantec identified as a "Key Financial Metric."[9]  Given that the $49 million should be reduced by the $12 million deferred to 1Q19, this means that Symantec's full year 2018 operating income was reduced by approximately 20% (*i.e.,* the $49 million reported operating income would have been $61 million without the improperly recorded $12 million).  In other words, the $12 million in improperly recognized revenue materially impacted Symantec's GAAP operating income for fiscal year 2018 by reducing it by ***20 percent***.

---

[9] *See* Symantec's Form 10-K for the Fiscal Year Ended March 30, 2018 (the "2018 10-K") filed on October 26, 2018 at 36 ("Key Financial Metrics").

67.     This exact point regarding the materiality of the $12 million in **admitted** improperly recorded revenue was made by Watchdog Research, an "independent research provider" that "identif[ies] red flags, issues and other anomalies in financial reporting."  As set forth in a Watchdog Report concerning Symantec titled "What happened?," this independent research provider stated:

> Any irregularities in accounting are material because they raise questions about the potential for failure or weakness in the personnel and/or systems used for a company's accounting.  In [Symantec's] case, it might seem a $12 million revenue recognition issue would be immaterial.  But that would be **false**.  Symantec reported $49 million in operating income in 2018.  If the $49 was reduced by the $12 million, that still means the $12 million had an impact of 20% on operating income – excluding any millions spent on the investigation![10]

68.     <u>Second</u>, the $12 million was also material to Symantec's quarterly financial metrics for the fourth quarter of 2018 (*i.e.*, the quarter from which the revenue should have been deferred).  Indeed, in its 2018 10-K, Symantec reported revised figures for the fourth quarter of 2018 that reduced gross profits by a full $12 million on a dollar-for-dollar basis.[11]  Thus, the $12 million likewise impacted Symantec's operating income on a dollar-for-dollar basis.  Critically, the $12 million was **double or 200%** of Symantec's reported $6 million in operating income for 4Q18.  In other words, following the Audit Committee investigation and deferral of the $12 million, Symantec's reported operating income for 4Q18 had to be reduced by **67 percent**.[12]

69.     Also, on September 24, 2018, Symantec announced a massive corporate reshuffling, and the need for improvements to its internal controls:

> The Audit Committee proposed certain recommendations which the Board of Directors has adopted, including: appointing a separate Chief Accounting Officer; appointing a separate Chief Compliance Officer reporting to the Audit Committee;

---

[10] This report is available by subscription at the following website:  https://www.cwdresearch.com.

[11] Symantec originally reported 4Q18 gross profits as $958 million – but later reduced that amount by $12 million to $946 million.  *Compare* Symantec's Form 8-K dated May 10, 2018 *with* Symantec's 2018 10-K at 51.

[12] Symantec did not reduce its 4Q18 operating income from the originally reported $6 million.  Thus, the Company must have off-set the $12 million in deferred revenue with an undisclosed but equivalent amount.

clarifying and enhancing the Code of Conduct and related policies; ***and adopting certain enhanced controls and policies related to the matters investigated***.

70.     Multiple reliable former employees provided firsthand accounts explaining that Defendants engaged in improper revenue recognition practices throughout the Class Period that were inconsistent with GAAP and the Company's internal revenue recognition policy.   For example, a former Vice President ("VP") and Chief Security Officer ("CSO") from 2014 through June 2017 worked at Symantec headquarters for 7.5 years.   For the first 3.5 years of his/her tenure as the CSO, he/she reported to Symantec's Chief Information Officer, Sheila Jordan ("Jordan"), who in turn reported to Noviello shortly after the Blue Coat acquisition.   During the last six months of his/her tenure as CSO, he/she reported to Symantec's General Counsel, Scott Taylor.

71.     Symantec's former VP and CSO recalled Defendant Clark making lots of references in meetings with executives about their ability and flexibility to shift and record revenue because it was a hardware business.   Clark would regularly talk about opportunities from having been at Blue Coat prior to the acquisition, and the opportunity to be flexible in how they were spreading out revenue over time for these big and expensive hardware purchases.   According to Symantec's former VP and CSO, they had the ability to "massage" that.

72.     Symantec's former VP and CSO further explained that Clark talked frequently about the ability to manipulate or adjust revenue by various periods or a year.   The intimation was that if they had already made their target for a particular quarter, then they would not deliver and record revenue until the next quarter.    Symantec's former VP and CSO explained that Clark specifically discussed this issue at senior leader meetings with executives which occurred approximately monthly.   He/she said that these calls included the next layer below Clark's immediate direct reports.   According to Symantec's former VP and CSO, during these calls, they discussed the financial performance of various parts of the business.   Clark's views on "opportunities" to be "flexible" with respect to revenue recognition were not a secret.

73.     Symantec's former VP and CSO confirmed that from the time that Defendant Clark became Symantec's CEO, it felt like they were working at Blue Coat, so it seemed that whatever went on at Blue Coat would go on at Symantec.   The former VP and CSO elaborated that it was

one step worse than that. Not only was the attitude that whatever they had done at Blue Coat was right, but it was also that whatever Symantec was doing was wrong. They believed that Defendant Clark's team knew best. Many of the Blue Coat processes were not fit for a public company the size of Symantec. Symantec's former VP and CSO confirmed that there was a lot of discussion about the ethics of the sales team and sales leadership that took over from Blue Coat, including general behavior around closing deals (and how they were using resources). The former VP and CSO confirmed that the legal team expressed significant concern to him/her that this practice was happening to the point that the legal team undertook a review, which was multiple prongs. There were discussions amongst peers around executive behavior at sales conferences in Las Vegas that were not up to Symantec's ethical standards. There were investigations into specific deals and the behavior of the sales team around closing deals. According to the former VP and CSO, there was a significant review of Symantec's channel partners and resellers to figure out who met Symantec's moral structure, including reviewing the use of slush funds to send customers various things. The investigations were led by Cameron Hoffman, head of investigations at Symantec, under Scott Taylor.

74.     A former Senior Manager, Pricing & Licensing from July 2011 through June 2017, who had worked at Symantec for 18 years in the Company's Springfield, Oregon office, first in Channel Inside Sales from September 1999 through September 2007, then as a Senior Project Management Specialist from September 2007 until July 2010, said that Blue Coat management imposed unethical accounting practices at Symantec. He/she explained, for example, that Symantec was trying to figure out a way to change from a subscription model to a licensing model so that they could bring all the revenue in at once and not defer it. He/she knew from a person who had been on his/her team and still works for the Company that they were changing a lot of those models so that they could recognize the revenue earlier. The former Senior Manager, Pricing and Licensing stated that Symantec was trying to do this with a majority of its customer base and this change would have affected both Fortune 500 companies as well as smaller companies. This work involved revamping hundreds of thousands of SKUs (stock keeping units). There were still

1  some products that were subscription-based, but approximately 70% of the subscription products

2  were changed to licenses.

3      75.    Symantec's former Senior Manager, Pricing & Licensing, further confirmed that

4  he/she was sure that people were trying to shove revenue through at the end of the quarter that they

5  should not have been.  They were trying to shove deals through that Symantec people would not

6  have allowed to go through previously.  For example, Symantec's former Senior Manager, Pricing

7  & Licensing stated that a few people said that they had been asked at quarter-end to put a bunch

8  of orders through, when they knew that the orders would not be processed, just to meet numbers

9  and then after end of quarter, back them out.  Specifically, the Senior Manager, Pricing and

10 Licensing stated that there was inappropriate pushing through of deals which was just a "flat-out,

11 let's just push that through and we will back it out at the end of the quarter type request."  He/she

12 described how the request came at quarter-end from a Vice President who came from Blue Coat.

13 The order processing team was located in Springfield, Oregon.  Symantec's former Senior

14 Manager, Pricing & Licensing, explained that he/she knew about this issue because at quarter-end

15 everyone was working long hours together and all sat together.  The Senior Manager, Pricing and

16 Licensing, discussed one situation in which a colleague, Ronda Turner Wilson, an Associate

17 Manager at Symantec, was asked by a Vice President on the Symantec sales side to process a "high

18 dollar" order without appropriate documentation.  The Senior Manager, Pricing and Licensing

19 stated that Wilson reported her concerns to the Ethics Committee through Symantec's ethics

20 hotline.

21     76.    The former Blue Coat Vice President's request occurred at a quarter-end after the

22 acquisition of Blue Coat, and after Blue Coat had gotten rid of a lot of Symantec management and

23 put its own in place.  The Senior Manager, Pricing and Licensing stated that before the [Blue Coat]

24 acquisition, those deals would have never even been considered.  The Senior Manager, Pricing &

25 Licensing stated that Symantec used an Oracle database to track deals and you would be able to

26 tell if a deal was improper because all of the signed contracts and documents that needed to be

27 assigned to the deal would not exist.  You would also see an order booked and then a return after

28 the quarter ended which would be a huge red flag.

77.     Specifically, one of the former Blue Coat and now Symantec Vice Presidents called the Springfield office and spoke with managers in Order Management, telling them to put numerous orders through at the end of the quarter.  You had to have a signed contract in order to put orders through, and they did not have the signed contracts and the things the Company normally required in order to put orders through.  According to Symantec's former Senior Manager, Pricing & Licensing, this raised a lot of red flags because there are certain processes with contracts, and with Symantec, for which there was no wiggle room.  The concern was that these were not solid, signed deals, and should not have been put through.

78.     Chris Kearney, a Regional Vice President of Sales at Blue Coat and then Symantec from May 31, 2016 until he was fired in retaliation for reporting accounting misconduct in September or October 2018 (*see infra*, Section V(K)), confirmed that improper accounting practices occurred at Symantec, that deals were pushed through at the end of the quarter, and that senior executives, including Michael Fey, Steve Tchejeyan, Marc Andrews, and possibly Defendant Clark attended meetings every quarter to track the revenue coming in from deals at the end of the quarter.[13]  Mr. Kearney was based in Florida but reported into Symantec's Mountain View California headquarters, which was the address listed on his paychecks.  Mr. Kearney has been in the industry for 20 years, and during his tenure at Symantec was responsible first for territories that went up through Washington DC, Virginia, and up through Michigan and Ohio, and later in his tenure at Symantec was responsible for sales territories spanning 13 states, or the entire southeastern United States.   Initially, Mr. Kearney reported to Craig Weimer, but from approximately April 2018 until the end of his tenure, Mr. Kearney reported to David Auslander.  Mr. Kearney had a team of nine field account managers reporting to him; his team was responsible for the entire Symantec product line.

79.     Mr. Kearney explained that on June 29, 2018 (a Friday), the tail end of the first quarter of Symantec's Fiscal Year, his direct manager, Auslander, asked him to go to a Symantec partner called Optiv, and request a purchase order for product that was not ordered by the end user,

---

[13] Mr. Kearney agreed to be identified by name in this Complaint.

Chico's.  The product that was the subject of the deal was a software product, and the deal was valued at approximately $750,000.  Mr. Kearney knew and had told management that this deal was not going to happen for the quarter – indeed, he knew that the customer did not have it in the budget and was not going to do it.  Then, Mr. Kearney received a text message from Auslander.  The text message, which Mr. Kearney received on June 29, 2018 and still has in his possession, stated:

> Optiv, when they know a deal is going to happen but we can't get a PO [purchase order] in time, has been willing to cut us a PO for a few extra points.  Ask the rep you are working with and see if they will go up their chain. … Not that you need any more incentive, but Fey just asked about Chico's [the end user in the Optiv deal] ***because he needs the end quarter revenue***.

80.     Mr. Kearney understood that the senior executives of Symantec, including Fey, Tchejeyan, Marc Andrews, and possibly Defendant Clark were holding their quarterly meeting where they sit in the same room at the Mountain View headquarters and track deals as they come in.  Chris Weimer would host a similar meeting each quarter in Symantec's New York office for the East Coast.  This deal with Optiv was one of the deals they were tracking.  In sum, Mr. Kearney understood from Auslander's text message that he was telling Mr. Kearney that the President of the Company is tracking the deal, and they need it for end quarter revenue so let's get it done.

81.     Mr. Kearney also knew from Auslander's text message that this practice occurred with other orders following the Blue Coat acquisition, and that these orders were at least $750,000 but much larger and would have gone up to ***tens of millions of dollars***.

82.     Mr. Kearney was in shock at Auslander's request.  This request was "absolutely" a violation of Symantec policy and the accounting rules.  As Mr. Kearney explained, you are not allowed to take an order from a customer without an order coming back from the customer.  You cannot simply go to the partner and say that you know this deal is going to come in but did not come in yet, so why don't you just give me this order, and I'll take it.  Indeed, Mr. Kearney explained that every person in sales has been trained on this and it is consistent training.  At the end of the quarter, employees have to sign and verify that they do not know of any deals that have

gone through the channel with side agreements and such.  Mr. Kearney did not sign this document for this quarter.

83.     In response to Auslander's text message on Friday, June 29, 2018, Mr. Kearney told him that it was a finance deal, so they could not do anything.  Over the weekend, ***Mr. Kearney called Symantec's whistleblower hotline and reported what happened***.  The following Monday, Mr. Kearney received a call from Auslander telling Mr. Kearney that he was ***not a team player and was not willing to do what it takes***.  Auslander told Mr. Kearney to resign now, or he would write Mr. Kearney up and Mr. Kearney would be gone by the end of the quarter.  Until that point, the Company had no reason to fire Mr. Kearney.  Mr. Kearney had received good reviews from his past boss.

84.     Mr. Kearney reported this blatant retaliation and misconduct.  One day later, on the following Tuesday, Mr. Kearney spoke to people from the Audit Committee and the General Counsel, including Carolyn Herzog, and made them fully aware of everything, including the text message and Auslander's threat to Mr. Kearney's job, as well as Mr. Kearney's refusal to sign the affidavit for the quarter verifying that he knew nothing improper was going on.  But the Audit Committee ***did not take any action*** in response to Mr. Kearney's report, and told him to just keep doing his job and that everything was fine.  Mr. Kearney also reported the misconduct to Steve Tchejeyan, but Tchejeyan told him to just worry about his job.  Tchejeyan further told Mr. Kearney that if he spoke to the Audit Committee, he did not want to talk to him.  Mr. Kearney knew they were trying to sweep the misconduct under the rug.

85.     A few months later, in September or October 2018, at the end of the following quarter (as Auslander had threatened Mr. Kearney he would), Mr. Kearney was fired.  Mr. Kearney was told that he was fired because he was not meeting his numbers, but in reality, it was because he refused to get the Optiv deal done improperly.

86.     In addition to the Audit Committee, Mr. Kearney reported his concerns to the SEC because he knew the Audit Committee was sweeping it under the rug.  In addition to the incident described above, Mr. Kearney told the SEC about another situation involving accounting misconduct at Symantec.  Specifically, any deal that was over $500,000 had to go through a review

process.  If it was a cloud deal, which is a subscription deal, it had to be reviewed by Tchejeyan and Fey, who would determine whether or not they could ***change the SKUs on those deals*** in order to make them "on premise" software so that they could ***recognize all the revenue at once*** instead of monthly

87.     Mr. Kearney explained that the Company started selling cloud subscriptions, which caused a shift in revenue from taking all the revenue upfront to being ratable.  The Company may only get $12,000 upfront instead of $100,000, as they had in the past.  The Company miscalculated how fast people would switch to subscription products.  Therefore, after that switch, Symantec wanted to review every deal to see if they could change it to an "on premises" license SKU in order to count the revenue upfront.  Mr. Kearney said that "a ton" of deals would be over $500,000 and be reviewed.  For example, Mr. Kearney had one deal himself with the end customer, Altria, a Philip Morris company, that involved ratable software products and partner IBM, and went through this process.  Mr. Kearney knew that management was looking at Chico's and coming up with old SKUs to change the product line to those SKUs to be able to count them.    As noted above, Mr. Kearney reported these concerns to the SEC.

88.     Similarly, a Regional Sales Manager at Symantec from September 2016 to November 2018, who worked in Georgia, stated that around April or May of 2018, a Senior Vice President forced through a deal that was not yet booked and that was worth almost eight figures (i.e., nearly $10,000,000).  This deal included all of the technology under Symantec's umbrella and was a complete "wall to wall" deal. The Senior Vice President had originally asked another manager to accept the deal even though there was no purchase order, but the manager refused because it was against the manager's ethics.  The deal was pushed through anyway. The Regional Sales Manager stated that the manager in question brought this to "everyone's attention," including Mike Fey, Steve Tchejeyan, and some Senior Vice Presidents. The Regional Sales Manager stated that he/she was not interviewed in connection with the Audit Committee investigation and would have told the Audit Committee about this deal.

89.     Additionally, a former Account Executive – who worked at Symantec as an Account Executive from November 2013 until July 2018 (working in Symantec's Springfield,

Oregon office at first, but then working remotely for the last three years of his/her tenure) and who worked with government and education accounts – stated that, in the proper sales process, they would need the customer to actually submit a purchase order.  But Symantec would allow customers to merely sign the intent to write the purchase order and Symantec would book it as closed business.  He/she initially worked with government and education accounts in California, Oregon, Washington, and Alaska and then his/her territory later switched to Texas, Oklahoma, and Louisiana when he/she moved to Texas.

90.     According to the former Account Executive, Symantec would also take "an IOU" from its channel partners to get the deal done.  The channel partner would foot the bill to let Symantec hit its numbers.  The partner would guarantee that they would get the order in the next couple of days.  The partner would pay Symantec so that Symantec would book the sale in the current quarter rather than the next quarter.  The former Account Executive thought that one or two deals a year happened in this manner.  The Account Executive thought that the percentage of deals done in this manner would probably be 10 times that size in the field due to the size of the opportunities in that business.  The former Account Executive estimated that if a salesperson in the field had 100 deals a year, and 1% were brought that way, approximately $10 million would be brought it that way.  The former Account Executive recalled one deal for $300,000 for a client in upstate New York that was done in this manner.  The former Account Executive further recalled discussing the deal in January of 2018 with Trip Ervin, VP of Sales, who told the former Account Executive that this was "dirty business."

91.     The former Account Executive explained, for example, that after the Blue Coat acquisition, Symantec engaged in the following practice:  if Company ABC said that it would cut a purchase order on the second of the month but the end of Symantec's quarter is a few days earlier on the 30th, the partner would hold the note for 2-3 days and then Symantec would book that as closed business.  The partner would pay Symantec and would write Symantec the purchase order, and would cover the customer until the customer paid.

92.     A former Healthcare Account Executive at Symantec from June 2016 until January 2019, confirmed that the Company changed its purchase order practices after the Blue Coat

acquisition.  According to the former Healthcare Account Executive, the Company had provisional purchase orders, which meant at times, if a deal did not come in quite yet, they would have the partner get a purchase order for them.  The former Healthcare Account Executive explained that this applied to deals in general, both software and hardware.  If they did not have a purchase order from the end customer but the end customer said in email form that its intent was to purchase X, the partner could issue a purchase order.  The former Healthcare Account Executive stated that one deal in which this occurred was a $3 million plus deal with the Mayo Clinic.

93.     A former Business Development Manager, a Business Development Manager for Symantec from December 2012 until February 2018, who worked remotely, but was based in Herndon, Virginia, stated that orders over $250,000 required a formal purchase order and Symantec would break up deals into two or three deals so that they could get around the rules of requiring a formal purchase order.  He/she was responsible for developing business and structuring deals, and worked with the sales teams and sometimes directly with the customer, dealing with the enterprise solutions business.  The former Business Development Manager was responsible for Latin America and the Caribbean, but was also in charge of leading other employees in India and the Asia Pacific Japan region.   During his/her last year at Symantec, the former Business Development Manager was also involved in the North American business.

94.     The former Account Executive referenced in ¶89 above similarly stated that he/she knew quite a few representatives in the Plano, Texas office that were encouraged to book orders on just an intent to sign a purchase order, rather than an actual purchase order. This practice happened more on the enterprise side, which had more "flexibility," than the government side.

95.     A former Senior Manager of NPI Operations from May 2017 to December 2017, who had worked for Symantec since 2006 and worked out of the Springfield, Oregon office, corroborated that in and around the start of fiscal year 2018, there was a push to change to certain licenses so that the Company could recognize all revenue upfront.

96.     According to several former employees, Symantec also pulled in deals in advance to recognize revenue.  For example, a former Symantec Manager Bill and Collect-Finance, Americas, from January 2014 until October 2017, who worked at Symantec for over 18 years and

worked in the Springfield, Oregon office, described how Symantec was bringing in deals two to three quarters in advance just to make numbers.  The former Manager Bill and Collect-Finance explained that the new sales team following the Blue Coat acquisition was allowed to bring in deals "that were sort of half baked."  The former Manager Bill and Collect-Finance, who had a background in sales, knew that deals were allowed to go through when customers really did not have a thorough credit check.

97.     There were a few multi-million dollar deals where the former Manager Bill and Collect-Finance and his/her boss, Toni Doveri, were told to ignore the fact that the deals were inappropriate and that the customers were not going to be able to pay two to three quarters out. The former Manager Bill and Collect-Finance explained that around January 2016, one deal was worth approximately $6 million, and they were allowed to bring it in about two quarters ahead of time to make numbers for the end of the fiscal year.  According to the former Manager Bill and Collect-Finance, deals like that occurred every quarter after the Blue Coat acquisition.  The amount of deals improperly being pushed through was millions of dollars.

98.     The former Manager Bill and Collect-Finance further explained that a lot of customers are sending him/her emails saying that they did not want to sign the deal with Symantec, but the sales rep forced them to.  He/she received three such emails in the last quarter.  Moreover, the former Manager Bill and Collect-Finance stated that Symantec would promise the customer something to make these deals.  Specifically, in the last quarter at DigiCert (where the former Symantec employee currently works),[14] he/she saw two instances where the customers had been promised a number of free security certifications from Symantec.  Symantec promised them X number of free security certificates to bring this deal now, and the customer would pay for it with extended terms.  The extended terms either did not come through Finance, or if they did, Finance was forced to push them through.  According to the former Manager Bill and Collect-Finance, revenue had to have been recognized improperly because DigiCert is still trying to get paid for deals that occurred a year and a quarter ago.

---

[14] DigiCert acquired Symantec's Website Security and related PKI solutions in 2017.

99.     The former Manager Bill and Collect-Finance further explained that the practice of pushing deals through continued at least until after he/she left the Company.  The former Manager Bill and Collect-Finance frequently received calls from the highest executive staff, such as Garfield, telling them to release those orders or to allow those orders to go out.  There would be a fight about it, but Garfield would indicate that the order to do so had come from someone else above him.  He would quote Defendant Clark or Noviello.

100.     In addition, a Senior Financial Analyst working at Symantec on a contract basis from May 2017 to July 2017, who was tasked with transitioning the merger/acquisition to Symantec of Watchful Software and who worked in New Jersey, stated that he/she questioned the way that Symantec was bringing in revenue.  Specifically, the former Senior Financial Analyst explained that Watchful Software had a lot of deferred revenue, including maintenance revenue, that went on for years.  According to the former Senior Financial Analyst, Symantec discounted that deferred revenue to approximately 50% and recognized it all upfront.  The former Senior Financial Analyst provided the following example of this practice: take a subscription for a three-year sale that was going to be $10,000 recognized over a three-year period.  Symantec would say that they were not going to recognize this over three years.  Instead, they were going to make it $5,000 and recognize it all today.  But it was revenue that was going to be earned over time.

101.     Moreover, Eloisa Schnurr, a Senior Manager in Finance at Symantec who coordinated Symantec's integrations, told the former Senior Financial Analyst that the former Senior Financial Analyst did not need to record deferred revenue entries because "we got rid of that."  The former Senior Financial Analyst confirmed with the former Controller of Watchful Software that this practice occurred and that both he/she and the former Controller questioned this practice at the time.

102.     A former employee, who worked at Symantec from November 2004 through April 2018, most recently as a Renewal Sales Representative from April 2012 until April 2018, and was based in the Springfield, Oregon office, confirmed that after the Blue Coat acquisition, Symantec changed the way it was recognizing certain deals in order to recognize revenue sooner.  Specifically, the former Renewal Sales Representative explained that after Blue Coat took over

Symantec, if you brought in revenue for a three-year deal, Symantec would recognize the revenue for all three years when it was booked.  With this new practice, the Company was showing a higher revenue plan for the first year of business instead of a consistent business plan.

103.    The former Renewal Sales Representative recalled a three-year deal with the State of Michigan for approximately $1 million that he/she believed had been recognized all at once in this manner.  He/she explained that "quite a bit" of the renewal business, which was about 60% of business compared to new sales, was pulled forward before Symantec would normally have recognized the deal.  With regard to larger deals with customers such as BlackRock, Verizon, or Wells Fargo, this could mean that millions of dollars were impacted.

104.    The former Renewal Sales Representative further elaborated that starting in early 2018, the Company would recognize deals even if they were a month early and he/she was pressured to pull in as many deals as he/she could before the end of the quarter.  Thus, the Company could show as much revenue in the current quarter as they could, but they robbed the next quarter. He/she took this as a sign that the Blue Coat management was going to bail out of Symantec after the first year or two.  As set forth herein, he/she turned out to be correct.  The former Renewal Sales Representative further confirmed that employees were pressured to pull in as many orders as they could before the new quarter, which according to him/her, was not stable accounting.

105.    The former Account Executive referenced in ¶89 above similarly stated that he/she left Symantec because Symantec wanted employees to pull in deals during Q1, Q2, or Q3 at half the revenue to make that quarter look better at the peril of satisfying the employee quota.  For example, in Q1 2018 (May 2017), the former Account Executive closed a significant deal early with the school district in Houston for around $1.7 million.  Quarter after quarter, according to the former Account Executive, Symantec seemed to be trying to shove as much as they could into the quarter even if the price needed to be discounted.

106.    The pressure to close deals any way they could increased after the Blue Coat acquisition.  According to the former Account Executive, a Senior Vice President, Americas Sales at Symantec, Steve Tchejeyan (who had previously been the Senior Vice President, Americas at Blue Coat) managed all the business that went through the western half of the U.S.   Therefore, if

something came downstream, it normally came from Tchejeyan.  The former Account Executive was personally involved in conversations and on forecast calls at the end of the quarter when Tchejeyan would instruct them to close deals *any way they could*.  The forecast calls were held weekly, and Tchejeyan would be on them once or twice a quarter, normally in the last two weeks of the quarter.

107.    The former Account Executive stated that a substantial amount of the deals in 2017 and 2018 were pulled in from future quarters, and that one of the reasons he/she left the Company was because his/her quota was based off of the prior year plus an expected growth, and pulling sales forward ate into future quarters and made his/her job that much harder. The former Account Executive stated that 20% of renewals were brought in early and discounted and that 20% of his/her renewals for 2018 would be 20% of $500,000.  With regard to the East Coast, the former Account Executive indicated that approximately $100,000 per territory for 19 reps on average, so perhaps $2 million would be brought in early.

108.    The former Account Executive provided an example that occurred around October 2017, wherein Symantec gave the state of Oklahoma an extremely discounted price – approximately $50,000 in discounts on a deal worth $400,000 – to bring the deal in the quarter before it was supposed to close.  The products involved included Symantec EndPoint Protection and Control Compliance suite and certain Blue Coat proxies.

109.    The former Business Development Manager referenced in ¶93 also faced situations where Symantec was giving discounts to partners of 3-5 points or more to get customers to buy products at quarter end or year-end. One such deal involved a million dollar deal with Itaú, a financial institution in Brazil, in 2017.  They were offering discounts to get customers to buy at quarter end or year end.  The former Business Development Manager also knew of past cases where a partner told Symantec that a deal that had not yet come through from a customer but would come through in the future, but Symantec was still was registering the deal as completed and closed.  According to the former Business Development Manager, this would mean that the Company was recognizing revenue on the deals because it was registering them as closed in Salesforce.

110.    The former Business Development Manager stated that pushing through deals that should not have gone through to meet quarterly or yearly targets happened all the time.  The former Business Development Manager remembered a deal worth approximately $3-5 million with Wells Fargo in 2018 that the Company booked in an earlier quarter than it was supposed to be booked. This deal involved replacing SKUs as well as renewals, and compensation had to be adjusted to go to both Renewals and the account management team.  He/she estimated that out of the $80 million that his/her business unit made per year, 20% of their accounts were pulled into an earlier quarter.

111.    The former Business Development Manager stated that frequently the customer received a certificate for a product but it would need date adjustments for the starting date.  The customer was not entering the same specific date and would lose a few days if not corrected.  The customers would tell him/her that the certificate is for date Y but that the former Business Development Manager was bringing them date X.  This happened more with renewals, and according to the former Business Development Manager, this was a way to recognize the numbers earlier.  This happened pretty often, and it would happen depending on the compensation policy because the sales team and leadership were trying to achieve the targets and goals.  Leadership in the renewals process would have been involved in the decision to recognize deals early; it would not have been the decision of one sales representative.

112.    The former Business Development Manager was aware of deals booking early because he/she knew when the bid was about to come and when Symantec was negotiating with a customer.  The former Business Development Manager would know that the bid had not happened yet, but would see the deal go through in Salesforce.

### 5.    Former CAO Garfield Leaves Symantec Due To Improper Revenue Recognition Practices And Ineffective Internal Controls, But Only After He Closes The Books For 2017

113.    Symantec's former VP and CSO explained that Garfield, the former CAO of Symantec who "resigned" effective August 7, 2017, left the Company due to revenue recognition concerns and due to the way that Symantec was recognizing revenue under the leadership of

Defendant Clark and Noviello.  Symantec's former VP and CSO heard this from both Carolyn Herzog, former Deputy General Counsel, and John Eversole, former head of Physical Security and Executive Protection.  Eversole was responsible for the executive protection program and personally did the majority of the protection of Clark himself.[15]

114.    Symantec's former VP and CSO explained that Garfield was pushed into a position he was uncomfortable with and took a stand that he would not close the books because of that. However, Garfield ultimately reached an accommodation that included him leaving with a financial package in hand so long as the books got closed.  Garfield ultimately did sign off on the books for the prior financial year (2017) in exchange for a package.

115.    Moreover, Symantec's former VP and CSO stated that he/she learned from multiple people who were part of the senior executive team that Garfield was really unhappy with the aggressive accounting practices that were being implemented under Noviello and was uncomfortable that the practices were not lining up to Symantec's controls.  It was common knowledge among the most senior VPs and EVPs that Garfield was very unhappy and butting heads with Noviello over accounting practices, and it was openly discussed.

116.    Symantec's former Manager Bill and Collect-Finance further explained that someone on Garfield's team, possibly Maddy Gatto ("Gatto"), brought something forward prior to the numbers being released to the Street.  The former Manager Bill and Collect-Finance believes that the bad numbers were reported to the Street.  Gatto left the week after Garfield, with her resignation effective on August 15, 2017.  According to the former Manager Bill and Collect-

---

[15] Lead Counsel communicated with Mr. Eversole numerous times during the course of the investigation, including most recently during calls on July 2nd (two calls), 3rd and 5th.  Mr. Eversole expressed a desire to speak with Lead Counsel about relevant activities at Symantec, but expressed concern that Symantec may claim that his doing so would violate his "non-disclosure agreement" with Symantec.  Thus, on July 3, 2019, Lead Counsel wrote to counsel for Symantec asking for confirmation by July 5, 2019 that "Symantec will not retaliate or take any other action against Mr. Eversole for providing answers" to various questions concerning Garfield's departure or other misconduct at Symantec.  On July 5, counsel for Symantec sent an email stating that they needed an extension to July 8 to respond.  Also on July 5, Lead Counsel spoke to Mr. Eversole, who confirmed his continued cooperation.  On July 8, 2019, Defendants provided the requested confirmation but, immediately thereafter, Mr. Eversole began refusing to accept calls and ceased his cooperation.

Finance, Garfield left first and received a big payout, and then Gatto may have been pushed out. The former Manager Bill and Collect-Finance explained that he/she knew this information because Symantec had a very family-like mentality and is a small community; therefore, people were not afraid to talk to each other, and Springfield employees (in his/her office) are very connected to Mountain View (Symantec's headquarters), and employees travel there.

117.    It was the former Manager Bill and Collect-Finance's understanding that Garfield knew things that people did not want him to know.  According to the former Manager Bill and Collect-Finance, someone continued to push forward this issue appropriately because it was still a topic of conversation when he/she left Symantec on November 1, 2017.  However, the former Manager Bill and Collect-Finance's understanding is that Symantec did file the incorrect numbers. The former Manager Bill and Collect-Finance believes, based on legitimate conversations that took place, that Gatto or Garfield may have tipped off the Audit Committee.

118.    Similarly, a former Senior Manager, Pricing & Licensing at Symantec stated that he/she heard from multiple people that Mark Garfield got paid a substantial amount to leave Symantec because he had legitimate information about improper financial dealings at Symantec. The former Senior Manager, Pricing & Licensing heard that Garfield reported to executives at Defendant Clark's level something *improper* that had to do with revenue, like an accounting practice that was improper, and told the executives that it was wrong and that they could not do it. Garfield was "given a payout to keep quiet and move on."

**6.    Defendant Clark Learns That Deals Involving
        SOX Violations Were Improperly Booked At Year-End**

119.    As set forth below, Defendant Clark was personally and directly involved in approving six "double digit" million-dollar deals – which can be estimated to amount to a total of at least $63 million dollars – that a former Symantec employee believes were double-booked in 4Q17 and 1Q18.  This sum was material both to Symantec's reported financial results as well as Defendants' ability to meet their bonus targets for 2017.

120.    Specifically, a former Symantec Account Manager – Strategic Account Manager – said that individuals who came over from Blue Coat to Symantec were violating the rules

applicable to public companies, including SOX.  As this former Account Manager put it, "It was almost like they did not understand the rules of a publicly traded company, or they just didn't care." He/she explained that the Company was not accurately and completely recording some financial information related to revenues, and there were breaches of SOX on multiple levels with the new management team coming in through the Blue Coat acquisition.  The former Account Manager left Symantec because he/she knew these issues would come out.  The former Account Manager worked at Symantec from December 2013 until October 2017 in the Tampa/St. Petersburg area, working remotely and reporting to different managers over time, including Regional Vice President Rich Ruggiero (based in New York) and, subsequently, Tim Hankins (a former Blue Coat employee also based in New York who was "very close" to former COO, Michael Fey).  Among other things, the former Account Manager handled the Verizon account.

121.    The former Account Manager stated that his/her manager, Tim Hankins, was fired because of unethical behavior and that Michael Fey followed quickly behind him.  He/she stated that there was an internal ethics investigation going on at Symantec in addition and in parallel to the Audit Committee investigation.

122.    The former Account Manager saw the first breach in the fourth quarter of fiscal year 2017.  Specifically, the former Account Manager was responsible for driving all net new purchases as well as maintaining and overseeing renewals of existing solutions.  There are specific approval processes that have to go through Symantec's systems to ensure that renewals stay at a run rate.  It is very strict and run rates that occur on renewals cannot go below a certain level. According to the former Account Manager, it takes a while to get all the approvals for these deals and if there are any changes or additional discounting during the negotiations, it has to go back through the approval process.

123.    The former Account Manager explained that he/she managed the Verizon account, which was Symantec's largest account on the East Coast (he/she also handled the AT&T account for a period of time).  He/she explained that Verizon was negotiating, and certain management got worried about closing a $13 million deal at the end of the fourth quarter of fiscal year 2017, which included a new product—Data Loss Prevention Connector—and renewed products such as Data

Center Security, and Symantec Endpoint Protection.  According to the former Account Manager, Steve Tchejeyan, Head of Global Sales at Symantec, breached SOX specifications.  Tchejeyan spoke with one of the contacts he knew at Verizon from his Blue Coat days that was involved in the transaction, and without consulting the former Account Manager, his/her boss, or his/her boss's boss, and without getting any approvals through the system, made a verbal agreement to give Verizon $1 million off the entire transaction.

124.    This created tremendous havoc throughout Symantec's whole process.  For example, according to the former Account Manager, approvals had to be made and overridden because renewals were not allowed to go below a certain amount.  The former Account Manager explained that relevant accounting practices do not allow renewals to go below a certain number called a run rate.  The deal created a lot of issues for the renewal team because they were discounting on products they cannot discount that low, but they all had no choice.  Without approvals and without consulting anyone downstream, Tchejeyan made a personal, verbal deal with an executive at Verizon that he had contact with.  This executive did not even own all of the products at issue, it was merely someone Tchejeyan had contact with from his Blue Coat days. Tchejeyan's actions breached SOX.  The former Account Manager stated that the Pricing and Licensing employees would have been well aware of this improper deal because it fell outside of the rules and regulations for booking deals.

125.    The former Account Manager further explained that the $13 million Verizon deal happened on Friday, March 31, 2017.  The cut-off for year-end was March 31 at midnight Pacific time.  He/she received his/her sales order number right before the year-end cutoff, which meant the deal made it through the system and he/she would receive compensation/credit for it in that fiscal year (*i.e.*, 2017).  He/she noted that they were upgrading the financial system that weekend to an Oracle application.  But, when the former Account Manager came back to work on the Monday (i.e., April 3, 2017) and checked the Oracle application in which everything was booked, the Verizon deal was no longer booked with a Q4 end date in the new system and, instead, it had a Q1 end date.  The deal also did not have the right products and included products that Verizon did not even own.  The former Account Manager believes that someone manually changed the

booking in the system to go into Q1 2018 because each line item in the system said "Manual Adjustment," which the former Account Manager described as a "huge accounting flag." The former Account Manager explained that if this was just a system malfunction, the relevant products for the Q4 deal and the Q1 deal would be the same, but they were different in the system.

126.   The former Account Manager further stated that many people know about this within Symantec. He/she explained that, after his/her manager – who at the time was Regional Vice President Rich Ruggiero – did some digging, Mr. Ruggiero reported to him/her that the booking of a Q4 deal in Q1 happened to five other Symantec Account Managers. The former Account Manager elaborated that the five other deals were all "big," "double digit" million- dollar deals likely involving some of Symantec's largest customers that were booked in Q4 but ended up in Q1.

127.   With respect to his/her $13 million Verizon deal, the former Account Manager went to his/her boss and his/her boss's boss to ask what happened. Ultimately, the former Account Manager had to write a justification to Defendant Clark documenting the order numbers for Q4 to prove that it actually booked in Q4, and the former Account Manager ultimately received credit for the deal as a Q4 deal at the Q4 rate. The former Account Manager knows that Defendant Clark was fully aware of the issue, and Defendant Clark responded to the former Account Manager's email telling him/her that the deal was approved. The other five account managers who experienced the same issue all similarly had to write to Defendant Clark to get credit for the deals as Q4 transactions. Indeed, Defendant Clark was the only person who had the authority to approve the account managers getting paid for these orders in Q4. According to the former Account Manager, one need only "audit" Defendant Clark's emails to prove that he knew that this was happening.

128.   The former Account Manager elaborated that he/she believed that these six "double digit" million-dollar deals were "double booked" in both Q4 of 2017 and Q1 of 2018. In that regard, the former Account Manager was paid as though the $13 million-dollar Verizon deal was booked in Q4 of 2017, but he/she could see in Symantec's system that someone had manually changed it to Q1 of 2018 – and that it remained booked in Q1 of 2018. Indeed, he/she reported

that Symantec never fixed the issue in the system.  According to the former Account Manager, this told him/her that the deal was counted in both the previous fiscal year in 4Q17 and then counted again in 1Q18 and, for this reason, he/she believes the Company double booked the deal.  The former Account Manager stated that he/she carried a resignation letter with him/her from March 2017 through October 2017 when he/she left Symantec because he/she was so concerned about how this deal occurred.

129.    Relatedly, the former Account Manager recalled that around the same time the "double booking happened," and as confirmed by a March 29, 2017 email from Amy L. Cappellanti-Wolf (Office of the CHRO) at Symantec to "Fellow Employees," which was provided by the former Account Manager to Lead Counsel, the Company announced that Symantec had "adopted a mutual arbitration agreement program ('Arbitration Agreement')."  The Arbitration Agreement required employment-related disputes to be referred to confidential arbitration.  While employees could opt-out of this agreement (which the former Account Manager did), he/she (and other employees) were "very suspicious" that the timing coincided with the above-described events.  Further, the former Account Manager stated that he/she was *not* interviewed in connection with the Audit Committee internal investigation.

130.    These six "double booked" deals in Q417 and Q118 were material to Symantec's reported financial results.  Even if each of the five other "double digit" million-dollar deals were the minimum – *i.e.*, $10 million each – the total amount double booked would be at least $63 million (*i.e.*, 5 x $10 million + $13 million = $63 million).  This was *5.4%* of Symantec's reported net revenues for 1Q18.  Symantec's software sales were pure profit and, as such, the revenue from these transactions flowed directly to Symantec's earnings.  Further, if these double-booked deals totaled at least $63 million, the six transactions accounted for approximately *17%* of Symantec's non-GAAP operating income for 1Q18 of $377 million (i.e., $63 million / $377 million).

131.    These double booked transactions were also material to Defendant Clark and former CFO Noviello hitting their bonus targets for fiscal 2017.  As also discussed below in ¶133, Defendant Clark and Noviello "achieved" their 2017 bonus targets by a razor thin margin – i.e., by only $46 million.  Thus, if Symantec's revenue was overstated by $46 million, management

would have missed the minimum revenue target for compensation. In that event, the revenue-related portion of managements' bonus would have fallen to zero percent rather than the 100% based on the amounts management reported.

| Metric | Minimum Threshold | Amount Reported | Δ |
|--------|-------------------|-----------------|---|
| Revenue | $4,040,000,000 | $4,086,000,000 | $46,000,000 |

132. Further, the second portion of managements' bonus was driven by non-GAAP operating income. For FY17, Symantec reported non-GAAP operating income of $1,197 million. This income level equated to a bonus payout of 125% of the target. That bonus payout, however, would have declined incrementally if reported income declined, which it would have without the double-booked transactions.

133. Given that the six double booked deals totaled at least $63 million (as set forth above), they had an outsized impact on managements' achievement of the 2017 bonus targets. <u>First</u>, without the $63 million in double-booked transactions, Defendant Clark and Noviello would have missed the revenue target entirely – *e.g.*, $4,086,000,000 – $63,000,000 = $4,023,000,000 *or $17,000,000 less than the minimum revenue threshold.* <u>Second</u>, the operating income target would have fallen to $1,134 million or approximately 76% (rather than 125%) of the income-related target. Taken together, Defendant Clark and former CFO Noviello would have realized only approximately 40% (i.e., the average of 0% of revenue and approximately 76% of operating income) of their 2017 bonuses rather than the 111% they received based on the improperly reported numbers.

134. The former Account Manager further explained that his/her boss, who came over from Blue Coat and was good friends with Michael Fey, asked him/her multiple times on conference calls to do a verbal agreement with Verizon. The former Account Manager refused and found the request shocking. According to the former Account Manager, there is a compliance document that everyone at Symantec has to sign that states that they have made no side agreements. A verbal agreement is considered a side agreement.

135.     The former Account Manager's boss requested that the former Account Manager enter into verbal agreements on conference calls with other people on the former Account Manager's team 2-3 more times on different calls about different products.  The team members were asking themselves what was going on, and what kind of business processes do these people follow.  Entering into such a verbal agreement would be grounds for termination.

**B.     Defendants' Manipulation Of Reported Transition
Costs Was Misleading And Violated SEC Rules And Regulations**

**1.     Additional Accounting Principles For Adjusted Financial Measures**

136.     Symantec reported "non-GAAP financial measures" in earnings releases and financial statements.  Such adjusted financial measures are not required disclosures under GAAP or SEC rules.  Rather, the intended purpose of including such supplemental financial measures is to allow management to present an adjusted picture of the company's past or future financial performance.  These adjusted financial measures typically remove the effect of certain revenues and expenses that may be non-recurring or not part of the company's core operations.

137.     As Symantec represented in its May 10, 2017 Form 8-K, regarding its fiscal year 2017 financial results, "*investors benefit from the presentation of non-GAAP financial measures . . . to facilitate a more meaningful evaluation of our current operating performance and comparisons to our past operating performance*."  Investors, analysts, and other market-makers focused heavily on Symantec's adjusted metrics during the Class Period.  Moreover, Defendants used these adjusted metrics almost exclusively when describing Symantec's performance, as well as planning and forecasting future periods.

138.     In addition, because of the importance of the adjusted numbers, Symantec uses them to determine executive compensation, including bonuses, stock grants, and the amount of those bonuses and stock grants.  Symantec set adjusted financial metric targets and corresponding compensation payouts for each fiscal year.

139.     Due to companies' increased reliance on adjusted metrics, the SEC has issued rules, regulations, and guidance that apply when a company publicly discloses or releases financial information that includes an adjusted measure.  Among others, Regulation G (17 C.F.R.

§ 244.100), which applies to the disclosure of adjusted measures, prohibits a company from making public an adjusted financial measure that is misleading or omits to state a material fact. 17 C.F.R. § 244.100(b) provides:

> A registrant, or a person acting on its behalf, ***shall not make public a non-GAAP financial measure that,*** taken together with the information accompanying that measure and any other accompanying discussion of that measure, ***contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading***.

140.    SEC Regulation S-K, Item 10 (17 C.F.R. § 229.10) further prohibits a company from filing with the SEC an adjusted measure that adds back expenses that are related to the Company's ordinary course of business (*i.e.*, recurring).  17 C.F.R. § 229.10(e)(1)(ii)(B), provides:

> A registrant must not: (B) Adjust a non-GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the nature of the charge or gain is such that it is ***reasonably likely to recur within two years or there was a similar charge or gain within the prior two years***.

141.    The SEC also publishes Compliance & Disclosure Interpretations ("C&DIs") containing questions and answers relating to adjusted financial measures.  Question and Answer 100.01 provides:

> **Question:** Can certain adjustments, although not explicitly prohibited, result in a non-GAAP measure that is misleading?
>
> **Answer:** Yes.  ***Certain adjustments may violate Rule 100(b) of Regulation G because they cause the presentation of non-GAAP measures to be misleading.*** For example, presenting a performance measure that excludes normal, recurring, cash operating expenses necessary to operate a registrant's business could be misleading.

142.    It is thus a violation of SEC Regulation G and Regulation S-K for a company to report adjusted financial measures that are misleading, omit to state a material fact necessary to make them not misleading, and/or exclude expenses in an adjusted measure that are related to the company's ordinary course of business.

143.    In addition, the SEC's Division of Corporate Finance published the following excerpt addressing the disclosure of adjusted financial measures: "If management is presenting the non-GAAP calculation as an alternative or pro forma measure of performance, ***the staff***

*discourages adjustments to eliminate or smooth items characterized as nonrecurring, infrequent, or unusual*."  For example, it would be misleading for a company to exclude rent because it is an ongoing expense.  As relevant here, Symantec improperly excluded ongoing consulting charges and other continuing costs from its adjusted measures, rendering those stated metrics misleading and in violation of SEC Regulations G and S-K.

### 2.   Defendants Inflated Symantec's Adjusted Revenue Through Improper Revenue Recognition Practices

144.   Symantec's non-GAAP revenue metric consisted of its reported GAAP revenue, adjusted for deferred revenue that had been written down in connection with Symantec's acquisitions (referred to as the "deferred revenue fair value adjustment").

145.   All of the improper revenue recognition practices set forth in Section V(A) above rendered Symantec's adjusted revenue metric inflated, and false and misleading, because it included revenue that did not meet the criteria for revenue recognition under GAAP.

### 3.   Symantec Reported "Transition Costs" As Adjusted Measures Throughout The Class Period

146.   Another metric that Symantec used throughout the Class Period for executive compensation was its non-GAAP operating income metric, which the Company calculated by subtracting Symantec's adjusted operating expenses from Symantec's adjusted operating income. The Company's adjusted expenses removed Symantec's "transition costs," which Symantec described as costs that the Company did not incur "in the ordinary course of business."   In Symantec's financial statements, including, for example, its 4Q2017 Form 8-K, Defendants told investors that Symantec reported non-GAAP financial measures, excluding charges such as transition costs "to facilitate a more meaningful evaluation of our current operating performance and comparisons to our past operating performance."

### 4.   Defendants Inflated And Misclassified Recurring Costs As "Transition Costs"

147.   Throughout the Class Period, Defendants improperly recorded continuing non-transition operating expenses, such as General and Administrative expenses, as "transition

costs" and adjusted their operating income metric for those purported "transition costs."  In reality, the purported "transition costs" were recurring operating expenses that Symantec had incurred in the ordinary course of its business.  Defendants' misclassification of non-transition related costs, such as General and Administrative expenses, as "unique" transition costs was particularly misleading to investors because it gave a false impression of the value of the Company's business operations.  Indeed, many investors discount the importance of one-time events to focus on a company's long-term business potential, which many investors believe is better represented by management's adjustments to the company's reported GAAP financial results.  In addition, by virtue of classifying certain operational expenses as "transition costs," such as the costs associated with the implementation of internal cloud-based software, Defendants were able to strategically capitalize these costs over a period of time, rather than record them as expenses when they were incurred as required.  In turn, Defendants were able to minimize current period operational expenses and spread the charges out over a longer period.

148.    Symantec's improper classification of such costs as nonrecurring "transition costs" violated SEC rules and regulations that prohibit adjustments to "eliminate or smooth items characterized as nonrecurring, infrequent or unusual."  Moreover, SEC Regulation S-K specifically prohibits a company from filing with the SEC a non-GAAP measure that adds back expenses that are related to the ordinary course of business, as Symantec did here.

149.    As detailed further in Section VI below, Symantec's improper adjustment for recurring costs rendered false and misleading Symantec's adjusted operating income, as well as Symantec's descriptions of "transition costs" in its financial statements.  Indeed, Symantec's descriptions of "transition costs" evolved over time.  For example, Symantec acknowledged at various points in its 2017 Form 10-K that "transition costs" were not actually nonrecurring: "we expect *continuing* significant transition costs associated with the implementation of a new enterprise resource planning system" and "we incurred $94 million in *continuing operations* transition expense."  Thus, Defendants knew that these so-called "transition costs" were recurring, but nonetheless wrongly accounted for such costs as if they were non-recurring and falsely told investors that Symantec did not incur such costs "in the ordinary course of business."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

150.    Symantec's reported transition costs increased dramatically during the Class Period, as reflected in the chart below:



**Transition and Other Related Costs**

151.    Moreover, with respect to Q2 2018, in its November 3, 2017 Form 10-Q, Symantec reported that transition costs had increased to $76 million, and that the Company had incurred $120 million in transition costs over the past two quarters. As a result, the Company stated that it had actually incurred $44 million in transition costs in Q1 2018, when it had previously reported in its 1Q2018 Form 10-Q filed on August 4, 2017, that transition costs for the quarter were $28 million. Symantec provided no explanation for raising its transition costs for Q1 2018 by $16 million, or nearly 60%.

152.    In addition, when Symantec belatedly filed its Form 10-K for fiscal year 2018 on October 28, 2018, Defendants revealed that Symantec had incurred $272 million in transition costs for fiscal year 2018, as opposed to the $94 million it reported for fiscal year 2017. As reflected in the chart below, this represented a nearly 200% year-over-year increase in transition costs:

1
2
3
4
5
6
7
8
9
10
11
12
13



14    153.    In Symantec's 2017 Form 10-K, Symantec listed a number of its competitors,

15  broken out by product market.  Symantec's stated competitors in more than one product market

16  include: Cisco Systems, Inc.; Dell EMC; Division of Dell Technologies, Inc.; IBM Corporation;

17  McAfee, Inc.; Microsoft Corporation; and Zscaler, Inc.  Each of these companies, with the

18  exception of Zscaler, Inc., had multiple acquisitions over the past few years.  Accordingly, although

19  Symantec's self-identified peers incurred the same types of costs as Symantec, none of these

20  companies made adjustments to operating income similar to the "transition costs" adjustment made

21  by Symantec.

22    154.    Symantec's ineffective internal controls enabled the improper adjustments for

23  "transition costs."  On September 24, 2018, the Company admitted:

24    The Audit Committee noted relatively *weak and informal processes with respect*
25    *to some aspects of the review, approval and tracking of transition and*
      *transformation expenses*.  The Audit Committee also observed that beginning in
26    the second quarter of fiscal year 2018 (ended September 29, 2017), the Company
      initiated a review by an outside accounting firm of, and took other steps to enhance,
27    the Company's policies and procedures regarding non-GAAP measures.

28

155.    Symantec's former VP and CSO confirmed that the Company was classifying continuing costs as "transition costs."  Symantec's former VP and CSO explained that he/she had a lot of insight and exposure to Symantec's classification of project costs as transformative or transition costs that could be excluded from non-GAAP income because a huge number of projects that Symantec was attempting to do that for fell under the CIO (his/her former boss), and because significant ERP [enterprise resource planning] projects, significant cloud infrastructure projects, and many of the security issues that he/she was personally responsible for were pushed into that bucket.

156.    Symantec's former VP and CSO explained that they were under incredible scrutiny at the budget level, and one way to maintain operational budget was to classify some of these projects as transformational.  The option to classify projects as transformational was available to them and increasingly widely used.  It was suggested that they consider using that option so as not to have to fund through their operational run budget.  There was a justification process and guidance given to justify whether a cost qualified was transformational, and his/her team went through a number of them with Jordan.   According to Symantec's former VP and CSO, "it was being quite aggressively used."

157.    Symantec's former VP and CSO explained that there were a number of things that were not going to get done unless they were classified as transformational, and Symantec started using this bucket more following the Blue Coat acquisition.  He/she further explained that the practice of classifying costs as transformational or transformative, and specifically using a transformational bucket and capitalizing the labor under that, definitely accelerated following the Blue Coat acquisition.  If labor could be capitalized under that, it would be.  As Symantec's former VP and CSO stated, "the numbers were huge" in that bucket; they were in at least the high tens of millions.  Some of the projects, including those around the cloud transformation and cloud build out, had big dollar numbers.  According to Symantec's former VP and CSO, the high dollar amount projects went through more scrutiny.

158.    Symantec's former VP and CSO further explained that some of his/her projects that would normally be put through as operational run projects were now being put into this

transformational bucket and could be capitalized. Symantec's former VP and CSO stated that the process of classifying costs as transformative "was used as a mechanism to be able to get large pieces of work done that otherwise wouldn't fit into operational budgets, knowing that you would pay the price when depreciation hits in the future." In his/her opinion, this practice was aggressive. Symantec's former VP and CSO explained that costs in the transformative bucket were being capitalized but would then depreciate, which would show as a hit against operational budget in future years. They were essentially smoothing out the hit over multiple years, rather than taking it all at once.

159.    Symantec's former VP and CSO further explained that Jordan (CIO) worked closely with a member of the Finance team on the process of classifying costs as transformation costs. Jordan was under a lot of pressure and scrutiny from Defendant Clark and Noviello. According to Symantec's former VP and CSO, there was an inner sanctum and Jordan was not part of it. Jordan was under quite a lot of scrutiny from Clark from the time he took over, which was evidenced in the fact that she was pushed down in the organizational chart underneath Noviello. Based on Symantec's former VP and CSO's personal conversations with Jordan, he/she knew that she was under tremendous scrutiny from Noviello to justify her job and explain cost management in IT. Symantec's former VP and CSO confirmed that more costs were moved in the direction of transformative or transformational costs once Blue Coat came in.

160.    Symantec's former VP and CSO further explained that Jordan had the incentive to want to get things done, and classifying project costs as transformation or transformative was a mechanism through which to do it. Jordan was pressing or pushing employees to consider opportunities to classify costs this way, especially in her infrastructure space where a big amount of her spend occurred. Jordan herself was under pressure from the management team to do the same. Jordan was looking at all avenues to manage the operational budget, and this was one of the avenues. There was constant budget pressure during this period, and there was especially pressure when it would have been a poor financial move to stop a project. It was the former VP and CSO's understanding, confirmed by the messaging Jordan conveyed to them, that she was under continued budget pressure and continued pressure to look at financial costs, and this was a

mechanism through which they could get stuff done.  According to Symantec's former VP and CSO, there were a number of projects well in place when Blue Coat showed up, and there was pressure to find ways to continue them.

161.   For example, Symantec's former VP and CSO stated that one type of project they were classifying as transformative or transitional was the building of a private cloud using Cisco technology.  This was an extension of Jordan's data center strategy of where they were going to be in the next 4-5 years.  Symantec's former VP and CSO looked at that as an extension of what they had to do in terms of operational run, and he/she questioned whether it was transformative for the business or just future planning for ongoing run.

162.   In sum, Symantec's former VP and CSO confirmed that many things were put in the transformation/transformative bucket that were questionable as to whether they were really transformation or for ongoing run.  There was a significant uptick in the usage of transformational costs and the Company's ability to spread costs out, and he/she had questions about the appropriateness of the decisions.  They had not used this mechanism a lot earlier in the former VP and CSO's tenure.

163.   Symantec's former Senior Manager Information Technology at Symantec from 2010 until October 2017, who had worked at Symantec for 20 years and was based out of the Springfield, Oregon office and reported to Denell Dickenson, the director of the business operations team, was responsible for the financial operations for his/her overall team in the sense that he/she interacted with the finance team and finance controller to ensure that things were reported properly and was essentially the internal financial coordinator.  The former Senior Manager Information Technology was not part of the Finance Department, but he/she was the internal person who handled the finances for the network hosting data center under Chandra Ranganathan.

164.   The former Senior Manager Information Technology confirmed that there was a lot of pressure to cut expenses and the budgets were being cut tremendously.  According to the former Senior Manager Information Technology, the biggest issue they had when talking about projects was being able to label the work as totally transformational or not totally transformational and

being able to tie any kind of action as being a transformational cost as opposed to a cost to just keep things running or in other words, an operational cost.

165.    The former Senior Manager Information Technology explained that the approach the Company took was a percentage approach.  Therefore, a percentage of the project would be called transformational with no real way of tracking whether it was real.  The reality could have been over that percentage or under that percentage.  Every project in a category got the same percentage, which was merely an educated guess by the SVP, Ranganathan.  Projects were placed into categories.  One category would be 50%; another would be 25%; and some would be 100% because some projects were obviously 100% transformational.  Projects would be put into these different categories, and then it was determined that a certain percentage of that project would be classified as transformational/transitional cost even if it was normal operating cost.

166.    The former Senior Manager Information Technology stated that he/she pushed back against Ranganathan and Dickenson, including with respect to implementing new procedures and developing new technologies, as developing technologies to make things easier to use is more operational.  For example, for one project involving Cognizant there was a team working simultaneously on a transformational project and an operational project, and the percentage classification for the transformation bucket was applied to both.

167.    The former Senior Manager Information Technology stated that the percentage system was aggressive.  He/she questioned why this project is 50% and why this one is 25% if they could not sit down and analyze and actually track what is transformative and what is operational, but they did not have the time to do that kind of analysis.   They did not have the time due to budget pressure but also due to time pressure.  The former Senior Manager Information Technology was concerned that the way the percentages were decided was risky and that they would not be able to justify it down the line.

168.    The former Senior Manager Information Technology confirmed that in addition to Ranganathan, Michael Gittleman (finance controller) and the team responsible for the bucket, the overall IT operations team, knew about the aggressive percentage classification.

169.     The former Senior Manager Information Technology further confirmed that they were under incredible scrutiny at the budget level, and one way to maintain operational budget was to classify some of these projects as transformational.  The former Senior Manager Information Technology further confirmed that "transformation bucket" was the term they used at Symantec, and that the numbers in that bucket were huge and in at least the high tens of millions. The former Senior Manager Information Technology further explained that they had a huge budget provided for transformational costs, and the Company slashed the operational budget to nothing. The operational budget was slashed down to the bare bones.  Because transformational costs are not GAAP associated, they were able to spend money there instead.

   **5.**   **Defendants Knew Or Recklessly Disregarded That Symantec's Reported "Transition Costs" Were Inflated And Misclassified During The Class Period**

170.     As noted above, Defendant Clark served as a member of Symantec's Board of Directors throughout the Class Period.  Defendants have ***admitted*** that "transition costs" were approved by Symantec's Board during the Class Period.  Accordingly, there is a strong inference that Defendant Clark knew (or recklessly disregarded) that the transition costs were inflated and misclassified during the Class Period.

171.     Specifically, in Symantec's Form 10-Q for the third quarter of fiscal 2018 (September 30, 2017 through December 29, 2017), filed with the SEC on February 2, 2018, Defendants stated:  "Transition costs are incurred in connection with ***Board of Directors approved*** discrete strategic information technology transformation initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automatic business processes."  Defendants admitted the same in Symantec's Form 10-K for the fiscal year ended March 30, 2018, filed with the SEC on October 26, 2018.

172.     Further, in their filings submitted to the Court in this litigation, Defendants likewise ***admitted*** that the "transition costs" referred to in the above quotation are the ***same*** transition costs that the former CSO of Symantec described, as set forth in ¶161 above.  For example, Defendant Symantec stated in its opening brief:

[T]he former VP and Chief Security Officer ("CSO")—asserts that his boss (the Chief Information Officer) referred to the "building of a private cloud using Cisco technology" where Symantec would "be in the next 4-5 years." ¶¶ 116, 110 ("significant cloud restructure projects"). The transformative building of a cloud falls precisely within what Symantec describes as "*transition cost…incurred in connection with Board of Directors approved discrete strategic information technology transformation initiatives*[.]" ¶ 241.

ECF No. 112, at 11 (emphasis added by Defendants).

Symantec repeated the same argument and quoted the same language regarding Board approval in its reply brief in support of its motion to dismiss. ECF No. 121, at 9-10. Defendant Clark himself joined this argument. *See* ECF Nos. 114, 124. So did other former Symantec executives. *See id* (re Noviello); *see also* ECF Nos. 115 and 123 (re Garfield). In sum, Defendants and other former Symantec executives have conceded that Defendant Clark was directly and personally involved in approving the transition costs that were improperly recorded by Symantec.[16]

173.    The fact that Defendant Clark was personally and directly involved in approving the improper transition costs at issue here gives rise to a strong inference that he knew (or recklessly disregarded) that those transition costs were inflated and misclassified during the Class Period. Indeed, in approving the "initiatives" in connection with which transition costs were incurred, Defendant Clark knew (or recklessly disregarded) that those "initiatives" were operational run projects that were previously recorded as operational expenses, not nonrecurring "transition costs" that are properly excluded under GAAP.

---

[16] Defendants also asserted in the motion to dismiss that this disclosure confirmed that the transition costs at issue were properly excluded from non-GAAP metrics. *See* ECF No. 112, at 11. This Court rejected Defendants' argument as raising a fact issue inappropriate for determination on the pleadings. *See* ECF No. 137, at 10-11 ("Pointing to this disclosure, defendants argue that the 'decision to exclude from non-GAAP metrics the costs associated with large-scale ERP systems and information technology initiatives made perfect sense, given [Symantec's] transformation through the divestiture of Veritas and acquisitions of Blue Coat and LifeLock.' These costs, Symantec argues, 'concern[ed] long-term strategic planning and investment, not the routine operation of the business' (ECF No. 112 at 11) (emphasis removed). Whether these were transition costs connected to the divestiture of Veritas and integration of Blue Coat and LifeLock, or whether the costs instead related to operational run projects previously recorded as operational expenses as alleged in the complaint, presents factual questions that cannot be resolved on a motion to dismiss.").

174.   Moreover, the facts set forth in the unsealed version of a Verified Stockholder Derivative Complaint (the "Derivative Complaint")[17] – together with the Court's discussion of those facts and documents in its July 3, 2019 Order unsealing most of the Derivative Complaint (the "Unsealing Order")[18] – indicate that accounting problems at Symantec were a main focus of, and specifically discussed in, Symantec Board and Audit Committee meetings that included Defendant Clark as well as other top executives, including Noviello and/or Garfield.  Indeed, for example, the Derivative Complaint and the Unsealing Order indicate that Defendant Clark, former CFO Noviello and former CAO Garfield were each present for an Audit Committee meeting on May 19, 2017 during which they discussed and reviewed "***errors in financial reporting and recording***, including "significant" deficiencies related to the Fiscal Year 2017 10-K.  *See* Derivative Complaint, ¶106; Unsealing Order at 4:1-3.  The Derivative Complaint further confirms that the Board approved adjustments to GAAP operating income for the purpose of determining executive compensation awards, including transition costs.  *See* Derivative Complaint, ¶98.

175.   The descriptions of meetings set forth *infra* in ¶¶176-203 (and immediately above) are based on information and belief, as alleged in the Derivative Complaint, Section VI.C ("The

---

[17] The Derivative Complaint is filed in *Lee v. Clark, et al.*, Case No. 3:19-cv-02522-WHA (the "Derivative Action"), which has been formally related to this Action and includes factual allegations based on "documents and information" produced by Symantec "pursuant to 8 Del. C § 220."  Defendant Clark, Noviello and Garfield are named defendants in the Derivative Action and Defendant Symantec is a nominal defendant.

[18] The "Unsealing Order" refers to the Court's July 3, 2019 "Order re Amended Administrative Motion To File Under Seal" in the Derivative Action, which ordered that the vast majority of the redacted information in the Derivative Complaint be unsealed by July 18, 2019.  In light of the Court's Unsealing Order, Lead Plaintiff asked Defendants whether they would consent to a two-week extension of the July 11, 2019 deadline to file this proposed amended complaint.  Defendants declined to consent and indicated that they would oppose any such extension.  On July 9, 2019, seeking to promptly file the unsealed Derivate Complaint in compliance with the Court's Unsealing Order, the Derivative Plaintiff asked Defendants whether they were seeking emergency relief to block operation of the Court's Unsealing Order.  Even though Defendants had not taken any steps to do so in the week following the Unsealing Order, Defendants nevertheless refused to confirm that they would not seek such relief.  Instead, Defendants said on July 10 that they were still reviewing their options.  The unsealed Derivative Complaint was filed on July 16, 2019.  Lead Plaintiff now seeks leave to further amend the allegations in the proposed FAC to incorporate new facts supporting its claims set forth herein.

---

Defendants Knowingly Caused the Company to Issue Misleading Statements"), ¶¶85-150 and in Section XI ("Derivative and Demand Futility Allegations"), ¶¶193-250 and as described by the Court in its Unsealing Order.

176.    On August 1, 2016, Defendant Clark attended a Symantec Audit Committee meeting involving Garfield – who presented information warning those in attendance of issues with the newly-installed management, including ensuring that sufficient controls existed at Blue Coat, and certain risks from the implementation of a new revenue recognition standard, including, *inter alia*, risks involving the Blue Coat integration, the availability of accounting resources, lack of IT resources to support critical system updates and implementation, and data quality concerns. *See* Derivative Complaint, ¶85.

177.    On August 5, 2016, the Audit Committee held a meeting during which they discussed pending litigation arising from Symantec's contract with the U.S. government. Specifically, the lawsuit concerned the Company's compliance with certain provisions related to pricing, country of origin, and the disclosure of commercial sales practices.  Thus, the Audit Committee members were aware that they must pay close attention to the Company's accounting and financial reporting.  *See* Derivative Complaint, ¶87.

178.    On October 31, 2016, the Audit Committee held a meeting attended by Garfield during which they discussed the impact of the Blue Coat acquisition on the Company's financial results. Specifically, they discussed that "T&T [*transition and transformation*] expenditures expected to *exceed Board Approved Range*" and that the "*executive team* is requesting approval of a revised Transition and Transformation plan with an expense range of $110M to $140M."  The "executive team" included the Defendant Clark and former CFO Noviello at the time.  The Audit Committee also reviewed deferred revenue in the context of current liabilities: "$255M increase [in deferred revenue] due to the acquisition of Blue Coat deferred revenue" had resulted in a $70 million quarter-over-quarter increase; a $152 million decrease year-to-date; and $784 million decrease year-over-year to deferred revenue.  *See* Derivative Complaint, ¶88.

179.    During the same October 31, 2016 Audit Committee meeting, they discussed and reviewed questions from the SEC concerning, *inter alia*, (i) "the ongoing impact of changes to [the

Company['s] renewal practices" to a decrease in revenue; and (ii) the relative contribution of each factor "underlying a variance in cost of revenues."  *See* Derivative Complaint, ¶89.  At the same meeting, Martin Espinosa, the Company's Chief Audit Executive, provided the Audit Committee with an update on internal audit matters, "including management of the Blue Coat integration related risks on a go-forward basis and SOX compliance process and controls."  Espinosa "responded to questions from the Committee based on the Committee's review of the materials provided."  Garfield discussed "the treatment of deferred revenue from the Blue Coat acquisition, the SEC comment letter received by the Company and the resolution of the issues raised in the letter."  Moreover, the Audit Committee "requested that it receive copies of comment letters going forward."  *See id.*  ¶90.

180.    On November 4, 2016, Garfield provided an accounting update to Symantec's Audit Committee members, including "summaries of key observations for Symantec and Blue Coat."  *See* Derivative Complaint, ¶91.

181.    On November 15, 2016, Defendant Clark and CFO Noviello were present for a Board call where they noted that "deferred revenue could be written down by 65% in acquisition accounting (to $66 million as of September 2016)."  *See* Derivative Complaint, ¶92.

182.    On January 30, 2017, Defendant Clark attended an Audit Committee meeting, which included several other Symantec Directors, at which a reclassification error from 2017 was discussed.  *See* Derivative Complaint, ¶¶93-94; Unsealing Order at 3:5-7.  Specifically, they reviewed and discussed financial metrics for the third quarter of 2017.  They noted that "Total Non-GAAP Revenue increased 20% due to Blue Coat contribution" and that "ES [Enterprise Segment] revenue outperformance driven by higher than expected bookings and higher than expected yield on bookings. Blue Coat revenue impacted by lower yield due to cross sell and CASB resulting in more ratable revenue recognition, plus large unshipped JPMorgan order."  Furthermore, Defendants would "continue[ to] focus on expense management" but "revenue growth lags bookings growth due to deferred revenue recognition."  Moreover, Defendants noted that "yield represents the amount of in-period billings that are recognized as revenue in-period" and that the "key drivers of yield include the mix of up front license vs. ratably recognized

bookings, linearity of renewal bookings, discounting, and shift to subscription." *See* Derivative Complaint, ¶93.

183.   During the same January 30, 2017 Audit Committee meeting, Defendant Clark and the members of the Audit Committee discussed a "$180M Short-term vs. Longterm ***reclassification error*** from Q2'17."  Required quarterly payments for a loan had not been recorded as current payables, and they noted that "a new control [was] being implemented to require tie outs of debt payments to prevent this error in the future."  *See* Derivative Complaint, ¶94.  Thus, even prior to the start of the Class Period, Defendant Clark was focused on non-GAAP revenue and deferred revenue recognition and made aware of at least one $180 million internal control error.

184.   On January 31, 2017, the Symantec Board of Directors held a meeting with both Defendant Clark and CFO Noviello in attendance.   During the meeting, Noviello gave a presentation that included an overview of FY18 planning outlook on a non-GAAP revenue and operating income basis and reviewed Symantec's "non-GAAP Reconciliation," which was a detailed table outlining the items added to GAAP revenue, operating income, and net income to produce non-GAAP metrics.  Specifically, the Board (including Defendant Clark) was informed that restructuring, separation and transition costs impacted non-GAAP operating income.  *See* Derivative Complaint, ¶¶96-97.

185.   On March 9 and 10, 2017, Defendant Clark and Noviello were present for a Board meeting during which they discussed the Company's fiscal 2018 financial plan and three-year outlook.   With Defendant Clark and Noviello exiting the room, the other Board members "discussed the financial metrics for measuring performance against the FY18 Financial Plan and the PRU/VCP [Value Compensation Plan – i.e., Executive Compensation Plan] awards . . . , and noted that the Board would need to retain discretion in determining the awards under the VCP to take into account the impact of one-time or unusual events, such as . . . certain one-time expenditures for transition and transformation projects . . . , which could affect the adjusted operating income and operating margin metrics under the VCP."  The Board approved the FY18 financial plan and compensation plan and "reserve[d] the right to approve all adjustments made to GAAP operating income to determine non-GAAP operating income for the purpose of determining

awards under the VCP . . . such as . . . . certain one-time expenditures for transition and transformation projects . . . ." *See* Derivative Complaint, ¶98.  Thus, this confirms that, as set forth above, the Board approved adjustments to GAAP operating income for the purpose of determining executive compensation awards, including transition costs.  It likewise confirms Board-level awareness and concern that Defendant Clark and Noviello had the ability and incentive to manipulate "operating income and operating margin metrics" through "certain one-time expenditures for transition and transformation projects," including to inflate their incentive compensation.

186.    On May 8, 2017 – a few days before the start of the Class Period – the Symantec Audit Committee met with Defendant Clark and CFO Noviello in attendance.  *See* Derivative Complaint, ¶¶99-103.  At the meeting, the Audit Committee reviewed a table of "FY18 Non-GAAP to GAAP Reconciliation" that detailed the "significant and consistent difference between Non-GAAP and GAAP EBIT margins," partly due to an "increase in [a]mortization of intangible assets . . . primarily due to BC and LL acquisitions." *Id.* ¶100.  In addition, the Audit Committee reviewed deferred revenue (non-GAAP) trends, including that "72% of FY18 revenue rolling off balance sheet." *Id.* ¶100.  Noviello also remarked that "Non-GAAP deferred revenue includes remaining deferred revenue purchase accounting haircut of $105M for Blue Coat and $62M for LifeLock as of the end of FY17 and $44M for Blue Coat and $0M for LifeLock as of the end of FY18" and that "FY17 ending deferred revenue balance includes $521M of Blue Coat and $203M of LifeLock non-GAAP deferred revenue." *Id.*

187.    As noted by the Court in the Unsealing Order, at the same May 8, 2017 Audit Committee meeting, Defendants also discussed "concerns of the SEC" and the "Audit Committee's understanding of SEC regulations."  *See* Unsealing Order at 3:21-28.  Specifically, the Audit Committee also reviewed seven "primary areas of SEC comments (as noted by Sulliven [sic] and Cromwell)" regarding non-GAAP measures: "1. failure to present GAAP measure with equal or greater prominence; 2. inadequate explanation of usefulness of non-GAAP measure; 3. ***misleading adjustments, such as exclusion of normal, recurring cash expenses***; 4. inadequate presentation of income tax effects of non-GAAP measure; 5. individually tailored revenue

recognition or measurement methods; 6. misleading title or description of non-GAAP measure; [and] 7. use of per share liquidity measures." *See* Derivative Complaint, ¶101.  Thus, immediately prior to the start of the Class Period, Defendant Clark and Noviello – and, indeed, the SEC – were focused on the Company's reporting of non-GAAP measures, including how the "exclusion of normal, recurring cash expenses," such as the transition costs at issue in this case, could be "misleading adjustments."

188.   As noted above, on May 19, 2017 (days after the start of the Class Period), Symantec's Audit Committee met with Defendant Clark in attendance, as well as  Noviello and Garfield.  As described by the Court in its Unsealing Order, during this meeting, Defendant Clark, Noviello and Garfield reviewed and discussed "errors in financial reporting and recording."  *See* Derivative Complaint, ¶106; Unsealing Order at 4:1-3.  Specifically, Defendant Clark, Noviello, and Garfield reviewed and discussed "significant" deficiencies related to the FY 2017 10-K. Garfield noted that in Q4 2017, "the Company initially recorded $13.7m of a restructuring charge that should not have been recorded, but the error was caught prior to the issuance of the press release and reversed." *See* Derivative Complaint, ¶106.  Due to the deficiency, Garfield noted that the Company would "increase the experience level and number of employee accountants involved in the planning, recording and analyzing of these balances as the expected volume in FY18 is over $1 Billion." *Id.*

189.   Additionally, the Company had "misstated Cash Flow from Investing Activities and Cash Flow from Operations by an equal amount for 5+ years" but the deficiency had not been detected until the week of the meeting. *See* Derivative Complaint, ¶106.  Accordingly, as set forth below, the "cash flow" disclosures in the Company's 2017 Form 10-K were false and misleading. Indeed, cash flow from operations is typically a key metric used by financial analysts to evaluate the health of a company's business in terms of generating cash flow.  As a result, deficiencies that cause the cash flow from operations metric to be misrepresented will mislead investors and analysts about the health of the business.

190.   Moreover, at the May 19, 2017 meeting, Defendant Clark, Noviello, and Garfield reviewed and discussed guidance on the use of non-GAAP measures.  *See* Derivative Complaint,

¶107.   Garfield noted that the "difference between GAAP and non-GAAP has increased dramatically, driven by stock comp and amortization." *Id.*  Furthermore, Garfield remarked that "increasing levels of complexity in business practices and processes while decreasing the availability of resources is contributing to late entries, a significant deficiency and audit adjustment in the second half of FY17." *Id.*  Specifically, the two major acquisitions of Blue Coat and LifeLock increased the complexity. *Id.*  Thus, as of May 19, 2017, Defendant Clark, Noviello, and Garfield were aware that a "significant" internal control deficiency existed at Symantec, which had resulted in accounting deficiencies and misstatements in the 2017 Form 10-K.

191.   On July 31, 2017, Defendant Clark, Noviello and Garfield were present for an Audit Committee meeting during which they reviewed, among other things, the Company's current liabilities, including a $48 million decrease in deferred revenue "due to Blue Coat billings, offset by the rolloff of the haircut balance" and a $41 million increase "due to LifeLock deferred revenue, including rolloff of haircut balance." *See* Derivative Complaint, ¶108.

192.   On August 4, 2017, Defendant Clark, Noviello, and Garfield were present for an Audit Committee meeting during which they approved the Form 10-Q for Q1 2018.

193.   As Symantec later admitted (in its September 24, 2018 press release), during the second quarter of fiscal year 2018 (which ended September 29, 2017), Symantec's Board of Directors, which included Defendant Clark, "initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures."  This is further confirmed by the unsealed Derivative Complaint, which identifies the outside accounting firm as Ernst & Young LLP (i.e., EY), and confirms that EY was engaged in order "to enhance the Company's reported non-GAAP measures."  Derivative Complaint, ¶133. *See also* Unsealing Order at 4:11-13, 17-19.  Thus, there can be no question that by this time, Defendant Clark was specifically aware of a need to "enhance" Symantec's "policies and procedures regarding non-GAAP measures" and that the issues were so serious that Symantec hired EY, an outside accounting firm, to undertake a review.  However, the fact that Symantec had taken these steps was not disclosed to investors until after the Class Period.

194.     On October 30, 2017, the Audit Committee met with Defendant Clark and Noviello in attendance.  *See* Derivative Complaint, ¶135.  During the meeting, they reviewed and discussed that Enterprise Segment "revenue [was] down 1% YoY in constant currency, adjusted to include the contribution of acquisitions."  *Id.*  They also reviewed and discussed that "revenue flat YOY vs. planned growth of 3%, impacted by . . . shortfall of deferred revenue roll-off coming into the quarter [and] shortfall in product bookings."  *Id.*  Furthermore, Defendants noted that, for Website Security in the Enterprise Segment, "revenue declined 7% year-over-year, impacted by bookings miss in prior quarters." *Id.*  Additionally, Defendants reviewed and discussed the impact to deferred revenue during the quarter, including a $98 million "decrease due to continued amortization of BC deferred revenue" as well as a separate "Blue Coat, LifeLock, and Haircut Analysis [that provided] additional information."  *Id.*  Finally, Defendants reviewed and discussed a detailed table outlining the "deferred revenue haircut waterfall" by quarter and by fiscal year.  *Id.*

195.     On October 31, 2017, the Symantec Board of Directors met with Defendant Clark and Noviello in attendance.  *See* Derivative Complaint, ¶136.  During the meeting, Noviello "reviewed the Company's 1HFY18 performance and the FY18 annual financial plan, including updates for acquisitions and the Website Security divestiture and the implications of the updated plan for the Company's compensation plans, as presented the prior day to the Audit Committee of the Board of Directors."  *Id.*  The Board reviewed and approved the FY18 annual financial plan. *See id.*  During the meeting, Noviello discussed the usage of Non-GAAP financial measures.  *See id.*  According to the minutes, EY had been engaged to study the "usage, policies, and controls related to [non-GAAP measures]," and the Board was informed as to the initial results of EY's work and "***remedial activities the Company ha[d] completed to date and will take in the next two quarters***."  *Id.*  The Board "requested that the Audit Committee be provided an additional level of detail on the ***Transition & Transformation accounts (T&T) and non-GAAP items in future updates***."  *Id.*  Thus, by October 31, 2017, Defendant Clark and Noviello were not only aware that a "significant" internal control deficiency existed (*see* Derivative Complaint, ¶107), but that Symantec had engaged EY and was actively implementing "remedial measures" to address issues

with respect to its "usage, policies, and controls related to [non-GAAP measures]," including "Transition and Transformation accounts." *See id.* at ¶¶133, 136.

196.   On November 16, 2017, Defendant Clark and CFO Noviello were present for an Audit Committee meeting during which the sole item on the agenda was a discussion of EY's work on non-GAAP measures. *See* Derivative Complaint, ¶140. Noviello presented a "Non-GAAP Measures Bridge to Financial Statements." *See id.* Defendant Clark and other meeting attendees reviewed materials provided by Noviello regarding non-GAAP adjustments, which stated in relevant part:

> Current non-GAAP adjustments impact 47 instances in our financials, most of which have been in place since at least FY15 and prior. Total number of lines impacted has remained relatively consistent, as new non-GAAP adjustments (i.e. deferred revenue fair value adjustment and acquisition & integration costs) have replaced others that were previously disclosed (i.e. EDS & NDI contingency and unallocated corporate charges).

*Id.*

197.   Noviello also explained at the November 16, 2017 meeting (which included Defendant Clark) that "Symantec has a long history of significant non-GAAP adjustments." Derivative Complaint, ¶143. He further noted:

> Some non-GAAP measures are derived directly from GAAP values and are commonly excluded from non-GAAP earnings (e.g. stockbased compensation and amortization of intangibles), while others are more judgmental in nature (e.g. unallocated corporate charges, ***transition costs***, and integration costs). Based on the judgment involved in deriving the values, we've ranked the judgmental nature of these measures as Low, Moderate, or High.

*Id.*

198.   During the November 16, 2017 meeting, Defendant Clark reviewed a presentation by EY on non-GAAP measures and SEC regulatory guidance. *See* Derivative Complaint, ¶145. Specifically, the Board reviewed materials highlighting the increased scrutiny by the SEC of non-GAAP measures ("NGMs") including an "increased use of NGMs by companies in filings and other mediums; the nature of adjustments included within NGM reconciliations; the increasingly

large variances between amounts reported under GAAP and the NGM itself; and the lack of adequate disclosures over a NGM's use and purpose for inclusion." *Id.* Moreover, the Board was informed that "the SEC staff has asked companies to explain how their use of NGMs complies with SEC guidance, including . . . questioning the tailoring of GAAP recognition and measurement principles, such as those to accelerate revenue." *Id.*

199.   Furthermore, EY noted that "an almost full non-GAAP income statement is presented in the [Company's] Press Release," but that "SEC guidance prohibits this presentation in SEC filings and SEC staff has issued comment letters to companies." *See* Derivative Complaint, ¶146.   EY advised "Symantec [to] consider discontinuing this presentation and move the information to supplementary information presented in its website." *Id.*

200.   Finally, EY made several recommendations as to the accounting treatment of earn outs from acquisitions. *See* Derivative Complaint, ¶147.   The Board, including Defendant Clark, was informed that "Symantec may conclude to adjust GAAP measures for aspects related to earn outs from acquisitions and/or the remeasurement of contingent consideration within the reconciliation of its NGMs[,] [but the Company must] ensure disclosures are robust enough that a clear rationale for the adjustment is discussed and that the adjustment is balanced (i.e. does not only exclude losses/costs, but also excludes any corresponding gains/income)." *Id.* EY further warned that "SEC comment letters also challenged companies for adjusting earn outs from acquisitions when companies were particularly acquisitive or indicated that is part of their strategy." *Id.* As a result, EY recommended that the Company "should consider whether the nature of an earn out from an acquisition is based on its operating results or other factors in determining whether to include as an adjustment to its NGMs" and "should provide sufficient disclosure of the earn out arrangement to explain why the adjustment provides meaningful information to its investors." *Id.*

201.   On December 20, 2017, Defendant Clark and Noviello were present for an Audit Committee meeting during which Fenwick & West LLP reviewed and discussed its "analysis of the Company's use of non-GAAP financial measures, including the materials and periods reviewed, the scope of the compliance and risk review performed, observations and

1   recommendations based on the observations." *See* Derivative Complaint, ¶148; Unsealing Order

2   at 4:22-26.

3       202.   In addition, as set forth in the Derivative Complaint, Defendant Clark was presented

4   at Board meetings with evidence of "the alleged misconduct," including aggressive accounting

5   practices to overstate revenue and operating income metrics that would increase his compensation,

6   so he had personal knowledge of the inaccuracy of the Company's financial metrics. *See*

7   Derivative Complaint, ¶197. Relatedly, as set forth in the Court's Unsealing Order, and confirmed

8   by the unsealed Derivative Complaint, Defendant Clark was "made aware [that] an outside

9   accounting firm[, EY] was retained to evaluate the wrongdoing." *See* Unsealing Order at 6:5-9;

10  Derivative Complaint, ¶136.

11      203.   As set forth above, Defendant Clark, Noviello and/or Garfield were personally

12  involved in discussions and meetings – which were held at the level of and involved Symantec's

13  Board of Directors and Audit Committee – concerning *inter alia* (a) non-GAAP adjustments,

14  "transition costs" and the accounting for those costs, (b) Board approval of adjustments to GAAP

15  operating income for the purpose of determining executive compensation awards, including

16  transition costs; (c) "errors in financial reporting and recording," which included "significant"

17  deficiencies and misstatements in Symantec's Fiscal Year 2017 10-K; (d) Symantec's need to

18  "increase the experience level and number of employee accountants" as a result of the deficiencies;

19  (e) the hiring of EY, an outside accounting firm, to review the Company's "policies and procedures

20  regarding non-GAAP measures" (as well as consulting an outside law firm); (f) EY's findings,

21  recommendations, and "remedial activities" undertaken by the Company during the Class Period;

22  (g) the Board's October 31, 2017 request that the Audit Committee be provided "an additional

23  level of detail on the Transition & Transformation accounts (T&T) and non-GAAP items in future

24  updates"; and (h) presentations from EY about increased scrutiny from the SEC concerning non-

25  GAAP reporting and changes that Symantec had to make in order to comply with SEC guidance

26  about non-GAAP reporting, all powerfully contribute to establishing a strong inference of each

27  Defendants' scienter.

28

1

2

### 6.      Symantec's Description of "Transition Costs" Was Materially Misleading

3      204.    Throughout the Class Period, Symantec's description of "transition costs," was

4  misleading and omitted material information regarding how Defendants were recognizing the

5  transition costs.  While this description changed over time, at no point did Defendants disclose that

6  Symantec was incorrectly classifying recurring operating expenses as transition costs.

7      205.    Prior to the Class Period, the Company presented non-GAAP measures, which

8  excluded "Restructuring, separation and transition costs."   For example, in the Company's

9  February 5, 2015 8-K presenting the Company's results for the third quarter fiscal year 2015

10  described "transition costs" as "consulting charges associated with the implementation of new

11  Enterprise Resource Planning systems":

12          <u>Restructuring, separation, and transition:</u>   We have engaged in various
          restructuring, separation, and transition activities over the past several years that
13          have resulted in costs associated with severance, facilities, transition, and other
          related costs.    Separation and other related costs consist of consulting and
14          disentanglement costs incurred to split the Company into two, independent publicly
          traded companies, as well as costs to prune selected product lines that do not fit
15          either the Company's growth or margin objectives.  ***Transition and other related
          costs consist of consulting charges associated with the implementation of new
16          Enterprise Resource Planning systems. Each restructuring, separation, and
          transition activity has been a discrete event based on a unique set of business
17          objectives or circumstances, and each has differed from the others in terms of its
          operational implementation, business impact and scope.  We do not engage in
18          restructuring, separation, or transition activities in the ordinary course of
          business.***  While our operations previously benefited from the employees and
19          facilities covered by our various restructuring and separation charges, these
          employees and facilities have benefited different parts of our business in different
20          ways, and the amount of these charges has varied significantly from period to
          period.  We believe that it is important to understand these charges and we believe
21          that investors benefit from excluding these charges from our operating results to
          facilitate a more meaningful evaluation of current operating performance and
22          comparisons to past operating performance.

23

24

25      206.    On February 1, 2017, still prior to the Class Period, the Company reported its third

26  quarter of fiscal year 2017 results, wherein Symantec slightly changed the definition of transition

27  costs to now include "costs to automate business processes:"

28

Restructuring, separation, transition and other: We have engaged in various restructuring, separation, transition, and other activities over the past several years that have resulted in costs associated with severance, facilities, transition, and other related costs. Separation and associated costs consist of consulting and disentanglement costs incurred to separate our security and information management businesses into standalone companies, as well as costs to prune selected product lines that do not fit either our growth or margin objectives. ***Transition and associated costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes.*** Additionally, other costs primarily consist of asset write-offs and advisory fees incurred in connection with restructuring events. ***Each restructuring, separation, transition, and other activity has been a discrete event based on a unique set of business objectives or circumstances, and each has differed from the others in terms of its operational implementation, business impact and scope. We do not engage in restructuring, separation, transition, or other activities in the ordinary course of business.*** While our operations previously benefited from the employees and facilities covered by our various restructuring and separation charges, these employees and facilities have benefited different parts of our business in different ways, and the amount of these charges has varied significantly from period to period. We believe that it is important to understand these charges and that investors benefit from the presentation of non-GAAP financial measures excluding these charges to facilitate a more meaningful evaluation of our current operating performance and comparisons to our past operating performance.

207.    While the definition of "transition costs" was changed again several times throughout the Class Period to include "continuing significant transition costs associated with the implementation of a new enterprise resource planning system and costs to automate business processes," "costs associated with divestitures of our product lines and businesses," and "formal discrete strategic information technology initiatives," these statements all continued to be false and misleading because they failed to disclose to investors that "operational run" expenses were being classified as "transition expenses."

### 7.    Defendants Inflated Symantec's Non-GAAP Operating Margins And EPS

208.    In addition to reporting adjusted revenue and adjusted operating income, Defendants reported additional metrics dependent on these figures.  These dependent adjusted metrics included adjusted operating margin, which measures profitability by indicating how much of each dollar of revenues is left over after both costs of goods sold and operating expenses are

considered (*i.e.*, Operating Margin = Operating Income / Revenue).  Further, Symantec provided adjusted EPS, which represents the portion of a Company's profit allocated to each share of common stock (*i.e.*, EPS = Operating Income – Preferred Dividends / Weighted Average Common shares).

209.    As a result of Defendants' misstating their adjusted operating income, Defendants similarly falsely represented their adjusted operating margin and EPS.

### C.    As A Result Of Their Accounting Manipulations, Executives Received Large Payouts In 2017 And 2018

210.    The Company disclosed its executive compensation targets and payouts for fiscal year 2017 in its Form 10-K/A filed with the SEC on July 25, 2017, and in its August 16, 2017 Proxy Statement.  Under the Company's fiscal year 2017 executive compensation plan, executives received specified levels of compensation based on their achievement of a percentage of the fiscal year 2018 adjusted revenue target of $4.040 – $4.120 billion and an adjusted operating income target of $1.143 billion.

211.    As illustrated by the charts below, the levels of compensation were as follows:

a.    For adjusted revenue: (a) at the achievement level of between $4.04 billion to $4.12 billion adjusted revenue, an executive would be awarded up to a funding level of 100% of the award; and (b) above the $4.12 billion target level, funding increased incrementally, up to a cap of 150% based on a maximum achievement level of $4.162 billion.

b.    For adjusted operating income: (a) at the threshold achievement level of 95.4% of the adjusted operating income target, an executive would be awarded 50% of their possible target compensation as proposed by the Company; (b) above the threshold achievement level, the funding level increased incrementally, up to a funding level of 100% of the award at a target achievement level of 100%; and (c) above the target achievement level, funding increased incrementally, up to a cap of a 150% funding based on a maximum achievement level of at least 109.1% of the target.





212.    Importantly, for non-GAAP revenue, there was zero award compensation if the adjusted revenue fell below the threshold achievement level of $4.04 billion.  There was also zero award compensation if non-GAAP operating income fell below the threshold achievement level of 95.4%.

213.    As set forth in the chart below, for fiscal year 2017, ended March 31, 2017, the Company represented in its August 16, 2017 Proxy Statement that it reached a 100% achievement on its revenue target, or $4.086 billion.  The Company further represented that it reached a 104.7% achievement on its operating income target, or $1.197 billion.  The Company approved a payout of 111.5%.

**Fiscal 2017**

| | Target ($)(millions) | Actual ($) (millions) | Achievement (%) | Funding (%) |
|---|---|---|---|---|
| Operating Income | 1,143 | 1,197 | 104.7 | 125.8 |
| Revenue | 4,040 - 4,120 | 4,086 | 100 | 100.0 |
| Fiscal 2017 Funding | | | | 111.5 |

214.    As a result, under the fiscal year 2017 executive compensation plan, Defendant Clark received bonus compensation in the amount of $743,333 (111.5% of his target amount of $666,667) and former CFO Noviello received bonus compensation in the amount of $479,673 (111.5% of his target amount of $430,200), as set forth in the chart below:

| Name | Non-GAAP Operating Income Funding & Non-GAAP Revenue Funding (%) | Individual Performance Modifier Funding (%) | Total Payout as % of Target Opportunity (%) | Payout Amount ($) |
|---|---|---|---|---|
| Gregory C. Clark | 111.50 | n/a | 111.50 | 743,333 |
| Nicholas R. Noviello | 111.50 | 100 | 111.50 | 479,673 |

215.    The "transition costs" for fiscal year 2017 amounted to $94 million, or 7.3% of Symantec's total adjusted operating income for the year.  Importantly, the difference between (i) the $1.1 billion that Symantec needed to hit 95.4% of the target and receive any target compensation at all, and (ii) the $1.197 billion that Symantec reported for fiscal year 2017 executive compensation purposes, which allowed Symantec to achieve 104.7% of the target, was $107 million.  Accordingly, the "transition costs" line item comprised 87.9% of the $107 million Symantec needed to achieve its executive compensation target.  Without the inflated "transition costs" metric, Defendant Clark and former CFO Noviello would have received far less compensation for fiscal year 2017.

216.    Moreover, Defendants calculated their adjusted operating income and adjusted revenue metrics differently for compensation purposes than they did for earnings releases. Specifically, as set forth in Symantec's August 16, 2017 Proxy Statement, Defendants excluded certain "website security and PKI results" and "certain litigation contingencies and settlements" from their executive compensation calculations, which were included in their earnings releases. As relevant here, transition costs were excluded in both the earnings releases and the executive compensation calculations.  As described above and confirmed by the unsealed Derivative Complaint, at Audit Committee meetings attended by Defendant Clark and Noviello (May 8, 2017 and October 30, 2017), and Defendant Clark, Noviello, and Garfield (July 31, 2017), they

discussed and were focused on these adjustments, including the "haircut" applied to deferred revenue for executive compensation purposes.

217.   In addition to cash incentives, Defendant Clark and former CFO Noviello also received equity incentive awards under their fiscal year 2017 executive compensation plan, including Performance-based Restricted Stock Units ("PRUs").  As reflected in the Company's 2018 Annual Report, under the Company's fiscal year 2017 executive compensation plan, executives received specified levels of PRUs based on the Company's achievement of a percentage of the adjusted 2018 non-GAAP operating income target of $1.56 billion.  For fiscal year 2018, the Company represented that it reached a 109.29% achievement on its adjusted non-GAAP operating income target, or $1.705 billion.  Thus, the Company exceeded its fiscal 2018 non-GAAP operating income target by $145 million (i.e., $1.705 billion minus $1.56 billion).  This excess was more than entirely fueled by the Company's outsized transition cost adjustment of $272 million.  *See* 2018 10-K, p.156.  By comparison, transition costs in fiscal 2016 were only $92 million and in fiscal 2017 were only $94 million. *Id.*  Thus, even the incremental transition costs recorded in fiscal 2018 exceeded $178 million (*i.e.*, $272 million minus $94 million) and alone allowed the Company's executives to meet compensation targets. Without this increment, management would have achieved less than 100% of its target (*i.e.*, $1.705 billion minus $0.178 billion would have yielded $1.527 billion which was less than $1.56 billion) rather than the 109% reported, which allowed the dramatic compensation accelerator to be met.

218.   Specifically, this achievement resulted in a payout of 268.2% of target under the FY 2017 PRUs.  According to the terms of the FY 2017 PRUs, 250% of the plan payout was earned at the end of the fiscal year, and the additional 18.2% is eligible to be earned at the end of fiscal 2019, provided the executive is employed by Symantec through the end of fiscal 2019.

219.   In addition, as confirmed by the Derivative Complaint, the Board "retain[ed] discretion in determining the award under the VCP [Value Compensation Plan – i.e., Executive Compensation Plan] . . . and the PRU/VCP awards," including "in determining the awards under the VCP to take into account the impact of one-time or unusual events, such as . . . certain one-time expenditures for transition and transformation projects . . . which could affect the adjusted

operating income and operating margin metrics under the VCP." *See* Derivative Complaint, ¶98. In August 2016, the internally forecasted margin was above 28%. *See id.* ¶128. According to the Derivative Complaint, the threshold set by the Compensation Committee of Symantec's Board was not less than 27%, the midpoint of the outlook provided to the public at the time. *See id.* If, in full year 2017, the ratio of "restructuring, separation, transition & other" non-GAAP adjustment to non-GAAP revenue had maintained the "normal" level of 2016, the Company's non-GAAP operating margin would have been approximately 25.9%, insufficient to meet the target. *Id.*

220. Symantec's former Principal Compensation Analyst at Symantec from 2011 until April 2018 who worked at the Company's Mountain View headquarters, and reported to Yoshino Harte, Director of Executive Compensation, built an excel tool that could be used on a self-service basis by certain Company employees to calculate their payout under the PRUs at any given point in time. Company employees could also access their PRU payouts through a third-party website and by a form letter that the former Principal Compensation Analyst would send out to all PRU participants a couple times per year.

221. According to the former Principal Compensation Analyst, the VCP [Value Compensation Plan] for Fiscal Year 2017 was unlike any compensation plan at Symantec before or since in several important ways. First, it was to be paid out after two years, which is very short term in the industry. All other PRU plans before and since had been on at least three-year cycles. Second, while all other PRUs had been awarded based on a mixture of various metrics, as well as the performance of the Company's stock, the VCP was based solely on operating income margins. According to the former Principal Compensation Analyst, the VCP misaligned executives' incentives, pushing them to enhance the operating income margin and short-term gains at the potential cost of long-term strategic growth. A few percentage points increase in operating income could translate into millions of dollars in compensation. Indeed, according to the former Principal Compensation Analyst, even $12 or $13 million was a significant dollar value with respect to the VCP, especially for high level executives like Defendant Clark and Noviello. They had so many units in this plan that a change like that would have been equivalent to millions and millions of dollars in payout.

222.     This created a lot of drive to push the operating income margin, causing a lot of cost cutting initiatives.  Indeed, according to the former Principal Compensation Analyst, there was a decision made by senior leadership, including Defendant Clark and CFO Noviello, to pay out annual bonuses for senior director positions and above in equity instead of cash, for all people in the U.S., Ireland, and India.  This was a cost-cutting measure, and it enabled the Company to recognize the cost as stock and not a regular operating expense which would, in turn, increase the operating income margin.  In other words, the Principal Compensation Analyst confirmed that this was done in order to increase the "stock based compensation" metric that was an input into the Company's non-GAAP operating income.     Symantec's reported adjusted stock-based compensation metric for non-GAAP operating income in its FY 2017 10-K was *$440 million*.[19]

223.     The former Principal Compensation Analyst further explained Symantec's decision to pay the bonuses in equity for the 2017 PRUs was very unusual, he/she had never heard of any other company doing this, and it is industry standard to pay bonuses in cash.  Moreover, the offer letters for these employees explicitly said that the employees would be paid in local currency, so they were going against those agreements.  The Principal Compensation Analyst knew that the Board was informed of this decision because he/she had access to the Board minutes and Board agenda, and he/she was personally involved in preparing slide decks for Board meetings.

224.     Further, the former Principal Compensation Analyst confirmed that the VCP's sole reliance on operating income as a metric was very narrowly minded, as opposed to standard fiscal metrics that companies would want to see incorporated into PRUs.  According to the former Principal Compensation Analyst, Defendant Clark and Noviello pushed for the operating income metric as a condition of joining Symantec.  The former Principal Compensation Analyst understood from his/her experience that the VCP's structure was due to pressure from Blue Coat employees during negotiations, including Defendant Clark and Noviello.

225.     Thus, as set forth in the table below, due to Defendants' manipulations of the Company's adjusted operating income metric set forth above, Defendant Clark received a total of

---

[19] Symantec's Fiscal Year 2017 Form 10-K, dated May 19, 2017, at 53.

over **$41.5 million** in Symantec stock at the end of fiscal year 2018, and is eligible to receive an additional $3 million in Symantec shares at the end of fiscal year 2019 under the FY 2017 PRUs plan. Noviello received nearly **$10.5 million** in Symantec stock at the end of fiscal year 2018, and is poised to receive $764,398 in additional Symantec stock at the end of fiscal year 2019.

**FY 2017 PRU Plan**

| Executive | PRU Target # | Target PRU Value at Grant Date | Eligible & Earned PRUs At End Of Fiscal 2018 | Actual Value of PRUs Earned At End Of Fiscal 2018 | Remaining PRUs To Be Received At End Of Fiscal 2019 | Value of Remaining PRUs To Be Received At End Of Fiscal 2019 |
|---|---|---|---|---|---|---|
| Clark | 961,670 | $16,636,891 | 2,404,175 | $41,592,228 | 175,024 | $3,027,914 |
| Noviello | 242,774 | $4,199,990 | 606,935 | $10,499,975 | 44,185 | $764,383 |

226. In addition, in designing the FY 2018 PRUs plan, Symantec's Compensation Committee chose Symantec's reported fiscal year 2018 non-GAAP EPS to determine the number of PRUs to be awarded in year one of the plan. For fiscal year 2018, Symantec's non-GAAP EPS target under the FY 2018 PRUs was $1.64 per share, with a threshold performance level of $1.56 per share. In Symantec's 2018 Annual Report, the Company reported that it achieved a fiscal year 2018 non-GAAP EPS of $1.56 per share, or 95.2% of this metric, resulting in the threshold level having been achieved and 50.5% of the FY18 Year One Shares (defined below) becoming eligible to be earned at the end of the FY 18 PRU Performance Period (*i.e.*, the end of fiscal year 2020).

227. Thus, as set forth in the table below, due to Defendants' manipulation of the Company's non-GAAP EPS, Defendant Clark is eligible to receive 85,768 Symantec shares with a value at grant date (June 9, 2017) of nearly $3 million at the end of fiscal year 2020. Similarly, Noviello is eligible to receive over 40,000 Symantec shares with a value at grant date of over $1.3 million at the end of fiscal year 2020.

**FY 2018 PRU Plan**

| Executive | PRU Target # in Year One | Target PRU Year One Value at Grant Date | PRUs Eligible To Be Earned at end of fiscal 2020 | Actual Value of PRUs Eligible To Be Earned At End Of Fiscal 2020 |
|---|---|---|---|---|
| Clark | 169,837 | $5,828,806 | 85,768 | $2,943,547 |
| Noviello | 79,257 | $2,720,100 | 40,025 | $1,373,651 |

**D.    Defendants Manipulated Costs To Indicate The Success Of Acquisitions**

228.    Defendants consistently described both the Company's GAAP revenue and non-GAAP metrics to investors as indicative of Symantec's growth and continued success. Analysts and other market participants focused heavily on Symantec's adjusted metrics, particularly its revenue and EPS.  By manipulating these metrics, Defendants were not only able to meet compensation targets, they were able to falsely assure the market that the Blue Coat and LifeLock acquisitions, which they heavily promoted to investors as "transformative" and composing the future of Symantec, were successful, and that Symantec was on track to achieve its cost-reduction goals.

229.    For example, on May 10, 2017, Symantec filed a Form 8-K and issued a press release to announce its fourth quarter and fiscal year 2017 results.  In the press release, the Company reported quarter and annual GAAP revenues, both companywide and for the Enterprise Security segment: "Q4 GAAP revenue $1.115 billion, up 28% year over year"; "Fiscal Year 2017 (FY17) GAAP revenue $4.019 billion, up 12% year over year"; "Q4 Enterprise Security segment GAAP revenue up 40%; [and] FY17 Enterprise Security segment GAAP revenue up 22%."

230.    On the same day, Jefferies reported that "non-GAAP operating margin of 26.7% was ahead of consensus 26%," and "non-GAAP EPS was in-line at $0.28."  Jefferies further wrote that "mgmt is tracking ahead on cost efficiencies."  Significantly, Jefferies also noted that analysts and other market participants had to rely on Symantec to accurately report the impact of the Blue

Coat and LifeLock acquisitions on its accounting: "Cash flow from operations of $313 was below consensus of $359 million, but we note this metric is difficult for the Street to model well given accounting adjustments related to the Blue Coat and LifeLock acquisitions."  Barclays Capital similarly wrote on May 11, 2017, "4Q17 results roughly in line against high expectations," as "SYMC reported 4Q17 non-GAAP revenue/EPS of $1,176M/$0.28 vs. Street's $1,181M/$0.28."

231.   Defendants and analysts also continued to credit Blue Coat and the new leadership of Defendant Clark and Noviello with Symantec's reported success.  For example, on May 10, 2017, Defendant Clark specifically attributed the Company's revenue growth to the successful integration of Blue Coat: "***The industrial logic of combining Symantec and Blue Coat is proving out***, with Enterprise Security growing organically year over year and Blue Coat cloud subscription revenue growing 67%. . . .   ***We are on-track to deliver long-term, sustainable growth and industry-leading profitability as the new Symantec***."

232.   On May 11, 2017, Cowen & Company similarly wrote that Blue Coat "finally provides [Symantec] with a legitimate network security presence, as well as stronger footing in the cloud.  Moreover, we believe the influx of leadership talent at SYMC was much needed, and that CEO Greg Clark is a great fit."

233.   The market continued to focus throughout the Class Period on Symantec's GAAP and reported non-GAAP results as a measure of the Company's financial success, as well as the success of the Blue Coat acquisition and the leadership of Defendant Clark and Noviello.  For example, on August 2, 2017, Symantec reported its Q1 2018 results on Form 8-K.  In the accompanying press release, the Company promoted its GAAP revenue growth, stating, "Q1 GAAP revenue $1.175 billion, up 33% year over year."  In the subsequently issued Quarterly Report filed on Form 10-Q, the Company specifically attributed the revenue growth to Blue Coat's and LifeLock's contributions: "Revenue increased by 33%, driven by a 34% and 31% increase in revenue from our Enterprise Security and Consumer Digital Safety segments, respectively, primarily due to the acquisitions of Blue Coat, Inc. ('Blue Coat') and LifeLock, Inc. ('LifeLock')."

234.   On August 3, 2017, JPM Securities LLC echoed Defendants' remarks in a report entitled, "A Good Management Team in a Good Space":

We maintain our Market Outperform rating on Symantec and raise our price target to $36 from $35 after the company reported strong F1Q18 results yesterday, including non-GAAP EPS of $0.33 (consensus $0.31) on revenue of $1.23B (consensus $1.20B), and guided above expectations for FY18 non-GAAP EPS and revenue – leaving the stock flat in the aftermarket. ***Both enterprise and consumer segments came in ahead of expectations as the integration of Symantec, Blue Coat, and LifeLock seems to be working and as the sales force restructuring went smoothly, in our opinion.***

235.    Barclays Capital similarly observed on August 3, 2017, "Revenue of ~$1.3B was ahead of our estimate by ~21M, with both consumer and enterprise exceeding our estimates."  In the same report, Barclays Capital wrote: "Management noted they remain ahead of schedule with the $580M of cost efficiencies from SYMC, Blue Coat and LifeLock, which helped drive the upside in the quarter and we think makes the margin ramp this year more linear than previously thought."

236.    On November 1, 2017, Symantec released its financial results for Q2 2018 on Form 8-K.  In the Company's press release, Defendants again focused on the Company's year-over-year GAAP revenue growth: "Q2 GAAP revenue $1.240 billion, up 27% year over year."  In the later-filed Form 10-Q, the Company again identified the Blue Coat and LifeLock acquisitions as the catalysts for the reported revenue growth: "Revenue increased by 27%, driven by a 20% and 37% increase in revenue from our Enterprise Security and Consumer Digital Safety segments, respectively, ***primarily due to the contributions from the acquisitions of Blue Coat, Inc. ('Blue Coat') and LifeLock, Inc. ('LifeLock'), respectively***."

237.    The next day, on November 2, 2017, Credit Suisse stated, "$0.40 non-GAAP EPS on $1.276bn revenue compares with $0.42/$1.276bn consensus," and "[o]n an adjusted basis, FY18 guidance was essentially maintained, as was longer term mid-to-high single digit growth targets for F18/19."

238.    On January 31, 2018, the Company announced its financial results for Q3 2018 on Form 8-K, together with a press release.  As in previous quarters, the Company emphasized its growing year-over-year GAAP revenue: "Q3 GAAP revenue $1.209 billion, up 16% year-over-year."  Further, in detailing the financial highlights for the past nine months in the Company's later-filed Quarterly Report, Defendants emphasized that "Revenue increased by 25% compared

to the corresponding period in the prior year, driven by a 15% and 38% increase in revenue from our Enterprise Security and Consumer Digital Safety segments, respectively, primarily due to the contributions from the acquisitions of Blue Coat and LifeLock."

239. Evercore ISI further observed in a report dated February 1, 2018, that "non-GAAP EPS saw outperformance in the quarter" and that the Company also saw "upside to non-GAAP margins from further cost control."

### E. Defendants Misrepresented The Success Of The Purportedly "Transformative" Blue Coat/Life Lock Integration To Investors

240. Throughout the Class Period, Symantec touted the success of the merger and the integration process generally and specifically claimed that Symantec had fully integrated the Symantec and Blue Coat sales forces. In reality, as confirmed by multiple former Symantec employees, the integration was a disaster.

241. The failure of the integration process forced Symantec to take drastic steps to better the appearance of its performance and to ensure that executives received their full compensation payout. As set forth above, under Defendant Clark's leadership, Symantec manipulated financial metrics throughout the Class Period to meet executive compensation targets and to persuade the market that the Blue Coat and LifeLock acquisitions were transformational for Symantec's revenue and growth.

242. Throughout the Class Period, Symantec touted the success of the merger and the integration process as a "transformation," telling investors that the Company had integrated Symantec with Blue Coat and Lifelock and, in particular, had "successfully combined 2 sales teams" with "extremely low" attrition. In reality, the integration was the "biggest debacle," with employees "fleeing" in "droves."

243. That the integration was a failure was corroborated by numerous former employees, who stated that the integration was rushed and problematic. Moreover, the unethical corporate culture imposed by the former Blue Coat executives resulted in departures for numerous legacy Symantec employees. For example, a former Symantec Human Resources M&A Integration Leader (September 2013 to June 2017) – who started working at the Company in July 2010, first

working remotely from Colorado and then from California, including spending a day or more per week at Symantec's headquarters in Mountain View, California – stated that there was "absolutely" a mass exodus of employees and a lot of attrition.  The former M&A Integration Lead recalled talking to a recruiter who asked what was happening at the Company because "people are leaving in droves" and "people were fleeing."  He/she confirmed that the breakdown of the attrition would be contained in the HR metrics.

244.   The former Renewal Sales Representative discussed in ¶102 further confirmed that with regard to sales attrition, a lot of people in the New Sales department left after the acquisition because they could not meet their quotas.

245.   In addition, the former Renewal Sales Representative explained that there were many resellers who said if they did not have a contract with Symantec, they would not purchase their products because they were frustrated with the changes after Blue Coat came in.  Specifically, the resellers were frustrated by the lack of knowing whom to reach out to, and by the lack of support they were getting.  He/she explained that when you let go of 75% of the workforce, the customer does not know whom to reach out to, and it is very frustrating.

246.   When asked about Defendants' statement that as of April 1, 2017, Symantec had successfully combined the two sales teams into a single organization, the former Renewal Sales Representative laughed.  He/she said: "Yes, they combined them.  It doesn't necessarily mean that it was a success."  The former Renewal Sales Representative confirmed that frustration was pretty high with the people who had to deal with the Blue Coat sales people, who came from a much smaller company.

247.   With regard to integrating the sales teams and products, a former Healthcare Account Executive at Symantec from June 2016 to January 2019 – who had been responsible at different times for accounts in Missouri, Kansas, Colorado, Utah, Minnesota, North Dakota, South Dakota, Iowa, Chicago, Wisconsin, and Colorado – stated that the attempt to combine the Safesforce instances in and around April 2017 was "the biggest debacle," a "complete mess" and simply not successful.  She/he also stated that this affected productivity.

248.   A former Symantec employee – who worked at Symantec's Springfield, Oregon office from September 2006 until December 2017, and most recently as a Senior Manager, NPI Operations from May 2017 until December 2017 – was asked about the Company's claim that, as of April 1, 2017, there was a successful integration of the sales teams.   In response, the Senior Manager, NPI Operations stated that the Company said that the teams were all integrated, but they were not because Blue Coat sales people were only selling Blue Coat products and Symantec sales people were only selling Symantec products.   According to the Senior Manager, NIP Operations, Blue Coat and Symantec products were also not integrated.

249.   Because of the problematic integration process and loss of customers and sales personnel, Defendants were motivated to and did manipulate its financials in order to create the appearance of the successful "transformation" that they had been touting to investors.

### F.   Violations Of Symantec's Codes Of Conduct

#### 1.   Symantec's Codes Of Conduct

250.   Symantec's Code of Conduct, which was publicly available on Symantec's website throughout the Class Period, further obligated Symantec employees to "accurately and completely record any financial information related to Symantec's revenues and expenses."   The version of the Code of Conduct posted on Symantec's website since July 29, 2017 stated:

SPEAK THE TRUTH

We do what we say we will do.  We speak the truth and are honest in our dealings.

FINANCE AND ACCOUNTING PRACTICES

As a publicly traded company, Symantec adheres to strict accounting PRINCIPLES and STANDARDS of financial reporting. ***You must accurately and completely record any financial information related to Symantec's revenues and expenses.***  The Audit Committee is directly responsible for the appointment, compensation, and oversight of the work of the Company's independent auditors and work cooperatively with the Company's independent auditors in their review of the Company's financial statements and disclosure documents.  Violations of laws associated with accounting and financial reporting can damage Symantec's REPUTATION, and can also result in fines, penalties, and even imprisonment.  You should promptly report to the Chief Financial Officer, General Counsel or the Audit Committee of the Board of Directors any conduct that you believe to be a violation of law or business ethics or of any provision of this Code, including any transaction or relationship that reasonably could be expected to give rise to such a conflict.

251.    The Company's Code of Ethics (also known as the Financial Code of Ethics) for Symantec's CEO and senior financial officers, including the Company's principal financial officer and principal accounting officer, was also publicly available on the Symantec's website throughout the Class Period.  The Code of Ethics likewise obligated Symantec employees to, among other things: (i) "Communicate information in a manner that ensures full, fair, accurate, timely and understandable disclosure in reports and documents that Symantec files with, or submits to, government agencies and in other public communications"; and (ii) "Comply with applicable laws, rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies."

252.    Defendant Clark stated that "corporate responsibility goals have remained an ***important part of our business success***, demonstrating our unique culture, our inspiring mission[.]"  The Company's website further provides that "***The very nature of our business*** – assuring the security, availability, and integrity of our customers' information – ***requires a global culture of responsibility.  Ethical conduct and integrity are the building blocks of Symantec's business success***."  In addition, the Company's website states that "[t]he reputation of Symantec is a valuable business asset, and ethical and legal conduct at all levels of our business is essential for our continued success."  Accordingly, the Company assures investors that "[e]mployees are required to complete ethics and compliance training and sign a statement acknowledging that they have received, read, and agree to abide by the Code.  Employees recertify their agreement to comply with Code provisions annually."

253.    Accordingly, Symantec's manipulation of its financial results violated Symantec's internal revenue recognition policy, and the SEC principles set forth in Section V(A)-(B) above, as well as the Company's Codes of Conduct.

## 2.    Widespread Code Of Conduct And Ethical Violations During The Class Period

254.    In its September 24, 2018 earnings release, the Company admitted to Code of Conduct violations at Symantec: "The Audit Committee also reviewed certain allegations concerning, and identified certain behavior inconsistent with, the Company's Code of Conduct

1   and related policies.  The Audit Committee referred these matters to the Company for, and the

2   Company intends to take, appropriate action."  Multiple former Symantec employees confirmed

3   that Blue Coat imposed additional unethical accounting practices at Symantec following the

4   acquisition.  For example, Symantec's former VP and CSO thought that Symantec was one of the

5   most ethical companies prior to Blue Coat, but after the acquisition, there was "a palpable feeling

6   of lessening of corporate ethics and our concern for the community at large."  Symantec's former

7   VP and CSO viewed Symantec as a highly ethical company before the Blue Coat Acquisition.

8   However, there were a number of investigations launched after the acquisition.  There were a

9   number of episodes that left you scratching your head about if this was how these people were

10  going to behave at a "grown up" company.  The former VP and CSO heard reports from Eversole,

11  who was responsible for the executive protection program and who personally provided security

12  protection to Clark on multiple occasions, about the questionable behavior of executives.  The

13  former VP and CSO confirmed that Symantec became a really uncomfortable place to work.

14  According to Symantec's former VP and CSO, Blue Coat employees brought a "toxic culture"

15  with them.  It was "dysfunctional."

16      255.   Symantec's former VP and CSO explained that the Blue Coat executives (including

17  Defendant Clark and Noviello) were notorious for being "pretty freewheeling" with many of their

18  practices as a private company.  According to Symantec's former VP and CSO, there was highly

19  centralized decision making as Defendant Clark thought he knew best about everything.  If Clark

20  said it was good, the Blue Coat people would do it.  Blue Coat's processes were immature, and

21  they were geared toward maximizing the return of either an IPO or acquisition.  Blue Coat's

22  processes were not good for a company like Symantec.  They were not right sized for Symantec.

23  Blue Coat was much smaller, and there was a lessening of the rigor around evaluation criteria.

24  Despite this, oftentimes leadership insisted that their Blue Coat processes should be adopted going

25  forward.

26      256.   Symantec's former Manager Bill and Collect-Finance similarly recounted that

27  he/she "frequently" saw Code of Conduct violations at Symantec, and more so in the years after

28  the Blue Coat acquisition.  The former Manager Bill and Collect-Finance stated that "Blue Coat

was definitely where things were swept under the rug, and you weren't allowed to ask questions, particularly within the finance realm, and things weren't as clean as they should have been."

257.    Symantec's former Senior Manager, Pricing & Licensing, similarly stated that he/she was fed up because the Company no longer had the level of honesty and integrity he/she was used to after Blue Coat came in.  The Senior Manager, Pricing and Licensing, stated that the Blue Coat executives imposed an unethical culture and there was pressure to get a deal done and "it doesn't matter if it's on a napkin," they would just sort it out later. This was frustrating for legacy Symantec employees who knew the right way to do things, but were just told to ignore that. There was a conflict between legacy Symantec and Blue Coat employees, who came in with completely different philosophies.  Symantec's former Senior Manager, Pricing & Licensing, explained that Blue Coat acted as if it were a startup almost, and it did not have all the procedures and policies in place that a public company needs.  Once Blue Coat came in, they just started ousting people from the top down and it was "almost like a hostile takeover."  According to Symantec's former Senior Manager, Pricing & Licensing, Blue Coat was a tight knit, small company that had its own people and was not interested in learning best practices from Symantec. It wanted to turn Symantec's culture into its culture.  As Symantec's former Senior Manager, Pricing & Licensing explained, after Blue Coat came in and the Blue Coat executives assumed leadership, Symantec's management practices absolutely lacked integrity and honesty. Moreover, it was common knowledge that if you raised accounting issues and disagreed with management, your job would be at risk.

### G.    Defendant Clark and Noviello Took Advantage Of Symantec's Inflated Stock Price To Sell Their Own Shares For Nearly $20 Million

258.    The Company's stated Insider Trading Policy "prohibits our directors, officers, employees and contractors from purchasing or selling Symantec securities while in possession of material, non-public information[,]" and "from short-selling Symantec stock or engaging in transactions involving Symantec-based derivative securities, including hedging transactions."

259.    In violation of Symantec's stated policy and the Exchange Act, Defendant Clark and CFO Noviello – both of whom are no longer with the Company – unloaded their own shares

for **nearly $20 million** in insider trades.  In total, during the Class Period: (i) Noviello made approximately **$12.89 million** in insider sales; and (ii) Defendant Clark made approximately **$6 million** in insider sales.  The sales made by Defendant Clark and Noviello are illustrated in the following chart:

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|
| NOVIELLO | 5/15/2017 | 27,741 | $32.45 | $900,154 |
| NOVIELLO | 7/12/2017 | 10,034 | $30.00 | $301,020 |
| NOVIELLO | 8/28/2017 | 14,925 | $30.00 | $447,750 |
| NOVIELLO | 9/7/2017 | 7,688 | $30.00 | $230,640 |
| NOVIELLO | 11/6/2017 | 375,000 | $29.38 | $11,018,400 |
| **Totals** | | **435,388** | | **$12,897,964** |

| Defendant | Transaction Dates | Shares Sold | Prices per Share | Total Value |
|---|---|---|---|---|
| CLARK | 8/28/2017 | 186,433 | $30.00 | $5,593,251 |
| CLARK | 8/31/2017 | 13,567 | $30.00 | $407,010 |
| **Totals** | | **200,000** | | **$6,000,261** |

260.    During the prior period,[20] neither Defendant Clark nor Noviello sold <u>any</u> Symantec shares they owned or controlled.

261.    Defendant Clark and Noviello enacted some or all of their trades pursuant to Rule 10b5-1 trading plans that **they adopted during the Class Period** when they were already in possession of material, nonpublic information.  For example, Noviello adopted a new Rule 10b5-1 plan during the Class Period on September 13, 2017, shortly before his sale of 375,000 shares for over $11.018 million in gross proceeds on November 6, 2017.  His previous Rule 10b5-1 trading plan was adopted in March of 2017, thereby suggesting that Noviello took advantage of his knowledge of material non-public information and adopted a new plan to enact his November trades.  Additionally, Defendant Clark enacted his trades pursuant to a Rule 10b5-1 trading plan

---

[20] Defendant Clark and Noviello joined Symantec in August 2016.  The "prior period" for Clark and Noviello is thus limited to the days that they were at Symantec.

adopted on May 31, 2017, during the Class Period, and while in possession of material non-public information.

**H.    The Truth Is Revealed**

262.    Defendants' misrepresentations to investors were revealed through two corrective disclosures.   First, on May 10, 2018, Defendants revealed that the Audit Committee had commenced an internal investigation due to a whistleblower's concerns and that the SEC was also investigation.   This caused Symantec's stock price to plummet by approximately 33%.   Second, on August 2, 2018, Defendants disclosed additional details concerning the Audit Committee's investigation, including that it was ongoing and would likely impact Q42018 results (which Symantec later admitted to be true), and disappointing results.   This caused Symantec's stock price to decline by another 8%.   As discussed in greater detail below, these two disclosures revealed *inter alia* that Defendants were engaged in accounting improprieties and that Defendants had misrepresented the success of the Blue Coat integration – which Defendants had attempted to hide by improperly recognizing revenue and manipulating transition cost disclosures – and caused Symantec's stock price to drop precipitously.

263.    On May 10, 2018, after market hours, Symantec released its fiscal fourth quarter 2018 earnings.[21]   While both the Enterprise Security and Consumer Digital Safety segments' fourth quarter results exceeded the Company's guidance and analysts' expectations, the news was greatly overshadowed by Symantec's concurrent announcement that the Audit Committee of the Board of Directors had commenced an internal investigation due to concerns raised by a former employee and that it had voluntarily contacted the SEC.   Symantec also announced that it retained independent counsel and other advisors to assist it in its investigation and would provide additional information to the SEC as the investigation proceeded.   Given the investigation, the Company informed investors that its "financial results and guidance may be subject to change," and that it is

---

[21] In announcing the Company's quarterly results, Symantec's practice throughout the Class Period was to issue a press release and Form 8-K and host an earnings call with analysts shortly after the market closed that day.   Within the next several days following the earnings press release, the Company issued its more detailed Quarterly Report on Form 10-Q.

1 "unlikely that the investigation will be completed in time for the Company to file its annual

2 report . . . in a timely manner."

3    264.    In the financial results for Q4 2018 filed after close on that same day, May 10, 2018,

4 on Form 8-K, Symantec changed its description of "transition costs" in its "Explanation of Non-

5 GAAP Measures and Other Items."   Defendants no longer described such transition costs as

6 "continuing."   Instead, Symantec attempted to justify the removal of such transition costs in

7 calculating the Company's adjusted operating income: "We exclude restructuring, transition and

8 other costs from our non-GAAP results as we believe that these costs are incremental to core

9 activities that arise in the ordinary course of our business and do not reflect our current operating

10 performance."

11    265.    Later that same day, Symantec held an earnings call with investors to discuss its

12 results for Q4 2018.   On the call, Defendants refused to comment on the internal investigation

13 other than it "does not relate to any security concern or breach with respect to our products or

14 systems."   Defendants announced that the Company would be reducing its guidance on expected

15 revenue, operating margin and earnings per share for the next quarter and the entire fiscal year of

16 2019 well below the Company's prior estimates and analyst consensus.   Defendants blamed the

17 continued shift to ratable sales in the Enterprise segment given the adoption of cloud solutions in

18 favor of on-premise appliances.   After providing their prepared remarks, Defendants cancelled the

19 question and answer session and refused to conduct follow-up calls with investors and analysts.

20    266.    Analysts were blindsided by the Company's revelation of the internal investigation

21 and immediately began expressing doubt about the Company's reported historical results and

22 management's fiscal year 2019 guidance.

23    (a)    Andrew J. Nowinski and James E. Fish, analysts at Piper Jaffray, for example,

24       reported on May 10, 2018, that Symantec's stock is down "*due to the*

25       *announcement that the company is conducting an internal investigation in*

26       *connection with concerns raise by a former employee*."   They further commented,

27       "[w]e believe this investigation creates *too much uncertainty to have confidence*

28

*in management's FY19 guidance*, as this could affect historical results and future demand trends" and noted as a risk "*leadership stability*."

(b)    Jefferies analyst John DiFucci issued a report titled "F418:  Does It Get Any Worse?," which stated that Symantec's F4Q results were "*overshadowed by an announcement of an internal investigation by the Board of Directors' Audit Committee due to a former employee's concerns*."  He further noted that "*it is difficult for us to accept the company's guidance at face value given the ongoing investigation and [the] lack of Q&A with management*," and added that "[w]hile we understand that a mix-shift is a headwind to reported revenue, *we continue to struggle to understand this as the singular explanation for Enterprise segment weakness*." (Emphasis in original).  This analyst also stated that "while a long-awaited *Blue Coat refresh* could be a positive catalyst for Enterprise, *we see little evidence of this taking hold*" and elaborated "*we have not yet seen indicators of the [Blue Coat] refresh cycle despite management talk of it for some time*."

(c)    BTIG analysts, Joel Fishbein, Jr., Edward Parker and Kingsley Crane, stated "[t]he *fog created by an internal investigation* of the company led by the audit committee of the board, with no semblance of detail provided to investors, *overshadows everything else* in Thursday's Q4 and FY 2018 earnings." They further stated "[w]e thought the company had started to find its stride in the Enterprise segment following *the restructuring of its salesforce* […]  However, the Q1 and FY19 guidance, which imply a ~20% decline for Q1 and ~10%-11% decline for FY 2019, *make us wonder what, beyond accounting changes, is going on in the business*."

(d)    In commenting on the Company's refusal to field analyst questions, Anne M. Meisner, an analyst at Susquehanna Financial Group, LLLP, stated in a note to clients on May 11, 2018, "We believe this raises a red flag as it relates to the potential severity of this issue."

(e)    Analysts Gregg Moskowitz, Michael Romanelli and Matthew Broome at Cowen & Company remarked, "*this is undoubtedly a serious matter, and it could be awhile*

*before transparency and investor confidence improves*" and further noted "*organic growth has been sluggish*."

(f)     Stephens analyst Jonathan Ruykhaver remarked, "We wonder if 1) something is fundamentally wrong with the Enterprise segment, or 2) guidance was dramatically haircut in case something comes of the internal investigation which would likely impact the Enterprise business instead of the Consumer business."

(g)     Deutsche Bank analysts noted "the internal probe, which must be serious to have forced the company to cancel the Q&A portion of the call" and "we're still not hearing enough of an uptick in tone from customer/partner checks about Symantec's competitiveness … or about any material Blue Coat refresh activity."

(h)     Evercore ISI analysts stated that Symantec's "F4Q report was punctuated by the announcement of an internal investigation," commented that "a core element of the rationale in integrating Symantec and Blue Coat is bringing the endpoint and network elements of security together … [B]ut the *integration may prove more difficult than currently assumed*" and noted "Blue Coat opportunity [is] *not a slam dunk*."

267.     On this news, Symantec stock declined on heavy trading over 33%, from $29.18 per share on May 10, 2018, to $19.52 per share on May 11, 2018, representing the worst day of trading in Symantec stock in almost 17 years and erasing roughly $6 billion of market capitalization.

268.     On May 14, 2018, in response to the dramatic drop in the price of its shares and demand for further transparency, Symantec released an updated statement regarding the Audit Committee's ongoing internal investigation.  The Company explained that the Audit Committee's internal investigation related to concerns raised by a former employee regarding the "[C]ompany's public disclosures, including commentary on historical financial results; its reporting of certain non-GAAP measures, including those that could impact executive compensation programs; certain forward-looking statements; stock trading plans; and retaliation."  While the Company also stated that it did not expect the investigation to have a "material adverse impact on its historical financial

statements," Symantec again acknowledged that "[t]he [C]ompany's financial results and guidance may be subject to change."  Symantec also said nothing about the veracity of the Company's other statements that are the subject of the internal investigation, such as Symantec's public "commentary on historical financial results," the Company's purported "forward-looking statements," as well as matters pertaining to executive compensation programs.

269.   Shortly thereafter, Symantec hosted a conference call with investors to provide "more information" about the internal investigation and the Company's fiscal year 2019 financial guidance and fiscal year 2020 financial outlook.  But on the call, Defendant Clark did little more than acknowledge the investigation.  Defendant Clark explained on the call that Company executives "can't answer any questions about the investigation," and instructed investors to read a prepared statement, issued before the call.

270.   Paulo Santos ("Santos"), an analyst and trading expert at Seeking Alpha, concluded that given the Company's disclosures, "[t]here's a good chance Symantec will find a level of exaggeration in the previously-used non-GAAP adjustments," including for recurring operating costs.[22]  Santos added:

> If Symantec finds that some non-GAAP adjustments were indeed not called for, their removal will still have consequences.  When you look at Symantec's earnings estimates, those are based on Symantec's non-GAAP reporting.  Were Symantec to remove some of those non-GAAP adjustments, and immediately it would start reporting lower non-GAAP earnings.  Even with no change to its historical financial statements and accounting practices. . . .  Symantec was always pretty expensive (for a stagnated business) when it came to GAAP measures, and only the non-GAAP adjustments made it look more reasonable.[23]

271.   Other analysts were in accord.  Anne Meisner of Susquehanna Financial Group, LLLP noted that "the potential for the investigation to conclude that non-GAAP numbers were presented inappropriately would not likely be favorable for the current executive team."  Similarly,

---

[22] Paulo Santos, *Symantec: Parsing the Details*, Seeking Alpha (May 15, 2018), *available at* https://seekingalpha.com/article/4174098-symantec-parsing-details.

[23] *Id.*

in a note to clients, Greg Moskowitz of Cowen & Company warned clients that "we continue to have fundamental concerns," and to "avoid the shares."

272.    On May 16, 2018, *Probes Reporter*, which provides commentary and analysis on public company interactions with investors and with the SEC, reported that, contrary to the Company's statement that it had voluntarily contacted the SEC regarding the whistleblower's expressed concerns, the SEC was already investigating Symantec as early as April 17, 2018.  The *Probes Reporter* published a letter dated April 17, 2018, that it had received from the SEC in response to the *Probes Reporter*'s request for information concerning Symantec pursuant to the Freedom of Information Act.  In the letter, the SEC denied the request, explaining that it was withholding the information requested under federal exemptions protecting from disclosure records compiled for law enforcement purposes the release of which could reasonably be expected to interfere with enforcement activities.  The *Probes Reporter* explained that this letter likely meant that the SEC had contacted Symantec and asked it to voluntarily produce certain information as part of an informal inquiry.[24]

273.    On May 31, 2018, Symantec announced that it had received a deficiency notice from NASDAQ stating that, as a result of failing to timely file its annual report on Form 10-K for the year ended March 30, 2018, Symantec was not in compliance with NASDAQ listing rules. The notice explained that Symantec had 60 calendar days from the date of the letter to submit a plan to regain compliance, and that if the plan was accepted by NASDAQ, Symantec would have until November 26, 2018 (*i.e.*, 180 days) to regain compliance.

274.    On May 31, 2018, Credit Suisse analyst Brad Zelnick issued a report summarizing opinions the firm had received from Ron Kiima, former assistant chief accountant for the SEC.  In the report, Mr. Kiima explained that following the May 10, 2018 announcement of the internal investigation, he had concerns about, among other things, Symantec's revenue recognition and

---

[24] John P. Gavin, CFA, *Investors Are Right To Worry About Symantec: It Appears The SEC Has Been Investigating Since At Least April*, Probes Reporter (May 16, 2018), *available at* https://seekingalpha.com/article/4174685-investors-right-worry-symantec-appears-sec-investigating-since-least-april.

M&A accounting.  Following the Company's May 14, 2018 embellishment, Mr. Kiima understood the investigation to concern the Company's non-GAAP adjustments, including those relating to restructuring, transition or other costs removed from Symantec's reported adjusted metrics.

275.    On August 2, 2018, Symantec released its Q1 fiscal year 2019 earnings and held a conference call with investors, announcing additional details concerning the internal investigation and delivering another quarter of disappointing results.  The Company said that the investigation was still "ongoing" and that, while the Company did not anticipate a material adverse impact on its historical financial statements for Q3 fiscal year 2018 and prior, "[o]ur fourth quarter fiscal year 2018 and subsequent periods remain open from an accounting perspective, subject to adjustment for material updates."

276.    In addition, Defendants stated that implied billings fell $110 million shy of management's expectations and declined by $203 million year-over-year, to $996 million, or nearly 20% lower.  Enterprise implied billings also declined by $203 million year-over-year, to only $453 million (31% decline), while Consumer Safety implied billings were flat.  The Company attributed the billings miss to pipeline management issues isolated to North America that resulted in elongated deal closure rates.  The Company also announced that it intended to cut 8 percent of its global workforce (or 1,000 employees) to reduce costs.  The Company further issued reduced revenue and earnings guidance for its second fiscal quarter and 2019 fiscal year that fell short of analysts' expectations.  In particular, the Company said it expected revenue in the range of $4.64 billion to $4.76 billion in the fiscal year, which was lower than the median forecast of $4.84 billion among analysts.  It also said it expected earnings per share of 8 cents, compared to market forecasts of 17 cents

277.    Analysts were "highly disappointed" by Symantec's report, questioned the veracity of the Company's justifications for the miss, and expressed a lack of confidence in management's guidance.  Analysts at William Blair, for example, stated, "We view the magnitude of the miss as troubling and another sign that the company is seeing deterioration in its core businesses . . . [and] are perplexed by the attribution of the miss largely to pipeline management, given the magnitude of the shortfall.  In our view, the company appears to be ***structurally challenged*** . . . .  In our view,

the company needs to take more tangible steps to right the ship and provide more transparency on the challenges.  Our confidence level in the prediction of a return to growth in 2020 is not high." Similarly, BTIG noted, "Mgmt. harped on the fact that a fuller, more integrated suite of products has led to longer sales cycles (specifically in the Americas) and that it's typical for most deals close in the last 3 weeks of the quarter. CEO Clark also mentioned on the call that numerous deals that had slipped in 1Q had since closed in 2Q.  We find these comments hard to reconcile with the lowering of FY19 guide after just one quarter."

278.    In an August 3, 2018 report, Willian Fitzsimmons of Morningstar Equity Research wrote that, after "scour[ing] Symantec's financial results for irregularities . . . investors should be aware of the two speculative theories that could have triggered the audit":

> [W]e've noticed an expansion in the spread between both GAAP and non-GAAP results.  It seems the restructuring line item of its income statement has increased, and it could be in the realm of possibility that management may have inflated restructuring expenses, by placing expenses that would have typically been regular operating expenses into this line item.  Whether an expense falls in the restructuring line item versus regular operating expense (S&M, R&D, or G&A) has no bearing on GAAP profitability, but when calculating non-GAAP Net Income, restructuring expenses are added back into the results.  Thus, it is within the realm of possibility that management inflated the restructuring line item to produce a better-looking non-GAAP EPS metric, allowing the firm to hit stock-based compensation targets.

279.    In response to these disclosures, Symantec stock declined nearly 8%, from $20.88 per share on August 2, 2018, to $19.25 per share on August 3, 2018, erasing roughly $1 billion of market capitalization.

**I.    Symantec's Audit Committee Investigation Confirmed Defendants' Misconduct**

280.    On September 24, 2018, Symantec announced that its Audit Committee, independent legal counsel, and a forensic accounting firm, had concluded their internal investigation into Symantec's improper accounting.  The announcement was carefully worded but disclosed numerous facts confirming Defendants' accounting misconduct.

281.    _First_, the Company admitted to internal control deficiencies, characterizing the controls as "relatively weak and informal processes" with respect to some aspects of the review, approval and tracking of transition and transformation expenses.

282.   <u>Second</u>, the Company admitted that it had identified certain behavior inconsistent with the Company's Code of Conduct and related policies, that these matters had been referred to the Company, and that the Company intended to take appropriate action.

283.   <u>Third</u>, the Company stated that in addition to the matters announced in May 2018, the Audit Committee had reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018, when $12 million of the $13 million should be deferred.  Accordingly, Symantec admitted that it must revise the financial results it disclosed on both May 10, 2018, and August 2, 2018, to take into account this deferral and any other financial adjustments required as a result of this revision.

284.   <u>Fourth</u>, the Company disclosed that over a year ago, in the quarter ending September 29, 2017, "the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures."

285.   <u>Fifth</u>, Symantec announced that it would be making structural changes to its internal management.  While no terminations of senior Symantec executives have been recommended as a result of the investigation, Symantec announced that it will appoint a separate CAO, appoint a separate Chief Compliance Officer reporting to the Audit Committee, and adopt enhanced internal controls.

286.   <u>Sixth</u>, Symantec stated that it intended to belatedly file its annual financial report on or before October 27, 2018 – approximately five months late.

287.   <u>Finally</u>, the Company disclosed that the SEC had commenced a formal investigation into Symantec's accounting.

**J.    The Audit Committee Investigation Was Cursory and Inadequate**

288.   Even though it reached the above conclusions, the Audit Committee investigation was nevertheless cursory and inadequate.

289.   <u>First</u>, as noted above, the former Account Manager discussed *supra* in ¶¶120-29 stated that he/she was ***not*** interviewed in connection with the Audit Committee investigation. Given that Defendant Clark personally knew about the improper "double booking" issues

described by the former Account Manager, the fact that the Audit Committee did not interview the former Account Manager undermines the thoroughness and legitimacy of its investigation and the veracity of its conclusions.

290.    Additional former Symantec employees were asked and all confirmed that they were not interviewed in connection with the Audit Committee investigation, including Symantec's former Business Development Manager discussed in ¶93; its former Renewal Sales Representative discussed in ¶102; its former Account Executive discussed in ¶89; its former Healthcare Account Executive discussed in ¶92, and its former Regional Sales Manager discussed in ¶88.

291.    Second, on information and belief, Defendant Clark regularly attended Audit Committee meetings and, as such, was able to exert improper influence and control over any investigation conducted by the Audit Committee.   Indeed, as confirmed in the Derivative Complaint, Defendant Clark attended *eight* Audit Committee meetings in 2017.

292.    Third, as discussed above in Section V(B)(5) above, the Audit Committee members were focused on and aware of (or recklessly disregarded) the accounting improprieties described above, including the fact that transition costs had been improperly accounted for by Defendants. Thus, the Audit Committee members conducting the investigation had conflicting interests and were motivated to cover-up their own knowing or reckless misconduct.

293.    Finally, Mr. Kearney, a former Regional Vice President of Sales, confirmed that it was common knowledge within Symantec that the revenue recognition issue was much bigger than the $12 million that the Audit Committee disclosed – and he underscored how the Audit Committee investigation was a whitewash designed to minimize and hide Defendants' misconduct. Indeed, when Mr. Kearney was interviewed by the Audit Committee and reported his concerns, including showing them the text message confirming Auslander's instruction to engage in revenue misconduct, the Audit Committee took no action and told him to just keep doing his job and that everything was fine.  As Mr. Kearney explained, the Audit Committee was sweeping everything under the rug.  Moreover, as set forth below, Symantec retaliated against Mr. Kearney for failing to engage in revenue misconduct and reporting it to the Audit Committee.

1

### K.      Symantec Retaliated Against Whistleblowers

2       294.     As described above, Symantec retaliated against Mr. Kearney, former Regional

3  Vice President of Sales, after he reported accounting misconduct to the Audit Committee.   Mr.

4  Kearney reported the revenue recognition misconduct that had been asked of him through the

5  Company's whistleblower hotline during the weekend of June 30, 2018, and the following

6  Monday, his boss, Auslander, told Mr. Kearney that he was not a team player and threatened to fire

7  him by the end of the following quarter if he did not "resign".  Mr. Kearney was retaliated against

8  when he was fired under false pretenses at the end of the following quarter.

9

10

### L.      Defendant Clark And Others Did Not Receive Incentive Payments, Compensation Increases Or Equity Awards

11       295.     On October 26, 2018, Symantec filed its Annual Report for 2018 on Form 10-K.

12  The Annual Report disclosed that in October 2017, the Company's Compensation Committee

13  adjusted the executives' non-GAAP operating income and non-GAAP revenue targets downward

14  from $1.857 billion and $5.210 billion, respectively, to $1.707 billion, and $5.007 billion,

15  respectively.  Despite these significant downward adjustments, the Company admitted that it did

16  not achieve the incremental threshold levels set for the non-GAAP operating income and

17  non-GAAP revenue under the fiscal year 2018 Executive Annual Incentive Plan.  Accordingly, no

18  cash payouts were made to Symantec's named executive officers under the payout formula for the

19  fiscal year 2018 Executive Annual Incentive Plan.

20       296.     Moreover, the Annual Report disclosed that Defendant Clark and Noviello, and

21  other members of the executive management, had "elected to forego" equity awards and salary

22  increase for fiscal year 2019:

23         Subsequent to the announcement of fiscal 2018 performance results, fiscal 2019
           guidance, and the Audit Committee Investigation, Symantec's stockholders
24         experienced a substantial decline in the Company's stock price.  In this context, Mr.
           Clark, in consultation with the Compensation Committee, elected to forego a fiscal
25         2019 equity award.   Mr. Clark also determined, in consultation with the
           Compensation Committee, that none of the Company's NEOs [Named Executive
26         Officers] would receive a base salary increase for fiscal 2019.

27

28

---

297.     Nevertheless, Defendant Clark and Noviello did receive windfall equity incentive awards due to manipulating financial results to hit targets in the plan.  The fiscal year 2017 PRUs were funded at 268.2% of a target, based on fiscal year 2018 adjusted non-GAAP operating income results that were ahead of the original goals and delivered achievement of 109.29% of target.  In particular, the fiscal year 2018 non-GAAP operating income target under the fiscal year 2017 PRUs was $1.56 billion, and the Company achieved $1.705 billion in adjusted non-GAAP operating income in fiscal year 2018, resulting in the achievement of 109.29% of target, with funding at 268.2% of target, 250% of which was earned and vested at the end of fiscal year 2018.  As a result, Defendant Clark and Noviello received nearly $52.1 million in performance-based equity awards at the end of fiscal 2018 and were due to receive a total of 219,209 additional shares of Symantec at the end of fiscal 2019 with a value at grant date (June 29, 2016) of nearly $3.8 million as a result of Symantec exceeding its fiscal 2018 adjusted non-GAAP operating income target.

298.     Moreover, the fiscal year 2018 PRUs were structured so that 50% of the awards were eligible to be earned based on fiscal year 2018 adjusted EPS ("FY2018 Year One Shares").  The Company achieved adjusted EPS of $1.56 per share, or 95.2% of this metric, resulting in the threshold level having been achieved and 50.5% of the FY2018 Year One Shares (25.25% of the total FY18 PRUs) becoming eligible to be earned at the end of fiscal year 2020.  Accordingly, Clark and Noviello were eligible to receive 125,793 Symantec shares with a value at grant date (June 9, 2017) of more than $4.3 million at the end of fiscal 2020.

### M.     Suspicious Executive Departures

299.     In the wake of the revelation of the fraud, virtually Symantec's entire senior executive team was terminated, including both Defendant Clark and Noviello, as well as multiple other senior executives who had come to Symantec as part of the purportedly "transformative" Blue Coat acquisition.

300.     First, on November 29, 2018, the Company announced that Michael Fey, Symantec's President and Chief Operating Officer, had resigned "effective immediately" and that Defendant Clark had been appointed as President in his stead.  According to a Form 8-K filed by the Company on November 29, 2018, under the terms of Fey's separation agreement, Fey agreed,

in part, to: (i) forego severance benefits or payments, rights to any unvested equity awards, and any cash bonus payments; and (ii) not exercise, sell or transfer any shares subject to currently vested or exercisable Company stock options previously awarded for 12 months.  Fey's separation agreement also contained a general release and waiver of claims by Fey against the Company.

301.   The media immediately questioned the true circumstances surrounding Fey's resignation, and Defendants refused to address those concerns.  For example, a November 29, 2018 CRN news article reported that: "Symantec declined to comment on whether Fey's departure was connected to the findings from the investigation."  As another example, the next day, a November 30, 2018 RBC Capital Markets analyst report stated: "Overall we are surprised by the move, and to us it appears that ***this was rather sudden and not a voluntary decision by Mr. Fey***."  Indeed, the former Symantec Account Manager identified in ¶120 confirmed that Fey left Symantec in connection with the Audit Committee investigation and an internal Ethics Committee investigation.   Mr. Kearney similarly confirmed that Fey left in connection with the Audit Committee investigation, and was paid millions of dollars.

302.   <u>Second</u>, at the exact same time that Fey left Symantec, multiple other senior executives left the Company, including Chief Marketing Officer Michael Williams and Senior Vice President Bradon Rogers.  Significantly, Symantec did not disclose any of those departures when it announced Fey's "resignation."  As Bloomberg observed in a November 30, 2018 article entitled *Three Executives Depart in Major Leadership Shuffle at Symantec*, "Symantec announced Thursday that President and Chief Operating Officer Michael Fey had resigned, ***but didn't publicize the other executive departures***."  Symantec again refused to provide any information concerning the departures of these senior executives.  As the same Bloomberg article reported, "A company spokesman said Symantec wouldn't be making any further public comments on the executive changes."

303.   <u>Third</u>, on January 31, 2019, Symantec announced Noviello's departure ostensibly to "pursue other opportunities."  The market again reacted to this news with concern, especially on the heels of the departure of Fey and other senior Symantec executives.  For example, as Trefis observed in a February 1, 2019 article, the fact that there had been "***a spate of executive exits (the***

*COO in November and now the CFO) while the audit committee review fades is not necessarily the most inspiring set of events for investors*."

304.   In addition to Trefis, other analysts directly connected Noviello's departure with the Audit Committee investigation.  For example, Macquarie reported on January 31, 2019 that "*CFO Nick Noviello will be stepping down, clearing some clouds around the stock from investigations & class action suits, though our concerns persist*."

305.   The same analyst report cited this Action and the ongoing SEC investigation as additional reasons for Noviello's departure.  Specifically, Macquarie stated: "*CFO Nick Noviello will be stepping down over the coming months, an outcome we view as reasonable following the co.'s Internal Audit Committee investigation, an ongoing SEC investigation, and a class action suit with allegations of accounting fraud*."  Mr. Kearney confirmed his understanding that Noviello left in connection with the Audit Committee investigation.

306.   <u>Fourth</u>, on May 9, 2019, the Company announced that Defendant Clark would be leaving the Company without a permanent replacement, and attributed Clark's departure to "personal issues" and wanting to "spend more time with his aging father."  Again, the market was concerned about the true circumstances of Defendant Clark's departure.  Specifically, during a May 9, 2019 investor call, Brad Alan Zelnick, an analyst from Credit Suisse, asked:

> [I]n the spirit of transparency, which you mentioned several times, I think I need to ask*, is Greg's departure in any way related to a disagreement with the Board or the company or in and way related to either the still unresolved SEC investigation or any pending litigation against the company*?

In response, Symantec's new interim president and CEO Richard Hill did not deny the connection, and instead he evasively stated:

> *So I can't answer for Greg.  You certainly can talk to him as much as you want.  From my perspective, there comes a time when CEOs, things happen in companies*, CEOs aren't – didn't do it or didn't have an effect on it other than you're at the top of the pyramid.  And when you're at the top of the pyramid, sometimes things happen.  *So that's the best I can do with an answer. Because I don't have definitive*.  And there's no connection, absolutely, to the investigation that I know of.  At least no one's ever said that to me.  *I can say that factually*.

307.   Analysts took note of this obviously evasive answer.  For example, a May 10, 2019 Credit Suisse report stated that "While Mr. Hill indicated Mr. Clark's departure was not due to any personal disagreement with him or any litigation that he was aware of, ***he stopped short of*** speaking on behalf of the entire board or ***denying any nexus with ongoing litigation or the company's still unresolved SEC investigation***."

308.   <u>Fifth</u>, on July 10, 2019, Bloomberg reported that Symantec's Head of Global Enterprise Sales, Marc Andrews, was leaving the Company, along with Denny Young, Symantec's former Vice President of Operations at Enterprise Security; Bryan Barney, the Company's former SVP, GM of Enterprise Security; Javed Hasan, former SVP, Endpoint, IAAS & Datacenter products; and Steve Schoenfeld, former SVP, Product Management.   Both Andrews and Schoenfeld had come to Symantec from Blue Coat.  The same Bloomberg article reported that Defendant Clark had been terminated "following the disclosure of internal investigation in May [2018]," that Clark's departure created "organizational disruption and distraction," and that Symantec was experiencing "fundamental turbulence."

309.   <u>Finally</u>, multiple other senior executives who were formerly at Blue Coat departed Symantec, including: (a) Francis C. Rosch, Symantec's former Executive Vice President for Consumer Digital Safety, who was principally responsible for managing the integration of LifeLock into Symantec's Consumer Digital Safety business segment and achieving the Company's project cost savings synergies; (b) Joe McPhillips, the Company's former Director of Channel Sales for Symantec's Pacific region and who came over from Blue Coat; and (c) Brian Kenyon, the former Chief Strategy Officer who had served in that role since August 2016 since coming over through acquisition of Blue Coat.

### N.   <u>Broadcom Lowers Its Price For Symantec By $1 Billion After Due Diligence</u>

310.   On July 2, 2019, the news media reported that Broadcom, Inc. ("Broadcom"), a chipmaker, was in advanced talks to buy Symantec.   Immediately, the market noted that this would be a good deal for Symantec given the terminations of Defendant Clark and Noviello described above.  On July 8, 2019, Bloomberg reported that Broadcom had secured financing and identified cost savings for an all cash deal for the Company.

311.   Days later, on July 14, 2019, citing multiple sources, CNBC suddenly announced that Broadcom was backing out of the deal and negotiations after having engaged in "constructive talks" for some time.[25]   Symantec would not accept $28 or less per share, and Broadcom refused to pay Symantec's demanded amount due to ***discoveries that Broadcom made during its due diligence investigation of Symantec***. In its July 14, 2019 article breaking the story, CNBC observed that "Symantec has been dogged in recent years by management turnover." On this news, Symantec stock dropped more than 15% in intraday trading, while Broadcom stock rose over 3% in intraday trading.

312.   News media including, for example, the *Financial Times* reported that "as the semiconductor group [Broadcom] was finalising its due diligence over the weekend, ***it discovered new information*** that prompted it to try to cut the value of the deal below $28 per share." Specifically, multiple news publications reported that the two sides had agreed to a transaction at $28.25 per share, but that after uncovering this new information during its diligence, Broadcom reduced the price by $1.50 per share.   Taking that $1.50 share price reduction multiplied by the number of Symantec shares outstanding as reported in Symantec's Form 10-K for the year ended March 29, 2019, amounts to a ***loss in value of nearly $1 billion.***

313.   The *New York Times*, for example, reported that "it is not clear what Broadcom discovered." Channel Partners similarly reported that according to GlobalData's principal analyst Amy DeCarlo, she expected that "during the due diligence process, Broadcom saw areas of uncertainty or weakness that caused concerns that didn't justify the price."

314.   The market was shocked by Broadcom's decision to lower its offer price in the middle of due diligence, and noted the serious, negative ramifications for Symantec, as well as Symantec's management turnover and the recent investigations and accounting allegations at issue in this case.  Indeed, the deal may close at the lower price or collapse entirely.

---

[25] The CNBC news report is available here:  https://www.cnbc.com/video/2019/07/15/symantec-broadcom-deal-negotiations-faber-squawk-on-street.html.

315.    For example, on July 15, 2019, The Register reported that Symantec's "CEO Greg Clark stepped down in May with no permanent replacement; something Symantec has had to get used to, losing five chief executives now in eight years.  The security ship is also plagued with allegations of dodgy accounting, into which investigations are ongoing."  On the same day, in an article entitled "Analyst Calls Abandoned Symantec-Broadcom Merger Talks A 'Head-Scratcher,'" Benzinga reported that, according to Wedbush analyst Daniel Ives, "Symantec must prove its standalone valuation to Wall Street, which may be difficult given its recent CEO departure [Defendant Clark], disappointing earnings, and a difficult environment."  Zacks Equity Research similarly reported on July 16, 2019, that "Symantec has been plagued with frequent changes in management…."

316.    Notably, while the Company told investors on May 9, 2019 that Defendant Clark had "resigned" to spend time with his aging father, CFRA reported on July 15, 2019 that Clark "has partnered with buyout firms Advent and Permira" and "could make a competing offer for Symantec."

## VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

317.    Throughout the Class Period, Defendants Symantec Corporation and Gregory S. Clark made false and misleading statements in which they misrepresented or omitted material facts concerning Symantec's financial and operating results, including in (a) presentations and commentary on Symantec's historical financial results; (b) statements of adjusted measures; (c) affirmations of effective internal controls for financial reporting; and (d) certifications pursuant to SOX attesting to the accuracy of Symantec's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

### A.    Fourth Quarter Fiscal Year 2017 And Fiscal Year 2017

318.    On May 10, 2017, after market hours, the Company filed with the SEC its quarterly report for the fourth quarter and fiscal year ended March 31, 2017, on Form 8-K.  The Company held an earnings call also on May 10, 2017 to discuss its results for the fourth quarter and fiscal year ended March 31, 2017. On May 19, 2017, Symantec filed with the SEC its Annual Report on

Form 10-K signed by Defendant Clark, as well as CFO Noviello and CAO Garfield.  As set forth below, the 4Q2017 Form 8-K, the 2017 Form 10-K, and Defendants' May 10, 2017 earnings call contained materially false and misleading statements about Symantec's: (i) reported revenue and cash flow; (ii) adjusted GAAP metrics for revenue, expenses and operating income; and (iii) effective internal controls for financial reporting.

### 2.    Improper Recognition Of Revenue and Misstated Cash Flow

319.    In its Forms 8-K and 10-K, Symantec reported quarterly GAAP revenue of $1.115 billion and fiscal year 2017 GAAP revenue of $4.019 billion.  On the Company's Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.353 billion as of March 31, 2017.

320.    In the section of the 2017 Form 10-K entitled "Notes to the Consolidated Financial Statements," Defendants affirmed, "The accompanying consolidated financial statements of Symantec and our wholly-owned subsidiaries are prepared in conformity with generally accepted accounting principles in the United States ('U.S. GAAP')."  Defendants also set forth the Company's policy for revenue recognition, which provides, among other things, "We recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability is probable."

321.    Defendants' statements regarding the Company's reported revenue, deferred revenue, and compliance with GAAP and its internal revenue recognition policy, as set forth above in ¶¶319-20, were false and misleading and omitted material facts.  Throughout the Class Period, Symantec improperly recognized revenue in violation of GAAP.  *See* Section V(A)-(B).  Contrary to GAAP, Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP.  Consequently, Symantec's reported fourth quarter fiscal year 2017 and fiscal year 2017 GAAP revenue in the Company's Forms 8-K and 10-K were overstated, the Company's reported deferred revenue for those same periods was understated, the Company's 2017 Form 10-

K was not prepared in accordance with GAAP, and the Company was not complying with its internal revenue recognition policy.

322.   Moreover, in its Forms 8-K and 2017 10-K, Symantec reported its cash flow.  In the section of Symantec's Form 8-K entitled "Q4 Cash Flow Statement," Symantec reported that "Cash flow from operations was $353 million which included the negative impact of separation and restructuring payments totaling $27 million, in addition to acquisition and integration payments."  In a Company presentation dated May 10, 2017, Symantec further represented that "cash flow from operating activities" was $353 million in Q4 2017 and $250 million in Q4 2016, for total year-over-year growth of 41%.   During its May 10, 2017 earnings conference call, Symantec (through CFO Noviello) further stated: "Cash flow from operations for the full year was negative $220 million, but included $887 million in cash tax payments related to the sale of Veritas and $141 million of restructuring and separation payments."

323.   Similarly, in its 2017 Form 10-K, Symantec reported its "cash flows" in millions in the charts set forth below:



324.   The 2017 Form 10-K also contained descriptions of cash flow from "continuing operating activities" and "continuing investing activities."  The 2017 Form 10-K stated: "Our primary source of cash from continuing operating activities has been from cash collections from our customers. … Our primary uses of cash from our continuing operating activities include payments for income taxes, payments for compensation, and related costs, payments to our resellers and distribution partners, and other general corporate expenditures."  The Form 10-K further stated: "Our investing cash flows consist primarily of acquisitions, capital expenditures and investment purchases, sales, and maturities."

325.   Defendants' statements regarding the Company's reported cash flows from operating activities and cash flows from investing activities, as set forth in ¶¶322-24 above were false and misleading and omitted material facts.  As of May 19, 2017, the Company had "misstated Cash Flow from Investing Activities and Cash Flow from Operations by an equal amount for 5+ years."  *See* Derivative Complaint, ¶106.

### 3.   Manipulating Adjustments Of GAAP Measures To Non-GAAP Measures

326.   In the Company's 4Q2017 Form 8-K, Defendants supplemented Symantec's reported GAAP financial results with a presentation of Symantec's adjusted financial measures.  Symantec reported non-GAAP revenue for Q4 2017 of $1.176 billion and $4.163 billion for fiscal year 2017.  The Company also reported non-GAAP operating income for Q4 2017 of $314 million and $1.194 billion for fiscal year 2017.

327.     In the Company's 4Q2017 Form 8-K and 2017 Form 10-K, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the Company reported "Restructuring, separation, transition, and other" expenses for Q4 2017 of $72 million, and $273 million for the entire fiscal year.  In Note 4 to the Consolidated Financial Statements in the 2017 Form 10-K, the Company provided further information regarding the nature of this line item expense, including a description of the type of costs that the Company recorded as "transition costs," and represented that the Company had incurred $94 million in so-called transition costs for fiscal year 2017:

Note 4.  Restructuring, Separation, Transition, and Other Costs

. . . Transition costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes.

. . .

We incurred $94 million in continuing operations transition expense during fiscal 2017.

328.     In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," the Company explained how its adjusted financial measures for Q4 2017 and fiscal year 2017 were derived, including Symantec's adjusted operating expenses and operating income. With respect to the Company's adjusted operating expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, separation, transition, and other," removing operating expenses of $72 million for Q4 2017 and $273 million for fiscal year 2017.

329.     In the "Explanation of Non-GAAP Measures and Other Items" attached as Appendix A to the 4Q2017 Form 8-K, Defendants explained their reasoning for making the "Restructuring, separation, transition and other" adjustment, stating that the Company removed this expense because these costs, including the Company's transition costs, were purportedly "discrete events" and costs not incurred in the "ordinary course of business":

Restructuring, separation, transition and other:  We have engaged in various restructuring, separation, transition, and other activities over the past several years that have resulted in costs associated with severance, facilities, transition, and other

related costs. . . .   Transition and associated costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes. . . .   ***Each restructuring, separation, transition, and other activity has been a discrete event based on a unique set of business objectives or circumstances, and each has differed from the others in terms of its operational implementation, business impact and scope. We do not engage in restructuring, separation, transition, or other activities in the ordinary course of business***.

330.   Defendants used its adjusted measures to inform investors about Symantec's financial condition.  For example, on May 10, 2017, Defendants held a quarterly earnings call, during which Defendant Clark emphasized the Company's "strong" financial performance and outlook, highlighting the Company's adjusted revenue and operating margins:

Enterprise Security profitability has improved dramatically with Q4 fiscal year 2017 operating margins up 17 points year-over-year.  Consumer Security revenue growth performed better than our guidance and LifeLock came in above our revenue expectations as well.  Overall, we continue to perform ahead of plan on our cost efficiencies and synergies.  Total company margins were at the high end of our guidance.  And as a result, we delivered EPS at the high end of our guidance, including LifeLock.

. . .

Consumer Security exceeded the high end of our revenue guidance on an organic basis and LifeLock performed above revenue expectations with strong underlying growth metrics.  LifeLock renewal rates increased year-over-year and cumulative ending numbers were up 8% year-over-year.  This is an impressive result amidst the significant acquisition and integration activity.

331.   Similarly, Symantec (through CFO Noviello) also emphasized the Company's adjusted operating margin on the call, representing the increasing margin was the product of the Company's execution on its cost-savings initiatives and synergies:

Our fourth quarter non-GAAP revenue was $1.176 billion[.]

. . .

Non-GAAP operating margin for the fourth quarter was 27%. . . .  Operationally, our strong non-GAAP operating margin was driven by continued execution against our cost-savings initiatives and synergies.

Fully diluted non-GAAP earnings per share was $0.28 . . . .  Excluding LifeLock, fully diluted non-GAAP earnings per share was $0.29, at the high end of our $0.27 to $0.29 guidance range.

. . .

Enterprise non-GAAP operating margin was 16%, up 17 points year-over-year.

. . .

Our Consumer Security segment non-GAAP . . . operating margin was 42%.

. . .

Including LifeLock, non-GAAP operating margin remained at 29%.  Non-GAAP EPS was $1.18, including a $0.01 headwind from LifeLock, which is an increase of 15% year-over-year and above our original guidance of $1.06 to $1.10 provided in May 2016.

332.    Defendants' presentation and commentary regarding Symantec's reported adjusted measures, including the Company's net revenues and operating expenses, and statements regarding the Company's "Restructuring, separation, transition, and other" expenses and "transition costs" as set forth above in ¶¶326-31, were false and misleading and omitted material facts.

(a)    As described above, throughout the Class Period, Defendants improperly recognized revenue.  *See* Section V(A)-(B).  Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms, or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy.  Consequently, Symantec's reported fourth quarter fiscal year 2017 and fiscal year 2017 adjusted revenue in the Company's Form 8-K was overstated.

(b)    Defendants overstated Symantec's adjusted operating income.  *See* Section V(B).  Defendants recorded General and Administrative costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Separation, Transition, and Other Costs" line item.  The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket.  Moreover, by virtue of the "Restructuring, separation, transition and other" adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business.  Consequently, Defendants'

description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, separation, transition and other" line item expenses were misstated. Additionally, while the Company's approach to recognizing "transition costs" changed after the Blue Coat acquisition, the description of "transition costs" remained the same or did not meaningfully change so as to disclose how Symantec was recording transition costs. Moreover, Defendants' reported adjusted operating income for Q4 2017 and for fiscal year 2017, as well as other reported adjusted metrics dependent on these figures, such as operating margin and EPS, as set forth in the Company's 4Q2017 Form 8-K and Defendants' commentary, were also misstated.

333. Securities analysts reacted positively to Symantec's apparent success in meeting or exceeding its non-GAAP earnings estimates. For example, analysts at Evercore ISI highlighted the Company's "Non-GAAP operating margin of ~36-37%" and management's "Continued success with cost reductions." Similarly, analysts at Piper Jaffray noted, "The company is clearly making progress in both the Enterprise and Consumer segments, with Blue Coat and LifeLock both performing in-line with expectations." Further, Joseph Bonner of Argus observed, "Fourth-quarter non-GAAP revenue rose 35% year-over-year to $1.176 billion, well above the high end of management guidance range and the consensus estimate of $1.080 billion."

### 4. False Internal Controls And SOX Certifications

334. In the section of the 2017 Form 10-K titled, "Controls and Procedures," Defendants affirmed that Defendants had evaluated Symantec's internal control over financial reporting, that the Company's internal control over financial reporting was effective, and that there were no changes in the Company's internal control over financial reporting during the quarter ended March 31, 2017, that materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

335. In addition, the 2017 Form 10-K contained certifications pursuant to SOX Sections 302 and 906 signed by Defendant Clark and Noviello attesting to the accuracy of financial reporting, the disclosure of material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

336.     Defendants' statements regarding the Company's internal control over financial reporting and in their SOX certifications were false and misleading.  In truth, Defendants maintained ineffective internal controls over financial reporting, including for the recognition of revenue and review, approval and tracking of transition and transformation expenses.  In addition, contrary to their SOX certifications, Defendants knew that the 2017 Form 10-K contained untrue statements of material fact and that the financial statements and other financial information included in the 2017 Form 10-K did not fairly present in all material respects the financial condition, results of operations and cash flows of Symantec for fiscal year 2017.  Moreover, Defendants failed to disclose all significant deficiencies and material weaknesses in the design and operation of Symantec's internal control over financial reporting likely to adversely affect Symantec ability to record, process, summarize and report financial information, as well as the financial fraud that Defendants and other employees with significant roles in Symantec's internal control over financial reporting were committing.

**B.      First Quarter Fiscal Year 2018 Results**

337.     On August 2, 2017, Symantec filed with the SEC its financial results for the first quarter fiscal year 2018 for the period ending June 30, 2017, and supplemental financial information and commentary by Noviello on Form 8-K.  On August 4, 2017, Symantec filed with the SEC its quarterly report for the first quarter fiscal year 2018 for the period ending on June 30, 2017, on Form 10-Q, which was signed by Defendant Clark and Noviello.  As set forth below, the 1Q2018 Form 8-K and 1Q2018 Form 10-Q contained materially false and misleading statements about Symantec's: (i) reported revenue; (ii) adjusted GAAP metrics for revenue, expenses and operating income; and (iii) effective internal controls for financial reporting.

**2.      Improper Recognition Of GAAP Revenue**

338.     In the 1Q2018 Form 8-K and 1Q2018 Form 10-Q, Symantec reported quarterly GAAP revenue of $1.175 billion.  On the Company's Condensed Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.329 billion as of June 30, 2017.

339.     In the section of the 1Q2018 Form 10-Q titled, "Notes to Condensed Consolidated Financial Statements," Symantec affirmed that its financial statements were prepared in

accordance with GAAP.  Likewise, in the section entitled "Critical Accounting Policies And Estimates," Defendants confirmed Symantec's adherence to its stated revenue recognition policies by affirming there "have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements during the three months ended June 30, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017."

340.   Defendants' statements regarding the Company's reported revenue, deferred revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above in ¶¶338-39, were false and misleading and omitted material facts.  Throughout the Class Period, Symantec improperly recognized revenue in violation of GAAP.  *See* Section V(A)-(B).  Contrary to GAAP, Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP.  Consequently, Symantec's reported first quarter fiscal year 2018 GAAP revenue in the Company's Forms 8-K and 10-Q was overstated, the Company's reported deferred revenue for those same periods was understated, the Company's 1Q2018 Form 10-Q was not prepared in accordance with GAAP, and the Company was not complying with its internal revenue recognition policy.

### 3.   Manipulating Adjustments Of GAAP Measures To Non-GAAP Measures

341.   In the Company's 1Q2018 Form 8-K, Defendants supplemented Symantec's reported GAAP financial results with a presentation of Symantec's adjusted financial measures.  The Company reported non-GAAP revenue for Q1 2018 of $1.228 billion and non-GAAP operating income (also referred to as net income) of $221 million.

342.   In the Company's 1Q2018 Form 8-K and 1Q2018 Form 10-Q, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the

Company reported "Restructuring, transition, and other" expenses for the first quarter of fiscal year 2018 of $88 million.  In Note 4 to the Consolidated Financial Statements in the 1Q2018 Form 10-Q, the Company provided further information on the nature of this line item expense, including a description of the type of costs that the Company recorded as "Transition Costs," and represented that it had incurred $28 million in transition costs over the first quarter fiscal year 2018:

Note 4.  Restructuring, Transition and Other Costs

. . . Transition costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes.

[W]e expect continuing significant transition costs associated with the implementation of a new enterprise resource planning system and costs to automate business processes.

Restructuring, transition and other costs summary

For the three months ended June 30, 2017 we incurred the following restructuring, transition and other costs:

| (In millions) | | June 30, 2017 | |
|---|---|---|---|
| Severance and termination costs | $ | 27 | |
| Other exit and disposal costs | | 32 | |
| Asset write-offs | | 1 | |
| Transition costs | | 28 | |
| Total restructuring, transition and other | $ | 88 | |

343.    In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," the Company explained how its adjusted measures for Q1 2018 were derived, including the Company's adjusted operating expenses and operating income.  As for the Company's adjusted expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, transition and other," removing operating expenses of $88 million for Q1 2018.

344.    In the "Explanation of Non-GAAP Measures and Other Items," attached as Appendix A to the 1Q2018 Form 8-K, Defendants explained their reasoning for making the "Restructuring, transition and other" adjustment, stating that the Company removed this expense

because these costs, including its transition costs, were purportedly "discrete events" and costs not incurred in the "ordinary course of business":

> Restructuring, transition and other:  We have engaged in various restructuring, transition and other activities over the past several years that have resulted in costs associated with severance, facilities, transition, and other related costs. Transition and associated costs primarily consist of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes. . . .  ***Each restructuring, transition and other activity has been a discrete event based on a unique set of business objectives or circumstances, and each has differed from the others in terms of its operational implementation, business impact and scope. We do not engage in restructuring, transition or other activities in the ordinary course of business***.

345.    Defendants used these adjusted measures to inform investors about Symantec's financial condition.  On August 2, 2017, Defendants held a quarterly earnings call during which Symantec (through CFO Noviello) made the following statements regarding the Company's first quarter fiscal year 2018 financial results, promoting the Company's adjusted operating margin and EPS:

> Operating margin for the first quarter was 31%, above our guided range of 27% to 29%, driven by top line outperformance and continued execution against our cost savings initiatives and synergies.  We remain ahead of schedule to achieve our expected net cost efficiencies as well as our expected Blue Coat and LifeLock cost synergies, which gives us further confidence around our guidance and the significant increase in operating margins we expect this year. . . .  Fully diluted earnings per share was $0.33, above our $0.28 to $0.32 guidance range.

> Enterprise Security operating margin was 17%, up 11 points year-over-year, driven by our cost savings initiatives.

> Q1 FY '18 Consumer Digital Safety operating margin was 47%, driven in part by top line growth and the faster realization of LifeLock synergies.

346.    Defendants' presentation and commentary regarding Symantec's reported non-GAAP financial measures, including the Company's non-GAAP net revenues and non-GAAP operating expenses, and statements regarding the Company's "Restructuring, transition, and other" expenses and "transition costs" as set forth above in ¶¶341-45 were false and misleading and omitted material facts.

(a)     As described above, throughout the Class Period, Defendants improperly recognized revenue.  Section V(A)-(B).  Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy.  Consequently, Symantec's reported first quarter fiscal year 2018 adjusted revenue in the Company's Form 8-K was overstated.

(b)     Defendants overstated Symantec's adjusted operating income.   Section V(B).  Defendants recorded General and Administrative costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Transition and Other Costs" line item.  The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket.  Moreover, by virtue of the "Restructuring, transition and other" adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business.  Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, separation, transition and other" line item expenses were misstated.  Additionally, while the Company's approach to recognizing "transition costs" changed after the Blue Coat acquisition, the description of "transition costs" remained the same or did not meaningfully change so as to disclose how Symantec was recording transition costs. Moreover, Defendants' reported adjusted operating income for Q1 2018, as well as other reported adjusted metrics dependent on this figure, such as operating margin and EPS, as set forth in the Company's 1Q2018 Form 8-K and Defendants' commentary, were also misstated.

347.   Analysts responded positively to Symantec's "strong" first quarter non-GAAP financial results, which exceeded the Company's guidance.  For example, analysts at Barclays Capital noted, "1Q revenue ahead of expectations on broad strength.  Revenue of ~$1.3B was

ahead of our estimate by ~$21M, with both consumer and enterprise exceeding our estimates. . . .
EPS also beat expectations as SYMC remains ahead of plan on cost synergies.  EPS of $0.33 was
$0.02 ahead of us and the Street, as operating margin was nearly 300 bps above our forecast."
BTIG remarked, "we're finally on the cusp of growth.  FY1Q saw growth in both segments with
improved profitability.  Encouragingly, FY18 should mark the year that Symantec metaphorically
pours more fuel on the fire, and firmly accelerates into a new reality of revenue and profitability
expansion.  We continue to have confidence that this management team can execute and meet and
likely exceed street expectations going forward.  Maintain Buy."

### 4.    False Internal Controls And SOX Certifications

348.    In the section of the 1Q2018 Form 10-Q titled, "Controls and Procedures,"
Defendants affirmed that Defendants had evaluated Symantec's internal control over financial
reporting, that the Company's internal control over financial reporting was effective, and that there
were no changes in the Company's internal control over financial reporting during the quarter
ended June 30, 2017, that materially affected, or were reasonably likely to materially affect, the
Company's internal control over financial reporting.

349.    In addition, the 1Q2018 Form 10-Q contained certifications pursuant to SOX
Sections 302 and 906 signed by Defendant Clark and Noviello attesting to the accuracy of financial
reporting, the disclosure of material changes to the Company's internal control over financial
reporting, and the disclosure of all fraud.

350.    Defendants' statements regarding the Company's internal control over financial
reporting and in their SOX certifications were false and misleading.  In truth, Defendants
maintained ineffective internal controls over financial reporting, including for the recognition of
revenue and review, approval and tracking of transition and transformation expenses.  In addition,
contrary to their SOX certifications, Defendants knew that the 1Q2018 Form 10-Q contained
untrue statements of material fact and that the financial statements and other financial information
included in the 1Q2018 Form 10-Q did not fairly present in all material respects the financial
condition, results of operations and cash flows of Symantec for the first quarter fiscal year 2018.
Moreover, Defendants failed to disclose all significant deficiencies and material weaknesses in the

design and operation of Symantec's internal control over financial reporting likely to adversely affect Symantec's ability to record, process, summarize and report financial information, as well as the financial fraud that Defendants and other employees with significant roles in Symantec's internal control over financial reporting were committing.

### C.    August 8, 2017 Item 5.02 On Form 8-K

351.    On August 8, 2017, Symantec filed Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers with the SEC on Form 8-K, announcing that Garfield, its Senior Vice President and CAO, resigned from his position effective August 7, 2017.  The Company stated, "Mr. Garfield has agreed to continue to serve in an advisory capacity with the Company through October 2017. ***Mr. Garfield[']s decision to leave the Company was not due to any disagreement relating to the Company[']s management, policies, or practices.***  Nicholas R. Noviello, the Company[']s Executive Vice President and Chief Financial Officer, assumed the responsibilities of Principal Accounting Officer effective August 7, 2017."

352.    Defendants' statements in the Form 8-K filed on August 8, 2017, were false and misleading and omitted material facts.  Mr. Garfield's decision to leave the Company was due to his disagreement relating to the Company's accounting policies and practices.  Such policies and practices directly impacted the Company's public disclosures, including commentary on historical financial results, its reporting of adjusted measures, including those that could impact executive compensation programs, certain forward-looking statements, stock trading plans and retaliation. Notably, the Company did not include the same explanation – that the departure "was not due to any disagreement relating to the Company[']s management, policies, or practices" – in the announcement of other executive departures.

### D.    August 16, 2017 Proxy Statement

353.    On August 16, 2017, the Company filed a Schedule 14A with the SEC ("2017 Proxy Statement"), which set forth the Company's executive compensation practices and philosophy. The 2017 Proxy Statement stated that the Company's executive compensation programs provided "direct alignment with stockholders" and that the Company uses "responsible pay policies to

reinforce strong governance and enhance shareholder alignment." The 2017 Proxy Statement discussion of executive compensation states, in relevant part:

### OUR EXECUTIVE COMPENSATION PHILOSOPHY AND PRACTICES

The overriding principle driving our compensation programs continues to be our belief that it benefits our employees, customers, partners and stockholders to have management's compensation tied to our near- and long-term performance. Our pay programs reward achievement of challenging performance goals that align with our business strategy. We measure shorter-term results, though the majority emphasis is placed on long-term equity compensation that provides direct alignment with stockholders. We use responsible pay policies to reinforce strong governance and enhance stockholder alignment.

| Base Salary | Annual Incentives | Long-Term Incentives |
|---|---|---|
| • Aligned with role, contributions, and competitive market practice<br>• Supports attraction and retention of talent | • 50% Revenue (non-GAAP)<br>• Encourages overall company growth, a key shareholder value driver | • 70% Performance Units (PRUs)*<br>• Special 1-time design that reinforces the multi-year business transformation and aligns to stockholder value generation*<br>• Measures Operating Income (non-GAAP) at the end of fiscal 2018 to assess achievement of growth and cost reduction goals |
| **Pay Policies** | 50% Operating Income (non-GAAP) | 30% time-vested restricted stock units (RSUs) |
| • Ownership guidelines<br>• No hedging/pledging<br>• Clawback policy<br>• Double-trigger equity | • Provides a strong focus on cost control, aligns with shareholder value growth | • Promotes retention and shareholder alignment |

354. The 2017 Proxy Statement also stated, "Fiscal 2017 Performance. Our non-GAAP operating income was 105% of the targeted performance level, and our non-GAAP revenue was 100% of the targeted performance level." The 2017 Proxy Statement further stated "Incentive Award Outcome. Our non-GAAP operating income metric funded at 125.8% of target and non-GAAP revenue funded at 100% of target. The approved funding level was 111.5% of target, slightly below the formulaic payout."

355. Defendants' statements regarding the Company's Executive Compensation programs, as set forth above in ¶¶353-54 were false and misleading and omitted material facts. Defendants inflated the Company's adjusted revenues and operating income through improper accounting practices and deceptive adjustments, allowing Defendants to meet their annual incentive targets. Consequently, the Company's executive compensation program was not tied to

the Company's actual near- and long-term performance, was not aligned with shareholder interests, and was not a responsible pay policy to reinforce strong governance and enhance stockholder alignment.  Moreover, contrary to Defendants' representations, the Company had not in fact achieved the stated adjusted revenue and operating income targets.

### E.   Second Quarter Fiscal Year 2018 Results

356.    On November 1, 2017, Symantec filed with the SEC its financial results for the second quarter fiscal year 2018 for the period ending September 29, 2017, and supplemental financial information and commentary by Noviello on Form 8-K.  On November 3, 2017, Symantec filed with the SEC its Quarterly Report for the second quarter fiscal year 2018 on Form 10-Q for the period ending September 29, 2017, which was signed by Defendant Clark and Noviello.  As set forth below, the 2Q2018 Form 8-K and 2Q2018 Form 10-Q contained materially false and misleading statements about (i) reported revenue; (ii) adjusted revenue, operating expenses and operating income; and (iii) effective internal controls for financial reporting.

### 1.    Improper Recognition Of GAAP Revenue

357.    In the 2Q2018 Form 8-K and 2Q2018 Form 10-Q, Symantec reported quarterly GAAP revenue of $1.240 billion.  On the Company's Condensed Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.041 billion as of September 29, 2017.

358.    In the section of the 2Q2018 Form 10-Q titled, "Notes to Condensed Consolidated Financial Statements," Symantec affirmed that its financial statements were prepared in accordance with GAAP.  Likewise, in the section entitled "Critical Accounting Policies And Estimates," Defendants confirmed Symantec's adherence to its stated revenue recognition policies by affirming there "have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements during the six months ended September 29, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017."

359.    Defendants' statements regarding the Company's reported revenue, deferred revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above

in ¶¶357-58, were false and misleading and omitted material facts.  Throughout the Class Period, Symantec improperly recognized revenue in violation of GAAP.  Section V(A)-(B).  Contrary to GAAP, Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP.  Consequently, Symantec's reported second quarter fiscal year 2018 GAAP revenue in the Company's Forms 8-K and 10-Q were overstated, the Company's reported deferred revenue for the same period was understated, the Company's 2Q2018 Form 10-Q was not prepared in accordance with GAAP, and the Company was not complying with its stated revenue recognition policy.

### 2.    Manipulating Adjustments Of GAAP Measures To Non-GAAP Measures

360.    In the 2Q2018 Form 8-K, the Company supplemented its reported GAAP financial results with a presentation of Symantec's adjusted financial measures.  The Company reported non-GAAP revenue for Q2 2018 of $1.276 billion and non-GAAP operating income of $435 million.

361.    In the Company's 2Q2018 Form 8-K and 2Q2018 Form 10-Q, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the Company reported "Restructuring, transition and other" expenses for the second quarter of fiscal year 2018 of $97 million.  In Note 4 to the Consolidated Financial Statements in the 2Q2018 Form 10-Q, the Company provided further information on the nature of this line item expense, including a description of the type of costs that the Company deems "Transition Costs," and represented that it had incurred a quarterly expense of $76 million in transition costs and $120 million over the past two quarters:

Note 4.  Restructuring, Transition and Other Costs

Our restructuring, transition and other costs and liabilities consist primarily of severance, facilities, transition and other related costs. . .. Transition costs primarily consist of consulting charges associated with the implementation of new enterprise

resource planning systems, costs to automate business processes and costs associated with divestitures of our product lines and businesses.

. . .

[W]e expect continuing significant transition costs[.]

. . .

Restructuring, transition and other costs summary

Our restructuring, transition and other costs are presented in the table below:

| (In millions) | Three Months Ended September 29, 2017 | | Six Months Ended September 29, 2017 | |
|---|---|---|---|---|
| Severance and termination benefit costs | $ | 12 | $ | 39 |
| Other exit and disposal costs | | 1 | | 17 |
| Asset write-offs | | 8 | | 9 |
| Transition costs | | 76 | | 120 |
| Total | $ | 97 | $ | 185 |

. . .

Restructuring, transition and other

. . . During the first six months of FY18, we also incurred additional divestiture costs as a result of the divestiture of our WSS and PKI solutions, as well as costs associated with our other transition and transformation programs including the implementation of a new enterprise resource planning system and costs to automate business processes.

362.    In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," the Company explained how its adjusted financial measures for Q2 2018 were derived, including Symantec's adjusted operating expenses and operating income. As for the Company's adjusted operating expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, separation, transition, and other," removing operating expenses of $97 million for Q2 2018.

363.    In the "Explanation of Non-GAAP Measures and Other Items," attached as Appendix A to the 2Q2018 Form 8-K, Defendants explained their reasoning for making the "Restructuring, transition and other" adjustment, stating that the Company removed this expense because these costs, including its transition costs, were purportedly "discrete events":

Restructuring, transition and other: . . .  We have also engaged in various transition and other activities which resulted in related costs primarily consisting of consulting charges associated with the implementation of new enterprise resource planning systems and costs to automate business processes . . . . *Each restructuring, transition, and other activity has been a discrete event based on a unique set of business objectives or circumstances, each has differed from the others in terms of its operational implementation, business impact and scope, and the amount of these charges has varied significantly from period to period*.

364.   Symantec's definition of "transition costs" as of November 21, 2017 no longer stated that Symantec did not "engage in restructuring, transition, or other activities in the ordinary course of business."

365.   Defendants reported these adjusted financial measures to investors as indicative of Symantec's financial condition.  On November 1, 2017, Defendants held a quarterly earnings call during which Symantec (through CFO Noviello) promoted its adjusted financials, including operating margins, operating expenses and EPS:

> *Operating margin for the second quarter was 34%,* at the low end of our prior guidance range of 34% to 36%.  *Overall spending finished the quarter on track* – finished on track for the quarter despite increased marketing cost in our Consumer Digital Safety segment and headwinds from M&A and divestiture-related costs, which totaled approximately $20 million.
>
> . . .
>
> *Fully diluted earnings per share was $0.40, at the low end of our prior guidance range*, impacted by the mix of lower in-quarter recognized revenue versus deferred revenue in our Enterprise Security segment and approximately $0.02 from the combination of increased marketing costs in our Consumer Digital Safety segment and headwinds from M&A and divestiture-related costs.

366.   Defendants' presentation and commentary regarding Symantec's reported non-GAAP financial measures, including the Company's non-GAAP net revenues and non-GAAP operating expenses, and statements regarding the Company's "Restructuring, transition and other" expenses and "transition costs" as set forth above in ¶¶360-65, were false and misleading and omitted material facts.

(a)   As described above, throughout the Class Period, Defendants improperly recognized revenue.  Section V(A)-(B).  Symantec recognized revenue on sales at period-end that

did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay. Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy. Consequently, Symantec's reported second quarter fiscal year 2018 adjusted revenue in the Company's Form 8-K was overstated.

(b)     Defendants overstated Symantec's adjusted operating income. Section V(B). Defendants recorded General and Administrative costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Transition and Other Costs" line item. The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket. Moreover, by virtue of the Restructuring, transition and other adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business. Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, transition and other" line item expenses were misstated. Additionally, while the Company's approach to recognizing "transition costs" changed after the Blue Coat acquisition, the description of "transition costs" remained the same or did not meaningfully change so as to disclose how Symantec was recording transition costs. Moreover, Defendants' reported adjusted operating income for Q2 2018, as well as other reported adjusted metrics dependent on this figure, such as operating margin and EPS, as set forth in the Company's 2Q2018 Form 8-K and Defendants' commentary, were also misstated.

367.     Analysts reported that Symantec's non-GAAP financial results were "in line" with the Company's guidance and the Street's expectations. For example, analysts at Evercore ISI commented, "SYMC reported in line results for total non-GAAP revenue, non-GAAP operating margin, and non-GAAP EPS: $1,276M, 34.1%, and $0.40 came roughly in line with our ($1,280, 35.0%, $0.41) and street numbers ($1,279M, 35.5%, $0.42) for 3Q."

368.     The statements set forth above were also materially untrue and omitted to disclose material facts.  As Symantec belatedly admitted on September 24, 2018, in the quarter ending September 29, 2017, "the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures."  This Court recognized in the Unsealing Order that this outside accounting firm, identified in the Derivative Complaint as EY, was retained to address "wrongdoing regarding non-GAAP adjustments."  Unsealing Order, at 5-6.  It was materially untrue for Defendants to report non-GAAP measures, and explain how those non-GAAP adjustments were derived, while failing to disclose that Defendants had retained EY to address "wrongdoing regarding non-GAAP adjustments" and was actively taking steps "to enhance" Symantec's "policies and procedures regarding non-GAAP measures," including changing the way that it reported non-GAAP metrics in order to comply with SEC guidance.

### 3.     False Internal Controls And SOX Certifications

369.     In the section of the 2Q2018 Form 10-Q titled, "Controls and Procedures," Defendants affirmed that Defendants had evaluated Symantec's internal control over financial reporting, that the Company's internal control over financial reporting was effective, and that there were no changes in the Company's internal control over financial reporting during the quarter ended September 29, 2017, that materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

370.     In addition, the 2Q2018 Form 10-Q contained certifications pursuant to SOX Sections 302 and 906 signed by Defendant Clark and Noviello attesting to the accuracy of financial reporting, the disclosure of material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

371.     Defendants' statements regarding the Company's internal control over financial reporting and in their SOX certifications were false and misleading.  In truth, Defendants maintained ineffective internal controls over financial reporting, including for the recognition of revenue and review, approval and tracking of transition and transformation expenses.  In addition, contrary to their SOX certifications, Defendants knew that the 2Q2018 Form 10-Q contained

untrue statements of material fact and that the financial statements and other financial information included in the 2Q2018 Form 10-Q did not fairly present in all material respects the financial condition, results of operations and cash flows of Symantec for Q2 2018.  Moreover, Defendants failed to disclose all significant deficiencies and material weaknesses in the design and operation of Symantec's internal control over financial reporting likely to adversely affect Symantec ability to record, process, summarize and report financial information, as well as the financial fraud that Defendants and other employees with significant roles in Symantec's internal control over financial reporting were committing.

## F.   **Third Quarter 2018 Results**

372.    On January 31, 2018, Symantec filed with the SEC its financial results for the third quarter fiscal year 2018 for the period ending December 29, 2017, and supplemental financial information and commentary on Form 8-K.  On January 31, 2018, Symantec held an earnings call to discuss its financial results for the third quarter fiscal year 2018. On February 2, 2018, Symantec filed with the SEC its Quarterly Report on Form 10-Q for the period ending December 29, 2017, which was signed by Defendant Clark and CFO Noviello.  As set forth below, the 3Q2018 Form 8-K and 3Q2018 Form 10-Q contained materially false and misleading statements about (i) reported revenue; (ii) adjusted revenue, operating expenses and operating income; and (iii) effective internal controls for financial reporting.

### 1.    **Improper Recognition Of GAAP Revenue**

373.    In the 3Q2018 Form 8-K and 3Q2018 Form 10-Q, Symantec reported quarterly GAAP revenue of $1.209 billion.  On the Company's Condensed Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.151 billion as of December 29, 2017.

374.    In the section of the 3Q2018 Form 10-Q titled, "Notes to Condensed Consolidated Financial Statements," Symantec affirmed that its financial statements were prepared in accordance with GAAP.  Likewise, in the section entitled "Critical Accounting Policies And Estimates," Defendants confirmed Symantec's adherence to its stated revenue recognition policies by affirming, "There have been no material changes in the matters for which we make critical accounting estimates in the preparation of our Condensed Consolidated Financial Statements

during the nine months ended December 29, 2017, as compared to those disclosed in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K for the fiscal year ended March 31, 2017."

375.    Defendants' statements regarding the Company's reported revenue, deferred revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above in ¶¶373-74, were false and misleading and omitted material facts.  Throughout the Class Period, Symantec improperly recognized revenue in violation of GAAP.  Section V(A)-(B).  Contrary to GAAP, Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP.  Consequently, Symantec's reported third quarter fiscal year 2018 GAAP revenue in the Company's Forms 8-K and 10-Q were overstated, the Company's reported deferred revenue for the same period was understated, the Company's 3Q2018 Form 10-Q was not prepared in accordance with GAAP, and the Company was not complying with its stated revenue recognition policy.

## 2.    Manipulating Adjustments Of GAAP Measures To Non-GAAP Measures

376.    In the 3Q2018 Form 8-K, the Company supplemented its reported GAAP financial results with a presentation of Symantec's adjusted financial measures.  In particular, the Company reported non-GAAP revenue for Q3 2018 of $1.234 billion and non-GAAP operating income of $463 million.

377.    In the Company's 3Q2018 Form 8-K and 3Q2018 Form 10-Q, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the Company reported "Restructuring, transition and other" expenses for the third quarter of fiscal year 2018 of $93 million.

378.    In Note 4 to the Consolidated Financial Statements in the 3Q2018 Form 10-Q, the Company provided further information on the nature of this line item expense, including a

description of the type of costs that the Company deems "Transition Costs," and represented that

it had incurred a quarterly expense of $75 million in transition costs and $195 million over the past

three quarters:

Note 4.  Restructuring, Transition and Other Costs

Transition costs are incurred in connection with Board of Directors approved discrete strategic information technology transformation initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes.  In addition, transition costs include expenses associated with divestitures of our product lines.

Restructuring, transition and other costs summary

Our restructuring, transition and other costs are presented in the table below:

| (In millions) | Three Months Ended December 29, 2017 | | | Nine Months Ended December 29, 2017 | | |
|---|---|---|---|---|---|---|
| Severance and termination benefit costs | $ | 11 | | $ | 50 | |
| Other exit and disposal costs (benefit) | | (2) | | | 15 | |
| Asset write-offs | | 9 | | | 18 | |
| Transition costs | | 75 | | | 195 | |
| Total | $ | 93 | | $ | 278 | |

379.    In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP

Measures," the Company explained how its adjusted financial measures for Q3 2018 were derived,

including Symantec's adjusted operating expenses and operating income.  As for the Company's

adjusted operating expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP

Measures" reflects an adjustment for "Restructuring, transition and other," removing operating

expenses of $93 million for Q3 2018.

380.    In the "Explanation of Non-GAAP Measures," attached as Appendix A to the

3Q2018 Form 8-K, Defendants explained their reasoning for making the "Restructuring, transition

and other" adjustment, stating that the Company removed this expense because these costs,

including its transition costs, were purportedly "discrete events":

Restructuring, transition and other costs: . . . Transition costs are associated with *formal discrete strategic information technology initiatives* and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes.  In addition,

transition costs include expenses associated with our divestitures. *We exclude restructuring, transition and other costs from our non-GAAP results as we believe that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current operating performance, and that excluding these charges facilitates a more meaningful evaluation of our current operating performance and comparisons to our past operating performance*.

381.   The Company changed the definition of "transition costs" to include "formal discrete strategic information technology initiatives." Moreover, the Company now claimed that it excluded transition costs from its non-GAAP results because Symantec "believe[s] that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current operating performance, and that excluding these charges facilitates a more meaningful evaluation of our current operating performance and comparisons to our past operating performance."

382.   Defendants used these adjusted measures to inform investors about Symantec's financial condition.  On January 31, 2018, Defendants held a quarterly earnings call during which Defendant Clark hyped Symantec's third quarter fiscal year 2018 adjusted operating margin, notwithstanding the Enterprise business segment's revenue shortfall:

> For Q3, even with our Enterprise revenue shortfall, we performed well against other financial metrics. Operating margin exceeded our guidance as we realized continued cost efficiencies. EPS benefited from those cost efficiencies as well as from U.S. tax reform. And we generated strong cash flow from operations, which should benefit going forward from our strong business momentum, deferred revenue and the drop-off in costs associated with our restructuring initiatives.
>
> . . .
>
> Now let me turn to our Consumer Digital Safety business which had a strong quarter. Recall that only 18 months ago, this business was in decline, with decreasing retention rates and ARPU. Today, our Consumer Digital Safety business has been transformed. Revenue in the third quarter was at the high end of our guidance range, with an organic growth rate of 4% year-over-year in constant currency. *We experienced 53% operating margins and an increased ARPU.*

383.   On the call, Symantec (through CFO Noviello) further touted its adjusted revenue, operating margin and EPS:

> *Our third quarter revenue was $1.234 billion*.  This was comprised of Consumer Digital Safety revenue at the high end of our prior revenue guidance range and Enterprise Security revenue below the low end of our prior revenue guidance range.

. . .

*Operating margin for the third quarter was 38%, above the high end of our prior guidance range of 36% to 37%.* The higher operating margin was the result of continued cost and operating efficiencies, including the completion of the net cost reduction and synergy programs we discussed last quarter across the business.

*Fully diluted earnings per share was $0.49, $0.03 above the high end of our prior guidance range*.

384.    Defendants' presentation and commentary regarding Symantec's adjusted financial measures, including the Company's adjusted revenues and operating expenses, and statements regarding the Company's "Restructuring, transition and other" expenses and "transition costs" as set forth above in ¶¶376-83, were false and misleading and omitted material facts.

(a)     As described above, throughout the Class Period, Defendants improperly recognized revenue.  Section V(A)-(B).  Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy.  Consequently, Symantec's reported third quarter fiscal year 2018 adjusted revenue in the Company's Form 8-K was overstated.

(b)     Defendants overstated Symantec's adjusted operating income.   Section V(B).  Defendants recorded General and Administrative costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Transition and Other Costs" line item.  The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket.  Moreover, by virtue of the Restructuring, transition and other adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business.  Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, transition and

other" line item expenses were misstated. Additionally, while the Company's approach to recognizing "transition costs" changed after the Blue Coat acquisition, the description of "transition costs" remained the same or did not meaningfully change so as to disclose how Symantec was recording transition costs. Moreover, Defendants' reported adjusted operating income for Q3 2018, as well as other reported adjusted metrics dependent on this figure, such as operating margin and EPS, as set forth in the Company's 3Q2018 Form 8-K and Defendants' commentary, were also misstated.

385.    Analysts relied on the Company's reported non-GAAP financial results in communicating their insight about Symantec to their clients.  For example, analysts at Evercore ISI stated, "Total non-GAAP revenue, non-GAAP operating margin, and non-GAAP EPS of $1,234M, 37.5%, and $0.49 vs. our ($1,265M, 36.4%, $0.44) and street numbers ($1,266M, 36.6%, $0.44) for 3Q were below expectations on the top-line but ahead on non-GAAP operating margins and non-GAAP EPS.  FCF came in at $261M versus our prior estimate of $105M and consensus of $67M."

386.    On February 2, 2018, the Company filed its Quarterly Report for the third quarter of fiscal year 2018 on Form 10-Q, disclosing that it had incurred $75 million in quarterly transition costs and $195 million over the past three quarters.  Moreover, the Company now disclosed that the "formal discrete strategic information technology initiatives" included in the definition of were "Board approved strategic IT initiatives:"

> Transition costs are incurred in connection with Board of Directors approved discrete strategic information technology transformation initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes. In addition, transition costs include expenses associated with divestitures of our product lines.

387.    Defendants' Quarterly Report for the third quarter of fiscal year 2018, and specifically its description regarding the Company's "Restructuring, transition and other" expenses and "transition costs" as set forth above in ¶386, were false and misleading and omitted material facts.

388.     Defendants overstated Symantec's adjusted operating income.   Section V(B).
Defendants recorded General and Administrative costs and other non-transition activity expenses
as transition related costs and reported them under the "Restructuring, Transition and Other Costs"
line item.  The Company routinely characterized enterprise resource projects that would normally
be put through as operational run projects into the transformational cost bucket.  Moreover, by
virtue of the Restructuring, transition and other adjustment, Defendants removed the entirety of
the Company's transition costs from the Company's adjusted operating expenses, despite the fact
that this line item consisted of continuing and recurring operating expenses incurred in the ordinary
course of business.  Consequently, Defendants' description of Symantec's transition costs was
misleading and the Company's reported transition costs and the "Restructuring, transition and
other" line item expenses were misstated.  Additionally, while the Company's approach to
recognizing "transition costs" changed after the Blue Coat acquisition, the description of
"transition costs" remained the same or did not meaningfully change so as to disclose how
Symantec was recording transition costs.

389.     The statements set forth above were also materially untrue and omitted to disclose
material facts.  As Symantec belatedly admitted on September 24, 2018, in the quarter ending
September 29, 2017, "the Company initiated a review by an outside accounting firm of, and took
other steps to enhance, the Company's policies and procedures regarding non-GAAP
measures."  This Court recognized in the Unsealing Order that this outside accounting firm,
identified in the Derivative Complaint as EY, was retained to address "wrongdoing regarding non-
GAAP adjustments."  Unsealing Order, at 5-6.  It was materially untrue for Defendants to report
non-GAAP measures, and explain how those non-GAAP adjustments were derived, while failing
to disclose that Defendants had retained EY to address "wrongdoing regarding non-GAAP
adjustments" and was actively implementing "remedial measures" to address issues with respect
to its "usage, policies, and controls related to [non-GAAP measures]."

### 3.     False Internal Controls And SOX Certifications

390.     In the section of the 3Q2018 Form 10-Q titled, "Controls and Procedures,"
Defendants affirmed that Defendants had evaluated Symantec's internal control over financial

reporting, that the Company's internal control over financial reporting was effective, and that there were no changes in the Company's internal control over financial reporting during the quarter ended December 29, 2017, that materially affected, or were reasonably likely to materially affect, the Company's internal control over financial reporting.

391.    In addition, the 3Q2018 Form 10-Q contained certifications pursuant to SOX Sections 302 and 906 signed by Defendant Clark and Noviello attesting to the accuracy of financial reporting, the disclosure of material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

392.    Defendants' statements regarding the Company's internal control over financial reporting and in their SOX certifications were false and misleading.   In truth, Defendants maintained ineffective internal controls over financial reporting, including for the recognition of revenue and review, approval and tracking of transition and transformation expenses.   In addition, contrary to their SOX certifications, Defendants knew that the 3Q2018 Form 10-Q contained untrue statements of material fact and that the financial statements and other financial information included in the 3Q2018 Form 10-Q did not fairly present in all material respects the financial condition, results of operations and cash flows of Symantec for Q3 2018.   Moreover, Defendants failed to disclose all significant deficiencies and material weaknesses in the design and operation of Symantec's internal control over financial reporting likely to adversely affect Symantec ability to record, process, summarize and report financial information, as well as the financial fraud that Defendants and other employees with significant roles in Symantec's internal control over financial reporting were committing.

G.    **Fourth Quarter 2018 Results**

393.    On May 10, 2018, Symantec filed with the SEC its financial results for the fourth quarter fiscal year 2018 and full fiscal year 2018 for the period ending March 30, 2018, and supplemental financial information and commentary on Form 8-K.   As set forth below, the 4Q2018 Form 8-K contained materially false and misleading statements about (i) reported revenue; and (ii) adjusted revenue, operating expenses and operating income.

**1.     Improper Recognition Of GAAP Revenue**

394.     In the 4Q2018 Form 8-K, Symantec reported quarterly GAAP revenue of $1.222 billion and GAAP revenue of $4.846 billion for the full fiscal year 2018.  On the Company's Condensed Consolidated Balance Sheet, the Company reported a deferred revenue balance of $2.356 billion as of March 30, 2018.

395.     Defendants' statements regarding the Company's reported revenue, deferred revenue and compliance with GAAP and its internal revenue recognition policy, as set forth above in ¶394, were false and misleading and omitted material facts.  Throughout the Class Period, Symantec improperly recognized revenue in violation of GAAP.  *See* Section V(A)-(B).  Contrary to GAAP, Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under GAAP.  Consequently, Symantec's reported fourth quarter fiscal year 2018 GAAP revenue in the Company's 4Q2018 Form 8-K was overstated, the Company's reported deferred revenue for the same period was understated.  On September 24, 2018, the Audit Committee first announced that it had reviewed a transaction with a customer for which $13 million was recognized as revenue in the fourth quarter of fiscal year 2018, but $12 million of the $13 million should have been deferred.

**2.     Manipulating Adjustments Of
          GAAP Measures To Non-GAAP Measures**

396.     In the 4Q2018 Form 8-K, the Company supplemented its reported GAAP financial results with a presentation of Symantec's adjusted financial measures.  The Company reported non-GAAP revenue for Q4 2018 of $1.234 billion and $4.972 billion for the full fiscal year 2018.  The Company also reported non-GAAP operating income for Q4 2018 of $451 million and $1.726 billion for the full fiscal year 2018.

397.     In the Company's 4Q2018 Form 8-K, Defendants presented the Company's Condensed Consolidated Statements of Operations, wherein the Company reported

"Restructuring, transition and other" expenses for the fourth quarter of fiscal year 2018 of $139 million and $417 million for the full fiscal year of 2018.

398.    In Appendix A to the Form 8-K entitled "Explanation of Non-GAAP Measures," the Company provided further information on the nature of this line item expense, including a description of the type of costs that the Company recorded as "Transition Costs":

> ***Transition costs are associated with formal discrete strategic information technology initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes.  In addition, transition costs include expenses associated with our divestitures***.

399.    In the Company's "Reconciliation of Selected GAAP Measures to Non-GAAP Measures," the Company explained how its adjusted financial measures for Q4 2018 and the full fiscal year 2018 were derived, including Symantec's reported non-GAAP operating expenses and non-GAAP operating income.   As for the Company's adjusted operating expenses, the "Reconciliation of Selected GAAP Measures to Non-GAAP Measures" reflects an adjustment for "Restructuring, transition and other," eliminating non-GAAP operating expenses of $139 million for Q4 2018 and $417 million for the full fiscal year 2018.

400.    In the "Explanation of Non-GAAP Measures," Defendants explained their reasoning for making the "Restructuring, transition and other" adjustment, stating that, similar to its description in the prior quarter, the Company removed this expense because these costs, including its transition costs, were purportedly "incremental to core activities that arise in the ordinary course of [Symantec]'s business":

> Restructuring, transition and other costs:  . . . Transition costs are associated with formal discrete strategic information technology initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automate business processes. In addition, transition costs include expenses associated with our divestitures.  ***We exclude restructuring, transition and other costs from our non-GAAP results as we believe that these costs are incremental to core activities that arise in the ordinary course of our business and do not reflect our current operating performance, and that excluding these charges facilitates a more meaningful evaluation of our current operating performance and comparisons to our past operating performance***.

401.   Defendants reported these adjusted financial measures to investors as indicative of Symantec's financial performance.

402.   On May 10, 2018, Defendants held a quarterly earnings call during which Defendant Clark promoted Symantec's fourth quarter and full fiscal year 2018 adjusted financial results, which purportedly exceeded the Company's guidance:

> We were pleased with our performance in the fourth quarter and FY '18, delivering operating results across the business above the guidance levels we provided on our last earnings call.  We're also pleased that we exceeded our full year EPS guidance based on our second half performance and good results from our cost control initiatives.
>
> In Q4, our total revenue was driven by performance in both Enterprise Security and Consumer Digital Safety.  Our operating margin exceeded our guidance as a result of revenue growth and continued cost and operating efficiencies.

403.   On the earnings call, Symantec (through  CFO Noviello) provided further color regarding the Company's fourth quarter and fiscal year adjusted 2018 financial results:

> [W]e were pleased with our performance in the fourth quarter, with both Enterprise Security and Consumer Digital Safety revenues above our prior guidance.
>
> . . .
>
> Total company operating margin for the fourth quarter was 36.5%.  The year-over-year improvement in operating margin was the result of higher revenue and continued cost and operating efficiencies.  Fully diluted earnings per share was $0.46, primarily driven by higher operating income.
>
> . . .
>
> Operating margin for the full fiscal year 2018 was 34.7% as compared to 28.7% in fiscal year 2017.  ***This year-over-year improvement reflects our top line revenue growth as well as operating efficiencies***. Fully diluted earnings per share was $1.69, up 43% year-over-year.

404.   Defendants' presentation and commentary regarding Symantec's adjusted financial measures, including the Company's adjusted revenues and operating expenses, and statements regarding the Company's "Restructuring, transition and other" expenses and "transition costs" as set forth above in ¶¶396-403, were false and misleading and omitted material facts.

(a)     As described above, throughout the Class Period, Defendants improperly recognized revenue.  Section V(A)-(B).  Symantec recognized revenue on sales at period-end that did not have a signed contract, did not go through required approval channels, contained unapproved extended terms or where the customer was unable or unwilling to pay.  Defendants also improperly accelerated the recognition of deferred revenue when such revenue had not met the criteria for revenue recognition under the Company's internal revenue recognition policy. Consequently, Symantec's reported fourth quarter fiscal year 2018 adjusted revenue in the Company's Form 8-K was overstated.

(b)     Defendants overstated Symantec's adjusted operating income.   Section V(B). Defendants recorded General and Administrative costs and other non-transition activity expenses as transition related costs and reported them under the "Restructuring, Transition and Other Costs" line item.  The Company routinely characterized enterprise resource projects that would normally be put through as operational run projects into the transformational cost bucket.  Moreover, by virtue of the Restructuring, transition and other adjustment, Defendants removed the entirety of the Company's transition costs from the Company's adjusted operating expenses, despite the fact that this line item consisted of continuing and recurring operating expenses incurred in the ordinary course of business.  Consequently, Defendants' description of Symantec's transition costs was misleading and the Company's reported transition costs and the "Restructuring, transition and other" line item expenses were misstated.  Additionally, while the Company's approach to recognizing "transition costs" changed after the Blue Coat acquisition, the description of "transition costs" remained the same or did not meaningfully change so as to disclose how Symantec was recording transition costs. Moreover, Defendants' reported adjusted operating income for Q4 2018, as well as other reported adjusted metrics dependent on this figure, such as operating margin and EPS, as set forth in the Company's 4Q2018 Form 8-K and Defendants' commentary, were also misstated.

## VII.     ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

405.    Numerous additional facts give rise to a strong inference that Defendants knew, or were deliberately reckless in not knowing, that: (i) Defendants were improperly recognizing

revenue, including revenue that should have been deferred, in violation of GAAP; (ii) in violation of SEC rules and regulations, Defendants improperly characterized costs that were incurred in the ordinary course of business as "transition costs," and adjusted those costs as part of Symantec's non-GAAP measures; and (iii) Symantec's internal controls for financial reporting were not effective during the Class Period.  Defendants therefore knew facts or were deliberately reckless in not knowing facts making their statements as set forth above in Section VI false and misleading.

406.    *Defendant Clark was personally and directly involved in approving improperly recorded revenues and costs.*  As discussed above, Defendant Clark was a member of the Board during the Class Period and, critically, Defendants publicly *admitted* that "transition costs" were approved by the Board.  Specifically, Defendants stated in Symantec's Q32017 Form 10-Q that: "Transition costs are incurred in connection with *Board of Directors approved* discrete strategic information technology transformation initiatives and primarily consist of consulting charges associated with our enterprise resource planning and supporting systems and costs to automatic business processes."  Moreover, Defendants, including Defendant Clark himself, admitted in filings in this litigation that the specific "transition costs" discussed by the former VP and CSO *supra*, including private cloud technology, were those approved by the Board including Defendant Clark.  The fact that Defendant Clark was *personally and directly* involved in approving Symantec's reported transition costs during the Class Period powerfully supports a strong inference of his scienter.

407.    As set forth in ¶¶119-35, Defendant Clark was also personally and directly involved in approving the six "double digit" million-dollar deals improperly double-booked in both 4Q17 and 1Q18.

408.    *Defendant Clark and other top executives at Symantec were focused on and personally involved in Board and Audit Committee discussions concerning non-GAAP adjustments, "transition costs" and the accounting for those costs, and "errors in financial reporting and recording," including "significant" deficiencies.*  In addition, Defendant Clark – as well as CFO Noviello and CAO Garfield – discussed "transition costs," the accounting for those costs, the Board's approval of those costs, and "errors in financial reporting and recording," at the

Symantec Board and Audit Committee level, including through presentations made by Noviello. For example, immediately prior to the start of the Class Period on May 8, 2017, Defendant Clark and Noviello were focused on the Company's reporting of non-GAAP measures, including how the "exclusion of normal, recurring cash expenses," such as the transition costs at issue in this case, could be "misleading adjustments" according to SEC guidance. *See* Derivative Complaint, ¶¶99-101. In addition, Defendant Clark, Noviello and Garfield were each present for an Audit Committee meeting on May 19, 2017 during which they discussed and reviewed "***errors in financial reporting and recording***, including "significant" deficiencies related to the Fiscal Year 2017 10-K. *See* Derivative Complaint, ¶106; Unsealing Order at 4:1-3. Moreover, on October 31, 2017, the Board requested that the Audit Committee be provided "an additional level of detail on the Transition & Transformation accounts (T&T) and non-GAAP items in future updates." By the same date, October 31, 2017, Defendant Clark and Noviello were not only aware that a "significant" internal control deficiency existed (*see* Derivative Complaint, ¶107), but that Symantec had engaged EY and was actively implementing "remedial measures" to address issues with respect to its "usage, policies, and controls related to [non-GAAP measures]." *See* Derivative Complaint, ¶136.

409.     ***Defendant Clark and other top executives, including Noviello and Garfield, discussed accounting for non-GAAP revenue at the Board level***. As described above, Defendant Clark, Noviello and Garfield attended Board meetings where accounting for non-GAAP revenue was discussed, including through presentations by Noviello. As of January 30, 2017, even prior to the start of the Class Period, Defendant Clark was focused on non-GAAP revenue and deferred revenue recognition and made aware of at least one $180 million internal control error. *See* Derivative Complaint, ¶94. In addition, as set forth in the Derivative Complaint, on May 8, 2017, the Audit Committee of Symantec's Board of Directors, including Defendant Clark, reviewed a presentation by Noviello that included deferred revenue (non-GAAP). *See* Derivative Complaint, ¶¶99-100. As set forth above, Defendants continued to be focused on revenue and deferred revenue throughout the Class Period, including at a July 31, 2017 Audit Committee meeting attended by Defendant Clark, Noviello and Garfield, and an October 30, 2017 Audit Committee meeting

attended by Defendant Clark and Noviello.  The fact that Defendant Clark, Noviello, and Garfield discussed non-GAAP revenue and the accounting for non-GAAP revenue at the Board level prior to and during the Class Period supports a strong inference of Defendants' scienter.

410.   ***CAO Garfield left Symantec due to improper revenue recognition practices and ineffective internal controls, after he closed the books for fiscal year 2017 in exchange for a pay package.***  As described above, Garfield, as the Chief Accounting Officer, oversaw all accounting-related areas at Symantec, including internal controls, accounting policies, and acquisition accounting. Garfield (a) left the Company due to revenue recognition concerns and due to the way that Symantec was recognizing revenue under the leadership of Defendant Clark and Noviello; (b) was really unhappy with aggressive accounting practices that were being implemented under Noviello and was uncomfortable that the practices were not lining up to Symantec's controls; and (c) ultimately signed off on the books for the prior fiscal year (2017) in exchange for a pay package. These facts support a strong inference that Defendants knew or recklessly disregarded that Symantec's internal controls were not effective and that Symantec's stated revenue metrics, and purported compliance with GAAP and its own revenue recognition policy, were false and misleading.

411.   ***Defendant Clark and former Symantec CFO Noviello pressured and encouraged employees to engage in the accounting manipulations that gave rise to the false statements, including improper revenue recognition and the improper classification of "transition costs."***  As discussed above, Defendant Clark and Noviello pressured and encouraged employees to improperly recognize revenue.  Defendant Clark made lots of references in meetings to Symantec's ability and flexibility to shift and record revenue, and that he talked about their ability to manipulate or adjust revenue by various periods or a year.  Clark specifically discussed this issue at senior leader meetings with executives which occurred approximately monthly, and Clark's views on "opportunities" to be "flexible" with respect to revenue recognition were not a secret. Moreover, Symantec's former Manager Bill and Collect-Finance explained with respect to Symantec's practice of pushing deals through that he/she frequently received calls from the highest executive staff, including Garfield, telling them to release those orders or to allow them to go out.

There would be a fight about it, but Garfield would indicate that the order to do so had come from someone else above him, and quote Defendant Clark or Noviello.  In addition, Symantec's former Account Manager confirmed that Defendant Clark knew and approved of deals that were booked in Q4 2017 and moved to Q1 2018, including one $13 million deal with Verizon, which involved a SOX violation.

412.  Moreover, the "transition costs" component of Symantec's restructuring, separation, transition, and other costs line item was manipulated as result of pressure from Defendant Clark and Noviello.  Symantec's former VP and CSO explained that Jordan (CIO) was under a lot of pressure and scrutiny from Defendant Clark and Noviello, that she was under tremendous scrutiny to justify her job and explain cost management in IT, and that more costs were moved in the direction of transformative or transformational costs once Blue Coat came in.  The fact that Defendant Clark and Noviello pressured employees, openly discussed, and encouraged the accounting manipulations at issue supports scienter.

413.  ***Defendants implemented significant structural management changes and then terminated numerous executives, including Defendant Clark and former Symantec CFO Noviello.***  The fact that, after the end of the Class Period, Symantec re-structured its internal management and then got rid of numerous senior executives, including Defendant Clark and Noviello, strongly supports scienter.

(a)  As discussed above, on September 24, 2018, the Company announced that it would change the structure of its internal management, including appointing a separate Chief Accounting Officer and a separate Chief Compliance Officer reporting to the Audit Committee.  Defendants' structural changes, particularly in combination with their admission that Symantec needed to enhance its internal controls, supports a strong inference that Defendants knew (or recklessly disregarded) that Symantec's internal controls were not effective during the Class Period.

(b)  The fact that numerous executives were terminated in the wake of the Audit Committee investigation further establishes a strong inference of scienter.  Indeed, as noted above, Symantec ousted Defendant Clark and CFO Noviello and

terminated the employment of the following former senior officers:  Michael Fey (President and Chief Operating Officer); Michael Williams (Chief Marketing Officer); Bradon Rogers (Senior Vice President); Marc Andrews (Head of Global Sales); Denny Young (Vice President of Operations at Enterprise Security); Bryan Barney (SVP, GM of Enterprise Security); Javed Hasan (SVP, Endpoint, IAAS & Datacenter products); Steve Schoenfeld (SVP, Product Management); Francis C. Rosch (Executive Vice President for Consumer Digital Safety); Joe McPhillips (Director of Channel Sales for Symantec's Pacific region); and Brian Kenyon (Chief Strategy Officer).  Analysts linked many of these suspicious executive departures directly to the financial improprieties and investigations.

414.  ***Broadcom lowers its price for Symantec by $1 billion due to a discovery in due diligence.***  As explained in detail above, the fact that Broadcom lowered its offer price by $1 billion in the middle of conducting due diligence on Symantec, which could cause the deal to collapse or close at a lower price, supports a strong inference of scienter.  Broadcom's ability to easily discover a serious problem at the Company supports Defendants' knowledge (or disregard) of it.

415.  ***The fundamental accounting principle at issue is straightforward and was known by Defendants.***  As explained in detail above, the fundamental accounting principle at issue in this case is straightforward: companies must recognize revenue consistently with GAAP only when certain criteria are met and in the period that revenue is realized.  This principle has been part of GAAP for decades.  Additionally, the prohibition on adjusting non-GAAP performance measures such as operating expenses by eliminating or smoothing items identified as non-recurring, infrequent or unusual, when the nature of the charge is such that it is a recurring expense incurred in the ordinary course of business has been a well-accepted accounting principle for over the past fifteen years and has been the subject of SEC guidance regarding the appropriate use of or references to non-GAAP measures in public statements or disclosures.  Moreover, Defendant Clark and Noviello specifically discussed the Company's reporting of non-GAAP measures, including how the "exclusion of normal, recurring cash expenses," such as the transition costs at issue in this case, could be "misleading adjustments" according to SEC guidance.  *See* Derivative Complaint,

1   ¶¶99-101.   Further, Defendant Clark, Noviello, and Garfield have decades of professional

2   experience in accounting and finance and would understand this concept.   Moreover, Symantec

3   employed many other experts and highly qualified personnel in accounting and finance whose

4   knowledge and experience they could readily draw upon.

5   416.   Additionally, Blue Coat had previously communicated multiple times with the SEC

6   before becoming a private company on the use of adjusted measures in assessing performance for

7   the purpose of executive compensation, and the SEC had asked Blue Coat for clarification and

8   additional disclosure on how it used its adjusted measures in assessing performance.   Thus, Blue

9   Coat and its former executives were aware of the importance of and SEC requirement that

10   companies make truthful and complete disclosures to investors concerning adjusted metrics and

11   executive compensation.

12   417.   ***The ease with which the Company's Audit Committee and consultants***

13   ***determined that Symantec had weak internal controls and had improperly recognized revenue***

14   ***supports scienter.***   As described above, Defendants announced on May 10, 2018, that Symantec's

15   Audit Committee had commenced an internal investigation due to concerns raised by a former

16   employee, that the SEC had been contacted, and that Symantec had retained independent counsel

17   and other advisors to assist it in its investigation and would be providing additional information to

18   the SEC as the investigation proceeded.   By September 24, 2018, Symantec announced that the

19   Audit Committee, independent legal counsel, and a forensic accounting firm had already

20   concluded their internal investigation into Symantec's improper accounting.   Within a little over

21   four months after its announcement of the initiation of an investigation, Defendants admitted: (i)

22   to weak and informal processes with respect to some aspects of the review, approval and tracking

23   of transition expenses; (ii) to behaviors inconsistent with the Company's Code of Conduct; (iii)

24   that the Company recognized $12 million as revenue in the fourth quarter of fiscal year 2018 that

25   should have been deferred, and the Company would have to restate its Q4 2018 and Q1 2019

26   financial statements; and (iv) that the Company's Board of Directors had adopted substantial

27   management changes, and "certain enhanced controls and policies related to the matters

28   investigated."   The fact that outsiders quickly and easily determined that such accounting and

internal control problems existed at Symantec supports a strong inference that Defendants knew facts or recklessly disregarded facts making their statements false and misleading.

418. ***The temporal proximity between Defendants' false statements and omissions and revelations of the truth supports an inference of scienter.*** On January 31, 2018, Symantec filed with the SEC its financial results for the third quarter of fiscal year 2018. This filing: (i) contained false and misleading statements concerning the Company's reported revenue, reported deferred revenue, compliance with GAAP, and internal revenue recognition policy; (ii) contained false and misleading adjusted measures and inflated "transition costs"; and (iii) falsely stated that the Company's internal control over financial reporting was effective. Less than four months later, on May 10, 2018, the truth started to emerge when Symantec disclosed the initiation of an internal investigation and that the Company had contacted the SEC. The close temporal proximity between the January 31, 2018 false statements and the May 10, 2018 disclosure supports a strong inference of Defendants' scienter.

419. ***Defendant Clark along with Noviello and Garfield were highly involved in all key decisions at Symantec, including integrating Symantec and Blue Coat.*** Defendant Clark, Noviello and Garfield were actively involved in the Blue Coat acquisition and post-close integration of the acquired entity. Defendant Clark, Noviello and Garfield controlled Symantec's financial processes and were personally involved in the preparation and reporting of Symantec's financial reports, including taking steps to ensure the financial statements and other financial information included in Symantec's reports fairly presented in all material respects the financial condition, results of operations, and cash flows of the Company. Defendant Clark, Noviello and Garfield were also personally responsible for establishing, designing, maintaining, and evaluating Symantec's internal controls over financial reporting. In addition, Defendant Clark, Noviello and Garfield had direct involvement in presenting their reported financial performance to investors, including formulating the financial communication strategy, setting guidance, drafting scripts, and performing Q&A with shareholders and analysts. Defendant Clark, Noviello and Garfield were further actively involved in the development of Symantec's executive compensation plans, including proposing financial performance goals tied off of Symantec's reported non-GAAP

measures to the Compensation Committee after taking into account factors such as historical performance, internal budgets, and their expectations for Symantec's performance. Finally, Defendant Clark, Noviello and Garfield had special knowledge regarding the nature and scope of the Company's reported transition costs as they affirmed that such costs were those presented to and approved by the Board of Directors.

420. Defendant Clark, Noviello and Garfield's significant personal involvement and control over these key decisions raises a strong inference that they knew, or were deliberately reckless in not knowing, about the Company's improper recognition and reporting of revenue, improper recording of continuing operating expenses incurred in the ordinary course of business as transition costs, and adjustment of these costs as part of Symantec's non-GAAP measures, as well as Symantec's materially weak and insufficient internal controls over financial reporting.

421. ***Defendant Clark, Noviello, and Garfield held themselves out as knowledgeable about and involved in the accounting and integration at issue.*** Defendant Clark, Noviello, and Garfield held themselves out in their public statements as personally familiar with the Company's integration and with its financials. For example, during the Class Period, Defendant Clark regularly spoke to investors and securities analysts regarding, among other topics, Symantec's financial and operating results, professing to know what he was speaking about. Further, on the Symantec website, Noviello held himself out as "lead[ing] the company's integration and transformation office, and the company's cost reduction program." During the Class Period, t Noviello further told investors that he personally "ran the integration of Blue Coat and Symantec before being named CFO" and was "still involved heavily in all of the pieces." Similarly, Noviello told investors that he was personally tracking "sales force attrition" in connection with tracking the process of the integration. Noviello also regularly spoke to investors and securities analysts regarding, among other topics, Symantec's financial and operating results, professing to know what he was speaking about. With regard to Garfield, the Chief Accounting Officer, Symantec's SEC filings stated that Garfield possessed "extensive expertise in financial reporting, accounting and finance function integrations, and Sarbanes-Oxley process management and compliance, and financial due diligence for all types of investments and acquisitions."

422.     ***Defendant Clark brought Blue Coat's unethical practices and "toxic culture"
with them to Symantec.***  According to former employees, the former Blue Coat executives, such
as Defendant Clark and former CFO Noviello, were known for being "pretty freewheeling" and
Blue Coat brought their "toxic culture" with them to Symantec (according to Symantec's former
VP and CSO).  According to Symantec's former VP and CSO, Blue Coat systematically replaced
the executives with their own people and processes, and many of the Blue Coat processes were not
fit for a public company the size of Symantec.  Symantec's former VP and CSO further confirmed
that a number of investigations, led by Cameron Hoffman, head of investigations at Symantec,
were opened about the Blue Coat leadership and unethical behavior, including the leveraging of
Company expenses and resources, and how the Company was closing deals.   Indeed, ethics
concerns were so great that, according to Symantec's former VP and CSO, the Company published
reports that showed who was behaving ethically and who was not and there was a steering
committee around this.   Further, according to Symantec's former Senior Manager, Pricing &
Licensing, after Blue Coat came in and the Blue Coat executives assumed leadership, Symantec's
management practices absolutely lacked integrity and honesty.   Moreover, the former Senior
Manager, Pricing & Licensing stated that it was common knowledge that if anyone raised
accounting issues and disagreed with management, their job would be at risk.

423.     ***Defendant Clark and former CFO Noviello affirmed Symantec's internal control
over financial reporting and signed SOX certifications***.  In Symantec's 2017 annual report on
Form 10-K, along with each Form 10-Q filed during the Class Period, Defendant Clark and
Noviello represented that (i) they were responsible for establishing and maintaining adequate
internal control over financial reporting; (ii) they had conducted an evaluation of the effectiveness
of Symantec's financial reporting; and (iii) they had concluded that Symantec's internal controls
over financial reporting were effective at the reasonable assurance level throughout the Class
Period.  Moreover, in their certifications pursuant to SOX Sections 302 and 906, submitted with
the Company's 2017 annual report on Form 10-K, along with each Form 10-Q filed during the
Class Period, Defendant Clark and Noviello represented that (i) they had reviewed the Company's
respective filings; (ii) the reports did "not contain any untrue statement of material fact or omit to

state a material fact necessary to make the statements made . . . not misleading"; (iii) the financial statements "fairly present in all material respects the financial condition, results of operations and cash flows" of Symantec; and (iv) the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." These types of public comments – through which Defendant Clark and Noviello held themselves out as knowledgeable on these subjects – further support a strong inference of Defendants' scienter.

424. ***Defendants took undisclosed steps that show their knowledge of Symantec's fraudulent accounting practices***. As noted in Symantec's September 24, 2018 announcement of the completion of the Audit Committee investigation, unbeknownst to investors, beginning in the second quarter of fiscal year 2018 (ended September 29, 2017), the Company initiated a review by an outside accounting firm of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures. As confirmed by the unsealed Derivative Complaint, by October 31, 2017, Defendant Clark and Noviello were not only aware that a "significant" internal control deficiency existed (*see* Derivative Complaint, ¶107), but that Symantec had engaged EY and was actively implementing "remedial measures" to address issues with respect to its "usage, policies, and controls related to [non-GAAP measures]." *See* Derivative Complaint, ¶136. Nevertheless, Defendants continued to report the Company's financial results, certified the accuracy of the information presented therein, and affirmed the internal controls over the Company's financial reporting. Such undisclosed steps raise an inference that Defendants knew of facts or recklessly disregarded facts making their statements false or misleading.

425. ***The accounting fraud concerned the Company's core products and key business areas.*** On August 1, 2016, Symantec acquired all of the outstanding common stock of Blue Coat for $4.67 billion. Immediately after the acquisition was completed, the Company identified Blue Coat's suite of network and cloud security products as <u>core</u> products within its Enterprise Security business segment. Indeed, in its May 19, 2017 Annual Report, the Company disclosed that by the period ending March 31, 2017, Blue Coat's revenues constituted 11% of Symantec's total consolidated revenues. Moreover, over the nine months ended December 29, 2017, the Company's Enterprise Security business segment increased revenue by over 15% compared to the

corresponding period in the prior year, which the Company claimed was largely driven by the addition of Blue Coat. In February 2017, Symantec acquired LifeLock for approximately $2.3 billion. Immediately after the acquisition was completed, the Company identified LifeLock's proactive identity theft protection services for consumers as <u>core</u> products within its Consumer Digital Safety business segment. For the nine months ended December 29, 2017, revenue in the Company's Consumer Digital Safety segment increased 38%. Accordingly, Symantec's financial health was dependent in large part on the operations and financial performance of Blue Coat and LifeLock. The fact that the Company's accounting fraud materially affected Symantec's core products and both of its business segments supports a strong inference of the Defendants' scienter.

426. ***Defendants admitted that Symantec had ineffective internal controls regarding transition costs during the Class Period***. As described above, Defendants admitted in a September 24, 2018 press release that Symantec's Audit Committee "noted relatively weak and informal processes with respect to some aspects of the review, approval and tracking of transition and transformation expenses." Further, Defendants admitted that Symantec had initiated a review by an outside accounting firm, EY, and taken other steps to enhance, the Company's policies and procedures regarding adjusted measures, since the quarter ending September 29, 2017. In addition, Defendants stated that in connection with the substantial structural changes to their senior management, they would be "adopting certain enhanced controls and policies related to the matters investigation." Defendants' admissions support a strong inference that Defendants knew (or recklessly disregarded) that Symantec's internal controls were not effective during the Class Period, and that their resulting GAAP revenue and adjusted revenue and operating income metrics were false and misleading.

427. ***Defendants admitted that Symantec had recognized revenue that should have been deferred during the Class Period and had to restate its Q4 2018 and Q1 2019 financial statements***. As described above, on September 24, 2018, the Company announced that it had inappropriately recognized $13 million in the fourth quarter of fiscal year 2018, of which $12 million should have been deferred, and that the Company would have to revise its previously disclosed financial results for both Q4 2018 and Q1 2019. Defendants' admission that Symantec

recognized revenue that should have been deferred during the Class Period supports a strong inference that Defendants knew or recklessly disregarded that Symantec's stated revenue and deferred revenue metrics were false and misleading, that Symantec's financial statements did not comply with GAAP, and that Symantec was not following its stated revenue recognition policy during the Class Period.

428.   ***Defendants' compensation and bonus targets were based on the Company's achievement of certain adjusted metrics.***   As discussed above in Section V(C), the Company disclosed that executive compensation relied on meeting certain adjusted operating income, revenue, and EPS metrics.   Thus, Defendant Clark and former CFO Noviello had an incentive to manipulate non-GAAP metrics in order to pocket millions of dollars.   Indeed, the six "double digit" million-dollar deals that were double booked in 4Q17 and 4Q18 – and which Defendant Clark specifically approved – allowed Defendant Clark and former CFO Noviello to hit their bonus target, which would have been missed without the extra, improperly-recorded $63 million in revenue.

429.   ***Defendants concealed their misconduct by requiring employees to sign non-disclosure agreements.***   Moreover, while Lead Counsel for the Plaintiff spoke with numerous former employees that corroborated the fraud alleged in this Complaint, Lead Counsel also contacted dozens of  witnesses who otherwise would be inclined to be interviewed who declined to provide information based on their fear that either they would be prosecuted by Symantec for violating the terms of non-disclosure agreements with the Company or they would be subject to retaliation from the Company in seeking employment, or both.

430.   ***Defendants retaliated against whistleblowers.***   As described above, Symantec retaliated against Mr. Kearney, former Regional Vice President of Sales, after he reported accounting misconduct to the Audit Committee.   Defendants' retaliation against whistleblowers supports a strong inference of scienter.

## VIII. ADDITIONAL ALLEGATIONS CONCERNING DEFENDANTS' WIDESPREAD AND SIGNIFICANT INFLATION OF REVENUE

431. *The $12 million in admittedly improperly recognized revenue was material*.  As set forth above, Defendants admitted that $12 million in revenue had been improperly and prematurely recorded in the fourth quarter of 2018 (4Q18), when it should have been deferred to the first quarter of 2019 (1Q19).  This $12 million was a material percentage – *approximately 20%* – of Symantec's reported $49 million in operating income for 2018, which Symantec itself described in SEC filings as a "Key Financial Metric."

432. *The six "double digit" million-dollar deals double-booked in 4Q17 and 1Q18 were material.*  As set forth above, the 4Q17 and 1Q18 double-booked deals included a Verizon deal for $13 million and five other "double digit" million-dollar deals, which were material.  Even if the five deals were the minimum of $10 million each, these six deals totaled $63 million (*i.e.,* 5 x $10,000,000 plus $13 million).  This sum was material to Symantec's reported financial results because it amounted to, for example, an estimated *17%* of Symantec's non-GAAP operating income for 1Q18 and *5.4%* of Symantec's reported net revenues for 1Q18.  These deals were likewise material from the perspective of Defendant Clark and former CFO Noviello's bonus targets for fiscal 2017 – as the targets would have been missed without the extra, improperly-recorded $63 million in revenue.

433. *Defendants' revenue recognition violations were widespread and occurred across the United States, which confirms materiality*.  As noted, at least 11 former employees of the Company interviewed by Lead Plaintiff and Lead Counsel in connection with their investigation described revenue recognition improprieties at Symantec.  These former employees worked in geographically diverse locations nationwide and covered different sales regions spanning multiple states.  The fact that the revenue recognition manipulations were widespread and occurred in multiple geographically diverse offices across the nation strongly supports materiality.

434. *Market reaction to Symantec's Audit Committee Investigation confirms materiality.*  In response to Symantec's May 10, 2018 announcement that its Audit Committee had commenced an internal investigation due to concerns raised by a whistleblower and that the SEC

had been alerted, Symantec's stock price dropped **33%.**  In response to the August 2, 2018 announcement of additional information concerning the investigation, Symantec's stock price dropped **8%**.  Together, these corrective disclosures erased over **$7 billion** in shareholder value.  These significant stock price declines further confirm the materiality of Defendants' misrepresentations.

435. ***Executive terminations, including of Defendant Clark and former CFO Noviello, confirm materiality.***  The fact that numerous executives were terminated in the wake of the Audit Committee investigation, including Defendant Clark and Noviello, further confirms the materiality of Defendants' misconduct.  Further, as noted above, Symantec terminated the employment of the following former senior officers:  Michael Fey (President and Chief Operating Officer); Michael Williams (Chief Marketing Officer); Bradon Rogers (Senior Vice President); Marc Andrews (Head of Global Sales); Denny Young (Vice President of Operations at Enterprise Security); Bryan Barney (SVP, GM of Enterprise Security); Javed Hasan (SVP, Endpoint, IAAS & Datacenter products); Steve Schoenfeld (SVP, Product Management); Francis C. Rosch (Executive Vice President for Consumer Digital Safety); Joe McPhillips (Director of Channel Sales for Symantec's Pacific region); and Brian Kenyon (Chief Strategy Officer).  Analysts linked many of these suspicious executive departures directly to the financial improprieties and investigations alleged herein.

436. ***The $1 billion loss in value and threat to the Symantec-Broadcom merger following Broadcom's due diligence into Symantec confirms materiality***.  The fact that Broadcom lowered its officer price in the middle of conducting due diligence on the Company, which could cause the deal to collapse or close at a price lowered by nearly $1 billion, further confirms the materiality of Defendants' misconduct.  As set forth above, the market attributed Broadcom's decision to lower its offer price to something that Broadcom discovered in due diligence, and expressly noted that Symantec had not recovered from Defendant Clark's departure from the Company, the "organizational disruption and distraction," and "fundamental turbulence" that followed, or the internal investigations into Defendants' accounting misconduct at issue in this

case.  On this news, Symantec stock dropped more than 15% intraday, while Broadcom stock rose over 3% intraday.

## IX.   **LOSS CAUSATION**

437.   Defendants' materially false and misleading statements and omissions artificially inflated the price of Symantec common stock before and during the Class Period and maintained inflation in the stock price.  Partial disclosures revealed the relevant truth and removed the artificial inflation from the stock price.  As detailed herein, these disclosures revealed *inter alia* that Defendants were engaged in the accounting improprieties set forth above and that Defendants had misrepresented the success of the Blue Coat integration – which Defendants had attempted to hide by improperly recognizing revenue and manipulating transition cost disclosures – and caused Symantec's stock price to drop precipitously.

438.   On May 10, 2018, after the market closed, Symantec filed a Current Report on Form 8-K with the SEC, disclosing that its Audit Committee had commenced an investigation "in connection with concerns raised by a former employee," that the Audit Committee had retained independent counsel and other advisors to assist in the investigation, and that the Company had contacted the SEC to advise the SEC of the investigation.  The Company also disclosed that the Company's financial results and guidance may be subject to change based on the outcome of the investigation.  The Company further disclosed that it was "unlikely that the investigation will be completed in time for the Company to file its annual report on Form 10-K for the fiscal year ended March 30, 2018 in a timely manner."  Later that same day, Symantec held an earnings call with investors to discuss the fourth quarter fiscal year 2018 results.  During the call, Defendant Clark reiterated the statements made in the Company's Form 8-K, and stated "because this is an ongoing matter, we will be unable to comment further on this topic during today's call and there will be no question-and-answer session following our prepared remarks."

439.   These partial disclosures caused Symantec's stock price to decline.  On May 11, 2018, the share price fell $9.66 per share, or approximately 33%.

440.   On August 2, 2018, after the market closed, Symantec filed a Current Report on Form 8-K with the SEC, disclosing that the Audit Committee's investigation was "ongoing" and

applied specifically to Symantec's reported fourth quarter of fiscal year 2018 results.   The Company also disclosed resulting financial results below the Company's recent estimates for the first quarter of fiscal year 2019 and reduced guidance for revenue, operating income and earnings per share for the upcoming second quarter and the entire fiscal year of 2019.   Later that same day, Symantec held an earnings call with investors to discuss the fourth quarter fiscal year 2018 results. Defendant Clark admitted a "slip of business in the quarter."   In response to an analyst's question as to whether "you saw any sort of negative customer reaction this quarter just around the headlines [on the audit investigation] and if that was maybe potentially impacting results," Defendant Clark stated "we cannot comment on the investigation.   I would say that Q1 had some negative press in the market during the quarter."

441.    These partial disclosures caused Symantec's stock price to decline.   On August 3, 2018, the share price fell $1.63, or approximately 8%.

## X.    **THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

442.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.   The statutory safe harbor or bespeaks caution doctrine does not apply to statements included in financial statements prepared in accordance with generally accepted accounting principles.   Moreover, none of the statements complained of herein was a forward-looking statement.   Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Symantec's current and historical financial accounting practices, financial condition, and internal controls, among other topics.

443.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.   As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Symantec's financial accounting practices, financial condition, and internal controls, among others.   Given the then-existing facts contradicting Defendants' statements, any

generalized risk disclosures made by Symantec were insufficient to insulate Defendants from liability for their materially false and misleading statements.

444.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Symantec who knew that the statement was false when made.

## XI.   THE PRESUMPTION OF RELIANCE

445.   At all relevant times, the market for Symantec's common stock was efficient for the following reasons, among others:

    (a)   Symantec's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Market, a highly efficient and automated market;

    (b)   As a regulated issuer, Symantec filed periodic reports with the SEC and the NASDAQ Stock Market;

    (c)   Symantec regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    (d)   Symantec was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

446.   As a result of the foregoing, the market for Symantec's common stock reasonably promptly digested current information regarding Symantec from all publicly available sources and reflected such information in the price of Symantec's common stock.  All purchasers of Symantec common stock during the Class Period suffered similar injury through their purchase of Symantec

common stock at artificially inflated prices, and a presumption of reliance applies.

447.   A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## XII.   CLASS ALLEGATIONS

448.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Symantec between May 11, 2017, and August 2, 2018, inclusive, and who were damaged thereby (the "Class").   Excluded from the Class are (i) Defendants; (ii) members of the immediate family of Defendant Clark; (iii) any person who was an officer or director of Symantec; (iv) any firm or entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged; (vi) Defendants' liability insurance carriers; (vii) any affiliates, parents, or subsidiaries of Symantec; (viii) all Symantec plans that are covered by ERISA; and (ix) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such.

449.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Symantec shares were actively traded on the NASDAQ Stock Market.   As of August 2, 2018, there were approximately 621,539,000 shares of Symantec common stock outstanding.   While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds-of-thousands of members of the Class.   Class members who purchased Symantec common stock may be identified from records maintained by Symantec or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

450.     Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

451.     Lead Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

452.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

(c)     whether Defendants acted with scienter; and

(d)     the proper way to measure damages.

453.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them.  There will be no difficulty in the management of this action as a class action.

**XIII.   CLAIMS BROUGHT PURSUANT TO**
**SECTION 10(b), 20(a) AND 20(A) OF THE EXCHANGE ACT**

**COUNT I**

**For Violations Of Section 10(b) Of The Exchange Act And**
**SEC Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

454.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

455.     This Count is asserted on behalf of all members of the Class against Defendants Symantec and Clark for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

456.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

457.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Symantec common stock during the Class Period.

458.     Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Symantec common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Symantec's GAAP and adjusted metrics in its financial statements, and accounting for those metrics, and the effectiveness of Symantec's internal controls; (b) artificially inflate and maintain the market price of Symantec common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Symantec common stock at artificially inflated prices and suffer losses when the true facts became known.

459.    Defendant Symantec is liable for all materially false and misleading statements made during the Class Period, as alleged above.  Defendant Clark, as a top executive officer of the Company during his tenure, is liable as a direct participant in the wrongs complained of herein. Defendant Clark is liable for the false and misleading statements he personally made and/or signed, as alleged above.

460.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Symantec stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

461.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Symantec common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiff and the Class would not have purchased Symantec common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

462.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Symantec common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendant Clark)

463.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

464.    This Count is asserted on behalf of all members of the Class against Defendant Clark for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

465.     During his tenure as an officer and director of Symantec, Defendant Clark was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. *See* ¶¶24.  By reason of his position of control and authority as an officer and director of Symantec, Defendant Clark had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  Defendant Clark was able to and did control, directly and indirectly, the content of the public statements made by Symantec during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

466.     In his capacity as a senior corporate officer of the Company, and as more fully described above in ¶¶24, Defendant Clark had direct involvement in the day-to-day operations of the Company.  Defendant Clark signed certain of the Company's SEC filings during the Class Period and was directly involved in providing false information and certifying and approving the false statements disseminated by Symantec during the Class Period.  As a result of the foregoing, Defendant Clark was a controlling person of Symantec within the meaning of Section 20(a) of the Exchange Act.

467.     As set forth above, Symantec violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

468.     By virtue of his position as a controlling person of Symantec and as a result of his own aforementioned conduct, Defendant Clark is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Symantec common stock.  As detailed above, during the time Defendant Clark served as an officer and director of Symantec, he was culpable for the material misstatements and omissions made by Symantec.

469.     As a direct and proximate result of Defendant Clark's conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Symantec common stock.

# COUNT III

## For Violation Of Section 20A Of The Exchange Act
## (Against Defendant Clark)

470.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

471.    This Count is asserted pursuant to Section 20A of the Exchange Act against Defendant Clark, on behalf of all persons who purchased Symantec common stock contemporaneously with any sales of Symantec common stock by Defendant Clark during the Class Period.

472.    As set forth in the chart below, Defendant Clark committed underlying violations of Section 10(b) and Rule 10b-5 thereunder by selling Symantec common stock while in the possession of material, adverse, nonpublic information about, among other things, the Company's improper accounting manipulations and ineffective internal controls.   This conduct violated Section 20A of the Exchange Act.

| Defendants' Open Market Sales | | | |
|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price |
| **Clark** | 8/28/2017 | 186,433 | $30.00 |
| **Clark** | 8/31/2017 | 13,567 | $30.00 |

473.    Lead Plaintiff purchased shares of Symantec common stock on the same day or one day after sales of Symantec common stock made by Defendant Clark while Defendant Clark was in possession of material, adverse, nonpublic information, as set forth in the chart below.  These sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

| Defendants' Open Market Sales | | | | Plaintiff's Purchases | | | |
|---|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Lead Plaintiff | Purchase Date | Shares Purchases | Price |
| **Clark** | 8/28/2017 | 186,433 | $30.00 | **SEB SICAV** | 8/28/2017 | 201,927 | $29.59 |

474.   Numerous other Class members also purchased Symantec common stock contemporaneously with Defendants' sales of stock during the Class Period based on material, adverse, nonpublic information.

475.   By virtue of his knowledge of material, adverse, nonpublic information, Defendant Clark was duty bound not to benefit therefrom, a duty which he violated by selling his shares at inflated prices.

476.   Accordingly, under Section 20A of the Exchange Act, Defendant Clark is liable to Lead Plaintiff and the Class for all profits gained and losses avoided by him as a result of his stock sales.

## XIV.   **PRAYER FOR RELIEF**

477.   WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)   Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)   Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)   Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## XV.   **JURY DEMAND**

478.   Lead Plaintiff demands a trial by jury.

Dated:  October 11, 2019                     Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

*/s/ Jeremy P. Robinson*

JEROEN VAN KWAWEGEN (*pro hac vice*)
(jeroen@blbglaw.com)
JEREMY P. ROBINSON (*pro hac vice*)
(jeremy@blbglaw.com)
REBECCA E. BOON (*pro hac vice*)

(rebecca.boon@blbglaw.com)
JULIA K. TEBOR (*pro hac vice*)
(julia.tebor@blbglaw.com)
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 554-1400
Fax:     (212) 554-1444

JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:     (310) 819-3472

*Counsel for Lead Plaintiff*
*SEB Investment Management AB*

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and emailed the versions of the attached filed under seal to counsel for the Defendants.


BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP

/s/ Jeremy P. Robinson
JEREMY P. ROBINSON

JEREMY P. ROBINSON (*pro hac vice*)
(jeremy@blbglaw.com)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444

*Counsel for Lead Plaintiff*
*SEB Investment Management AB*