UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SEB INVESTMENT MANAGEMENT AB,
individually and on behalf of all others
similarly situated,

            Plaintiff,

    v.

SYMANTEC CORPORATION and
GREGORY S. CLARK,

            Defendants.

No.  C 18-02902 WHA

**ORDER ON MOTION FOR CLASS
CERTIFICATION**

### INTRODUCTION

In this PSLRA action, lead plaintiff moves for class certification.  Defendants oppose.  To the extent stated below, the motion is **GRANTED**.

### STATEMENT

Prior orders set forth the background of this action in detail (Dkt. Nos. 137, 181).  At bottom, this action stems from allegations that defendant Symantec Corporation and its former executive officers defrauded shareholders by manipulating Symantec's financial reports to create the illusion of stronger-than-actual financial performance and outlook for fiscal years 2017 and 2018.

Symantec, a company that sold cybersecurity products and services, emerged as an industry leader in the 1990s.  By 2016, however, the company found itself at the end of a ten-

United States District Court
Northern District of California

year period of disappointing financial results.  In early 2016, Symantec divested Veritas Software, a major acquisition it had made in 2005, aiming to save $400 million in costs by the end of fiscal year 2018.  Symantec also announced two acquisitions:  Blue Coat Systems, Inc., in June 2016, and Lifelock, Inc., in November 2016.  When the Blue Coat deal closed, Blue Coat's management team took control of Symantec, with defendant Gregory Clark and now-dismissed defendant Nicholas Noviello taking over as Symantec's CEO and CFO, respectively.  Several other members of Blue Coat's top management team also assumed high-level roles at Symantec.  Mark Garfield, Symantec's Chief Accounting Officer prior to Symantec's acquisition of Blue Coat, continued on in his role as Symantec's CAO.  Symantec described both acquisitions as transformative, promising that cost savings and revenue growth would come.  To that end, Symantec increased its revenue and income targets for executive compensation.

In May 2017, Symantec filed its Forms 8-K and 10-K with the SEC announcing its quarterly results for the fourth quarter and for fiscal year 2017, its fiscal year ending March 31. Symantec's reported revenue and operating margin appeared to confirm the revenue growth and costs savings Symantec had led its investors to expect, following the Blue Coat and Lifelock acquisitions.  In the Form 10-K, signed by CEO Clark, CFO Noviello, and CAO Garfield, defendants affirmed that Symantec's financial statements were GAAP compliant. The revenues exceeded CEO Clark and CFO Noviello's 2017 executive compensation plan targets and they accordingly received tens of millions of dollars in equity awards.

Publicly, in a press release and earnings call, CEO Clark attributed Symantec's increased revenue to cost-saving initiatives and synergies related to the Blue Coat and LifeLock acquisitions.  Behind the scenes, however, the new leadership had allegedly began inflating recognized revenue in violation of GAAP and misclassifying ordinary operating expenses as "transition costs."  These improper practices allegedly led CAO Mark Garfield and other former Symantec employees to resign.  Although CAO Garfield originally refused to sign off on the books for fiscal year 2017, he allegedly agreed to do so in exchange for a financial package upon his resignation.  Despite these alleged concerns, defendants continued to report

United States District Court
Northern District of California

1   Symantec's strong financial performance and the success of the Blue Coat and LifeLock

2   acquisitions throughout fiscal year 2018.

3        Starting on May 10, 2018, however, defendants began to reveal the alleged fraud

4   publicly. After market close on May 10, Symantec issued a press release announcing that its

5   audit committee had commenced an internal investigation and had voluntarily contacted the

6   SEC after a former employee raised unspecified concerns. The press release, which also

7   announced Symantec's fourth quarter results for fiscal year 2018, stated the following

8   regarding the investigation (Opp. Exh. B at 7):

9            The Audit Committee of the Board of Directors has
             commenced an internal investigation in connection with
10           concerns raised by a former employee. The Audit
             Committee has retained independent counsel and other
11           advisors to assist it in its investigation. The Company has
             voluntarily contacted the Securities and Exchange
12           Commission to advise it that an internal investigation is
             underway, and the Audit Committee intends to provide
13           additional information to the SEC as the investigation
             proceeds. The investigation is in its early stages and the
14           Company cannot predict the duration or outcome of the
             investigation. The Company's financial results and
15           guidance may be subject to change based on the outcome of
             the Audit Committee investigation. It is unlikely that the
16           investigation will be completed in time for the Company to
             file its annual report on Form 10-K for the fiscal year ended
17           March 30, 2018 in a timely manner.

18   Defendants also held a conference call with investors but scrapped the customary question and

19   answer portion of the call (Skinner Rep. ¶ 26). During the call, the company stated that "[t]he

20   investigation [did] not relate to any security concern or breach with respect to [Symantec's]

21   products or systems" (*id.* ¶ 30).

22        When the market reopened on Friday, Symantec's stock plummeted by over 33 percent,

23   erasing roughly six billion dollars of market capitalization before the weekend. At least fifteen

24   Wall Street analysts cut their price targets by Friday morning and market commentators noted

25   the puzzling lack of detail and Symantec's decision to completely forego the question and

26   answer portion of the conference call (*id.* ¶¶ 31–32).

27

28

United States District Court
Northern District of California

1    Before the markets opened Monday morning, May 14, Symantec announced that it would

2    hold an "investor briefing call" in the afternoon to provide more information regarding the

3    investigation.  Just prior to the call, Symantec issued a press release stating the following:

> The Audit Committee of the Board of Directors has commenced an internal investigation in connection with concerns raised by a former employee regarding the Company's public disclosures including commentary on historical financial results, its reporting of certain Non-GAAP measures including those that could impact executive compensation programs, certain forward-looking statements, stock trading plans and retaliation.  The Audit Committee has retained independent counsel and other advisors to assist it in its investigation.  The Company has voluntarily contacted the Securities and Exchange Commission to advise it that an internal investigation is underway, and the Audit Committee intends to provide additional information to the SEC as the investigation proceeds.  The investigation is in its early stages and the Company cannot predict the duration or outcome of the investigation.  The Company's financial results and guidance may be subject to change based on the outcome of the Audit Committee investigation.  It is unlikely that the investigation will be completed in time for the Company to file its annual report on Form 10-K for the fiscal year ended March 30, 2018 in a timely manner.  At this time, the Company does not anticipate a material adverse impact on its historical financial statements.

17    Defendants repeated this statement during the conference call.  Although the company did

18    allow questions at the end of the call, those concerning the investigation remained off limits.

19    During the call, defendants also announced that all discretionary and performance-based

20    compensation for named executive officers would remain on hold pending the outcome of the

21    audit committee investigation and that Symantec did not expect to repurchase its shares during

22    the course of the audit committee investigation (*id.* ¶¶ 34–36).

23    Prior to the conclusion of the investigation, individuals filed two lawsuits in this district

24    on behalf of themselves and a putative class of similarly-situated investors.  An August 2018

25    order consolidated the two actions and appointed SEB Investment Management AB as lead

26    plaintiff in the consolidated action (Dkt. No. 75).  This order pauses to note that up to this

27    point, the proposed class period ran from May 19, 2017, to May 10, 2018.  When lead plaintiff

28

4

filed the operative complaint in October 2019, however, the complaint extended the proposed

class period to August 2, 2018, the date of the second alleged "corrective disclosure."

On August 2, 2018, Symantec released its earnings for the first quarter of fiscal year

2019. At the same time, with respect to the audit committee investigation, the August 2 press

release stated (Skinner Rep. ¶ 46):

> As previously disclosed, Symantec's Audit Committee is
> conducting an internal investigation in connection with
> concerns raised by a former employee regarding the
> Company's public disclosures including commentary on
> historical financial results, its reporting of certain non-
> GAAP measures including those that could impact executive
> compensation programs, certain forward-looking
> statements, stock trading plans and retaliation. The
> investigation is ongoing. The Company's financial results
> and guidance may be subject to change based on the outcome
> of the Audit Committee investigation. At this time, the
> Company does not anticipate a material adverse impact on
> its historical financial statements for the third quarter of
> fiscal year 2018 and prior. As noted above, our fourth
> quarter of fiscal year 2018 and subsequent periods remain
> open periods from an accounting perspective, subject to
> adjustment for material updates.

Following the August 2 disclosure, Symantec's stock price dropped another eight percent

on August 3. Although the investigation ended in September 2018, the proposed class period

ends following the August 2 disclosure.

At the conclusion of its investigation in September 2018, the Audit Committee

announced that it had found "'relatively weak and informal processes' with respect to some

aspects of the review, approval and tracking of transition and transformation expenses" and

had identified "behavior inconsistent with the Company's Code of Conduct." Although there

would be no restatement of historical financial results, the investigation uncovered that $12

million of a $13 million transaction previously recognized as revenue in the fourth quarter of

fiscal year 2018 should be deferred (which deferral would impact preliminary results

previously announced for that quarter). The Audit Committee further announced that

Symantec would be adopting enhanced controls and appointing a separate Chief Accounting

Officer and Chief Compliance Officer to report to the Audit Committee. Finally, Symantec

also announced that in September 2017 it had "initiated a review by an outside accounting firm

5

of, and took other steps to enhance, the Company's policies and procedures regarding non-GAAP measures" (Skinner Rep. ¶¶ 48–53).

Lead plaintiff now seeks to certify the following class:

> All persons or entities who purchased or otherwise acquired publicly-traded Symantec common stock during the period from May 11, 2017, to August 2, 2018, inclusive (the "class period"), and who were damaged thereby (the "class").

In its motion, plaintiff notes that its proposed class definition includes all investors who purchased Symantec common stock contemporaneously with sales made or caused by CEO Clark during the class period (Mot. at 4 n.2). In other words, the proposed class includes those with insider-trading claims under Section 20A.

In opposing class certification, defendants contend that individual issues predominate because plaintiff is not entitled to the presumption of class-wide reliance under its "fraud on the market" theory and that plaintiff fails to provide a viable damages model. Defendants also contend that plaintiff is an inadequate and atypical class representative.

An order vacated the hearing in light of the national health emergency and the motion's suitability for submission on the papers. This order follows full briefing.

**ANALYSIS**

Certification under Rule 23(b)(3) is a two-step process. Plaintiff must first show that the four prerequisites of Rule 23(a) are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. For a damages class under Rule 23(b)(3), plaintiff must next establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Plaintiff bears the burden of demonstrating that these requirements are met. *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956–57 (9th Cir. 2013).

1    The Supreme Court has "cautioned that a court's class-certification analysis must be

2  rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," *Wal–*

3  *Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); however, "[m]erits questions may be

4  considered to the extent — but only to the extent — that they are relevant to determining

5  whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn.*

6  *Ret. Plans and Trust Funds*, 568 U.S. 455, 464–65 (2013).

7    **1.    RULE 23(a)**

8        **A.    Numerosity.**

9    Defendants do not challenge certification based on the numerosity prerequisite. Here,

10 plaintiff estimates that there are hundreds-of-thousands of investors in the proposed class based

11 on the over six-hundred thousand outstanding shares of Symantec common stock during the

12 class period (Mot. at 8). This is sufficient to satisfy the numerosity requirement of Rule

13 23(a)(1).

14       **B.    Commonality.**

15   Defendants likewise do not challenge certification under Rule 23(a)'s commonality

16 requirement. To show commonality, a plaintiff "need not show . . . that every question in the

17 case, or even a preponderance of questions, is capable of class wide resolution. So long as

18 there is even a single common question, a would-be class can satisfy the commonality

19 requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014). Here,

20 plaintiff's allegations that investors were defrauded by the same misrepresentations concerning

21 revenue recognition and misclassification of costs over the same period of time, and suffered

22 similar losses as a result are sufficient to fulfill Rule 23(a)'s commonality requirement.

23       **C.    Typicality.**

24   Typicality is satisfied if "the claims or defenses of the representative parties are typical of

25 the claims or defenses of the class." Rule 23(a)(3). "Under the rule's permissive standards,

26 representative claims are 'typical' if they are reasonably co-extensive with those of absent class

27 members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

28 1020 (9th Cir. 1998). Class certification is inappropriate, however, if a putative class

1    representative is subject to "unique defenses which threaten to become the focus of the

2    litigation."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

3         Defendants contend that lead plaintiff's "disproportionately large" purchases of Symantec

4    shares following the alleged corrective disclosures "could" subject plaintiff to unique defenses.

5    Specifically, plaintiff's post-disclosure purchases might allow defendants to rebut the "fraud on

6    the market" presumption of reliance plaintiff invokes here as to lead plaintiff individually.  If

7    defendant successfully rebuts the presumption, lead plaintiff would be forced to come forward

8    with direct proof of reliance on the alleged misrepresentations, rather than benefit from the

9    presumption that it indirectly relied on the alleged misstatements by relying on the integrity of

10   the stock price established by the market.

11        The "fraud on the market" presumption arose as a practical response to the difficulties of

12   proving direct reliance in the context of modern securities markets, where impersonal trading

13   rather than a face-to-face transaction is the norm.  With the presumption, a plaintiff need not

14   prove that it read or heard the misrepresentation that underlies its securities claim.  Rather,

15   plaintiff is presumed to have relied on the misrepresentation by virtue of plaintiff's reliance on a

16   market that fully digests all available material information about a security and incorporates it

17   into the security's price.  *See Basic, Inc. v. Levinson*, 485 U.S. 224, 243–44 (1988).  The market's

18   valuation process is substantially equivalent to what an investor does for himself in face-to-face

19   transactions.  The market in effect acts as the agent of the investor, informing the investor that,

20   "given all the information available to it, the value of the stock is worth the market price."  *Id.* at

21   244.

22        To rebut the presumption, defendants must show that there is no link between plaintiff's

23   decision to trade at the market price and the alleged misrepresentations or omissions.  *Ibid.*

24   Defendants correctly note one way they may do so is by showing that plaintiff "would have

25   bought or sold the stock even had [it] been aware that the stock's price was tainted by fraud."

26   *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 269 (2014) (*Halliburton II*).

27        Although defendants do not actually attempt to demonstrate plaintiff's non-reliance at this

28   stage, defendants suggest that plaintiff's "disproportionately large percentage" of post-disclosure

United States District Court
Northern District of California

8

United States District Court
Northern District of California

purchases could show that plaintiff would have decided to trade at the market price even had it been aware of the alleged misrepresentations. As an initial matter, plaintiff is not likely unique in purchasing shares following the disclosures. Even if plaintiff is revealed to be the only putative class member that bought additional shares after the disclosures, defendants' argument fails to acknowledge that plaintiff's class-period purchases prior to the May 10 disclosure far exceed its post-disclosure purchases, and that the market price significantly declined after both the May 10 and August 2 disclosures.

In the year prior to the May 10 disclosure, plaintiff paid an average of $28.76 per share for more than 805,000 shares, totaling $23 million. The market discounted Symantec's stock by 33 percent following the May 10 disclosure. During the remainder of the class period, plaintiff purchased 172,300 shares at an average of $21 per share, totaling $3.7 million. Plaintiff's post-disclosure purchases during the remainder of the class period are neither disproportionate to its prior purchases, nor indicative of the purported fact that plaintiff did not rely on the market to value the shares following the May 10 disclosure. Defendants do not prove otherwise. After the class period ended and following the August 2 disclosure, plaintiff purchased an additional 166,966 shares for roughly $20 per share, totaling $3.4 million. These purchases likewise do not prove that plaintiff would have paid the higher *pre*-disclosure price had it known of defendants' misrepresentations.

All told, defendants estimate that the post-May 10 purchases, including those after the proposed end of the class period on August 2, constituted a 33% increase in plaintiff's holdings in Symantec (Opp. at 23, Exh. T). By comparison, defendants' primary authority, a non-binding minute order from a district court in Los Angeles, found the presumptive lead plaintiff atypical based on a single post-disclosure purchase constituting 60% of the plaintiff's total holdings. *Erickson v. Snap, Inc.*, Case No. C 17-03679, Dkt. No. 54 at 4 (C.D. Cal. Sep. 18, 2017) (Judge Stephen Wilson). Defendants' other support, *In re Valence Tech. Sec. Litig.*, 1996 WL 119468 at *4–5 (N.D. Cal. Mar. 14, 1996) (Judge James Ware), turned away a proposed class representative that had *tripled* its holdings after the first disclosure there. Here, even counting

the purchases falling outside the class period, plaintiff's post-disclosure purchases do not differ so dramatically from its pre-disclosure purchases.

The fact that plaintiff may be subject to a defense of non-reliance is not a reason to deny class certification unless the facts giving rise to the defense make plaintiff atypical. *Hanon*, 976 F.2d at 508–09. Plaintiff's reliance on the integrity of the market is not subject to serious dispute as a result of its post-disclosure purchases.

Here, plaintiff's claims arose from the same set of events and course of conduct that gave rise to the claims of other class members, thus satisfying the typicality requirement of Rule 23. Defendants have failed to offer sufficient evidence to establish that plaintiff would be subject to and preoccupied with unique defenses to the detriment of absent class members. Therefore, this order concludes that plaintiff has satisfied the typicality requirement of Rule 23.

### D.     Adequacy.

Defendants do not contest the adequacy of counsel. They do, however, challenge lead plaintiff's adequacy to represent a putative class as to a portion of the insider trading claim alleged against CEO Clark under Section 20A. Plaintiff's Section 20A claim is based on CEO Clark's insider stock sales on August 28 and 31 of 2017, while CEO Clark possessed allegedly material, nonpublic information — the truth regarding the misrepresentations in Symantec's financial reporting. Defendants argue that plaintiff lacks standing to represent a Section 20A class in connection with CEO Clark's August 31 sale of stocks. Notably, defendants do not challenge plaintiff's adequacy to represent a class based on any of plaintiff's other claims. Nor do defendants challenge plaintiff's adequacy to bring its Section 20A claim in connection with CEO Clark's August 28 sale. Rather, defendants merely attempt to limit plaintiff's representative claim to only the August 28 sale.

To determine whether a plaintiff will adequately serve the class, courts consider two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members[,] and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020.

Defendants' argument does not address either of these questions.  Instead, defendants argue that because plaintiff purportedly lacks standing to bring an individual claim under Section 20A in connection with the August 31 sale, it is not a member of the class it seeks to represent and therefore plaintiff is an inadequate class representative.

Although framed as a standing argument, the issue is one of statutory interpretation. Section 20A states:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, *contemporaneously* with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

(emphasis added).  Section 20A expressly provides for private actions against insiders who trade "contemporaneously" with private party plaintiffs.  In enacting Section 20A, Congress based the contemporaneous trading requirement upon the same requirement created by the courts for the *implied* private action against insiders under Rule 10b-5.  *Neubronner v. Milken*, 6 F.3d 666, 669 n.5 (9th Cir. 1993).  In the Rule 10b-5 context, our court of appeals has referred to the contemporaneous trading requirement as a "judicially-created standing requirement, specifying that to bring an insider trading claim, the plaintiff must have traded in a company's stock at about the same time as the alleged insider."  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1001 (9th Cir. 2002).  *Brody* noted that the requirement is not "of course of the constitutional variety, grounded in Article III of the Constitution, but simply delineate[s] the scope of the implied cause of action."  *Id.* at 1001 n.3.

In the context of Section 20A, the so-called standing requirement is simply a statutory limit on the scope of the express claim for relief provided by statute.  Where an insider trades on material, nonpublic information and a separate violation of the Exchange Act is proven, Section 20A imposes on that insider liability "to any person who, contemporaneously with the . . . sale of securities that is the subject of such violation, has purchased . . . securities of the same class."  Here, the operative complaint alleges and defendants' opposition evidence confirms that plaintiff

11

United States District Court
Northern District of California

1   purchased shares on August 28 (FAC ¶ 473; Opp. Exh. T).  Defendants do not dispute that

2   plaintiff purchased the shares on August 28 contemporaneously with CEO Clark's sale of shares

3   that same day.  As such, plaintiff may bring a claim against CEO Clark for his alleged violation

4   under Section 20A.  If plaintiff meets the requirements of Rule 23, it may also bring the Section

5   20A claim in a representative capacity on behalf of all other similarly-situated investors.

6          The issue defendants raise is whether a plaintiff with a viable Section 20A claim based on

7   one insider trade gives plaintiff standing as a class representative to assert a Section 20A claim

8   that encompasses *other* insider trades.  Defendants rely on *In re Verifone Sec. Litig.*, 784 F.

9   Supp. 1471, 1489 (N.D. Cal. Feb. 21, 1992) (Judge Vaughn Walker), for the propositions that

10  "[n]o liability can attach for trades made by plaintiffs before the insider engages in trading

11  activity[,]" and "[w]here a plaintiff lacks standing to bring a claim personally, that plaintiff

12  cannot represent the class."  Even though the named plaintiffs in *Verifone* could not assert an

13  individual claim against the Section 20A defendants, the plaintiffs there argued they should have

14  been permitted to maintain a class action for the benefit of those who *did* trade

15  contemporaneously with the Section 20A defendants.  Judge Walker rejected that argument,

16  holding that where a plaintiff lacks standing to bring a claim personally, that plaintiff cannot

17  represent the class.  *Verifone*, 784 F. Supp. at 1489.  In other words, a plaintiff must be a member

18  of the class it seeks to represent.

19         Here, plaintiff is a member of the class as the operative complaint defines it:  "[A]ll persons

20  who purchased Symantec common stock contemporaneously with any sales of Symantec

21  common stock by Defendant Clark during the Class Period" (Dkt. No. 183 at ¶ 471).  Defendants

22  provide no reason or authority to further parse plaintiff's Section 20A claim into one for those

23  who purchased shares contemporaneously with CEO Clark's August 28 sale and another

24  concerning his August 31 sale.  Such a distinction would make little sense under any of Rule

25  23's requirements.  For example, common questions predominate among those who purchased

26  contemporaneously with the August 28 sale as those who did with the August 31 sale.

27  Specifically, both groups must prove that CEO Clark "committed underlying violations of

28  Section 10(b) and Rule 10b-5 . . . while in the possession of material, adverse, nonpublic

information about, among other things, the Company's improper accounting manipulations and ineffective internal controls" (Compl. ¶ 472).  The individual questions involved in determining whether a putative class member traded contemporaneously with CEO Clark are no more difficult to resolve than other issues routinely found insufficient to derail certification in securities class actions.

### 2.  RULE 23(b).

#### A.  Predominance.

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  This requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. 591, 623 (1997).  Class certification under Rule 23(b)(3) is proper when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication.  *Comcast v. Behrend*, 569 U.S. 27 (2013).  Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.  The office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the "metho[d]" best suited to adjudication of the controversy "fairly and efficiently."  *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 461 (2013).

Defendants' predominance challenge is limited to two issues.  The first concerns reliance, a specific element that plaintiffs must prove to succeed on its Section 10(b) claim, and the second addresses the general requirement that plaintiffs provide a method to measure and quantify damages on a class-wide basis.  Both fail because each challenge rests on loss causation issues that plaintiff need not prove at the class certification stage.

#### *(i)  Reliance.*

Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security.  To recover damages for violation of Section 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the

United States District Court
Northern District of California

13

defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (*Halliburton II*).

Defendants contend that individual issues concerning reliance predominate over common issues, at least for a portion of the proposed class period. As stated, plaintiff relies on the "fraud-on-the-market" theory to establish reliance. In *Basic*, 485 U.S. at 242–43, the Supreme Court ruled that reliance may be presumed in securities cases under a fraud-on-the-market theory. *Basic* "created a rebuttable presumption of investor reliance based on the theory that investors presumably rely on the market price, which typically reflects the misrepresentation or omission." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 934 n. 12 (9th Cir.2003). Without the presumption, class certification would be virtually impossible as individual questions regarding reliance would predominate over common questions. *Binder v. Gillespie,* 184 F.3d 1059, 1063 (9th Cir.1999).

Defendants do not dispute that Symantec common stock traded in an efficient market during the class period. This is unsurprising, as Symantec stock traded on NASDAQ. Because plaintiff's entitlement to the presumption is undisputed, the burden shifts to defendants to rebut the presumption, which defendants seek to do for a portion of the class period.

*Basic* held that "[a]ny showing that sever[ed] the link between the alleged misrepresentation and the price [would] be sufficient to rebut the presumption[.]" *Basic*, 485 U.S. at 248. One way a defendant may do so is by showing that the alleged misrepresentation did not actually affect the stock's price — that is, that the misrepresentation had no "price impact." If successful, the basis for finding that the fraud had been transmitted through market price would be gone. *Id.* at 248.

Defendants seek to end the class period on May 10, the date of the first alleged corrective disclosure, because the alleged misrepresentations purportedly did not impact Symantec's stock price on August 2. Thus defendants attempt to rebut plaintiff's presumption of reliance between May 10 and August 2. Defendants found their argument upon *Halliburton II*, where the

14

Supreme Court held that defendants must be afforded the opportunity to rebut Basic's presumption of reliance at the class certification stage by challenging price impact. *Id.* at 284.

Defendants argue that plaintiff's event study, prepared by Dr. Michael Hartzmark, shows no positive price impact when defendants made the alleged misrepresentations. Defendants additionally argue that there is no economic evidence that the alleged misrepresentations impacted Symantec's stock price on August 3, 2018.

Defendants' arguments fail for two key reasons. *First*, defendants misconstrue the burden to show no price impact and erroneously place it with plaintiff. The burden is on defendants. *Second*, defendants' arguments present loss causation issues that need not be decided at the class certification stage as the issues would be common to the putative class. *Erica P. John Fund v. Halliburton Co.*, 563 U.S. 804, 807 (2011) (*Halliburton* I). Defendants' own expert admits that both the May 10 and August 2 disclosures were followed by statistically significant price declines, indicating that the price had been inflated during the time period prior to August 2.

Although defendants assert that plaintiff's evidence does not demonstrate inflation on May 11, defendants bear the burden on this issue. As defendants argue with regard to the August 2 disclosure, the impact of one piece of information can be blurred by confounding news released at the same time. Any misrepresentations made in connection with the May 10 disclosure likely would have been obscured by the announcement of the internal investigation that, all told, sent Symantec's stock price down 33 percent. Defendants bore the burden to show that the alleged misrepresentations did not in some way stem the decline and failed to do so. Disaggregating the effect of the May 10 disclosure is not the task of plaintiffs at certification stage.

Defendants seek leave to file a sur-reply to respond to plaintiff's arguments made on reply. No good cause shown, the request is denied. Defendants will have an opportunity to rehash their arguments in the proper frame — loss causation — on summary judgment or at trial

Because the *Basic* presumption applies, this order need not and does not reach plaintiff's argument that the *Affiliated Ute* presumption of reliance applies.

15

United States District Court
Northern District of California

1

(ii)     *Damages.*

2    Relying on *Comcast* Corp*. v. Behrend*, 569 U.S. 27, 34 (2013), defendants next argue that

3    lead plaintiff has not provided a sufficient method for calculating damages and, therefore, has

4    failed to prove predominance.

5    In *Comcast*, the Supreme Court reiterated the principle that under FRCP 23(b), a plaintiff

6    must establish that damages are capable of measurement on a classwide basis. *Id.* at 34. This

7    requires plaintiffs to "show that their damages stemmed from the defendant's actions that created

8    the legal liability" and can "feasibly and efficiently be calculated once the common liability

9    questions are adjudicated." *Leyva v. Medline Indus. Inc*., 716 F.3d 510, 514 (9th Cir. 2013)

10    (citing *Comcast*, 569 U.S. at 34).

11    Plaintiff's proposed "out of pocket" damages methodology, which uses an event study to

12    determine the price inflation attributable to the alleged fraud, is widely accepted for calculating

13    damages of a class of stockholders.

14    The daily levels of artificial inflation — the inputs into the out-of-pocket formula — are

15    calculated and represented by what is generally referred to as the "inflation ribbon." The ribbon

16    represents an estimate of the daily level of artificial inflation in the prices of Symantec common

17    stock caused by the alleged misrepresentations and omissions. The method bases the inflation

18    estimates on the price reactions to disclosures either related to or revealing the alleged

19    misstatements and omissions (Hartzmark Rep. ¶ 98).

20    Calculating the actual inputs into the out-of-pocket method by parsing and scaling the

21    abnormal returns requires an analysis of *loss causation*. For present purposes, one need only

22    realize that the inflation-ribbon inputs will be common and applied classwide. Thus, the out-of-

23    pocket method does not involve any individualized issues.

24    Defendants argue that an event study cannot work here because there is allegedly no

25    evidence of price increases following the alleged misrepresentations and no evidence of price

26    declines following any disclosure of the alleged truth concerning what defendant contends are

27    plaintiff's liability theories. Defendants' arguments are not, as defendants would have it, an

28    attack on Dr. Hartzmark's damages model. Rather, defendants assert that plaintiff will be unable

16

to disaggregate the artificial inflation from confounding events.  This is an inquiry into loss causation and loss causation need not be analyzed at the class certification stage. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011).

**CONCLUSION**

Plaintiff's motion for class certification is **GRANTED** and the above-quoted class is hereby certified.  SEB Investment Management AB shall serve as lead plaintiff, and Bernstein Litowitz Berger & Grossman LLP is appointed as class counsel.

Within **TWENTY-ONE CALENDAR DAYS** of the date of entry of this order, all parties shall submit jointly an agreed-upon form of notice.  Plaintiff along with defendants must also submit a joint proposal for dissemination of the notice, and the timeline for opting out of the action. Plaintiff must bear the costs of the notice, which shall include mailing by first-class mail.

Furthermore, all parties are hereby **ORDERED TO APPEAR** before Magistrate Judge Ryu for the September 14 settlement conference.

**IT IS SO ORDERED.**

Dated:  May 8, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE