United States District Court
Northern District of California

SEB INVESTMENT MANAGEMENT AB, individually and on behalf of all others similarly situated,

    Plaintiffs,

    v.

SYMANTEC CORPORATION and GREGORY S. CLARK,

    Defendants.

No. C 18-02902 WHA

**ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND GRANTING ATTORNEY'S FEES AND LITIGATION EXPENSES**

## INTRODUCTION

In this securities class action under Sections 10(b), 20(a), and 20A of the 1934 Securities Exchange Act, 15 U.S.C. § 78a *et seq.*, and Securities and Exchange Commission Rule promulgated thereunder, lead plaintiff moves for final approval of a $70 million class action settlement. Because the settlement is fair, reasonable, and adequate, final approval is **GRANTED**. The plan of allocation is **APPROVED**. Class counsel moves for an award of attorney's fees in the amount $13.3 million. The amount is reasonable and fair measured both by the percent-of-fund method and by the lodestar method, so the request is **GRANTED**. Litigation expenses in the amount of $2,000,208.69 are also **GRANTED**.

//
//

**STATEMENT**

Defendant Symantec Corporation (now known as NortonLifeLock Inc.) sold cybersecurity products and services. In early and mid-2016, Symantec divested one software company and acquired another, all in an effort to shore up its ailing financials. After acquiring the new company, the newly-acquired company, Blue Coat, sent its management team to the helm. Defendant Gregory Clark took over as Symantec's CEO, dismissed defendant Nicholas Noviello became Symantec's CFO, while Symantec's CAO before the Blue Coat acquisition, dismissed defendant Mark Garfield, continued on in his role. In November 2016, Symantec acquired a second cyber-security company, LifeLock, Inc. In the relevant financial disclosures, Symantec described the acquisitions of Blue Coat and LifeLock as transformative acquisitions which would lead to cost savings and growth. In this connection, Symantec increased its revenue and income targets for executive compensation.

In May 2017, Symantec filed with the SEC Forms 8-K and 10-K announcing favorable quarterly results for the fourth quarter and for fiscal year 2017, based in part on costs that the company classified as "transition and transformation" (T&T) expenses, rather than ordinary operating costs. In the Form 10-K, signed by CEO Clark, CFO Noviello and CAO Garfield, defendants affirmed that Symantec's financial statements complied with Generally Accepted Accounting Principles (GAAP). Clark publicly chalked up Symantec's increased revenue to cost-saving initiatives related to the Blue Coat and LifeLock acquisitions. The reported revenues exceeded CEO Clark and CFO Noviello's 2017 executive compensation plan targes so they received tens of millions of dollars in equity awards.

According to confidential sources who previously worked at Symantec, however, the leadership shakeup that followed the Blue Coat acquisition resulted in negative changes in Symantec's policies and practices concerning financial reporting. Specifically, these sources alleged that defendants began to improperly recognize revenue in violation of GAAP and to improperly record ordinary operating expenses as T&T expenses.

On May 10, 2018, Symantec announced that its audit committee had commenced an internal investigation and had voluntarily contacted the SEC after a former employee raised

unspecified concerns. Following the announcement, Symantec's stock declined by over 33 percent. A few days later, Symantec released an updated statement, explaining that the concerns raised by the former employee related to the company's public disclosures about historical financial results and certain non-GAAP revenue measures, among others.

Later in May 2018, individual investors filed two putative class action lawsuits alleging violations of the 1934 Securities Act. An August 2018 order consolidated the two actions and appointed SEB Investment Management AB lead plaintiff.

Also in August 2018, Symantec released its earnings for the first quarter of fiscal year 2019. At the same time, it announced that the internal investigation was "ongoing." Symantec's stock price dropped another eight percent. At the conclusion of its investigation in September 2018, the audit committee announced that it had found "'relatively weak and informal processes' with respect to some aspects of the review, approval and tracking of transition and transformation expenses" and had identified "behavior inconsistent with the Company's Code of Conduct." Although there would be no restatement of historical financial results, the investigation uncovered that $12 million of a $13 million transaction previously recognized as revenue in the fourth quarter of fiscal year 2018 should be deferred, which deferral would diminish the preliminary results already announced for that quarter.

In October 2018, the undersigned approved SEB's selection of class counsel, Bernstein Litowitz Berger & Grossman LLP (BLBG).

The parties next litigated a motion to dismiss. A June 2019 order dismissed the complaint entirely (Dkt. No. 137.) That order found that the complaint failed to sufficiently allege materiality with respect to the improper recognition of $12 million in revenue and failed to sufficiently allege scienter (false statements made intentionally or with deliberate recklessness) with respect to the misclassification of T&T costs. The order invited plaintiff to move for leave to file an amended complaint. Plaintiff moved for leave to amend, adding allegations about other financial measures to show that the $12 million in improperly recognized revenue was material to Symantec, and that defendants acted with scienter with respect to the misclassification of T&T costs.

3

An October 2019 order granted in part and denied in part leave to file the amended complaint. The order sustained lead plaintiff's principal claims of improper revenue recognition and expense misclassification as to the company and CEO Clark, but dismissed CFO Noviello and CAO Garfield for lack of scienter. Thus, the surviving factual grounds for this action include the allegations that the company's financial disclosures hid misclassifications of ordinary operating expenses as T&T and an improper revenue deferral of $12 million in contravention of GAAP.

Plaintiff filed its motion for class certification in January 2020. Following full briefing and a hearing, a May 2020 order certified the following class:

> All persons or entities who purchased or otherwise acquired publicly-traded Symantec common stock during the period from May 11, 2017, to August 2, 2018, inclusive (the "class period"), and who were damaged thereby (the "class").

BLBG was appointed class counsel, A.B. Data, Ltd., was approved as class administrator, and the parties' stipulation as to form of notice and plan for disseminating the notice to potential class members was approved. In June 2020, A.B. Data mailed by first class mail more than 126,000 copies of the original notice to potential class members. A.B. Data received 49 requests for exclusion in connection with the original notice.

Meanwhile, discovery continued apace. Defendants and third parties produced more than 360,000 documents, totaling more than 2.1 million pages. Class counsel deposed a total of 20 fact witnesses, served subpoenas on and negotiated document discovery with ten third parties, including Symantec's outside auditor. Plaintiffs produced reports from three experts and defendants rebutted with three of their own experts. Parties deposed all six. The parties completed all discovery by early March 2021.

In September 2020, pursuant to an order referring the case to her for mediation and settlement, Magistrate Judge Donna Ryu held an initial settlement conference with the parties, but no agreement was reached then.

In November 2020, law firm Robbins Geller Rudman & Dowd LLP, wrote to the Court. It represents a Norfolk County Council as administering authority of the Norfolk Pension

4

Fund, which had applied to be class counsel in this action. In its Notice of Potential Conflict of Interest, Robbins Geller reported that the corporate representative for lead plaintiff SEB, Hans Ek, had left SEB and gone to work for class counsel during the pendency of the litigation, a fact which neither SEB nor BLBG had disclosed to the Court. These facts raised the prospect that lead plaintiff's representative, Ek, had chosen BLBG as class counsel in exchange for the promise of a lucrative position at class counsel's firm, contrary to his fiduciary duty to the investor class to select the best class counsel on the merits.

The undersigned dedicated no small amount of time to investigating this unsettling revelation. The Court ordered targeted discovery and briefing, held two hearings, and requested several rounds of further briefing. The April 2021 order resolving this issue could not conclude that pay-to-play had occurred, but directed BLGB and SEB to report, for the next three years, the order to the attention of district courts in future applications for appointment as lead plaintiff or class counsel. It also directed parties to notify class members of the issue and provide them another chance to opt out. In May, A.B. Data mailed more than 162,800 copies of the supplemental class notice and it received 72 timely requests for exclusion following that notice.

Meanwhile, in March, defendants filed their motion for summary judgment, which is now fully briefed, and remains pending. In late May, the parties had a second settlement conference with Judge Ryu. In advance of the second settlement conference, each side submitted their summary judgment briefing along with private submission to Judge Ryu. In early June, the parties entered into the stipulation and agreement of settlement that is the subject of the instant motion. In July, lead plaintiff moved for preliminary approval of the settlement and approval of the proposed form and manner of notice. The parties stipulated to adjourning the hearing on defendants' motion for summary judgment in light of the motion for preliminary approval, which was granted.

In September, an order granted preliminary approval of the proposed settlement under Rule 23(e)(1)(B); approved A.B. Data to administer the notice program and claims procedure; approved (after some improvements) the form and content of the settlement notice

5

1   and claim form; approved the manner of distribution of the settlement notice packet by first-
2   class mail.  The order granting preliminary approval ordered A.B. Data, by September 24, to
3   mail the notice packet by first-class mail to all potential class members who were previously
4   mailed a copy of the original class notice or supplemental class notice.  And for all notice
5   packets returned as undeliverable, A.B. Data searched the national change of address registry
6   and resent the notices within three business days.  The September order also ordered brokers
7   and other nominees who held Symantec common stock in "street name" to follow the
8   procedures outlined in the order for distributing the notice to the beneficial owners (Dkt. No.
9   411.)

On December 30, lead plaintiff filed the instant motion for final approval of the proposed $70 million class action settlement and plan of allocation.  In addition, class counsel moves for an attorney's fee award of $13.3 million (19% of the settlement fund) and reimbursement of $2,000,208.69 for litigation expenses.  This order follows full briefing and an in-person hearing held at the place and time stated in the settlement notice.

**ANALYSIS**

"The class action device, while capable of the fair and efficient adjudication of a large number of claims, is also susceptible to abuse and carries with it certain inherent structural risks."  *Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 623 (9th Cir. 1982).

Rule 23(e)(2) provides that if a proposed class settlement "would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate . . . ."  "In this Circuit, a district court examining whether a proposed settlement comports with Rule 23(e)(2) is guided by the eight *Churchill* factors, viz., (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the

reaction of the class members of the proposed settlement." *Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (cleaned up).

### 1. THE SETTLEMENT, THE NOTICE PROGRAM, AND THE CLAIMS PROCEDURE AND PLAN OF ALLOCATION.

The settlement provides an all cash, $70 million non-reversionary common fund.

*The notice.* The notice program utilized a notice packet which consisted of (i) the settlement notice and (ii) the claim form (together, "notice packet"). The settlement notice satisfied all of the requirements of Rule 23(c)(2)(B). The settlement notice clearly and plainly stated that written requests for exclusion had to be received by the administrator by no later than January 13, 2022 at midnight (Settlement Notice ¶¶ 77–79.) The settlement notice also plainly and clearly stated that class members had the right to object to any aspect of the settlement, and the manner and deadline for doing so (*id.* ¶¶ 87–88.) Further, in light of the complex nature of this case, it stated in plain, easily understood language, the nature of the case, the claims and defenses asserted, and the measure of recovery under the plan of allocation, including an example calculation (*see id.* ¶¶ 55–61.) The settlement notice informed class members that class counsel would "apply to the Court for an award of attorney's fees in an amount not to exceed 19% of the Settlement Fund, or $13.3 million, plus interest" (*id.* ¶ 5.)

*The claim form.* Rule 23(e)(2)(C)(ii) requires consideration of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." The settlement notice informed class members that they had to submit a claim form and informed them how to do so (*id.* ¶ 44) (emphasis original):

> To be eligible for a payment from the Settlement, you must be a member of the Class and you must timely complete and return the Claim Form with adequate supporting documentation ***postmarked* (if mailed), or submitted online at www.SymantecSecuritiesLitigation.com, no later than 28 days after the Court approves the Settlement. This deadline may be as early as March 10, 2022**. . . . You do not need to wait until after the Court approves the settlement, but may submit your Claim Form now or at any time before the deadline.

7

The claim form was mailed together with the settlement notice. Although the undersigned judge usually disfavors claims procedures, as opposed to simply cutting checks to class members, a claims process was necessary in this securities class action because the parties could not have known the details of each class members' common stock transactions necessary to calculate each class member's damages. Moreover, the claim form provided clear instructions about how to submit a claim, it stated the release of claims against defendants that claimants agreed to by submitting a claim, and it was as concise as practicable (*see* App'x 2.)

*The plan of allocation*. A plan of allocation must be fair, reasonable, and adequate, and must "treat[] class members equitably relative to each other." FRCP 23(e)(2)(D). The settlement notice explained that each class member who made a proper claim was entitled to a *pro rata* share of the net settlement fund. Each class member's distribution equals the class member's total "recognized loss amounts" divided by the total recognized loss amounts of all proper claims made, multiplied by the net settlement fund. The settlement notice explained in detail how "recognized loss amounts" would be calculated and provided an example calculation (*see* Settlement Notice ¶ 61.) The notice explained, in general (*id.* ¶ 57):

> Recognized Loss Amounts for transactions in Symantec common stock are calculated under the Plan of Allocation based primarily on (1) the difference in the amount of alleged artificial inflation in the price of Symantec common stock at the time of purchase and the time of sale or (2) the difference between the actual purchase price and sale price, whichever is less.

In addition, class members who purchased Symantec common stock within nine trading days after sales by defendant Clark will receive a two percent enhancement on their recognized loss amounts because they possessed claims under Section 20A of the 1934 Securities Exchange Act with greater potential damages not possessed by class members who did not make such purchases.

The plan of allocation is fair, reasonable, and adequate and treats class members equitably relative to each other because it is tied directly to the certified claims and theories of liability, and the notice adequately explained the plan.

*The notice program.* On September 24, A.B. Data, the administrator, mailed 162,865 settlement notice packets to potential class members or their nominees. Pursuant to the nominee procedures for sending notice to class members whose shares were held in street name, A.B. Data mailed an additional 3,318 notice packets to potential class members whose names and addresses were received from nominees requesting that the notice be sent to such persons, and A.B. Data sent an additional 3,575 notice packets to nominees for forwarding to their customers. All told, A.B. Data mailed a total of 169,578 notice packets. A.B. Data re-mailed a total of 2,606 notice packets to potential class members whose original notices were returned as undeliverable but for whom updated addresses were provided by the postal service. The USPS has returned a total of 3,452 notice packets for which the administrator could not obtain an updated address, representing two percent of the total number of notice packets mailed (Dkt. No. 420-1 ¶¶ 2–3.)

As of February 2, the administrator had received 2,149 claims (*id.* ¶ 7.) The postmark deadline to submit claims is 28 days after this order.

On the same day as the initial mailing, A.B. Data uploaded the notice packet to the website previously established for this action, SymantecSecuritiesLitigation.com. The website address was stated in the settlement notice. The website has had the settlement notice, important filings, the claim form, and has provided the option of submitting a claim online.

Finally, the summary settlement notice was published in the *Financial Times* and *The Wall Street Journal* on October 5 and transmitted over the *PR Newswire* on October 8. The summary settlement notice informed readers of the $70 million settlement, the deadline for objecting or requesting exclusion, and that copies of the full settlement notice and claim form could be downloaded from the settlement website.

In sum, the notice program satisfied all the requirements of Rule 23(c)(2)(B) and was the best practicable under the circumstances.

//

//

//

## 2. THE *CHURCHILL* FACTORS.

*First*, the relative strength of plaintiff's case supports approval of the settlement. As noted, the Court initially dismissed plaintiff's case entirely for insufficient allegations that the $12M in allegedly misclassified transition and transformation (T&T) expenses was material (it represented less than 0.25% of annual revenue and less than one percent of quarterly revenue) and for insufficient allegations of scienter. At summary judgment, defendants argued persuasively that scienter could be proved only through former CEO Clark but that Clark relied on employees solely responsible for classifying the company's expenses. Defendants further argued that the accountants "testified uniformly and unambiguously" that the T&T expenses were properly classified (Dkt. No. 291 at 9.) Defendants made similarly strong arguments attacking each of the elements of plaintiff's claims.

*Second*, the risk, expense, complexity and likely duration of further litigation support approval. The summary judgment briefing and exhibits totaled more than 8,000 pages. Together, the parties have produced nine expert reports from six different experts in the fields of accounting, executive compensation, and damages. At bottom, the great complexity and expense that would result from further litigation of this securities class action based on alleged accounting fraud strongly supports approval of the settlement.

*Third*, this case appears to present no greater risk from maintaining class action status throughout the trial than in a typical class action, so this factor is neutral.

*Fourth*, the amount offered in settlement supports approval. Plaintiff's damages expert, Michael L. Hartzmark, Ph.D. Economics, conducted a thorough and detailed damages analysis (*see* Dkt. No. 345 at 266–375.) Plaintiff's expert estimated that the maximum possible total classwide damages, assuming plaintiff's complete success in proving liability and 100% valid claims from the class post-trial, equaled $1,009.6 million. Thus, the $70 million settlement represents a recovery of approximately 6.9% of the absolute maximum possible damages for all claims or about $0.20 per affected share. This is a low-end deal but barely within the range of reasonableness. *See, e.g., Int'l Broth. of Elec. Workers Local 697 Pension Fund v. Int'l Game Technology, Inc.*, 2012 WL 5199742 (D. Nev. Oct. 19, 2012) (Judge Miranda M. Du)

10

1    (granting final approval of securities class action settlement providing 3.5% of maximum
2    possible damages); *Cheng Jiangchen v. Rentech, Inc.*, 2019 WL 5173771 (C.D. Cal. Oct. 10,
3    2019) (Judge Georg H. Wu) (granting final approval of securities class action settlement
4    providing 10% of maximum possible damages).

*Fifth*, the extent of discovery and stage of proceedings support approval. Defendants and third parties produced more than 360,000 documents, totaling more than 2.1 million pages. Class counsel deposed a total of 20 fact witnesses, served subpoenas on and negotiated document discovery with ten third parties, including Symantec's outside auditor. Plaintiffs produced reports from three experts and defendants rebutted with three of their own experts. The parties deposed all six. The parties completed all discovery by early March 2021 and the defendants' motion for summary judgment was fully briefed and pending before the parties reached the settlement in May 2021.

*Sixth*, the experience and views of counsel support settlement. Class counsel BLBG is experienced in securities litigation so their support behind the settlement carries weight (*see* Dkt. Nos. 415-5, 415-6.)

*Seventh*, no governmental entity participated in this action so this factor is neutral.

*Eighth*, the reaction of the class members to the proposed settlement has been positive. Only eleven individual class members (no institutional investors) have opted out in connection with the proposed settlement (Dkt. No. 420-1 ¶ 6.) Not a single class member has submitted an objection. In addition, at the hearing held today in the courtroom, at the time and place stated in the notice, no class member appeared, either in-person or telephonically, and no class member made an objection.

**3.    OTHER RELEVANT CONSIDERATIONS.**

Consideration of the *Churchill* factors alone is not enough. "Rule 23(e)(2) also requires the court to consider the terms of any proposed award of attorney's fees and scrutinize the settlement for evidence of collusion or conflicts of interest before approving the settlement as fair." *Kim*, 8 F.4th at 1179.

11

### A. ANY OTHER AGREEMENT.

Rule 23(e)(2) and (3) require the Court to scrutinize the terms of "any agreement made in connection with the proposal" when considering whether the proposed settlement is fair, reasonable, and adequate. Paragraph 36 of the settlement provides, in part:

> . . . Symantec shall have the unilateral right to terminate the Settlement in the event that Class Members timely and validly requesting exclusion from the Class in connection with the Supplemental Class Notice or, if the Court requires that Class Members be given an additional opportunity to exclude themselves from the Class with respect to the Settlement, in connection with the Settlement Notice, meet the conditions set forth in Symantec's confidential supplemental agreement with Lead Plaintiff (the "Supplemental Agreement"), in accordance with the terms of that agreement. The Supplemental Agreement, which is being executed concurrently herewith, shall not be filed with the Court and its terms shall not be disclosed in any other manner . . . unless the Court otherwise directs . . . .

In connection with preliminary approval and upon request of the Court, the parties filed the supplemental agreement under seal (Dkt. No. 403.) The supplemental agreement gives Symantec the right to terminate the settlement if requests for exclusion exceed the amount specified in the supplemental agreement. In granting preliminary approval of the settlement, the Court found that the fairness and adequacy of the settlement to class members was not affected by the supplemental agreement and, moreover, that keeping the supplemental agreement confidential did not affect the fairness and adequacy of the settlement or undermine class members' ability to independently assess the fairness, reasonableness, and adequacy of the settlement.

That remains true. The confidential supplemental agreement does not affect the fairness and adequacy of the settlement for class members.

### B. INCENTIVE PAYMENT.

An incentive payment for a representative or lead plaintiff is a red flag because it does not "treat[] class members equitably relative to each other." FRCP 23(e)(2)(D). Lead plaintiff SEB does not seek an incentive payment. Lead plaintiff will receive the same measure of compensation as other class members.

12

### C. SCOPE OF RELEASE.

A release should be limited only to the claims certified for class treatment. The stipulation and settlement agreement defines the released claims in part as follows (Stip. & Agrm't of Settlement ¶ 1. (mm), (yy)):

> "Released Plaintiff's Claims" means all claims and causes of action, whether known claims or Unknown Claims, whether arising under federal, state, common or foreign law, that (i) Lead Plaintiff or any other Class Member asserted in the Complaint or Action under Sections 10(b), 20(a), and 20A of the Exchange Act and Rule 10b-5 or (ii) that arise out of or relate to the transactions or occurrences asserted in the Complaint or Action *and* concern claims or causes of action of or by Lead Plaintiff or any other Class Member who purchased or otherwise acquired Symantec common stock during the Class Period and were allegedly damaged thereby. . . .

\*          \*          \*

> "Unknown Claims" means any Released Plaintiff's Claims which Lead Plaintiff or any other Class Member does not know or suspect to exist in his, her, or its favor at the time of the release of such claims . . . . Unknown Claims are limited to those that (a) Lead Plaintiff or any other Class Member or Defendants (i) asserted in the Complaint or Action or (ii) arise out of or relate to the transactions or occurrences asserted in the Complaint or Action *and* concern claims or causes of action of or by Lead Plaintiff or any other Class Member who purchased or otherwise acquired Symantec common stock during the Class Period and were allegedly damaged thereby. . . .

These provisions are needlessly cumbersome and verbose. Nonetheless, stripped of the bloat, the release provides that released claims are limited to those that (i) were actually asserted, or (ii) "arise out of or relate to the transactions asserted in the Complaint or Action *and* concern claims or causes action" for the same but not actually asserted. The release is sufficiently tailored to the certified claims.

### 4. MOTION FOR ATTORNEY'S FEES AND EXPENSES.

Rule 23(e)(2) and our court of appeals require scrutiny of any proposed award of attorney's fees for evidence of collusion. *Kim, supra*. Our court of appeals has identified three signs of collusive attorney's fees agreements, the so-called *Bluetooth* factors:

> (1) When counsel receives a disproportionate distribution of the settlement; (2) when the parties negotiate a 'clear sailing arrangement', under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the

13

> agreement contains a 'kicker' or 'reverter' clause that returns unawarded fees to the defendant, rather than the class.

*Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (quoting *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 947 (9th Cir. 2011)).

The proposed settlement here raises none of those red flags because the settlement agreement does not provide for attorney's fees. The settlement agreement expressly provides that it is not conditioned upon any award of attorney's fees and that "[n]either Lead Plaintiff nor Class counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorney's fees and/or Litigation Expenses" (Stip. & Agrm't of Settlement ¶ 16.) The settlement fund will retain any difference between the fee award requested by class counsel and the amount actually awarded by this Court, nothing will revert to defendant.

In addition, $13.3 million for attorney's fees, as requested, is fair and reasonable. Our court of appeals has established 25% of the total, gross settlement fund as the benchmark for a reasonable attorney's fee. *In re Bluetooth*, 654 F.3d at 942; *In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 953 (9th Cir. 2015). Here, $13.3 million represents 19% of the gross settlement amount.

The reasonableness of the requested fee is confirmed by a lodestar cross-check. Class counsel has expended a total of 43,240 hours on this action for a total lodestar of $20,028,151.25. This does not include time spent responding to the alleged conflict of interest issue raised by Robbins Geller, noted above. The $13.3 million thus represents a multiplier of 0.66 of counsel's lodestar (Robinson Decl. ¶¶ 184, 185, Exh. 3.)

//
//
//
//
//
//
//

**CONCLUSION**

For the foregoing reasons, final approval of the $70 million settlement is **GRANTED**. The plan of allocation is **APPROVED**. The motion for attorney's fees is **GRANTED**. Class counsel Bernstein Litowitz Berger & Grossman LLP is awarded **$13.3 MILLION FOR ATTORNEY'S FEES**, with interest at the same rate as the settlement fund. Class counsel shall have half the fees immediately upon entry of this order, and the other half when class counsel certifies that all settlement funds have been properly distributed and the file can be completely closed. Class counsel's litigation expenses in the amount of $2,000,208.69, to be paid immediately, are **GRANTED**.

Counsel shall file a report promptly after the claims deadline detailing the results of the claims process.

**IT IS SO ORDERED.**

Dated: February 10, 2022

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE